UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                                         Chapter 11

    53 Stanhope LLC, *et al*,[1]                        Case no.  19-23013 (RDD)
                                                                                     Jointly Administered

                      Debtor.
----------------------------------------------------------x

## OBJECTION TO APPLICATION FOR RULE 2004 EXAMINATION

        53 Stanhope LLC, and each of the jointly administered debtors herein, (the "Debtors"), as and for their objection to the application made by Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") to examine the Debtor and numerous third parties under Bankruptcy Rule 2004, respectfully represents as follows:

### BACKGROUND

        1.        On May 20, 2019, each of the Debtors filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), except 167 Hart LLC which filed its petition on May 21, 2019.

        2.        These cases involve loans made by Signature Bank to the Debtors in the form of 13 separate notes and mortgages covering 26 properties dating back to September 2012. All of the loans were assigned to Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") on or about May 17, 2017. At that time, each Debtor was current on its payment obligations and not

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

otherwise in default. The principal amount owed on the loans total at the time of transfer to

Brooklyn Lender was approximately thirty-six million ($36,000,000) dollars, as follows:

| Debtor | Property | Value | Mortgage Principal |
|---|---|---|---|
| 53 Stanhope LLC<br>325 Franklin LLC<br>(Joint Owners) | 53 Stanhope Street Brooklyn NY<br>325 Franklin Avenue, Brooklyn NY | $3,500,000 | $2,664,019 |
| 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, NY | $3,000,000 | $2,077,307 |
| 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, NY | $3,500,000 | $2,121,334 |
| 167 Hart LLC | 167 Hart Street, Brooklyn, NY | $2,100,000 | $791,396 |
| 106 Kingston LLC | 106 Kingston Ave Brooklyn, NY | $2,100,000 | $730,949 |
| 618 Lafayette LLC | 618 Lafayette Ave<br>Brooklyn, New York | $1,900,000 | $779,122 |
| C&YSW, LLC<br>Natliach LLC<br>(Joint Owners) | 129 South 2nd Street, Brooklyn, NY<br>107 South 3rd Street Brooklyn, NY<br>109 South 3rd Street Brooklyn NY | $9,000,000 | $4,943,431 |
| Eighteen Homes LLC | 263 18th Street, Brooklyn, NY | $1,800,000 | $823,000 |
| 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, NY | $1,500,000 | $898,840 |
| 92 South 4th LLC<br>834 Metropolitan LLC<br>(Joint Owners) | 92 South 4th Street, Brooklyn, NY<br>834 Metropolitan Ave, Brooklyn, NY | $4,500,000 | $2,236,419 |
| 1125-1131 Greene Avenue, LLC | 1125-1131 Greene Avenue, Brooklyn, NY | $6,000,000 | $3,025,651 |
| APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, NY | $3,500,000 | $1,256,364 |
| D&W Real Estate Spring LLC<br><br>Meserole & Lorimer LLC<br>(Joint Owners) | 130 South 2nd Street, Brooklyn, NY<br>318 Bedford A venue, Brooklyn, NY<br>740 Driggs Avenue, Brooklyn, NY<br>144 Huntington Street, Brooklyn, NY<br>68 Carroll Street, Brooklyn, NY<br>342 Rodney Street, Brooklyn, NY<br>178 Meserole Street, Brooklyn NY<br>180 Meserole Street, Brooklyn NY<br>182 Meserole Street, Brooklyn NY<br>440 Lorimer Street, Brooklyn NY | $26,000,000 | $12,897,588 |

3.      Brooklyn Lender LLC was created on May 9, 2017, immediately before it

acquired the loans. Upon information and belief, Brooklyn Lender is affiliated with Maverick Real

Estate Partners LLC. According to its website, Maverick is a private equity fund manager that

acquires commercial mortgages secured by real estate in New York City. Maverick, Brooklyn Lender and or its affiliated entities actively sought loans in which Chaskiel Strulovitch was the guarantor or principal of the borrower. From correspondence between Maverick and various banks, including Bank United, Maverick requested that the banks default the Strulovitch loans and then assign them.

4.  Evidently, Signature refused to default the Debtors. As soon as Brooklyn Lender acquired the loans, it sent its own default notices primarily alleging non-monetary defaults arising from alleged misrepresentations in financial statements Chaskiel Strulovitch submitted with the Debtors' loan applications as the potential guarantor of the mortgages. Brooklyn Lender claims that due to those alleged defaults, it is entitled to 24% default interest retroactive to the loans' origination dates, for a total of about $25 million more than the principal amount due! This, notwithstanding the fact that the loans are essentially non-recourse with only limited guaranties, so the value of Mr. Strulovitch's stake in the properties listed was not particularly important. Brooklyn Lender also made allegations that Mr. Strulovitch misrepresented the extent of his ownership of a few of the Debtors.

5.  Maverick relied upon allegations made against Mr. Strulovitch in the District Court for the Eastern District of New York a month earlier on April 10, 2017, by various Israeli investors alleging that they were entitled to ownership interests in certain properties controlled by Mr. Strulovitch. Those certain properties included several owned by the Debtors and others listed on the financial statement submitted by Strulovitch in connection with his limited guarantee for the Debtors' loan applications.

6. The Federal Court lawsuit was dismissed in a 47-page Memorandum and Order dated November 2, 2017 (Amon, J.) where the District Court either dismissed or refereed to arbitration plaintiffs' federal securities' claim and declined to retain jurisdiction over plaintiffs' remaining state law claims. The plaintiffs appealed, but then withdrew the appeal. Although the state law claims were dismissed without prejudice for re-filing in state court, no such state claims were filed. Nor have the plaintiffs proceeded with the arbitration of their alleged Federal claims. The Brooklyn Lender's foreclosure case, however, proceeds.

7. Besides the misrepresentations alleged as an event of default, Brooklyn Lender also declared each loan in default for various alleged open water and sewer bills and HPD and DOB violations, as an additional basis for 24% interest.

8. New York law does little to protect a borrower from a bank assigning a loan to a predatory secondary market purchaser seeking to declare a technical default to effectuate a forfeiture or windfall profits. In the City of New York where minor building violations are common and often time consuming, expensive and difficult to remove, the consequences of a loan assignment to a predator can be devastating for owners and general unsecured creditors.

9. The Debtors filed these cases to obtain a determination that the default notices were defective and that the loans were not in default. Alternatively, the Debtors seek to effectuate a cure of any default under a Chapter 11 plan pursuant to section 1124(2)(A) incorporating section 365(b)(2)(D), which does not require the satisfaction of a penalty rate relating to the failure to perform a nonmonetary obligation.

10. The Debtors have proceeded with their case strategy since filing these cases on May 20, 2019. The Debtors paid June debt service to Brooklyn Lender and shall continue to

pay debt service during the pendency of these cases. The Debtors obtained a letter of intent, a copy of which is annexed hereto, from a lender prepared to refinance the Brooklyn Lender mortgages. Thus, the Debtors intend to draft and file a Chapter 11 Plan that pays all creditors in full, including Brooklyn Lender without interest at the penalty rate on the effective date of the plan.

## ARGUMENT

11. A court considering a Rule 2004 motion must determine whether the proposed discovery is for a proper purpose: "Despite the breadth of Bankruptcy Rule 2004, it must *first* be determined that the examination is proper." *In re Enron Corp.*, 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002) (emphasis in original) (internal citations and quotations omitted). "[T]he examiner bears the burden of proving that good cause exists for taking the requested discovery" under Bankruptcy Rule 2004. *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) (quashing Rule 2004 discovery). "[T]he burden of showing good cause is an affirmative one and is not satisfied merely by a showing that justice would not be impeded by production of the requested documents, (citation omitted)." *Id.* Seeking discovery for a "proposed proceeding" is improper. *In re Interpictures, Inc.*, 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1989) (denying Rule 2004 discovery).

12. Here, Brooklyn Lender's stated purposes for its examination are to (a) determine the potential for Chapter 11 misconduct based on the Debtors' principals' background, (b) to evaluate creditor claims for plan purposes, and (c) to determine the existence of defaults under Brooklyn Lender's loan documents.

5

13. The Debtors respectfully submit that the purported concern over post-petition misconduct is at best premature given prompt post-petition payment of debt service and progress towards payment in full under a plan, which is in prospect based on the Letter of Intent. And on the determination of potential Debtor defaults, that has been the subject of two years of litigation in the Supreme Court, which will likely continue in this Court.

14. Indeed, the Debtors first announced in their goal in this case in their Local Rule Affidavit – to avoid Brooklyn Lender's demand for $25,000,000 of default interest, despite the payment of debt service when due, based on pre-loan a technical default, which technical default originates in unproven allegations in a third party lawsuit commenced five years after the loan was made. The veracity and materiality of Brooklyn Lender's default allegations is at issue, as well as the allowance of default interest under section 1124 of the Code, even if such default allegations are proven to be material defaults.

15. Knowing that such a proceeding is likely, the Debtors believe Brooklyn Lender made its 2004 application to get a head start on discovery and to take advantage of the broad scope of Rule 2004 instead of discovery under the Federal Rules when the litigation ripens.

16. The Debtors suspect further that Brooklyn Lender's is trying to distract the Debtors by tying them up in discovery making it harder to focus on refinancing, plan confirmation, property management, and generally keeping up with their obligations as debtors in possession, particularly at the outset of the case.

17. Brooklyn Lender may have another hidden agenda as well. The plaintiffs in that case recently made a motion to re-open after withdrawing their appeal. Although the application states that the purpose of the examination is to examine parties regarding post-petition

6

management and Brooklyn Lender's claim, the specific items sought read more like discovery demands for the dismissed Federal Court litigation. For example, item 15, which is only the tip of the iceberg, seeks all documents between the plaintiffs and defendants in that case:

> All communications, documents, agreements and/or memoranda concerning each Debtor-Entity's relationship with Chaskeil Jacobowitz, Nachman Strulovitch, Joshua Wagshal, Meir Bamberger, Jacob Schonberg, Bertha Schonberg, Nathan Gross, Michael Muller, Zwiebel Chaja Chava, Binyomin Halpern, Benjamin Schonberg, Frieda Karmel, Morris Karmel, David Schonfeld, Pnina Schonfeld and/or any other investor.

18. In summary, the application is improper not only because it seeks discovery for almost certain claim litigation, ostensibly based on potential post-petition mismanagement, but also because it is a Trojan horse for discovery for a dismissed lawsuit among alleged equity interest holders.

19. In summary, it is barely two weeks into the case, the Debtors are current with debt service, and preparing a plan that will pay all creditors in full in cash with interest on the Effective Date. The Debtor should be permitted to satisfy Brooklyn Lender's legitimate interests under the Bankruptcy Code undisturbed by discovery designed to advance an unspoken agenda unrelated to payment in full under a Chapter 11 plan.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Application be denied and that the Court grant such other and further relief as may be just and proper.

Dated: New York, New York
       June 7, 2019

        **BACKENROTH FRANKEL & KRINSKY, LLP**
        **Attorneys for Debtors**


By:    s/Mark Frankel
       800 Third Avenue
       New York, New York 10022
       (212) 593-1100



June 6, 2019

Cheskel Strulowitz
Address: [TBA]



**Re: Loan for 31 Assets in Brooklyn (the "Property")**

Dear Mr. Strulowitz:

The purpose of this Letter of Intent ("**LOI**") is to set forth certain of the proposed terms and conditions under which Lightstone Capital LLC (together with its affiliates, successors, assigns or designees, collectively, "**Lender**") may extend credit to a special purpose bankruptcy remote entity ("**Borrower**") in the form of a mortgage and Lender's option, mezzanine financing (the "**Loan**"), in each case relating to the Property. This LOI is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to provide the Loan or any other financing on the terms contained herein or any other terms.  This LOI is not intended to set forth all of the terms and conditions of the proposed Loan, is for discussion purposes only and is non-binding for all purposes except as expressly set forth herein.  Each of the provisions of this LOI which are phrased as covenants to enter into the Loan are subject to Lender's determination in its sole and absolute discretion and are subject to modification at any time by Lender.

| | |
|---|---|
| **Property:** | 31 Properties located throughout Brooklyn, New York with an aggregate gross area of 100,181 SF and 114 units (108 residential and 6 retail). See Exhibit A for summary of properties. |
| **Purpose of the Loan:** | Refinance existing loan. |
| **Borrower:** | The borrower ("**Borrower**") will consist of one or more newly formed, single purpose entities with no operations, assets, or activities other than the ownership interest in the Property and no debts or liabilities other than the Loan.  Borrower will be structured as a bankruptcy-remote entity in a manner satisfactory to Lender. |
| **Closing Date:** | Subject to review of Bankruptcy proceedings. |
| **Loan Amount**: | The lessor of (i) $40,000,000 and (ii) 70% LTV of the as-is Value of the Property |
| **Initial Funding**: | Lender will disburse the full amount of the Loan to Borrower at closing, less the Interest Reserve and any other reserves determined by Lender to be appropriate based on the circumstances surrounding the Loan (collectively, the "**Reserves**"). |
| **Sponsor/Guarantor:** | Cheskel Strulowitz |
| **Interest Rate:** | The Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum. The Interest Rate will be charged on an actual/360 basis. |
| **Amortization:** | Interest Only |
| **Origination Fee:** | Borrower shall pay a fee equal to 2.00% of the Loan Amount to Lender or its designee at closing. |
| **Exit Fee:** | 1.00% of the Loan Amount will be due on any prepayment and/or repayment of the Loan including payoff at maturity and shall be paid, pro rata, in connection with any partial prepayments of the Loan. |

Page 1

| | |
|---|---|
| **Term:** | 12 months |
| **Extension Option(s):** | Subject to certain conditions then existing, including that no event of default has occurred or is continuing, a satisfactory credit check, and a replenishment of Reserves as required by Lender, the Loan may be extended for three (3) separate six (6) month periods (each an "**Extension Period**") by Borrower. In consideration for each extension of the Loan, Borrower shall pay to Lender 0.50% (the "**Extension Fee**") and the Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum (the "**Extension Interest Rate**"). The Interest Rate will be charged on an actual/360 basis. |
| **Loan Collateral & Loan Documents:** | The collateral for the Loan shall include, without limitation, (a) a first priority perfected mortgage, deed of trust or deed to secure debt, as applicable, encumbering the Property, (b) a first priority perfected assignment of leases and rents, (c) a first priority perfected assignment of all contracts, agreements, trademarks, licenses, goods, equipment, accounts, fixtures and all other tangible and intangible personal property located on or used in connection with the Property, (d) a first priority perfected security interest in all monies deposited into the lockbox account and cash management account, including all subaccounts, escrow accounts and reserve accounts, (e) the Guaranty of Non-Recourse Obligations, the Carry Guaranty, and the Completion Guaranty (each as defined herein), (f) UCC-1 financing statements (personal property, fixture filing and accounts and reserves), (g) an assignment of all development, design and construction contracts, and (h) any and all other agreements and assurances reasonable or customary in commercial transactions similar to the Loan.  The mortgage, deed of trust or deed to secure debt liens and the priority thereof shall be insured in favor of Lender and its successors and assigns, which insurance shall be issued and underwritten by a title insurance carrier designated by Lender.  The Loan shall be evidenced, secured and governed by documentation customary for similar transactions by Lender and be in form and substance acceptable to Lender in its sole discretion and consistent in all material respects with the terms and provisions hereof, including without limitation, standard loan documentation, security and insurance for mezzanine financings as Lender may require in the event Lender creates a mezzanine loan as described below (collectively, the "**Loan Documents**"). |
| **Prepayment:** | The Loan may be prepaid at any time subject to Lender's receipt of no less than $1,550,000 (equal to 6 months of projected interest costs) of interest payments ("the "**Minimum Interest**") such that, at the time of prepayment, if Lender has not received $1,550,000 in interest payments, Borrower will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment. |
| **Mezzanine:** | Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt or subordinate debt, as well as participations in the foregoing, and to create component notes to reflect such conversions; provided, however, that any such conversion shall not materially affect the all-in interest cost to Borrower.  If mezzanine debt is created, one or more mezzanine borrowers may be required to own 100% of the equity interests of Borrower. |
| **Recourse:** | Full recourse to Guarantor. Guarantor shall also execute an environmental indemnity agreement. |

Page 2

| | |
|---|---|
| **Carry Guaranty:** | Guarantor must execute a carry guaranty guaranteeing (a) interest due under the Loan, and (b) operating expenses, insurance premiums and real estate taxes related to the Property. |
| **Release Pricing:** | To be determined at Closing |
| **Interest Reserve:** | $1,250,000 |
| **Other Reserves:** | To be determined by Lender at closing of the Loan. |
| **No Additional Liens:** | There shall be no financing, pledge, hypothecation or encumbrance, secured or unsecured, of the Property or of any direct or indirect ownership interests in Borrower at any level or tier of ownership, except the Loan. |
| **Due on Transfer:** | Subject to Lender's standard exceptions with respect to permitted transfers, the Loan shall immediately become due and payable upon a transfer of all or any portion of the Property or of any direct or indirect ownership interests in Borrower. |
| **Assumption:** | No assumption |
| **Financial Reporting:** | Guarantor and Borrower shall provide to Lender, in form and substance acceptable to Lender, (a) leasing and operating reports no less than monthly and more frequently upon request, (b) Borrower-certified quarterly financial statements and operating statements, within fifteen (15) days of the end of each quarter, with each report providing information regarding such quarter as well as a year-to-date analysis, contrasted against the comparable period of the previous year and the then approved budget, (c) audited annual financial statements within sixty (60) days of the end of the year, and (d) such other information as Lender may reasonably request from time to time. Additionally, any and all material financial information received by Borrower related to the Property shall be made available to Lender within five (5) days of Borrower's receipt thereof. |
| **Lease Approvals:** | All new leases and material amendments to existing leases are subject to Lender's reasonable prior approval. |
| **Title:** | Borrower must provide Lender with such searches with respect to title to the Property, Borrower, its principals and Guarantor as Lender may require from time to time, including a survey thereof certified to Lender and the applicable title company. Borrower shall purchase an ALTA title insurance policy for Lender in the Loan Amount, containing such endorsements as Lender may require in its sole discretion. Title work will be done by Madison Title Agency. |
| **Insurance:** | Borrower shall maintain at all times, at Borrower's sole cost and expense, insurance policies with such coverages, carriers, amounts, and deductibles as are required by Lender from time to time. Each of Lender and its successors and assigns must be listed as mortgagee, loss payee and additional insured on all such policies. |
| **Due Diligence:** | Prior to closing, Lender will conduct customary due diligence with respect to the Property, Borrower and Guarantor, all of which must be satisfactory to Lender. All third party reports shall be addressed to Lender and shall upon delivery become the sole property of Lender, its successors and assigns. As a condition to closing, Borrower shall represent and warrant to Lender that it has |

Page 3

|   |   |
|---|---|
| | not made, and the due diligence materials delivered to Lender have not included, any untrue statement of a material fact or any omission that makes Borrower's statements or any of the due diligence deliverables materially misleading. |
| **Patriot Act Disclosure:** | To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that enters into a business relationship with such institution.  Accordingly, Lender's due diligence will include customary background searches on the direct and indirect owners of Borrower, and Lender is hereby authorized to conduct such searches. |
| **Confidentiality:** | In consideration of Lender's issuance of this LOI at Borrower's request, Borrower agrees not to disclose, or knowingly permit any third party to disclose, either the fact that that discussions or negotiations are taking place between the parties concerning the Loan or any of the proposed terms, conditions, or other facts relating to the Loan.  The terms set forth in this LOI are proprietary to Lender and are made available to Borrower solely for the evaluation of the Loan contemplated hereby. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI. |
| **Broker Fee:** | There is no broker associated with this transaction. Borrower agrees to indemnify, defend and hold Lender harmless from and against any claims for a broker's commission, finder's fee or other payments no matter how described, and any other costs liabilities or expenses incurred by Lender in connection with any claim asserted by a broker or other party who claims to have worked with or represented Borrower in connection with the Loan. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI. |
| **Good Faith Deposit:** | Borrower or an affiliate thereof must remit a good faith deposit in the form of bank check or wire to Lender ("**Deposit**") in the amount of $150,000 concurrently with an executed copy of this LOI.  Borrower hereby agrees that its acceptance of this LOI shall constitute its unconditional agreement (a) that the Deposit may be held by Lender and used to pay all out-of-pocket expenses, fees, cost and charges actually incurred by Lender in any way relating to the Loan (including Lender's underwriting due diligence in connection therewith), including without limitation  legal  and auditing fees, appraisals, environmental and structural engineering reports for the Property, any other necessary or appropriate third party reports, recording and filing fees, taxes and other customary costs and expenses (collectively, "**Costs**"), and (b) to indemnify, defend and hold Lender harmless from and against all such Costs. All such Costs are due and payable regardless of whether a loan commitment is issued or the Loan closes. If the Loan is not consummated for any reason, the Deposit will be returned, without interest, less any Costs incurred by Lender as of such time. If the Loan is consummated, the Deposit shall be applied toward Lender's Costs. At any time prior to closing, Lender reserves the right to demand an additional or increased good faith deposit if the original Deposit has been expended. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI. |
| **Exclusivity/Break-Up Fee:** | Each of Borrower and Guarantor hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this |

underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event Borrower obtains financing from a competitor of Lender. Accordingly, each of Borrower and Guarantor hereby expressly agree that, upon the execution of this LOI, it will work solely with Lender to procure the Loan for the Property and agrees not to, and will cause its principals and affiliates not to, obtain or attempt to arrange a financing for the Property with any party other than Lender. In the event Borrower, Guarantor or any affiliate thereof obtains financing for the Property from a source other than Lender, Lender shall become immediate entitled to payment of a break-up fee ("**Break-Up Fee**") equal to one percent (2.0%) of the Loan Amount, which each of Borrower and Guarantor acknowledges and agrees constitutes liquidated damages and is a reasonable estimate of Lender's damages under the circumstances. Lender may apply any remaining portion of the Deposit to the Break-Up Fee at any time after it becomes due and payable. Borrower and Guarantor shall be jointly and severally responsible for Lender's legal and other out-of-pocket fees and expenses in connection with the recovery of the Break-Up Fee. If Lender determines not to move forward with the Loan on terms materially consistent with those outlined above, no Break-Up Fee shall be required.  The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Terms Conditional/Investment Committee Review:**   Borrower understands and acknowledges that Lender has not obtained internal investment committee approval for the Loan and that its agreement to make the Loan is subject to (a) investment committee approval, (b) Lender's satisfactory completion of underwriting and due diligence, and (c) final documentation of the Loan acceptable to Lender is its sole discretion.

**No Commitment:**   This LOI is provided for discussion purposes only and does not constitute a contract or a commitment or agreement to lend, either express or implied, or an agreement to issue a commitment, but merely indicates Lender's willingness to proceed with its evaluation of this Loan. The terms hereof are not all-inclusive and are subject to change. Except as expressly set forth herein, this LOI shall not be binding. No agreement (whether written, oral or otherwise) that may be reached during negotiations with respect to the Loan, nor any course of dealing between the parties, shall constitute a commitment by Lender to lend or otherwise be binding upon the parties.

**Governing Law:**   This LOI shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principals of conflicts of laws. Any action, suit, proceeding or litigation arising out of or relating in any way to this LOI shall commence and be maintained exclusively in the state or federal courts of the State of New York. Borrower will be responsible for Lender's legal and other out-of-pocket fees and expenses in the event Borrower is unsuccessful in any action, suit, proceeding or litigation brought against Lender. EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR LITIGATION ARISING OUT OF OR RELATING IN ANY WAY TO THIS LOI.

To commence processing of the requested Loan, please sign and return an original counterpart of this LOI together with the Deposit.  This LOI supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto. This LOI shall be null and void and shall automatically terminate if not countersigned by Borrower and returned to Lender along with the Deposit by June 12th, 2019, unless mutually extended by the parties in writing. We look forward to working with you on this transaction.

Sincerely,

LIGHTSTONE CAPITAL LLC

By: _____/s/ Joseph E. Teichman_____
    Name:   Joseph E. Teichman
    Title:    Executive Vice President

Agreed to and accepted on behalf of Borrower:

[Borrower]

By: _____
    Name:
    Title:

**EXHIBIT A**

| | Assets | | Portfolio Summary | | |
|---|---|---|---|---|---|
| # | Address | Type | Gross Sq Ft | Residential Units | Retail Units |
| 1 | 568 Willoughby Avenue, Brooklyn, NY 11206 | Multi-Family | 4,290 | 6 | 0 |
| 2 | 55 Stanhope Street, Brooklyn, NY 11221 | Multi-Family | 5,560 | 8 | 0 |
| 3 | 106 Kingston Avenue, Brooklyn, NY 11213 | Mixed-Use | 4,032 | 2 | 1 |
| 4 | 618 Lafayette Avenue, Brooklyn, NY 11216 | Four Families | 1,944 | 4 | 0 |
| 5 | 119 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,613 | 6 | 0 |
| 6 | 127 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,370 | 6 | 0 |
| 7 | 167 Hart Street, Brooklyn, NY 11206 | Three Family | 4,160 | 3 | 0 |
| 8 | 325 Franklin Ave, Brooklyn, NY 11238 | Mixed-Use | 4,050 | 3 | 2 |
| 9 | 53 Stanhope Street, Brooklyn, NY 11221 | Two Family | 1,848 | 2 | 0 |
| 10 | 107 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,080 | 4 | 0 |
| 11 | 109 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,000 | 4 | 0 |
| 12 | 129 South 2nd Street, Brooklyn, NY 11249 | Three Family | 4,000 | 3 | 0 |
| 13 | 130 South 2nd Street, Brooklyn, NY 11249 | Four Family | 4,608 | 4 | 0 |
| 14 | 318 Bedford Ave, Brooklyn, NY 11249 | Mixed-Use | 2,640 | 2 | 1 |
| 15 | 740 Driggs Ave, Brooklyn, NY 11211 | Mixed-Use | 1,995 | 2 | 2 |
| 16 | 144 Huntington Street, Brooklyn, NY 11231 | Two-Family | 1,776 | 2 | 0 |
| 17 | 68 Carroll Street, Brooklyn, NY 11231 | Three Family | 2,450 | 3 | 0 |
| 18 | 342 Rodney Street, Brooklyn, NY 11211 | Four Family | 4,275 | 4 | 0 |
| 19 | 178 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 20 | 180 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 21 | 182 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 22 | 440 Lorimer Street, Brooklyn, NY 11206 | Three Family | 1,890 | 3 | 0 |
| 23 | 263 18th Street, Brooklyn, NY 11215 | Four Family | 2,850 | 4 | 0 |
| 24 | 1213 Jefferson Avenue, Brooklyn, NY 11221 | Three Family | 2,250 | 3 | 0 |
| 25 | 92 South 4th Street, Brooklyn, NY 11249 | Three Family | 4,140 | 3 | 0 |
| 26 | 834 Metropolitan Ave, Brooklyn, NY 11211 | Two-Family | 2,136 | 2 | 0 |
| 27 | 1125 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 28 | 1127 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,194 | 2 | 0 |
| 29 | 1129 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 30 | 1131 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 31 | 1133 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| Total | | | 100,181 | 108 | 6 |