**Hearing Date: September 9, 2019 at 10:00 a.m.**
**Objection Deadline: September 3, 2019**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
Daniel A. Fliman
Jennifer S. Recine
Tiffany L. Ho
Isaac S. Sasson

*Counsel for Brooklyn Lender LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| 53 STANHOPE LLC,[1] | Case No. 19-23013 (RDD) |
| Debtor. | Jointly Administered |

**BROOKLYN LENDER LLC'S OMNIBUS OBJECTION TO**
**APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT AND**
**APPLICATION FOR ORDER EXTENDING EXCLUSIVITY PERIODS**

---

[1]   The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer LLC (8197); 106 Kingston LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155) (collectively, the "Debtors").

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ..........................................................................................................3

    A.    The Mortgages ...............................................................................3

    B.    The Debtors' Mismanagement.........................................................5

    C.    The Federal Action .........................................................................6

    D.    The Default Acceleration and Foreclosure Actions.........................7

    E.    The Bankruptcy Cases ....................................................................9

    F.    The 2004 Application .....................................................................9

    G.    The Plan, Disclosure Statement and Motion to Extend Exclusivity.....................11

    H.    Brooklyn Lender's Claims .............................................................14

ARGUMENT ..............................................................................................................15

    I.    THE PLAN IS PATENTLY UNCONFIRMABLE................................15

        A.    Applicable Standards ................................................................15

        B.    Even Under The Debtors' Assumptions, The Plan Lacks Adequate Funding ...................................................................16

        C.    The Plan Is Unrealistic Based On The Treatment Required For Brooklyn Lender's Unimpaired Claims..............16

        D.    Feasibility Is In Doubt Given Uncertainties Concerning The Purported Exit Financing ................................19

    II.    The Disclosure Statement Lacks Adequate Information .......................19

    III.    Exclusivity Should Not Be Extended ................................................21

CONCLUSION............................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 1111 Myrtle Ave. Grp., LLC,*
   598 B.R. 729 (Bankr. S.D.N.Y. 2019) ..............................................................................17, 18

*In re 139-141 Owners Corp.,*
   306 B.R. 763 (Bankr. S.D.N.Y. 2004) ....................................................................................18

*In re 139-141 Owners Corp.,*
   313 B.R. 364 (S.D.N.Y. 2004) .................................................................................................18

*In re 231 Fourth Ave. Lyceum, LLC,*
   506 B.R. 196 (Bankr. E.D.N.Y. 2014) .....................................................................................16

*In re 243rd St. Bronx R & R LLC,*
   No. 11 B 13321(ALG), 2013 WL 1187859 (Bankr. S.D.N.Y. Mar. 21, 2013) ......................18

*In re Adelphia Commc'ns Corp.,*
   336 B.R. 610 (Bankr. S.D.N.Y. 2006) ...............................................................................21, 22

*In re Ashley River Consulting, LLC,*
   No. 14-13406(MG), 2015 WL 6848113 (Bankr. S.D.N.Y. Nov. 6, 2015) .............................20

*In re Curry Corp.,*
   148 B.R. 754 (Bankr. S.D.N.Y. 1992) .....................................................................................21

*In re Frank's Nursery & Crafts, Inc.,*
   No. 04 15826 PCB, 2006 WL 2385418 (Bankr. S.D.N.Y. May 8, 2006) ...............................18

*In re Gen. Growth Properties, Inc.,*
   451 B.R. 323 (Bankr. S.D.N.Y. 2011) ...............................................................................17, 18

*In re GMG Capital Partners III, L.P.,*
   503 B.R. 596 (Bankr. S.D.N.Y. 2014) .....................................................................................21

*In re Momentum Mfg. Corp.,*
   25 F.3d 1132 (2d Cir. 1994) .....................................................................................................20

*In re Moody Nat'l SHS Houston H, LLC,*
   426 B.R. 667 (Bankr. S.D. Tex. 2010) ......................................................................................8

*In re Moshe,*
   567 B.R. 438 (Bankr. E.D.N.Y. 2017) ............................................................................ *passim*

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .........................................................................15

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) .........................................................................16

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) .......................................................................15

*In re Route One W. Windsor Ltd. P'ship*,
    225 B.R. 76 (Bankr. D.N.J. 1998) .............................................................................17

*In re Sagamore Partners, Ltd.*,
    No. 11-37867 BKC AJC, 2012 WL 2856104 (Bankr. S.D. Fla. July 10, 2012) ..............15, 18

**Statutes**

11 U.S.C. § 365 ............................................................................................................18

11 U.S.C. § 1121 ........................................................................................................... 21

11 U.S.C. § 1124 .....................................................................................................17, 18

11 U.S.C. § 1125 .....................................................................................................19, 20

11 U.S.C. § 1129 ............................................................................................................15

Brooklyn Lender LLC ("Brooklyn Lender"), creditor in interest in the above-captioned jointly-administered bankruptcy cases (the "Bankruptcy Cases"), by and through the undersigned counsel, hereby submits this omnibus objection (the "Objection") to approval of the Debtors' proposed *Disclosure Statement* dated August 1, 2019 [Docket No. 30] (the "Disclosure Statement")[1] and the Debtors' *Application for Order Extending Exclusivity Periods* [Docket No. 33] (the "Exclusivity Application"), and in support hereof, respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

The Disclosure Statement is fundamentally flawed and should not be approved. It proposes a plan that cannot be consummated under any set of circumstances, including if one blindly accepts the wildly unrealistic assumptions being made by the Debtors. On its face, the Plan proposes a combination of sales of all of the Debtors' real properties, to undisclosed parties, for undisclosed amounts, to make distributions which the Debtors simply cannot afford given the terms of the exit financing contemplated in the Disclosure Statement. Inasmuch as the Debtors have no other disclosed sources of funding, that financing shortfall, alone, is a death knell to the Plan and the Disclosure Statement.

Assuming, *arguendo*, that the Debtors could cure such a glaring defect in their Plan, the Court and stakeholders should not be expected to just take as gospel the unrealistic and untested, yet critically important, assumptions upon which the Plan is premised. Chief among them is the Debtors' assumption that Brooklyn Lender will not be entitled to ***any*** interest at the default rate,

---

[1]    This Objection supplements the *Preliminary Objection to Approval of the Debtors' Disclosure Statement* that Brooklyn Lender filed at Docket No. 36 (the "Preliminary Objection").

[2]    Capitalized terms used in the Preliminary Statement but not herein defined shall have the meanings ascribed to them elsewhere in the Objection.

either because its claims will be disallowed (by approximately 50%) or else because Brooklyn Lender could somehow be underpaid and at the same time unimpaired.

Brooklyn Lender submits that disallowance of its claims in the manner proposed in the Plan is highly unlikely given undisputable pre-petition defaults based on (a) known evidence of the Debtors' misrepresentations and (b) certain loans having reached maturity pre-petition. As discussed below, Brooklyn Lender intends to commence an adversary proceeding to seek allowance of its claims in full. Based on pre-petition litigation, concerning not only the existence of defaults, but also the Debtors' pattern of fraud and deceit (which depended on such misrepresentations), a substantial record already exists to help establish the relevant facts to support Brooklyn Lender's claims. In addition, it is important to note that similar allegations of fraud by the Debtors are separately before the Court through claims filed by certain purportedly defrauded investors in the Investors Claim (defined and addressed below).

The Debtors' alternative plan of attack -- to unimpair Brooklyn Lender while depriving it of payment of allowed portions of its claim -- runs afoul of the Bankruptcy Code and well-established precedent. Although the Plan purports to unimpair Brooklyn Lender by repaying its claims, section 1124(1) applies and prohibits the Plan from altering Brooklyn Lender's "legal, equitable, and contractual rights." As such, there is no doubt that to the extent Brooklyn Lender's allowed claims include default interest (which they do), such amounts must be paid in full (or Brooklyn Lender is not unimpaired under the Plan). Debtors' counsel is surely aware of that, having attempted the same improper treatment in at least two prior and different cases, and having lost in both instances.

Beyond Brooklyn Lender's claims, the Plan faces serious feasibility issues that the Debtors have the burden to overcome. The Debtors have not demonstrated that the exit

2

financing on which they depend is real and achievable and, moreover, it seems doubtful that the Debtors would be able to make the contemplated debt service payments on such financing.

Last, the Disclosure Statement fails to adequately inform stakeholders concerning important facts and circumstances, including allegations of fraud that have been made against the Debtors and their principals, the inherent uncertainties and risks of the Plan and the nature and identity of the entities and persons that will own and control the Debtors post emergence.

Brooklyn Lender respectfully requests that the Disclosure Statement not be approved. Moreover, Brooklyn Lender respectfully requests that the Court establish an expedited schedule to determine (1) the allowed amount of Brooklyn Lender's claims and (2) the Debtors' ability to unimpair Brooklyn Lender without paying in cash any default interest that is ultimately allowed as part of its claim.  Assuming such an expedited schedule is implemented, Brooklyn Lender is prepared to consent to a corresponding extension of the Debtors' exclusivity periods.  However, Brooklyn Lender opposes extending the exclusivity periods just so the Debtors can continue to prosecute a fundamentally flawed Plan without also addressing the issues that are at the core of these Bankruptcy Cases.

## BACKGROUND

### A.      The Mortgages

1.      Between 2012 and 2016, Signature Bank ("Signature") provided loans to each of the Debtors (each a "Loan" and collectively, the "Loans") secured by mortgages on the Debtors' residential apartment buildings located in Brooklyn, New York (each a "Mortgage" and collectively, the "Mortgages").  (*See Application for Joint Administration* [Case No. 19-23013 at Docket No. 4] at ¶ 3.)  To induce Signature to extend credit to the Debtors, in connection with each of the Loans, Strulovitch made representations regarding his ownership and control of

3

certain limited liability companies (including some of the Debtors), which in turn owned or leased real property (collectively, the "Property LLCs"), and his net worth.

2.      Accordingly, on the documents attendant to each Loan (the "Loan Documents"), Strulovitch represented that he was the sole (or substantial) owner of the Property LLCs.

3.      Strulovitch also provided Signature with his personal financial statements in connection with each Loan's origination process.  There, Strulovitch represented that he had considerable net worth, in part, based on his ownership interest in the Property LLCs. Strulovitch doubled down on these representations in the commitment letters he signed for each Mortgage.

4.      On information and belief, based on the representations in the Loan Documents, Signature in turn provided the Debtors with below market interest rates on the Loans.  To protect itself against a scenario where these representations proved false (thus, significantly shifting the risk profile of the Loans), Signature included certain protections in the Mortgages.  In particular, paragraph 18(g) of each Mortgage ("Paragraph 18(g)") provides that the Mortgage will become due and payable at the option of the lender:

> if any representation or warranty of the Mortgagor or of any person (a 'guarantor') guaranteeing payment of the Debt or any portion thereof or the performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement, made herein or in any such guaranty or in any certificate, report, financial statement or other instrument furnished in connection with the making of the notes, the Mortgage, this Agreement or any such guaranty, shall prove false or misleading in any material respect.

The Mortgages further provide that upon acceleration pursuant to Paragraph 18(g), interest would become due at the default rate of 24% per annum (the "Default Interest Rate").  Through Paragraph 18(g) and the Default Interest Rate, Signature ensured that it would be adequately compensated in the event Strulovitch's representations proved false or fraudulent.

4

5.      Given the materiality of Strulovitch's representations to Signature's decision to extend credit at the interest rates set forth therein, and to provide further security to Signature, Strulovitch also provided guarantees (each a "<u>Guarantee</u>" and collectively, the "<u>Guarantees</u>"), whereby he "unconditionally and absolutely" guaranteed the payment of any losses incurred by Signature arising out of, or due to, among other things "fraud or intentional misrepresentation of either the Mortgagor or a Principal of the Mortgagor; [and] the gross negligence or willful misconduct of either the Mortgagor or a Principal of the Mortgagor."

6.      On May 17, 2017, Signature assigned the Loans, Mortgages, Guarantees, and other Loan Documents to Brooklyn Lender.

**B.      The Debtors' Mismanagement**

7.      Throughout the periods covered by the Mortgages, the Debtors' properties were in a constant state of default and disarray.  Among other things, the Debtors were consistently late in paying their taxes and other fees and expenses to various governmental agencies and had incurred numerous uncured violations from, among others, the Environmental Control Board of the City of New York (the "<u>ECB</u>"), the New York City Department of Housing Preservation and Development ("<u>HPD</u>") and the New York City Department of Buildings ("<u>DOB</u>").

8.      Similarly, as Brooklyn Lender recently learned, the Debtors entered into alleged profit-sharing agreements with certain third parties, which, on information and belief, constitute conveyances of ownership interests in the Mortgaged Property (as defined in the Mortgages) in violation of paragraph 9 of the Mortgages.

9.      Finally, the Mortgages issued by, among others, Debtors 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 325 Franklin LLC, 53 Stanhope LLC, 1125-1133 Greene Ave LLC, 1213 Jefferson LLC and APC Holding 1 LLC have matured by their original terms, yet remain unpaid.

5

C.    **The Federal Action**

10.    On April 10, 2017, Strulovitch and certain of the Debtors, among others, were named as defendants in a complaint commenced in the United States District Court for the Eastern District of New York (Case No. 1-17-cv-2161-CBA-RML) (the "Federal Action").

11.    The complaint in the Federal Action alleged that, beginning in 2012, Strulovitch and others engaged in a scheme to fraudulently induce the plaintiffs -- foreign national investors and part owners of the Property LLCs -- to invest in the acquisition and development of certain real estate, only to then unlawfully funnel substantial portions of the plaintiffs' investments to themselves or certain other properties.

12.    The plaintiffs in the Federal Action further alleged that Strulovitch "distributed fraudulent prospectuses for each of the Investment Properties . . . [and] distributed fraudulent updates and assurances as to the status of the investments and their rate of progress to avoid the arousal of any suspicion." The plaintiffs alleged that they suffered approximately $20 million of damages.

13.    During the pendency of the Federal Action, Strulovitch admitted that he was not in fact the sole member or 100% owner of many of the Debtor entities. Instead, it was apparent that Strulovitch acted as a "syndicator," *i.e.*, contrary to his sworn representations made in connection with the Loan Documents (and otherwise), Strulovitch would syndicate ownership in the Property LLCs to retail investors who each held equity in an investment vehicle, which in turn held a membership interest in the Property LLCs that Strulovitch purported to own.

14.    Strulovitch later admitted his role as a syndicator in an affidavit he submitted to the Supreme Court of the State of New York - County of New York in the case styled as *940First LLC v. First Ave. Realty Holdings L.P. et al.*, Index No. 850255/2017. There, Strulovitch confirmed that, contrary to his sworn representations, he is not the sole member of

the Property LLCs. Instead, Strulovitch represented that the Property LLCs are typically owned by a management company and a "Second-Removed Entity," which entity is syndicated out and owned by a number of individual members. *See id.*, [ECF No. 200] at *5.

15.     On November 2, 2017, Judge Amon dismissed in part the Federal Action, referring certain causes of action contained therein to arbitration pursuant to the terms of the governing documents. *See Schonberg, et al. v. Strulovitch, et al.*, Case No. 17-cv-2161-CBA-RML, [Docket No. 257] (E.D.N.Y. Nov. 2, 2017) at *46-47.

16.     On August 9, 2019, the plaintiffs in the Federal Action filed proofs of claims against each of the Debtors making substantially similar allegations to those contained in the Federal Action and asserting a claim for over $20 million (the "Investors Claim"). (*See* Proofs of Claim Nos. 4, 5, 7.)[3]  The Investors Claim is attached hereto as **Exhibit A**.

**D.    The Default Acceleration and Foreclosure Actions**

17.     On information and belief, upon learning of the allegations in the Federal Action, and given Strulovitch's pattern and practice of mismanagement, Signature sought to offload the risk related to the Strulovitch loan portfolio and thus, in May of 2017, assigned the Loans to Brooklyn Lender.

18.     Upon acquiring the Loans, Brooklyn Lender placed the Debtors on notice that an event of default had occurred pursuant to Paragraph 18(g), among other provisions of the Loan Documents. Brooklyn Lender further placed the Debtors on notice that defaults had occurred, and were continuing, with respect to the Debtors' obligations under the Loan Documents (a) not to further encumber any mortgaged property without the Mortgage lender's prior written

---

[3]     Substantially similar proofs of claim were filed against each of the Debtors.

consent, (b) to pay all taxes and fees owed when due and (c) to cure promptly all municipal code violations issued by, among others, the ECB, HPD, and DOB.

19.    In October of 2017, Brooklyn Lender filed fourteen (14) foreclosure actions (the "Foreclosure Actions") pursuant to which Brooklyn Lender sought to accelerate the Mortgages and declare the outstanding obligations immediately due and payable, with interest accruing at the Default Interest Rate from the dates of the various defaults.[4]

20.    In the Foreclosure Actions, Brooklyn Lender alleged, among other things, that Strulovitch's misrepresentations regarding the Debtors' and Property LLC's ownership structure were material under the terms of the Loan Documents, in that they directly implicated each Debtor's honesty and credit-worthiness, ability to fully repay the Loans and ownership of the properties, among other important credit considerations.

21.    Although the Foreclosure Actions were outstanding for more than a year and a half, the Foreclosure Actions did not advance to judgment.  Instead, counterclaims by Strulovitch and the Debtors were brought and dismissed, Strulovitch and the Debtors' motions to dismiss the Foreclosure Actions were denied, and a temporary receiver was appointed to manage certain of the Debtor-owned properties.  On January 17, 2019, the Debtors moved by Order to Show Cause for leave to reargue Brooklyn Lender's motion to appoint a receiver and temporarily to stay and

---

[4]    *Brooklyn Lender LLC v. D & W Real Estate Spring LLC, et al.*, Kings County Supreme Court Index No. 519437/2017; *Brooklyn Lender LLC v. C & YSW, LLC, et al.*, Kings County Supreme Court Index No. 519665/2017; *Brooklyn Lender LLC v. 1125-1133 Greene Ave LLC, et al.*, Kings County Supreme Court Index No. 519671/2017; *Brooklyn Lender LLC v. 92 South 4th St LLC, et al.*, Kings County Supreme Court Index No. 519682/2017; *Brooklyn Lender LLC v. 55 Stanhope LLC, et al.*, Kings County Supreme Court Index No. 519695/2017; *Brooklyn Lender LLC v. 167 Hart LLC, et al.*, Kings County Supreme Court Index No. 519812/2017; *Brooklyn Lender LLC v. 106 Kingston LLC, et al.*, Kings County Supreme Court Index No. 519820/2017; *Brooklyn Lender LLC v. Eighteen Homes LLC, et al.*, Kings County Supreme Court Index No. 519825/2017; *Brooklyn Lender LLC v. 618 Lafayette LLC, et al.*, Kings County Supreme Court Index No. 519826/2017; *Brooklyn Lender LLC v. 1213 Jefferson LLC, et al.*, Kings County Supreme Court Index No. 519842/2017; *Brooklyn Lender LLC v. 119 Rogers LLC, et al.*, Kings County Supreme Court Index No. 519843/2017; *Brooklyn Lender LLC v. 127 Rogers LLC, et al.*, Kings County Supreme Court Index No. 519848/2017; *Brooklyn Lender LLC v. 325 Franklin LLC, et al.*, Kings County Supreme Court Index No. 519849/2017; and *Brooklyn Lender LLC v. APC Holding 1 LLC, et al.*, Kings County Supreme Court Index No. 519969/2017.  Brooklyn Lender reserves all rights with respect to the Foreclosure Actions, and in particular, the other defaults and events of default alleged therein.

to restrain enforcement of the receiver appointment pending the motion to reargue.  The Debtors

commenced these Bankruptcy Cases while cross-motions for summary judgment were pending.

No discovery from the Debtors took place in the Foreclosure Actions.

**E.      The Bankruptcy Cases**

22.      On May 20, 2019 and May 21, 2019 (the "Petition Date"), the Debtors

commenced the Bankruptcy Cases by filing voluntary petitions (collectively, the "Petitions") for

relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The

Court consolidated the Bankruptcy Cases and they are being jointly administered for procedural

purposes only by Order dated May 24, 2019.  (*See Order Directing Joint Administration* [Case

No. 19-23013 at Docket No. 6].)

23.      Since the commencement of the Bankruptcy Cases, the Debtors have repeatedly

failed to meet important deadlines and obligations.  The Debtors were delinquent in filing their

schedules of assets and liabilities and statements of financial affairs (collectively, the

"Schedules").  Even once filed, the Schedules were deficient in many material regards, including

by failing to provide comprehensive accountings of payments made by the Debtors prior to the

Petition Date.  Indeed, while Mr. Goldwasser testified at the section 341 meeting of creditors (the

"341 Meeting") that Mr. Strulovitch received numerous payments from the Debtors prior to the

Petition Date, such payments were not disclosed in the Schedules.

24.      The Debtors also have failed to comply with the Office of United States Trustee

(the "UST") guidelines, which has already required two adjournments of 341 Meeting.

**F.      The 2004 Application**

25.      Given the Debtors' pre (and post) petition misrepresentations, on June 6, 2019,

Brooklyn Lender filed its *Ex Parte Application of Brooklyn Lender LLC for entry of an Order*

*pursuant to Federal Rule of Bankruptcy Procedure 2004 and 9016 Authorizing the Examination*

9

*of the Debtors, Chaskiel Strulovitch, David Goldwasser, GC Realty Advisors, Nachman Strulovitch, Chaskeil Jacobowitz and Joshua Wagshal* [Docket No. 10] (the "2004 Application"). In the 2004 Application, Brooklyn Lender sought discovery related to (a) the current ownership and management of the Debtors; (b) any fraud, deceit or dishonesty in connection with management of the Debtors; and (c) the facts underpinning the Brooklyn Lender's claims against the Debtors.

26.    At a hearing before the Court on June 19, 2019, the Court granted in part the 2004 Application, recognizing that Brooklyn Lender's entitlement to default interest, and the ownership issues attendant thereto, is a gating issue in these Bankruptcy Cases.   On June 20, 2019, the Debtors informed Brooklyn Lender that given the Court's ruling on the 2004 Application, it was retaining special litigation counsel -- Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP ("Abrams Fensterman") -- to assist the Debtors in responding to Brooklyn Lender's discovery requests.   To date, the Debtors have yet to file a retention application for Abrams Fensterman.

27.    Despite knowing about the 2004 Application and Brooklyn Lender's document requests for more than two months, on Friday, August 16, 2019, the Debtors (one day after their initial production was due) informed Brooklyn Lender that they required additional time to produce any documents.   The Debtors further requested, for the first time, to reschedule the examination of the Debtors that was scheduled for the following Monday, August 19, 2019 until September 16, 2019, purportedly because the Debtors' representative was out of the country. While Brooklyn Lender was willing to accommodate the Debtors' schedule, it informed the Debtors that it saw no reason to delay the deposition for four weeks, given that all parties will be in New York on September 3, 2019 for the continued 341 Meeting, and requested that the

deposition be rescheduled for the week of the 3rd.  The Debtors refused to agree to Brooklyn

Lender's reasonable attempt to accommodate the Debtors' representative's travel schedule.

28.     On August 23, 2019, two days after the Debtors' already extended deadline for

production of documents, Brooklyn Lender finally received the Debtors first production of

documents.  However, as Brooklyn Lender informed the Debtors on August 27, 2019, the

Debtors' production was woefully deficient in many material respects.  In response to Brooklyn

Lender's twenty-one (21) document requests, which were approved by the Court and served only

after a meet-and-confer process with the Debtors, the Debtors produced only 48 documents,

consisting of eighteen (18) operating agreements, eighteen (18) articles of organization, eleven

(11) property management agreements, and one (1) agreement concerning David Goldwasser's

appointment as the Debtors' manager during the Bankruptcy Cases.  That meager production,

which lacked a single communication and did not include documents that Brooklyn Lender

knows to exist based on comments by Mr. Goldwasser and previous filings by the Debtors, is

wholly insufficient to provide Brooklyn Lender with a reliable understanding of the Debtors'

ownership, management, and control and the facts underpinning Brooklyn Lender's claims.

29.     The Debtors' refusal to comply with this Court's Order granting the 2004

Application, and its willful violation of the relevant procedural rules related thereto, has caused

unnecessary costs and delays and will require Brooklyn Lender to seek the Court's intervention.

**G.**     **The Plan, Disclosure Statement and Motion to Extend Exclusivity**

30.     On August 1, 2019, the Debtors filed their Disclosure Statement and

corresponding plan of reorganization (the "Plan").

31.     According to the Disclosure Statement, the Debtors filed these Bankruptcy Cases

"to obtain a determination that [Brooklyn Lender's] default notices were defective, that the loans

were not in default, and/or that any such default [*sic*] were so non-material or remote in time as

to be unenforceable in law and equity." (*See* Disclosure Statement at ¶ 19.)  Alternatively, the Debtors note that they will seek to effectuate a cure of any default under the Mortgages pursuant to section 1124(2)(A) of the Bankruptcy Code, which, the Debtors contend, would allow the Debtors to cure their defaults without payment of default interest.  (*Id.*)  Thus, the Plan purports to treat all creditors as unimpaired, and, as such, the Debtors do not contemplate solicitation of votes on the Plan.  (*Id.* at ¶ 3).

32.     Generally, the Plan contemplates that, upon emergence, all of the Debtors' properties will be transferred to "New Owners" -- a yet to be formed vehicle that will own the Debtors' assets post-reorganization -- and all outstanding claims against the Debtors will be paid off in full as of the effective date.  (*See generally id.* at ¶¶ 22-36.)

33.     Specifically, the Plan proposes: (1) payment to Brooklyn Lender of approximately $37,625,717, purportedly in full satisfaction of Brooklyn Lender's claim, (2) payment of approximately $209,866 in satisfaction of the Debtors' "New York City real estate tax and other Liens"; (3) payment of approximately $454,330 to general unsecured creditors, purportedly in full satisfaction of their claims, assuming approximately 90% of the general unsecured claim pool elects to receive equity interests in the New Owners (the "New Equity") in lieu of cash; and (4) payment of "$255,000, plus any litigation costs" as administrative expense claims.  (*See id.* at ¶¶ 23, 25, 32, 38.)  As such, the Plan and Disclosure Statement require ***at a minimum*** ***$38,544,913*** of funding.

34.     To fund the distributions provided for in the Plan, the Debtors contemplate that Lightstone Capital LLC ("Lightstone") will loan to the New Owners $40 million in exit financing.  (*Id.* at ¶ 40.)  In support, the Disclosure Statement annexes a non-binding letter of intent between Lightstone and the Debtors (the "LOI").  (*Id.* at Exhibit A).

35.     Notably, the LOI includes certain bidder-type protections (*i.e.*, a good faith deposit, deal exclusivity, a break-up fee etc.) that will require Court approval, which the Debtors have not yet sought.

36.     The LOI provides that, of the $40,000,000 in purported exit financing, (a) $1,250,000 must be funded into an Interest Reserve and (b) 2.00% (or $800,000) must be paid as an Origination Fee to "Lender or its designee at closing." (*Id.* at Exhibit A, pp. 1, 3.)  As such, of the $40,000,000 of purported exit financing, $2,050,000 would be tied up and so, *at most*, **$37,950,000** would be available to fund Plan distributions -- less than the minimum required for the Plan to be feasible.

37.     Moreover, the LOI contemplates an interest rate of "One Month LIBOR + 5.25% with a floor of 7.75% per annum." (*Id.* at Exhibit A, p. 1.)  As such, *at a minimum*, the financing contemplated in the LOI would require $3,100,000 of annual debt service.  However, the Debtors' own projections, prepared in connection with cash collateral usage, show that the Debtors' properties simply cannot service this amount of debt. (*See Application to Use Cash Collateral* [Docket No. 23] at 13-27.)

38.     Accordingly, the Plan, on its four corners, is unachievable.  It does not provide sufficient funding to deliver even the treatment that it contemplates, which treatment, as discussed below, renders the Plan unconfirmable anyhow.

39.     Given the myriad of issues with the Plan and Disclosure Statement, on August 9, 2019, Brooklyn Lender filed its Preliminary Objection.  Contemporaneously therewith, Brooklyn Lender served targeted discovery on the Debtors and Lightstone concerning issues relevant to feasibility of the Plan and the LOI.

13

40.    On August 13, 2019, the Debtors informed Brooklyn Lender that they were not responding to the discovery requests, as the September 9, 2019 hearing on the Disclosure Statement (the "DS Hearing") is not meant to be an evidentiary hearing.

41.    On August 14, 2019, Brooklyn Lender informed the Debtors that it would be willing to withdraw its discovery requests, provided that the Debtors agree that they will not present evidence relating to the LOI at the DS Hearing.   The Debtors did not respond to Brooklyn Lender's proposal nor did they produce any documents in response to Brooklyn Lender's discovery requests.

42.    Separately, on August 6, 2019, the Debtors filed their Exclusivity Application.   In the Exclusivity Application, the Debtors requested that the Court extend their exclusive time to propose and solicit a plan pursuant to section 1121(d) of the Bankruptcy Code by 120 days, respectively.   (*See* Exclusivity Application at ¶ 17.)   In support, the Debtors cite to, among other things, the need for time to litigate Brooklyn Lender's entitlement to default interest and that the Debtors have made "good faith progress towards reorganization" as evidenced by the Debtors filing of the Plan.   (*See id.* at ¶¶ 22-31.)   However, over the past three months the Debtors have made *no* progress towards a successful reorganization.

**H.    Brooklyn Lender's Claims**

43.    On August 9, 2019, Brooklyn Lender filed a proof of claim against each of the Debtors, asserting a claim in the aggregate amount of not less than $74,515,177.43.   Recognizing that allowance of Brooklyn Lender's claims will inevitably require litigation, Brooklyn Lender will file an adversary complaint seeking allowance of such claims.

## ARGUMENT

44.    The Disclosure Statement should not be approved because (1) the Plan is patently unconfirmable and (2) the Disclosure Statement lacks sufficient disclosures.

## I.    THE PLAN IS PATENTLY UNCONFIRMABLE

### A.    Applicable Standards

45.     "If the plan is patently unconfirmable on its face, the application to approve the disclosure itself must be denied as solicitation of the vote would be futile." *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) (denying approval of disclosure statement, where, like here, the plan of reorganization was patently unconfirmable, as it sought to reinstate a secured creditor without providing default interest as part of its cure); *In re Sagamore Partners, Ltd.*, No. 11-37867 BKC AJC, 2012 WL 2856104, at *1 (Bankr. S.D. Fla. July 10, 2012) (same); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.") (citations and internal quotations omitted).

46.    The Plan is unconfirmable because the Debtors cannot establish that it is feasible. To confirm a plan of reorganization, the Debtors have the burden to prove that the plan is feasible, such that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).    The purpose of the feasibility test is "'to prevent confirmation of visionary

schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation.' . . . . [W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *In re 231 Fourth Ave. Lyceum, LLC,* 506 B.R. 196, 202–03 (Bankr. E.D.N.Y. 2014) (citations omitted); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986).

**B.      Even Under The Debtors' Assumptions, The Plan Lacks Adequate Funding**

47.      Even assuming that all the Debtors' untested assumptions underlying the Plan are all true and come to fruition, the Plan simply lacks sufficient funding.  The Plan requires $38,544,913 of cash funding on the Effective Date, but only provides for $37,950,000 of net proceeds from the LOI.  Notably, funding under the LOI is the sole source of plan funding.  (*See* Disclosure Statement at ¶ 40 ("Effective Date payments under the Plan will be paid from the Exit Financing, the terms of which are annexed to the Plan as Exhibit A.").)  As the Disclosure Statement identifies no alternative or additional source of funding, and because LOI itself is insufficient to make all payments contemplated under the Plan, the Plan cannot be effectuated, under any set of circumstances.

**C.      The Plan Is Unrealistic Based On The Treatment
         Required For Brooklyn Lender's Unimpaired Claims**

48.      Even if the Debtors were able to address the nearly $600,000 shortfall in plan funding, serious doubts exist that the funding contemplated in the Disclosure Statement will be sufficient to pay all necessary obligations.  To consummate the Plan, the Debtors would have to unimpair Brooklyn Lender by paying it just $37,030,804 (the maximum amount available pursuant to the LOI assuming unsecured creditors agree to equitize at the levels assumed by the Debtors).  That result would require massive disallowance of Brooklyn Lender's asserted claims

and/or altering the "legal, equitable, and contractual rights" to which it is entitled.  (*See* 11 U.S.C. § 1124(1).)  Neither can happen.

49.    **First**, as discussed above, the record strongly supports a finding that the Mortgages have been in default since origination, and the Debtors have been on notice of such since May of 2017, based on intentional misrepresentations made by Strulovitch at origination. (See *supra* ¶¶ 17-21.)  Tellingly, through their filings before this Court, the Debtors have never directly addressed Brooklyn Lender's contractual entitlement to default interest.  Rather, the Debtors have attempted to minimize their defaults as immaterial and mere technicalities. However, the Investors Claim shows the pervasive nature of the Debtors' deceit and that their misrepresentations were not mere oversights, but important tools in their fraudulent schemes.

50.    **Second**, there is no basis whatsoever to deprive Brooklyn Lender of payment of the full amount of its claims under the Plan, which treats Brooklyn Lender as unimpaired. Inasmuch as the Plan proposes to *repay* the Mortgages, Section 1124(1) applies and requires paying to Brooklyn Lender the full amount of its allowed claim.[5]  *See In re Moshe*, 567 B.R. at 444-45 (denying disclosure statement motion, where, as here, the debtor attempted to pay any arrears owed to secured creditor at the non-default interest rate); *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 735 (Bankr. S.D.N.Y. 2019) (holding that secured creditor was entitled to post-petition interest at the default rate of 24%); *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 331 (Bankr. S.D.N.Y. 2011) (finding that imposition of default interest is both consistent and mandated by the terms of section 1123(d) of the Bankruptcy Code); *In re Route One W. Windsor Ltd. P'ship,* 225 B.R. 76, 85 (Bankr. D.N.J. 1998) (holding that the non-payment of default interest would not leave unaltered legal, equitable and contractual rights of a secured creditor).

---

[5]    Section 1124(1) of the Bankruptcy Code provides that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).

51.    Moreover, while the Disclosure Statement makes vague references to "litigating" and "curing" under section 1124(2) the defaults under the Loan Documents, the Debtors' citation to 1124(2) is misplaced; that provision only applies to debts that are *reinstated, not repaid*. The Plan does not reinstate and so 1124(2) just does not apply.[6]

---

[6]    Even if 1124(2) did apply, and it does not, that provision would not excuse the Debtors from paying any allowed default interest to cure and reinstate the Mortgages. "Nothing in [section 1124] provides expressly or by implication that a debtor has the power to avoid or vitiate a secured creditor's contractual right to default interest by complying with the [five] subdivisions of [section 1124(2)]." *In re 139-141 Owners Corp.*, 306 B.R. 763, 768 (Bankr. S.D.N.Y. 2004) *aff'd in part, vacated in part on other grounds*, 313 B.R. 364, 368 (S.D.N.Y. 2004) ("Because the denial of a mortgagee's contractual right to interest at a default rate does 'alter' the secured creditor's contractual rights within the meaning of subsection [E] of Section 1124(2) . . . Section 1124(2) . . . does not provide a statutory basis for judicial nullification of a contract right to default rate interest."). To cure a default pursuant to section 1124(2), a creditor is entitled to be paid pre and post-petition interest "at the contract rate as permitted under state law" including, "the higher rate triggered upon an event of default." *In re 243rd St. Bronx R & R LLC*, No. 11 B 13321(ALG), 2013 WL 1187819, at *1 (Bankr. S.D.N.Y. Mar. 21, 2013) (citing *In re 785 Partners LLC*, 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012)); *see also In re Frank's Nursery & Crafts, Inc.*, No. 04 15826 PCB, 2006 WL 2385418, at *4 (Bankr. S.D.N.Y. May 8, 2006) ("a plan that cures a mortgage default and de-accelerates the mortgage impairs the mortgagee's secured claim if it fails to provide for the payment of interest at the contractual default rate"); *In re Moshe*, 567 B.R. at 447 (same).

Indeed, given this, courts have denied motions to approve disclosure statements in the exact scenario presented here, *i.e.*, where the accompanying plan purports to treat a holder as "unimpaired" by virtue of curing and "eliminating" default interest pursuant to section 1124(2). *See, e.g.*, *In re Moshe*, 567 B.R. at 447 (denying the debtors' motion to approve disclosure statement and finding that amended plan was "patently unconfirmable" as claimant's "contractual right to receive the default rate of interest" was unaffected by section 1124(2) and thus holder's "claim is impaired, and . . . entitled to vote on the" plan); *In re Sagamore Partners, Ltd.*, 2012 WL 2856104, at *1 ("Because, as presently structured, the Plan does not provide for the payment of default interest to the Secured Lender, the Plan is facially unconfirmable over the objection of the Secured Lender and approval of the Disclosure Statement is therefore denied.").

Likewise, Debtors are mistaken in their reference to curing defaults pursuant to section 1124(2)(A), which incorporates section 365(b)(2)(D) of the Bankruptcy Code, which, per the Debtors, "does not require the satisfaction of a penalty rate relating to the failure to perform a nonmonetary obligation." (Disclosure Statement at ¶ 19.) Section 365(b)(2)(D) only applies to curing "any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under [an] executory contract or unexpired lease." 11 U.S.C. § 365(b)(2)(D). As the Mortgages are neither executory contracts nor unexpired leases, section 365(b)(2)(D) does not apply. *See In re General Growth Props., Inc.*, 451 B.R. at 329; *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. at 737 n.3 (recognizing that numerous courts in this district have held that loan documents, similar to those at issue here, are not executory contracts) (collecting cases); *In re Moody Nat'l SHS Houston H, LLC,* 426 B.R. 667, 673 (Bankr. S.D. Tex. 2010) (rejecting debtor's attempt to cure default and eliminate default interest pursuant to 1124(2)(A) because, among other things, "[a] mortgage note is neither a lease nor an executory contract").

***Debtors' counsel surely knows all this, as he has unsuccessfully attempted these same maneuvers in other cases and repeatedly lost***. *See e.g.*, *In re Moshe*, 567 B.R. at 447; *In re 139-141 Owners Corp.*, 313 B.R. at 368; *In re 139-141 Owners Corp.,* 306 B.R. at 769-70.

### D.     Feasibility Is In Doubt Given Uncertainties Concerning The Purported Exit Financing

52.     Even assuming that the Debtors are successful in their challenge to Brooklyn Lender's claim and eliminate its rights to proper unimpaired treatment, there is still significant risk that the Plan will be followed by a liquidation or further reorganization.

53.     As described above: (1) the LOI is wholly non-binding and the Debtors provide no assurances that the requisite exit funding will be available (nor that backup financing exists), indeed, the Debtors have refused to provide Brooklyn Lender with any discovery concerning the LOI, including the status of discussions with Lightstone; (2) the LOI includes certain bidder-type protections (*i.e.*, a good faith deposit, deal exclusivity, a break-up fee etc.) requiring Court approvals, which the Debtors have not yet sought; and (3) the LOI contemplates an interest rate of "One Month LIBOR + 5.25% with a floor of 7.75% per annum," and, as such, ***at a minimum***, the financing contemplated in the LOI would require $3,100,000 of annual debt service; however, the Debtors' own projections show that the Debtors' properties simply cannot service this amount of debt (and there is little to no likelihood of increased cash flows in any of the Debtors' fully leased properties), rendering the debt unserviceable. (*See supra*, § G.)

* * *

54.     For the foregoing reasons, the Plan is not feasible and is unrealistic and is thus patently unconfirmable. The Disclosure Statement, therefore, should not be approved.

## II.     <u>The Disclosure Statement Lacks Adequate Information</u>

55.     The Disclosure Statement further fails to meet the requirements of section 1125(b) of the Bankruptcy Code, which prohibits the solicitation of votes in respect of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement . . . containing adequate information." 11 U.S.C. § 1125(b). Adequate

information is defined in section 1125(a) of the Bankruptcy Code as "information of a kind, and in sufficient detail . . . that would enable a hypothetical investor . . . to make an informed judgment about the plan." *Id.* § 1125(a)(1).

56.    The primary purpose of a disclosure statement is to give stakeholders adequate information necessary to make an informed decision about whether to accept or reject the proposed plan of reorganization. *See In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir. 1994) ("Of prime importance in the reorganization process is the principle of disclosure."). Under section 1125 and its legislative history, courts have held that a disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization. A disclosure statement should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization. *In re Ashley River Consulting, LLC*, No. 14-13406(MG), 2015 WL 6848113, at *7 (Bankr. S.D.N.Y. Nov. 6, 2015).

57.    The Disclosure Statement fails to meet the adequacy requirements of the Bankruptcy Code and cannot be approved in its current form because, among other things, it:

- Contains no disclosures concerning allegations of misrepresentations and fraud made against the Debtors and their principals in the Federal Action, in the Foreclosure Actions or in the Bankruptcy Cases, including in the Investors Claim;

- Contains no disclosures concerning the New Owners, including, without limitation, their management and control, ownership or capitalization;

- Contains no disclosures concerning Mr. Goldwasser's role in the New Owners and, assuming such role, concerning his prior criminal conviction for fraud;

- Does not provide adequate disclosure related to the risks of litigation regarding the Investors Claim and Brooklyn Lender's claim; and

- Does not provide reasonable backup or data regarding its liquidation analysis.

Thus, the Disclosure Statement should not be approved.

### III.   Exclusivity Should Not Be Extended

58.    Through the Exclusivity Application, the Debtors are seeking an extension of their exclusive periods to propose and to solicit a plan by 120 days.

59.    The Bankruptcy Code grants Debtors a 120-day exclusivity period to propose a plan of reorganization.  "The 120–day period should be sufficient to allow the debtor to negotiate a settlement without unduly delaying the creditors."  *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600-01 (Bankr. S.D.N.Y. 2014).  However, the Bankruptcy Code allows a debtor to extend that initial 120-day period, "'for cause' shown."  *Id.; see also In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (stating that "[t]he debtor must make a clear showing of 'cause' to support an extension of the exclusivity period").

60.    Although "cause" for purposes of section 1121(d) is not defined in the Bankruptcy Code, courts have held that the determination as to whether "cause" exists turns on the facts and circumstances of each individual case.  *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).  Accordingly, courts have delineated certain non-exhaustive factors to aid in the assessment and determination of whether sufficient "cause" exists to extend exclusivity, including, without limitation: (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan; (3) the existence of good faith progress towards reorganization; (4) whether the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of its exclusivity periods in order to pressure

creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *Id.* (citations omitted).

61.     The Debtors have failed to establish that cause exists to extend exclusivity. As set forth above, the central issue in these cases has been known from the start: litigating Brooklyn Lender's entitlement to interest at the Default Interest Rate. Yet, these Bankruptcy Cases have been ongoing for over three months and the Debtors have done nothing to address those issues. Instead, as described herein, the Debtors have, to date, delayed and avoided producing any meaningful documents in discovery and proposed a patently unconfirmable plan premised, in part, on a wholesale misunderstanding and misapplication of section 1124 of the Bankruptcy Code. That the Debtors squandered their statutory exclusivity period is their fault, not Brooklyn Lender's. For this reason alone, exclusivity should be denied.

62.     That said, Brooklyn Lender understands that confirmation of any plan of reorganization, no matter who proposes it, will necessarily require litigating, to conclusion, Brooklyn Lender's entitlement to interest at the Default Interest Rate. Accordingly, Brooklyn Lender is willing to consent to a limited extension of exclusivity, through December 2, 2019, provided that such extension is utilized to address the allowance and treatment of Brooklyn Lender's claims.

63.     To that end, Brooklyn Lender respectfully requests that the Court establish a discovery and briefing schedule and respectfully suggests the following timeline:

| September [●], 2019 | • Brooklyn Lender to commence an adversary proceeding (the "Adversary Proceeding") by filing a complaint (the "Adversary Complaint") asking the Court to allow its claims. |
|---|---|
| September 11, 2019 | • Deadline for the Debtors to complete their production in connection with the 2004 Application. |
| September 13, 2019 | • Deadline for Brooklyn Lender and the Debtors to notice any depositions, serve any document requests, or issue any subpoenas in the Adversary Proceeding (the "Adversary Discovery"). |

| | |
|---|---|
| **September 20, 2019** | • Deadline to complete the Debtors' examination in connection with the 2004 Application.<br>• Deadline for the Debtors to respond to the Adversary Complaint (with an answer or motion to dismiss).<br>• Deadline for the parties to meet and confer with respect to any disputes concerning the Adversary Discovery and to finalize scheduling of any depositions in connection with same.<br>• Deadline for the Debtors and Brooklyn Lender to file memoranda of law in the Bankruptcy Cases concerning permissible unimpaired treatment for Brooklyn Lender's claims, to the extent any interest at the default rate is allowed (the "Unimpairment Briefs"). |
| **September 27, 2019** | • Deadline for the Debtors and Brooklyn Lender to respond to each other's Unimpairment Briefs. |
| **October 3, 2019** | • Deadline for the non-Debtors to complete their production in connection with the 2004 Application and to appear for examinations. |
| **October 4, 2019** | • Deadline for the parties to complete all document productions sought in the Adversary Discovery. |
| **October 11, 2019** | • Deadline by which any discovery disputes in connection with the Adversary Discovery must be raised with the Court.<br>• (If needed) Deadline for Brooklyn Lender to respond to any motion to dismiss the Adversary Proceeding. |
| **October 28-31, 2019** | • Timeframe for depositions in connection with the Adversary Discovery. |
| **October 31, 2019** | • Conclusion of discovery in connection with the Adversary Proceeding.<br>• (If needed) Deadline for the Debtors to file any reply in further support of any motion to dismiss the Adversary Proceeding. |
| **November 7, 2019** | • Deadline for Brooklyn Lender and the Debtors to file cross-motions for summary judgment in the Adversary Proceeding. |
| **November 18, 2019** | • Deadline for oppositions to cross-motions for summary judgment in the Adversary Proceeding. |
| **November 27, 2019** | • Deadline for replies in further support of cross motions for summary judgment in the Adversary Proceeding. |
| **December 2, 2019 (or as soon thereafter as reasonably practicable)** | • Hearing on cross-motions for summary judgment in the Adversary Proceeding. |

**CONCLUSION**

64.     Based on the foregoing, Brooklyn Lender respectfully requests that the Court: (1)
deny approval of the Disclosure Statement; (2) set a comprehensive discovery and briefing
schedule with respect to the issues surrounding unimpairment and allowance of Brooklyn
Lender's claims; and (3) grant to Brooklyn Lender such other and further relief as the Court
deems just and proper.

Dated: September 3, 2019                    STROOCK & STROOCK & LAVAN LLP
        New York, New York

                                           /s/ *Daniel A. Fliman*
                                           Daniel A. Fliman
                                           Jennifer S. Recine
                                           Tiffany L. Ho
                                           Isaac S. Sasson
                                           180 Maiden Lane
                                           New York, New York 10038
                                           Telephone: (212) 806-5400
                                           Facsimile: (212) 806-6006

                                           *Counsel for Brooklyn Lender LLC*