UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                      Chapter 11

      53 STANHOPE LLC, *et al*,[1]                      Case no.  19-23013 (RDD)
                                                         Jointly Administered
                        Debtors.

--------------------------------------------------------x

## **OBJECTION TO TRUSTEE MOTION**

         53 STANHOPE LLC and the jointly administered debtors herein (the "Debtors"

and each a "Debtor"), as and for their objection to the motion ("Motion") made by Brooklyn

Lender LLC ("Mortgagee" or "Brooklyn Lender") to appoint a Chapter 11 Trustee, respectfully

represents as follows:

**(a)** **The Motion is a transparent attempt to derail the confirmation hearing, or at least compound the litigation to drain the Debtors' resources in advance of trial,**

**(b)** **The Motion repackages the ownership allegations from the Federal Action that gave rise to the original illegitimate loan acceleration, and adds new alleged defaults, which are similarly untrue, immaterial, or both,**

**(c)** **Just as Brooklyn Lender is legally wrong under New York law in demanding default interest as an absolute right based on alleged technical and nonmaterial defaults, Brooklyn Lender is legally wrong under Bankruptcy law in demanding the appointment of a trustee as an absolute right based on alleged technical and nonmaterial defaults, and**

**(d)** **Even if Brooklyn Lender's allegations were true, there is no benefit to the appointment of a trustee because the case is already at the plan confirmation stage, providing for payment in full to all creditors.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## BACKGROUND

1.        On May 20, 2019, each of the Debtors filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), except 167 Hart LLC which filed its petition on May 21, 2019.

2.        These cases involve loans made by Signature Bank to the Debtors in the form of 14 separate notes and mortgages covering 31 properties dating back to September 2012. All of the loans were assigned to Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") on or about May 17, 2017. At that time, each Debtor was current on its payment obligations and, they assert, not otherwise in default. The principal amount owed on the loans total at the time of transfer to Brooklyn Lender, as reflected in Signature Bank loan statements, was $37,283,614.

3.        Brooklyn Lender LLC was created on May 9, 2017, immediately before it acquired the loans. Upon information and belief, Brooklyn Lender is affiliated with Maverick Real Estate Partners LLC. According to its website, Maverick is a private equity fund manager that acquires commercial mortgages secured by real estate in New York City.  Upon information and belief, Maverick, Brooklyn Lender and or its affiliated entities' business model involves predatory purchases of loans and mortgages for the purpose of defaulting borrowers on performing loans.[2]

---

[2]  *See, e.g.*, *Lenders in glass houses? Judge rules Maverick can't foreclose on Chelsea property because it violated loan agreement,* The Real Deal, May 20, 2019.

**The Federal Action**

4.     On April 24, 2017 the Debtors, among others, were sued in the United States District Court for the Eastern District of New York (the "Federal Action").  The Federal Action plaintiffs sued several dozen defendants alleging a "Bernie Madoff" type scheme.  They asserted contract claims, tort claims, equitable claims, and securities law claims.  The plaintiffs included limited liability companies ("LLC Plaintiffs") and super-minority individual members of those limited liability companies ("Individual Plaintiffs," with the LLC Plaintiffs, the "Plaintiffs") who sued on their own behalf and derivatively on behalf of the LLC Plaintiffs.

5.     The LLC Plaintiffs hold profit sharing interests in four of the Debtors, each of whom was named as an "LLC Defendant": 106 Kingston LLC, 1213 Jefferson LLC, 618 LaFayette LLC and 325 Franklin LLC ("Debtor LLC Defendants").  The Individual Plaintiffs are Israeli nationals.  The managing members of the LLC Plaintiffs include Charles Strulovitch.  He was named as an individual defendant.

6.     As to the Debtor LLC Defendants, the complaint alleges no misrepresentations in any prospectus.  To the contrary, the complaint alleges that the Debtor LLC Defendants, "returned the vast majority of the investment funds."  That, in fact, was the promise made in the so-called "Prospectuses" that the Plaintiffs rely on.

7.     Fourteen of the Debtors were named as 'relief defendants' ("Relief Defendants"):  53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole and Lorimer  LLC, Eighteen Homes LLC, and 167 Hart LLC ("Debtor Relief Defendants").  None of the Plaintiffs

2

alleged any existing interest in the Relief Defendants.  The Plaintiffs asserted constructive trust

claims, arguing that some of the money they invested may have been diverted to the Relief

Defendants.  The Plaintiffs filed notices of pendency against all of the LLC Defendants and the

Relief Defendants.

8.      The Debtor LLC Defendants moved to dismiss arguing that, among other

things, they fulfilled their obligations under the Prospectuses by "returning the vast majority of

the investment funds," and any dispute was nonetheless subject to arbitration.  The District Court

dismissed the complaint on November 2, 2017 (Amon, J.) and vacated the notices of pendency,

finding that as to the claims against the Debtor LLC Defendants, Plaintiffs may arbitrate any

claim they may have.  No arbitration was commenced.

9.      The Debtor Relief Defendants moved to dismiss arguing that the

Plaintiffs' allegations of diversion of funds were conclusory with no facts pled to support a

constructive trust claim.  The Debtor Relief Defendants argued further that even if the Plaintiffs

properly alleged facts to support their claims, at best their claims were limited to claims against

the Relief LLC Defendants' LLC membership interests as personalty and cannot serve as the

basis for attaching the real property owned by the LLCs.  The District Court dismissed the

complaint and vacated the notices of pendency, finding that as to the claims against the Debtor

Relief LLC Defendants, Plaintiffs may sue in State Court.  No State Court lawsuits have been

filed.

10.     The Plaintiffs filed a notice of appeal which they later withdrew.  The

Plaintiffs then made a motion to amend the dismissed complaint, which was pending at the time

the Debtors filed these cases.

## Brooklyn Lender Claims

11.     Apparently, Maverick discovered the Federal Action against Mr. Strulovitch and, the Debtors assert, predatorially targeted the loans on the Debtors' Properties. Maverick then offered to purchase such loans from Bank United and Signature Bank to implement a scheme to effectuate technical defaults on the loans. Correspondence between Maverick and various banks, including Bank United, indicates that Maverick requested that the banks issue non-monetary technical defaults on the Strulovitch loans and then assign them as defaulted loans.

12.     Evidently Signature refused to default the Debtors, probably because the loans were all performing based on the Debtors' excellent payment history. As soon as Brooklyn Lender acquired the loans, it sent own default notices ("Acceleration Letters") primarily alleging non-monetary defaults arising from the now-dismissed Federal Court lawsuit.

13.     The Acceleration Letters state that each of the Debtors are in default primarily based on purported allegations in the Federal Action. The Acceleration Letters state:

> Please be advised that Lender has been made aware of the certain lawsuit against Guarantor captioned Jacob Schonberg, et al v. Yechezkel Strulovitch a/k/a Chaskiel Strulovitch, et al., Case No. 17-cv-02161, currently pending in the United States District Court for the Eastern District of New York, wherein it is alleged, among other things, that [Mr. Stulovitch] misrepresented that he is the sole member of certain limited liability companies in connection with the making of certain mortgage loans. Pursuant to Paragraph 18(g) of the Agreement, the Debt "will become due at the option of the Mortgagee upon any one or more of the following events: (g) if any representation or warranty of the Mortgagor or of any person (a "guarantor") guaranteeing payment of the Debt or any portion thereof or the performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement, made herein or in any such guaranty or in any certificate, report, financial statement or other instrument furnished in connection with the making of the notes, the Mortgage, this Agreement or any such guaranty, shall prove false or misleading in any material respect.

4

Such misrepresentation constitutes any Event of Default under the Loan
Documents. Moreover, pursuant to the terms of the Note, "any acts or omissions
constituting fraud or misrepresentation by the Maker in connection with applying
for the loan secured by the Agreement or in supplying information or
documentation to the Payee subsequent to the date hereof" shall give Lender
rights of full recourse against Borrower and Guarantor for any deficiency
remaining after a foreclosure sale of the Property.

14.     It bears repeating that as to the Debtor Relief Defendants there were no
allegations nor any affidavits concerning membership interests.  As to those fourteen Debtors,
the Federal Action Complaint contradicts the Acceleration Letters' allegation that there are
undisclosed members.

15.     As to the four Debtor LLC Defendants, at one point in time, the Federal
Action LLC Plaintiffs had an indirect membership interest in those entities under certain
operating agreements produced by the Debtor LLC Defendants in support of their dismissal
motion.  The LLC Plaintiffs actually argued that those operating Agreements were not effective.
The LLC plaintiffs argued that the operating agreements the Debtor LLC Defendants submitted
to Signature identifying Chaskiel Strulovitz as sole member controlled.

16.     The operating agreements the Debtor LLC Defendants produced in the
Federal Action evidenced the profit sharing and arbitration provisions among the parties.  When
the Debtors sought financing from Signature Bank, the Federal Action Plaintiffs stated that they
did not want to be identified.  Thus, the Debtor LLC Defendants made Chaskiel Strulovitch sole
member but continued the profit-sharing arrangement and arbitration provisions.  In the Federal
Action, therefore, the Debtors insisted upon compliance with the arbitration provisions of the
agreements they produced.

5

17.    In addition to the Mortgagee's mistaken assumption that the Debtors had misrepresented their ownership, the default letters also declared an event of default premised on other non-Debtor operating agreements for entities Mr. Strulovitch listed as wholly owned on his personal financial statements submitted to Signature.

18.    Paragraph 18(g) of the Mortgage requires that an event of default occurs only "if any representation or warranty …. shall prove false or misleading in any material respect."  According to Black's Law Dictionary, the word "prove" is defined as "to establish a fact or hypothesis as true by satisfactory and sufficient evidence."  Based on the language of the Mortgage, therefore, **before** declaring a default on that basis, the Debtors assert, there must have been proof to establish that the representation claimed by Lender was *false or misleading* and *material*.

19.    The Federal Action was dismissed.  Nothing has been adjudicated because the Plaintiffs did not submit to arbitration against the LLC Defendants, nor did they sue in State Court as the District Court permitted for the Relief Defendants.

20.    Therefore, the Debtors assert, the existence of the Federal Action alone was and is insufficient to "prove" that any representation was false or misleading in any material respect prior to declaring an event of default based on Paragraph 18(g).  In summary, the Acceleration Letters did not even allege a present default or constitute a valid notice of a present default. Instead, the letters simply notified the Debtors that IF the allegations in the Federal Complaint were determined to be true, it would constitute a potential FUTURE event of default. Accordingly, the Debtors assert, the Mortgagee's demand for 24% interest dating back to the origination of the loans on the basis of these alleged misrepresentations is at best premature.

6

21.    The Debtors assert Brooklyn Lender has failed further to sufficiently allege or establish that any such claimed misrepresentation was "material" as also required under Paragraph 18(g), particularly with respect to Mr. Strulovitch's financial statement. The courts have defined a "material misrepresentation" in this context to be one that is a "basic credit consideration" that has a "direct relationship to [the borrower's] ability to repay the loan." *Sunrise Federal Savings Bank v. Verex Assurance, Inc.*, 204 A.D.2d 617 (2d Dep't 1994).

22.    The Loans were originated by Signature Bank.  There is no evidence that Signature required that Strulovitch have a minimum net worth as part of its basic credit consideration, or that the allegations in the Federal Action, if proven, would drop Strulovitch' net worth below such minimum net worth.

23.    The Debtors assert that Brooklyn Lender's allegation of an event of default on the basis of allegedly false statements in his personal financial statement fails for the additional reason that Mr. Strulovitch is not an entity or person covered by the relevant mortgage provision. The Mortgage states, in pertinent part, as follows:

> The Debt will become due at the option of the Mortgagee upon any one or more of the following events:
>
> (g) if any representation or warranty of the Mortgagor or of any person (a "guarantor") **guaranteeing payment of the Debt** or any portion thereof or the performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement, made herein or in any such guaranty or in any certificate, report, financial statement or other instrument furnished in connection with the making of the notes, the Mortgage, this Agreement or any such guaranty, shall **prove false or misleading in any material respect**;" (emphasis added).

24.    The plain reading of this section demonstrates that if a "representation or warranty" by any of three categories of person or entity proves false in a material respect then

7

such misrepresentation shall constitute an event of default. The three categories of person or

entity are the following: (i) the Mortgagor; (ii) any person (a "guarantor") guaranteeing payment

of the Debt or any portion thereof; or (iii) any person (a "guarantor") guaranteeing . . . the

performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement,

made therein.

25.     Mr. Strulovitch is not a mortgagor. Mr. Strulovitch did not guaranty

repayment of the debt.  Signature did not require Mr. Strulovitch to execute a "personal"

guaranty.  The Non-Recourse Indemnity/Carve-Outs only guaranteed "losses[es], cost[s] or

expense[s]" resulting from specific conditions at the mortgaged premises. Accordingly, Mr.

Strulovitch did not guarantee any performance by the Debtors.

26.     Here, based on the plain language of the Mortgage, any alleged

misrepresentation by Mr. Strulovitch, even if true, would not constitute an event of default under

the loan documents because he is not a guarantor. Accordingly, the Debtors dispute the

allegation of default by Brooklyn Lender on multiple grounds.

27.     As additional events of default, Brooklyn Lender alleged the Debtors'

failure to promptly cure property violations issued by the Environmental Control Board of the

City of New York ("ECB") and the New York City Department of Housing Preservation and

Development ("HPD"), or pay two water and sewer bills. The amounts in dispute, the Debtors

contend, were trivial, and moreover, were substantially "cured" or resolved.

28.     The Debtors consistently and timely made all payments of the monthly

principal and interest owned not only to Signature but also to Brooklyn Lender. Because monthly

principal and interest payments have been consistently paid, the Debtors contend Brooklyn

8

Lender has not and cannot show that any direct relationship existed between any trivial defaults

or alleged misrepresentation and the Debtors' ability to repay their loans.  Brooklyn Lender was

not prejudiced.  Its security was not impaired.

29.     The Debtors contend that against this background, strict enforcement

would irreparably injure the Debtors and undermine all equitable considerations.  In 1977, the

Court of Appeals adopted the dissenting opinion of Chief Judge Cardozo and applied "the

general equitable principle that 'the gravity of the fault must be compared with the gravity of the

hardship.'" *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392 (1977).  Evolving

case law has stepped away from the decision in *Graf v. Hope Building Corp.*, 254 N.Y. 1 (1930),

which held "acceleration clauses in mortgages will be strictly enforced irrespective of the

circumstances and nature of default." *Karas*, 91 A.D.2d at 812, citing to *Blomgren,* 18 A.D.2d

979; 100 Eighth Ave. Corp., 4 A.D.2d 754; More Realty Corp., 232 A.D. 705; Scelza v. Ryba,

169 N.Y.S.2d 462 (Sup. Ct. 1957); *Domus Realty Corp. v. 3440 Realty Co.,* 40 N.Y.S.2d 69

(Sup. Ct. 1943), aff'd, 266 A.D. 725 (1st Dep't 1943). Indeed, the dissenting opinion of Chief

Judge Cardozo, which stated that the equitable remedy of foreclosure may be denied based upon

the circumstances and nature of default, has been embraced instead. *See J.N.A. Realty Corp.*, 42

N.Y.2d at 392.

30.     Here, the Debtors contend that to the extent, if any, defaults exist, the

nature and circumstances of such defaults are such that they should not be enforced by a court of

equity.

31.     Indeed, Chief Judge Cardozo stated that strict enforcement is

unconscionable where, among other things, the default "is limited to a trifling balance." *Graf,*

9

254 N.Y. at 12 (Cardozo, J., dissenting). In *J.N.A. Realty Corp.*, the Court held that "[t]here

would be a forfeiture and the gravity of the loss is certainly out of all proportion to the gravity of

the fault," warranting equitable relief if there is no prejudice. 42 N.Y.2d at 399-40; accord, *4 B 's*

*Realty* 818 F.Supp.2d at 659 *(quoting* N.Y.C.P.L.R. § 500l(a)) (citing *Danielowich v. PEL Dev.*,

292 A.D.2d 414, 415, 739 N.Y.S.2d 408, 409 (2d Dep't 2002)); *See generally Blomgren v.*

*Tinton 763 Corp.*, 18 A.D.2d 979, 980 (1st Dep't 1963); *W.F.M. Restaurant, Inc. v. Austern*, 35

N.Y.2d 610 (1974); *In Rockaway Park Series Corp. v. Hollis Automotive Corp.*, 135 N.Y.S.2d

588 (Sup. Ct. 1954); *Caspert v. Anderson Apartments*, 94 N.Y.S.2d 521 (Sup. Ct. 1949);

*European American Bank v. Harper*, 163 A.D.2d 458 (2d Dep't 1990); *ING Real Estate* Finance

*(USA) LLC v. Park Ave. Hotel Acquisition LLC*, 26 Misc.3d 1226(A) (Sup. Ct. 2010); *Fifty*

*States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573 (1979)

32.     Laches is a defense as well.  In *Caspert*, a foreclosure action brought on

the basis of alleged municipal building violations, the mortgagee was not entitled to foreclosure

where it failed to ***promptly*** assert its rights. 94 N.Y.S.2d at 521. "Equity aids the vigilant, and he

who seeks the aid of equity must show that he has used reasonable diligence in asserting his

rights and demanding their protection." *Id.* at 526.  Where, as here, the basis for foreclosure is

building violations that were issued months or years prior to assertion of the event of default,

equity does not permit foreclosure. *See also Karas v. Wasserman*, 91 A.D.2d 812 (3d Dep't

1982) (it is a defense to foreclosure that the mortgagee failed to complain about a continuing

default for five years; foreclosure was not warranted because mortgagor was entitled to rely on

the absence of complaints by mortgagee); *More Realty Corp. v. Mootchnick*, 232 A.D. 705 (2d

Dep't 1931) (mortgagee may be estopped from foreclosure where mortgagee did not object to

mortgagor's conduct in breach of the mortgage agreement over years of dealings); *Amsterdam*

*Sav. Bank v. City View Management Corp.*, 45 N.Y.2d 854 (1978) (three-month delay in taking

action together with detriment to other parties "require[d] application of the doctrine of laches");

*Deutsche Bank Nat. Trust Co. v. Joseph*, 117 A.D.3d 982 (2d Dep't 2014) (citations omitted).

33.   In summary, the Debtors contend that default interest is disproportionate

to the allegations of default, and under such circumstances, equity requires relief to the borrower

and Brooklyn Lender's claim to default interest should be disallowed.

34.   The Debtors contend that the portion of Brooklyn Lender's Claim for

"Legal Fees" of $1,337,510 should be disallowed in its entirety. At the outset, no documentation

(such as attorney invoices, billing statements, time records, attorney affidavits, and the like

supporting the fees and costs allegedly incurred) was submitted in support of any attorneys' fees

or collection costs claimed.  As a result, it is impossible for the Debtor or the Court to properly

consider the purported validity of this portion of the Claim. Absent sufficient evidentiary

support, the claim for "Legal Fees" has no prima facie merit.

35.   In addition, the mortgages provide for the recovery of "reasonable"

attorneys' fees in paragraph 18(j), but only to "protect the Mortgagee's interest in the Mortgaged

Property."  Under paragraph 19, attorneys' fees are recoverable "If the Mortgagor fails to make

any payment or to do any act as herein provided. . ."  Since debt service was paid and all acts

performed, even if the Mortgagee has evidentiary support for attorneys' fees, the Debtors will

argue that the Mortgages do not permit legal fees for collection action arising from a

misrepresentation, particularly since the alleged misrepresentations were not made by

"Mortgagor."

11

36.     In any event, Brooklyn Lender's pre-Petition Date efforts to enforce the
Consolidated Note and the Consolidated Mortgage consisted entirely of issuing the Acceleration
Notices and, shortly thereafter, commencing the foreclosure actions in which the only
meaningful matter undertaken was the Receiver litigation and the filing of the Summary
Judgment Motion.  In that context, the Debtors contend that $1.3 million for fees appears to be
unreasonably high.

37.     Even if the $1.3 million of fees were reasonable and allowable under the
mortgages, the foreclosure action itself was improper, the Debtors contend, and thus the legal
fees incurred by Lender should be denied in their entirety, because, as noted above, the
Mortgagee incurred those fees prosecuting a bad faith foreclosure action in breach of the Loan
Agreements.

38.     In that regard, a failure to properly accelerate is a complete defense to a
mortgage foreclosure action.  *See,* 1 Bergman, *New York Mortgage Foreclosures*, § 4.05[1][b].
Where there is no basis for the acceleration of a mortgage obligation, an acceleration notice sent
by the lender is a nullity and constitutes a material breach of the loan agreement.  *Household Fin.
Realty Corp. of NY v Dunlap*, 15 Misc 3d 659, 665 (Sup Ct, N.Y. County 2007); *see also*
Bergman, B., *Strict Acceleration in New York Mortgage Foreclosure-Has the Doctrine Eroded?*,
Pace Law Review, 480 (June 1988).

39.     According to the Debtors, since there was no evidence of material default,
by wrongfully accelerating the debt, the Mortgagee materially breached.  A breach is material if
it goes to the "root" of the agreement, i.e., it defeats the object of the parties and deprives the
injured party of the benefit it justifiably expected. *Frank Felix Assoc. v Austin Drugs*, Docket

12

No. 96-7604, 1997 U.S. App. LEXIS 19795 at * 14 (2d Cir. Apr. 10, 1997); *Times Mirror Mags., Inc. v Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000)). Not surprisingly, courts have found that the improper acceleration of a mortgage loan constitutes a material breach of the loan agreement. *See Seidman v Indus. Recycling Props., Inc.*, 106 A.D.3d 983, 984-985 (2nd Dep't 2013)(the improper acceleration of a mortgage loan and commencement of a foreclosure action constitutes a breach of the loan agreement); *see also Mayo v Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 26383 at * 8 (E.D Va. Mar. 4, 2015) (a deficient acceleration notice may constitute a material breach); *Johnson Fed. Home Loan Mortg. Corp.*, No. 4:13cv163, 2013 U.S. Dist. Lexis 97713 at * 9 (W.D. Va. 2013) (same).

40.     In addition, the Debtors will argue that the actions taken by the Lender were in breach of its implied obligation of good faith and fair dealing under the Loan Agreement. New York law recognizes that UCC §1-203 imposes an obligation of good faith on a secured party's enforcement of its security agreement. *See Tudisco v Duerr*, 89 A.D.3d 1372, 1376 (4th Dep't 2011); *Stillwater Liquidating LLC v Partner Reins. Co., Ltd.*, Index No. 652451/15, 2017 N.Y. Slip. Op 30257[U] at * 20 (Sup. Ct, N.Y. Cty. 2017).

41.     In summary, the Debtors will argue that the Mortgagee improperly noticed alleged defaults asserting ownership misrepresentations and trivial other defaults, and utilized those asserted defaults as the basis to accelerate the amounts due under the loan, commence a foreclosure action and seek the appointment of a receiver. The Mortgagee's breach was material since it goes to the root of the contract and was intended to deprive the Debtors of the right to its use and enjoyment of their Properties by forcing sales in a foreclosure proceeding.

42.     When one party commits a material breach of a contract, the other party to the contract is relieved, or excused, from further performance under the contract. *Grace v Nappa*, 46 N.Y.2d 560, 567 (1979).  Having repudiated and materially breached its contract with Debtors, the Mortgagee could not claim relief either in the form of foreclosure or damages. *Net2Globe Intl. v Time Warner Telecom of NY*, 273 F Supp. 2d 436, 457 (S.D.N.Y 2003); *see also Daniel Perla Assocs. LP v. ZLD Realty LLC*, 277 A.D.2d 115, 115 (1st Dep't 2000)(upholding lower court's dismissal of the foreclosure complaint and reducing the principal of the mortgage based upon plaintiff's bad faith breach). The foreclosure action was improper, as it was based on an improper acceleration.

43.     The Debtors contend that Brooklyn Lender's claimed $873,158 "Late Fee" must also be disallowed in its entirety.  Paragraph 20 of the Mortgages provide a late fee on an "Installment to defray the expense incurred by the Mortgagee in handling and processing such delinquent payment and such amount."  Installment refers to monthly payments, which were paid timely.  Presumably, the Mortgagee deems the improperly accelerated amounts due as an installment and has imposed late fees on such amounts.

44.     It is well-settled that, under New York law, "'[i]n the absence of a provision in the mortgage to the contrary, the collection of late fees after a mortgage note has been accelerated is impermissible.'" *Home Loan Inv. Bank v. Goodness & Mercy, Inc.*, No. 10-CV-4677 (ADS) (ETB), 2012 U.S. Dist. LEXIS 46256 at *17 (E.D.N.Y. March 30, 2012) (*quoting Carreras v. Weinreb*, 33 A.D.3d 953, 955 (2d Dep't 2006)); *see also Pereira v. Cogan*, 294 B.R. 449, 515 (S.D.N.Y. 2003) ("The Trustee is only entitled to a late charge up until the time that the notes at issue were accelerated ... ") (*citing Centerbank v. D 'Assaro*, 158 Misc. 2d

14

92 (N.Y. Sup. Ct., Suffolk Cnty. 1993)). The basis for this general rule is that it is "inconsistent

to allow a lending institution to accelerate a note, thereby denying the debtor the right under the

mortgage note to make monthly installments and to continue to insist on its own right under the

note to impose monthly late charges." *Id.* (*citing Green Point Sav. Bank v. Varana*, 236 A.D.2d

443, 443 (2d Dep't 1997) (*quoting Centerbank*, 158 Misc. 2d at 95); *LaSalle Bank Nat'l Ass 'n v.

Shepherd Mall Partners, LLC*, 2006 OK CIV APP 91, 140 P.3d 559, 562 (Okla. Civ. App.

2005)); *see also Reis v. Decker*, 135 Misc. 2d 741, 742 (Cnty. Ct. of N.Y., Delaware Cnty. 1987)

(by electing to accelerate the mortgage debt and proceeding by foreclosure plaintiff had "elected

to seek recovery of the full amount due, rather than to sue only for those installments which are

currently due. The purpose of late charges is to compensate a creditor for the expense and

inconvenience of collecting installments. Such charges are proper and recoverable in actions to

recover installments which are due and unpaid, but are not recoverable in a foreclosure

proceeding whereat one seeks to recover a full accelerated principal debt."). Courts have

consistently held further, that a creditor should not receive both default interest and late charges

as both are "designed to compensate the lender for the same injury, and awarding both amounts

to a double recovery." *In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012); *see

also In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998).

45.    In summary, the principal amount due, as reflected in Signature Bank loan

statements, is $37,283,614.25.  Brooklyn Lender now seeks more than $74,515,177, claiming

$37,231,563 for default interest, late fees, and legal fees, despite, the Debtors assert, the absence

of payment defaults.  The Debtors respectfully submit that contrary to Brooklyn Lender's

insinuations of Debtor misconduct, Brooklyn lender is the true party with unclean hands.

15

**Treatment of Brooklyn Lender**

46.     The Debtors filed these cases to obtain a determination that the
Acceleration Notices were defective, that the loans were not in default, and/or that any such
defaults were so non-material or remote in time as to be unenforceable in law and equity.  As
noted in footnote 2 above, the Debtors would not be the first to defeat Maverick's attempts to
manufacture defaults.

47.     Even if the Court finds that the Debtors must pay default interest to
reinstate, in certain circumstances, lender misconduct is also grounds to deny a lender default
interest. *E.g. In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011); *See,
In re Northwest Airlines, Corp.*, 2007 WL 3376895, (Bankr. S.D.N.Y. 2007).

48.     In any event, the Court may disregard a contractual provision calling for
high default interest rates when such rates would be inequitable. In *In re P. G. Realty Co.,* 220
B.R. 773 (Bankr. E.D.N.Y. 1998), the Court held that "it possesses the power to modify rights
created by state law or private agreement. Indeed, the Bankruptcy Code itself contains many
provisions which specifically modify or abrogate such rights. The Code is also replete with
instances in which Congress has made such a power explicit." *Id.,* 220 B.R. at 780 (citations
omitted). *See also In re Marfin Ready Afix Corp.,* 220 B.R. 148, 155-56 (Bankr. E.D.N. Y. 1998)
(acknowledging that Courts may take a flexible approach when considering the application of
contractual default interest rates); *accord, In re Vest Assocs.,* 217 B.R. 696, 702-703 (S.D.N.Y.
1998).  Here, 24% interest is punitive and should not be permitted under any circumstances

because it bears no reasonable relationship to the Mortgagee's actual damages.  There are no

actual damages.

## **ARGUMENT**

### (a) **The Motion is a transparent attempt to derail the confirmation hearing, or at least compound the litigation to drain the Debtors' resources in advance of trial**

49.    The Debtors have obtained exit financing, proof of which is annexed as

Exhibit A to the Plan, to pay all creditors the Allowed Amounts their Claims under the Plan,

including Brooklyn Lender at the non-default contract rate.  In the meantime, the Properties'

rental income is being used to pay debt service to Brooklyn Lender and to preserve and protect

the Properties.

50.    The confirmation hearing is less than two months away.  The hearing is a

combined hearing on the Debtors' objection to Brooklyn Lenders' Claims.  The objection

incorporates the background herein, and argues that:

(a) Since no material default was proven when Brooklyn Lender accelerated the loans, there was no legitimate basis for acceleration,

(b)  Even if the loans were properly accelerated, the Court should disallow default interest on equitable grounds including unconscionability, unjust enrichment, and lender misconduct,

(c) Legal fees should be disallowed since (i) the Mortgagee wrongfully accelerated, (ii) the loan documents permit fees only to "protect the Mortgagee's interest in the Mortgaged Property," and (iii) in all events, the fees claimed are unreasonably high, and

(d) Late fees are not allowed except on installment payments, nor are late fees allowed in addition to default interest.

17

51.     In a transparent attempt to derail the confirmation hearing, or at least compound the litigation to drain the Debtors' resources in advance of trial, Brooklyn Lender's repackaged the ownership allegations from the Federal Action that gave rise to the original illegitimate loan acceleration, and alleged new defaults, which like the original acceleration defaults, are untrue, immaterial, or both.  None of them approach the level of misconduct that must be proven for the appointment of a Chapter 11 Trustee.

**(b) Just as Brooklyn Lender was legally wrong under New York law in demanding default interest as an absolute right based on alleged technical and nonmaterial defaults, Brooklyn Lender is wrong under Bankruptcy law in demanding the appointment of a trustee as an absolute right based on technical and nonmaterial defaults**

52.     The appointment of a trustee is an extraordinary and disfavored remedy to be exercised only in the most dire circumstances. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006); *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 1998) ; *see also In re W.R. Grace & Co.,* 285 B.R. 148, 158 (Bankr. D. Del. Oct. 24, 2002) (appointment of a trustee is warranted only as "a last resort").

53.     Generally, there is strong presumption under the Bankruptcy Code that a debtor be permitted to remain in possession, which "arises from a belief that the debtor and current management are generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989); s*ee also Marvel Entertainment*, 140 F.3d at 471 (strong presumption against appointing a trustee is based on "the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization.").

18

54.     Section 1104 of the Bankruptcy Code allows the Bankruptcy Court to appoint a trustee in a Chapter 11 case "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of affairs of the debtor by current management," or "if such appointment is in the interests of creditors."  11 U.S.C. § 1104(a)(1), (2).  "The standard for § 1104 appointment [of a trustee] is very high." *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F. 3d 541, 546 (2d. Cir. 2008) *(quoting In re Smart World Techs., LLC v. Juno Online Servs., Inc (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005)).

55.     The moving party "has the burden of showing by 'clear and convincing evidence' that the appointment of a trustee is warranted."  *Adams v. Marwil*, 564 F. 3d at 546. In making this determination, "the bankruptcy court must bear in mind that the appointment of a trustee 'may impose a substantial financial burden on a hard-pressed debtor seeking relief under the Bankruptcy Code,' by incurring the expenditure of 'substantial administrative expenses' caused by further delay in the bankruptcy proceedings.  Id. at 546-47.  *See Adelphia*, 336 B.R. at 655; *In re Cajun Elec. Power Co-op., Inc.,* 69 F.3d 746 (5th Cir. 1995), *opinion withdrawn on other grounds, on reh'g,* 74 F.3d 599 (5th Cir. 1996).

56.     It would be difficult to design a more egregious fact pattern to demonstrate "cause" to appoint a trustee than that presented in *In re General Oil Distribs., Inc*., 42 B.R. 402 (Bankr. E.D.N.Y. 1984).  In *General Oil*, the debtor's principals engaged in countless transactions not even arguably defensible, including:  (i) borrowing corporate funds for personal use on an unsecured, non-interest-bearing basis without repayment thereof, (ii) transferring and selling assets of the debtor and using the proceeds thereof to benefit a personal business, and (iii)

19

taking personal positions in the oil futures market opposite to those taken by the debtor under such principal's supervision.  Id. at 404-405.

57.    Despite the debtor's blatantly egregious transactions, the court exercised its discretion to deny the motion to appoint a trustee, stating: "The findings show numerous instances of conduct approaching gross mismanagement, violations of fiduciary obligations, incompetence and dishonesty. . . .  Under the circumstances herein, the court must find that their conduct does not constitute that which would mandate the appointment of a trustee."  Id. at 410.

58.    Presented with similarly nefarious conduct, the United States Court of Appeals for the Fourth Circuit affirmed the denial of a motion to appoint a trustee in *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239 (4th Cir. 1987).  In flagrant violation of both the letter and the spirit of the Bankruptcy Code, and a prior order, the debtor in Robins:  (i) utilized its subsidiaries as conduits for making charitable contributions, investments, and payments of pre-petition indebtedness, (ii) paid pre-petition claims of present and former executives and pre-petition claims arising under unassumed executory contracts, and (iii) made payments to settle an employee's pre-petition lawsuit.  Id. at 240.

59.    The Fourth Circuit emphasized that although the debtor's conduct warranted the contempt sanction imposed by the lower court, whether such conduct constitutes "cause" to appoint a trustee is a matter of judicial discretion that was exercised properly below:

> [A] policy of flexibility pervades the bankruptcy code with the ultimate aim of protecting creditors.  A determination of cause, therefore, is within the discretion of the court and due consideration must be given to the various interests invoked in the bankruptcy proceeding.

_Id._, at 242. Implicit in the court's determination was the precept that a "bad act", or even a series of "bad acts" indicating fraud, dishonesty, gross mismanagement or incompetence, is not _a fortiori_ cause to appoint a trustee. Rather, cause is manifest only when that conduct rises to a level such that extraordinary action must be taken:

> "[T]he concepts of incompetence, dishonesty, gross mismanagement and even fraud cover a wide range of conduct.... Implicit in a finding of incompetence, dishonesty, etc., for purposes of §1104(a)(1) is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee." Obviously, the appointment of a trustee, regardless of the consequences, in the event of an act of dishonesty by the debtor ... could frustrate the purpose of the Bankruptcy Act.

_Id._, (_quoting General Oil_, 42 B.R. at 409) (emphasis added).

60.     Thus, in _In re Clinton Centrifuge, Inc._, 85 B.R. 980, (Bankr. E.D. Pa. 1988), cause to appoint a trustee did not exist despite the debtor's fraudulent conveyance, the debtor's formation of a corporation to shield assets from execution by the fraudulent conveyance judgment creditor, and the debtor's unauthorized execution of numerous post-petition lease agreements with the newly-formed corporation. _Id._ at 981-82. The court stated: "[W]hether cause exists to appoint a trustee is largely a matter of degree. In most bankruptcy cases there will be some display of mismanagement, some disregard or oversight of statutory provisions, and some legitimate concerns raised by creditors that creditor interests would be better served by replacing current management. The question becomes whether these concerns rise to a level justifying the extraordinary relief. _Id._ at 987.

61.     Against this background, the Movant has failed to demonstrate, or even credibly allege, that the Debtors' conduct approaches the fraud, dishonesty, incompetence, and gross mismanagement exemplified in _General Oil, A.H. Robins_, or _Clinton Centrifuge_. These cases illustrate that allegations of fraud, gross mismanagement, incompetence, or other "cause"

21

must be supported not only by credible evidence of actionable conduct causing *actual detriment*

*to the estate*, but also by clear and convincing evidence that the level of misconduct warrants the

extraordinary relief sought.

62.     By the same token, virtually every case cited by Brooklyn Lender resulted

in a trustee appointment of a trustee only after an examination of the consequences for plan

confirmation and the impact on creditors.

63.     In contradiction to the uniform weight of authority, Brooklyn Lender

seeks to impose a new absolutist non-discretionary standard for the appointment of a trustee.  As

stated by Brooklyn Lender: "whether the Debtors are harming Brooklyn Lender or others is

irrelevant.  No legal principle should excuse a debtor-in-possession's duty to comply with court

orders and statutory obligations.  The Debtors' obligations are absolute and are the price they

must pay to enjoy the protections afforded by the Bankruptcy Code."

64.     Just as Brooklyn Lender is wrong for asserting an absolute right to

retroactive default interest to the loan's inception for unproven defaults, Brooklyn Lender is

wrong for asserting an absolute right to the appointment of a trustee based on the "cause" it

proffers.

**(c) The Motion repackages the ownership allegations from the Federal Action that gave
rise to the original illegitimate loan acceleration, and adds new alleged defaults,
which are similarly untrue, immaterial, or both,**

65.     For "cause," Brooklyn Lender alleges tardy filings, incomplete discovery,

inadequate insurance, untrustworthy management, the dismissed investor allegations, and

incomplete information regarding the Debtors' ownership and profit sharing.  Based on the case

law cited herein, even if true, these allegations do not justify a Chapter 11 trustee appointment, particularly within weeks of a confirmation hearing on a plan that will pay all creditors in full. There is not a hint of material post-bankruptcy misconduct such as theft of assets, total neglect of the business, total neglect of bankruptcy obligations, or an attempt to subvert the bankruptcy process. Late filings, slow discovery production, and allegations of pre-bankruptcy misconduct exist in almost every bankruptcy case.

**The Debtor Made all Required Filings**

66.    On lack of full disclosure, Brooklyn Lender complains that the Debtors' petitions were filed without complete schedules. Few cases are. The rules provide for incomplete filing of a bankruptcy petition. The Debtors maintained open communications with the Office of the United States Trustee to ensure that the delay did not impede the orderly administration of the case and subsequently made all required filings.

**The Debtor answered all proper questions at the 341 Meetings**

67.    This case was filed to help the Debtors recover from the damage inflicted on them by Brooklyn Lender's improper acceleration based on unproven allegations regarding the Debtors' ownership. That this issue would be subject of a contested matter in this court was foreseeable, if not inevitable, given the size of the windfall Brooklyn Lender will be justly denied if its scheme fails.

68.    The first meeting of creditors is intended to be a general information session for creditors. It is not intended to be an opportunity for individual creditors to take discovery on their specific issues, particularly where those issues are ripe for litigation.

23

69.     The Debtors were sensitive, therefore, to Brooklyn Lender's attempts to leverage the first meetings of creditors in these cases into depositions for litigation purposes. The Debtors objected when they thought Brooklyn Lender was crossing the line.  The Debtors then deferred to the judgment of the Office of the United States Trustee in deciding fair game for Brooklyn Lender's 341 meeting questions.  Brooklyn Lender's frustration with the Debtors' refusal to permit the 341 meeting to be used as a premature deposition is not cause to appoint a Trustee.

**The Debtor has Filed Complete Operating Reports**

70.     It took the Debtors some time to establish a system for preparing operating reports for so many properties involving several managing agents.  Operating reports are being filed as required, albeit a little late at times.

**Debt service, operating expenses and insurance have been paid**

71.     Meanwhile, operating expenses have been paid and Brooklyn Lender has been paid monthly debt service since filing these cases.

72.     Annexed hereto as Exhibit A is a schedule of property taxes.  The current outstanding amount of property taxes across all 31 Properties is $77k.  As of the Petition Date, the outstanding amount of property taxes was $175k.  The reason for the large balance due on the petition date was that the taxes were being escrowed and paid by Signature Bank.  Brooklyn Lender, however, failed to pay the taxes due after it acquired the loans, with no notice to the Debtors.  The 2 buildings with the largest balances, 55 Stanhope Street, Brooklyn, New York,

11221 & 325 Franklin Avenue, Brooklyn, New York, 11238 make up 87% of the total outstanding amount.  Both are on payment plans with the city.

73.     Annexed hereto as Exhibit B is a schedule of water bills.  The outstanding water bills across all 31 Properties total $35,000.  As of the Petition Date, the outstanding amount was $88,000.  325 Franklin Avenue, Brooklyn, New York, 11238, the Property with the largest balance, makes up 23% of the total outstanding amount.  Due to the nature of the commercial tenant's business, water bills for this Property are consistently higher than comparable buildings. This Property has an arrangement with the commercial tenant for 80% reimbursement of the water charges.  The reimbursement schedule does not sync with the payment schedule.  The Debtor expects receipt from the tenant in two months.  Upon receipt, the overdue amount due will be reduced significantly.

74.     Annexed hereto as Exhibit C is a breakdown of the insurance coverage on the Debtors' Properties.  All buildings are currently (and have continuously been) insured.  Each Debtor maintains a policy for the Property or Properties owned by that Debtor except for D & W Real Estate Spring LLC and Meserole and Lorimer LLC which have individual policies per Property.  Each Debtor maintains appropriate property coverage and 1M/2M of liability coverage.  There is an umbrella policy which covers the Properties of 13 Debtors. The other 5 Debtors have their own umbrella policy.

**ECB and HPD citations have been unremarkable and resolved in the ordinary course**

75.     Every owner of real estate in New York City deals with ongoing violations.  The Debtor has been resolving them in the ordinary course.

76.     Annexed hereto as Exhibit D is a breakdown of the violations on the Debtors' Properties.

77.     There are currently 101 open HPD and ECB violations across 31 properties.  15 of those 31 Properties have no open violations. Of the 16 with violations, 12 buildings have 4 or fewer.  Only 4 of the 31 violations involve monetary amounts.  The dollar amount of these violations is $203,000 with $199,000 (98%) on the Property at 107 South 3rd Street, Brooklyn, New York, 11249.

78.     Annexed hereto as Exhibit E is a letter from the Debtors' violations expediter.  On the violations at 107 South 3rd Street, the expediter explains that the Debtor is awaiting permits to make necessary structural repairs, following which the penalties are likely to be drastically decreased.

79.     The Debtor respectfully submits that the violations against the Properties are not unusual and do not constitute cause for a trustee appointment.

**Brooklyn Lender's discovery expectations are one-sided and unreasonable**

80.     On document production, both sides have been slow to produce.  As a routine courtesy, the Debtors extended Brooklyn Lender's time to respond.  Similarly, the Debtors met and conferred with counsel to Signature Bank, Brooklyn Lender's predecessor in interest on production.  The result is that the Debtors produced thousands pages of discovery to Brooklyn Lender before Brooklyn Lender produced anything.  The Debtors extended Signature's time to December 30, 2019, despite the fact that Signature has had the document requests for years dating back to Brooklyn Lender's foreclosure.  To date, no documents have been received

from Signature Bank, even though as predecessor-in-interest, Signature Bank is synonymous

with Brooklyn Lender.  Brooklyn Lender, therefore, has no right to complain, let alone demand a

trustee.

81.     Nonetheless, Brooklyn Lender has tolerated few delays, escalated most

late responses into a hearing before the Court, and now, demands the appointment of a trustee.

Furthermore, Brooklyn Lender's description of the Debtor's discovery efforts is a gross

mischaracterization, to say the least.

82.     As a threshold matter, it must be noted that Brooklyn Lender is using

discovery to find documents to retroactively support the defaults it declared with no evidentiary

basis.  The demands are overly broad and many are irrelevant to the mortgages.  The Debtors did

not anticipate such an onslaught.  Since this action involves eighteen (18) separate Debtors, it has

taken significant time to gather and serve the documents demanded.

83.     It must also be noted that Abrams, Fensterman, Fensterman, Eisman,

Formato, Ferrara, Wolf & Carone, LLP, as special litigation counsel, has been handling the

discovery.  There has been some turn over and unexpected events which have made complying

with the original schedule impossible.  The two attorneys who were handling the matter left the

firm at the end of October and in mid-November.  It was difficult and time-consuming for new

lawyers to take over the project.  However, the discovery schedule was amended and the Debtors

have complied with the amended schedule as agreed.

84.     In response to the Rule 2004 demands, the Debtors have produced each

and every tax return in their possession.  Brooklyn Lender demands a trustee because it still

seeks different versions of approximately five (5) returns from 2012 and/or 2013.  The Debtors

27

have requested those from their accountant and the accountant reports that he does not have

them.  Similarly, Brooklyn Lender complains that certain of the tax returns are unsigned.  But the

tax returns were e-filed, so they lack ink signatures. Brooklyn Lender does not accept that the

Debtors cannot provide documents it does not possess.

85.     With regard to emails, Abrams, Fensterman was given access to Mr.

Strulovitch's email account, which is hosted by Google. Their IT department attempted to load

the email account into Concordance, an email discovery program, but the program continuously

crashed.  Therefore, the entirety of the email account was loaded into Outlook. This,

unfortunately, caused much delay, during the change of attorneys at Abrams Fensterman.  There

was also miscommunication as to whether Brooklyn Lender had approved the search terms prior

to the IT department running their first search. Debtors' counsel objected to Brooklyn Lender's

proposed search terms as overly broad which would return many unrelated and unnecessary hits.

86.     Brooklyn Lender would not compromise.  The IT department therefore ran

and each and every search term, and a "hit report" was provided to Brooklyn Lender's counsel.

This hit report was NOT the number of emails but rather the number of hits of each search term.

A single email could contain many hits.  From the (overbroad) hit list, the emails were reviewed

and provided to Brooklyn Lender.  Since there was substantial pre-bankruptcy litigation, a

significant number of emails involved the Debtors' attorneys. The Debtors produced all relevant

emails.

87.     In summary, the Debtors produced thousands of documents in response to

both the Rule 2004 requests and the subpoenas for additional document production including

operating agreements, tax returns, emails, proof of insurance, proof of resolution of ECB

28

violations, among other items requested.  But so far, Signature Bank, upon whose records

Brooklyn Lender relies, and to whom Brooklyn Lender is necessarily joined at the hip, has

produced nothing, despite the Debtors' courtesy adjournments through December 30, 2019.

**The Debtor's Ownership and Management Allegations are immaterial**

88.     The Debtors are aware that their tax returns are not consistent with their

operating agreements. and by extension, the Debtors' schedules, in identifying the Debtors'

members and the tax treatment of profit-sharing persons.

89.     Brooklyn Lender believes that inconsistency vindicates their retroactive

acceleration and demand for default interest as of the inception of the loans by Signature Bank.

The Debtors disagree.  The Debtors have the right to correct any mistakes in their tax returns and

or corporate documents.

90.     The Robinson Brog law firm has been reviewing the operating agreements

and is working on proposed amendments to reflect the actual business deals among the parties as

described by the Debtors.  Robinson Brog is also reviewing the filed tax returns to determine

whether amendments to will be needed to reflect the proposed amendments to the operating

agreements.

91.     The Debtors don't have uniform profit-sharing arrangements.  They differ

by entity.  Robinson Brog has reported that this is not uncommon in the real estate world.  For

example, explains Robinson Brog, a person can be entitled to a 45% share of the profits but own

no membership interests.  Sometimes a 1% member may have different tax treatment as well as a

different percentage of the profits as well. There are endless situations that can arise due to

business agreements between parties.  Here, the Debtors filed tax returns that they believed to

29

reflect the financial arrangement per Debtor. Many of the agreements, if not all, were made between the parties verbally without formal written agreements. As reported by Robinson Brog, this does not invalidate the agreements between the parties, but may require amendments to the written agreements and or tax returns.

92.     Either way, the existence of the dispute is not cause to appoint a Chapter 11 trustee.

93.     Nor is David Goldwasser's record from 2003 grounds for a trustee appointment. Mr. Goldwasser suffered the consequences of his actions in his younger days and moved on. He has since developed a successful real estate consulting and investment business specializing in distressed assets in bankruptcy. Over the past 10 years, he has undoubtedly directed more Chapter 11 plan confirmations than any other workout specialist in the Southern and Eastern Districts of New York.

94.     Character assassination is no substitute for clear and convincing evidence of actionable fraud, gross mismanagement, or incompetence causing severe detriment to the Debtors' estates.

**The Federal Action was dismissed before any of allegations were decided**

95.     The Federal Action was dismissed and the plaintiffs did not file State Court cases or commence rabbinical arbitrations. They filed proofs of claim against each of the Debtors. The Debtors objected to those claims seeking, among other things, to recharacterize them as claims to equity interests. Under the Plan, all rights of those claimants are preserved.

96.     Whether Brooklyn Lender properly accelerated based on the Federal Action is being litigated as part of Plan confirmation.

30

97.     Brooklyn Lender has not yet filed a response to the Debtors' objections to their claims nor to Plan confirmation.  The Motion is a preemptive strike to avoid the issues.

98.     The ploy will not work.  It bears reiterating that allegations in a dismissed lawsuit, even if relevant, prove nothing.

**Chapter 11 filings are being made in the ordinary course**

99.     Last, Brooklyn Lender complains about the Debtors' failure to file a retention application for Abrams Fensterman, a cash collateral stipulation, and their revised disclosure statement.

100.    The Debtors submitted the Abrams Fensterman retention application to the United States Trustee for review in November.  After following up a couple of times, the United States Trustee reported no objection, subject to some revisions, just after Brooklyn Lender filed its trustee motion.  The Debtors are working on the revisions and will file the application before the hearing.

101.    As disclosed by Brooklyn Lender, the Debtors and Brooklyn Lender agreed to most of the language for a final cash collateral order.  The biggest issue was Debtors' refusal to agree to tripwire provisions that could result in the Debtors' loss of cash collateral without any order of the Bankruptcy Court.  Mr. Fliman called the undersigned to discuss this after my email which Brooklyn Lender attached to its motion.  The call ended with Mr. Fliman agreeing to speak to his client about whether Brooklyn Lender would modify the tripwire provisions.  The Debtors heard nothing more on the subject until the Trustee Motion in which Brooklyn Lender states that it does not consent to the Debtor's proposal.

31

102.    Sine Brooklyn Lender failed to file a timely objection to the Debtors' cash

collateral application, and since settlement attempts apparently failed, the Court should enter an

order with the limited protections proposed in the cash collateral application.

103.    The Debtors and Brooklyn Lender agreed on the form of the Debtor's

disclosure statement inclusive of the Court's comments.  The undersigned called chambers to

find out whether to file the disclosure statement on ECF as amended or to submit it to the Court

first for its pre-review of the Court's suggested revisions.  Upon the advice of Ms. Lee, the

undersigned sent the Debtors' proposed amended disclosure statement to chambers with the

Court's original markup.  The undersigned followed up with Ms. Lee periodically.  The Debtors

did not abandon their plan as suggested by Brooklyn Lender.

104.    Had Brooklyn Lender asked why there was delay on these items, and the

other items Brooklyn Lender has cited as cause for a Chapter 11 Trustee, Brooklyn Lender

would have discovered nothing nefarious *before* making its baseless allegations.

**(d) Even if Brooklyn Lender's allegations were true, there is no benefit to the
appointment of a trustee because the case is already at the plan confirmation stage,
providing for payment in full to all creditors**

105.    Courts have consistently refused to appoint a trustee under section

1104(a)(1) simply because the debtor has experienced financial problems, is insolvent, or has

made imprudent business decisions, reasoning that such factors are not "conclusive of the

debtor's lack of integrity or his inability to superintend the reorganization." *See In re Eichorn*, 5

B.R. 755, 757 (Bankr. D. Mass. 1980)*; see also Dalkon Shield Claimants v. A.H. Robins Co.,

Inc.*, 828 F.2d 239 (4th Cir. 1987) ("[T]o require the appointment of a trustee, regardless of the

32

consequences, in the event of an act of dishonesty by the debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy Code.").

106.     To satisfy the burden of proof under section 1104 of the Bankruptcy Code, the movant must present probative evidence of misconduct. As stated by one court: "mere naked allegations are not enough to warrant the necessary expense and delay involved with such an appointment and investigation… although there is no requirement that actual misconduct or incompetence be proved, there should at least be some evidence presented that such allegations have some factual basis." *In re Bel Air Assoc., Ltd.* 4 B.R. 168, 173 (Bankr. W.D. Okla. 1980).

107.     Here, Brooklyn Lender has alleged no detriment to the estate.  Brooklyn Lender objects to the Debtors' motion to reduce its claim and does not, therefore, support the Debtor's plan.  Brooklyn Lender would undoubtedly prefer a sale.

108.     The motion was made for ulterior purposes unrelated to the best interests of creditors.  Predictably in such circumstances, the movant cannot sustain its burden of proof.

109.     The best interests test of Bankruptcy Code § 1104(a)(2) involves a cost-benefit analysis of the time and expense attendant to the appointment of a trustee against the potential benefits to be gained by the estate from such appointment.  *In re Stein & Day, Inc.*, B.R. 290, 295 (Bankr. S.D.N.Y. 1988).  Where costs exceed benefits, a trustee is not in the best interests of the estate, creditors, and equity security holders.  *See, In re Sovereign Estates, Ltd.*, 104 B.R. 702, 705 (Bankr. E.D. Pa. 1989).

110.     Although subsection (a)(2) seemingly provides a more flexible standard for the appointment of a trustee than that provided under subsection (a)(1), the "best interests" test of subsection (a)(2) is not a "catch-all" provision for the appointment of a trustee when

"cause" cannot be established under subsection (a)(1). As articulated by the leading treatise:
"Few situations come to mind in which grounds will exist for the appointment of a trustee under
subsection (a)(2) although "cause" for such appointment does not exist under subsection (a)(1)."
7 COLLIER ON BANKRUPTCY § 1104.02[3][d][iii], at 1104-17 (L. King 15th ed. 2002).

111.    The presumption in favor of the continuation of current management,
places a "substantial burden" on the party seeking the appointment of a trustee. Similar to
subsection 1104(a)(1), to prevail under subsection (a)(2), there must be a showing of clear and
convincing evidence of egregious conduct, such as to warrant the grant of extraordinary relief.
*See, e.g., In re W.R. Grace & Co.,* 285 B.R. 148, 157 (Bankr. D. Del. 2002) (movant must prove
facts under section 1104(a) by "clear and convincing evidence"); *In re Oklahoma Ref. Co.,* 838
F.2d 1133, 1136 (10th Cir. 1988) (any conclusion to the contrary would permit subsection (a)(2)
to eviscerate the established law under subsection (a)(1)).

112.    The moving party must show that the benefit to be derived from ousting
the debtor in possession clearly outweighs the detriment to the estate and the bankruptcy process
that results from the appointment of a trustee. *Ionosphere*, 113 B.R. at 168-69; *See* H.R. Rep. No.
595, 95th Cong., 1st Sess. 232-33 (1977); *In re Table Talk,* 22 B.R. 706, 710 (Bankr. D. Mass.
1982) (denying motion for appointment of examiner, concluding that examiner should be
appointed only if such protection is needed and costs and expenses not "disproportionately
high"); Kenneth N. Klee & K. John Shaffer, *Creditors' Committees Under Chapter 11 of the
Bankruptcy Code,* 44 S.C. L. Rev. 995, 1045, 1049 (1993) (observing generally that "the
incremental costs" of a trustee usually "outweigh[ ] the benefits," and that "maximization of
value rarely lies down this path.").

34

113.     As stated by the Second Circuit in *In re Bayou Group, LLC* 564 F.3d 541, 546-7 (2d. Cir. 2009):  "In determining whether a § 1104 appointment is warranted or in the best interests of creditors, the bankruptcy court must bear in mind that the appointment of a trustee "may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code," by incurring the expenditure of "substantial administrative expenses" caused by further delay in the bankruptcy proceedings. *See Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980)."

114.     Here, there is no benefit to the appointment of a trustee because the case is already at the plan stage.  If confirmed, the plan pays all creditors in full and preserves the ownership interests of equity holders.

115.     The appointment of a Chapter 11 trustee will not change the analysis.  A Chapter 11 trustee will merely add an additional layer of administrative expense.  The appointment of a Chapter 11 trustee might also kill the Debtor's financing, and leave the Debtor exposed to an auction sale of the Properties solely for Brooklyn Lender's benefit.

116.     There is no basis upon which to conclude, that in the context of the Debtor's pending plan, the appointment of a trustee is necessary, or will confer a benefit to the estate.

## **CONCLUSION**

117.     While the Motion for a trustee was ostensibly made to benefit the Debtors' estate, the motion was actually made *in terreo* as a litigation tactic to obstruct Plan confirmation and the Debtors' objection to Brooklyn Lender's Claims.  Such posturing should not be permitted.  Indeed, the Supreme Court has specifically condemned litigation ostensibly

35

interposed to benefit creditors generally, but actually interposed as a tactic for the purposes of

obtaining a personal benefit. *Young v. Higbee Co.*, 324 U.S. 204 (1945).

WHEREFORE, the Debtors respectfully request that the Court deny Brooklyn

Lender's motion and grant such other relief as is just and proper.

Dated: New York, New York
       January 2, 2020

BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for Debtors


By:    s/Mark Frankel
       800 Third Avenue
       New York, New York 10022
       (212) 593-1100

36

Exhibit A

| Entity | PROPERTY ADDRESSES | Taxes as of 5/22/19 Pre-Petition | Taxes as of 12/30/19 | Post-Petition |
|---|---|---|---|---|
| 01. 53 Stanhope LLC | 53 Stanhope Street, Brooklyn, New | $        - | $        - | $        - |
| 02. 55 Stanhope LLC | 55 Stanhope Street, Brooklyn, New | $   61,939.00 | $   48,429.51 | $   (13,509.49) |
| 04. 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, New | $   10,934.00 | $        - | $   (10,934.00) |
| 05. 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, New | $   11,240.00 | $        - | $   (11,240.00) |
| 03. 325 Franklin LLC | 325 Franklin Avenue, Brooklyn, New | $   17,852.00 | $   18,543.00 | $   691.00 |
| 06. 167 Hart LLC | 167 Hart Street, Brooklyn, New York | $   57.00 | $   36.83 | $   (20.17) |
| 07. 106 Kingston LLC | 106 Kingston Avenue, Brooklyn, New | $   3,482.00 | $   1,193.26 | $   (2,288.74) |
| 15. 618 Lafayette LLC | 618 Lafayette Avenue, Brooklyn, | $   1,994.00 | $        - | $   (1,994.00) |
| 08. C & YSW, LLC | 1) 107 South 3rd Street, Brooklyn, | $   2,177.00 | $   2,251.41 | $   74.41 |
|  | 2) 109 South 3rd Street, Brooklyn, | $        - | $        - | $        - |
| 09. Natzliach LLC | 129 South 2nd Street, Brooklyn, New | $   2,117.00 | $   2,168.05 | $   51.05 |
| 10. Eighteen Homes LLC | 263 18th Street, Brooklyn, New York, | $   3,091.00 | $   1,101.66 | $   (1,989.34) |
| 11. 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, | $   2,180.00 | $        - | $   (2,180.00) |
| 12. 92 South 4th St LLC | 92 South 4th Street, Brooklyn, New | $   4,150.00 | $   2,869.22 | $   (1,280.78) |
| 13. 834 Metropolitan Avenue LLC | 834 Metropolitan Avenue, Brooklyn, | $   2,405.00 | $ | $   (2,405.00) |
| 14. 1125-1133 Greene Ave LLC | 1) 1125 Greene Avenue, Brooklyn, | $        - | $        - | $        - |
|  | 2) 1127 Greene Avenue, Brooklyn, | $   3,707.00 | $        - | $   (3,707.00) |
|  | 3) 1129 Greene Avenue, Brooklyn, | $   3,707.00 | $        - | $   (3,707.00) |
|  | 4) 1131 Greene Avenue, Brooklyn, | $   3,707.00 | $   803.14 | $   (2,903.86) |
|  | 5) 1133 Greene Avenue, Brooklyn, | $        - | $        - | $        - |
| 16. APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, | $        - | $        - | $        - |
| 17. D & W Real Estate Spring LLC | 1) 130 South 2nd Street, Brooklyn, | $   7,866.00 | $        - | $   (7,866.00) |
|  | 2) 318 Bedford A venue, Brooklyn, | $   2,132.00 | $        - | $   (2,132.00) |
|  | 3) 740 Driggs Avenue, Brooklyn, NY | $   2,559.00 | $        - | $   (2,559.00) |
|  | 4) 144 Huntington Street, Brooklyn, | $   3,732.00 | $        - | $   (3,732.00) |
|  | 5) 68 Carroll Street, Brooklyn, NY | $   5,125.00 | $        - | $   (5,125.00) |
|  | 6) 342 Rodney Street, Brooklyn, NY | $   5,139.00 | $        - | $   (5,139.00) |
| 18. Meserole and Lorimer LLC | 7) 178 Meserole Street, Brooklyn, NY | $   4,773.00 | $        - | $   (4,773.00) |
|  | 8) 180 Meserole Street, Brooklyn, NY | $   5,139.00 | $        - | $   (5,139.00) |
|  | 9) 182 Meserole Street, Brooklyn, NY | $   1,930.00 | $        - | $   (1,930.00) |
|  | 10) 440 Lorimer Street, Brooklyn, NY | $   2,804.00 | $        - | $   (2,804.00) |
| **Total:** |  | $   175,938.00 | $   77,396.08 | $   (98,541.92) |

Exhibit B

| Entity | PROPERTY ADDRESSES | Water as of 5/22/19 (Pre-Petition) | Water as of 12/30/19 | Post-Petition |
|---|---|---|---|---|
| 01. 53 Stanhope LLC | 53 Stanhope Street, Brooklyn, New | 5,501 | 5,127 | $ (374.40) |
| 02. 55 Stanhope LLC | 55 Stanhope Street, Brooklyn, New | 545 | - | $ (545.45) |
| 04. 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, New | 711 | 238 | $ (473.49) |
| 05. 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, New | 777 | 1,033 | $ 255.89 |
| 03. 325 Franklin LLC | 325 Franklin Avenue, Brooklyn, New | 14,634 | 8,078 | $ (6,556.80) |
| 06. 167 Hart LLC | 167 Hart Street, Brooklyn, New York | | - | $ - |
| 07. 106 Kingston LLC | 106 Kingston Avenue, Brooklyn, New | | 37 | $ 36.80 |
| 15. 618 Lafayette LLC | 618 Lafayette Avenue, Brooklyn, New | 243 | 343 | $ 99.64 |
| 08. C & YSW, LLC | 1) 107 South 3rd Street, Brooklyn, | 514 | 888 | $ 374.45 |
| | 2) 109 South 3rd Street, Brooklyn, | 3,359 | 5,432 | $ 2,073.26 |
| 09. Natzliach LLC | 129 South 2nd Street, Brooklyn, New | 3,803 | 6,109 | $ 2,306.60 |
| 10. Eighteen Homes LLC | 263 18th Street, Brooklyn, New York. | 911 | 1,112 | $ 201.27 |
| 11. 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, | 926 | 515 | $ (411.28) |
| 12. 92 South 4th St LLC | 92 South 4th Street, Brooklyn, New | 254 | 342 | $ 88.17 |
| 13. 834 Metropolitan Avenue LLC | 834 Metropolitan Avenue, Brooklyn, | 400 | 1,138 | $ 737.96 |
| 14. 1125-1133 Greene Ave LLC | 1) 1125 Greene Avenue, Brooklyn, | - | 302 | $ 301.61 |
| | 2) 1127 Greene Avenue, Brooklyn, | - | 333 | $ 332.55 |
| | 3) 1129 Greene Avenue, Brooklyn, | - | 83 | $ 82.67 |
| | 4) 1131 Greene Avenue, Brooklyn, | - | 62 | $ 62.00 |
| | 5) 1133 Greene Avenue, Brooklyn, | - | 1,013 | $ 1,013.26 |
| 16. APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, | 263 | 456 | $ 192.24 |
| 17. D & W Real Estate Spring LLC | 1) 130 South 2nd Street, Brooklyn, | 7,096 | 413 | $ (6,682.68) |
| | 2) 318 Bedford A venue, Brooklyn, NY | 9,323 | 1,320 | $ (8,003.03) |
| | 3) 740 Driggs Avenue, Brooklyn, NY | 2,739 | 272 | $ (2,466.55) |
| | 4) 144 Huntington Street, Brooklyn, | 7,452 | 41 | $ (7,410.76) |
| | 5) 68 Carroll Street, Brooklyn, NY | 1,033 | 318 | $ (715.70) |
| | 6) 342 Rodney Street, Brooklyn, NY | 1,017 | - | $ (1,017.41) |
| 18. Meserole and Lorimer LLC | 7) 178 Meserole Street, Brooklyn, NY | 1,613 | 147 | $ (1,465.84) |
| | 8) 180 Meserole Street, Brooklyn, NY | 21,774 | - | $ (21,774.05) |
| | 9) 182 Meserole Street, Brooklyn, NY | 1,847 | - | $ (1,846.76) |
| | 10) 440 Lorimer Street, Brooklyn, NY | 1,671 | - | $ (1,670.73) |
| | | | | |
| Total: | | $ 88,406.25 | $ 35,149.69 | $ (53,256.56) |

Exhibit C

| | | Property | | Liability | | Umbrella | |
|---|---|---|---|---|---|---|---|
| | | Exp | Limit | Exp | Limit | Exp | Limit |
| 01. 53 Stanhope LLC | | 11/19/2020 | 385,480 | 11/6/2020 | 1M/2M | 11/1/2020 | 5M |
| 02. 55 Stanhope LLC | | 11/6/2020 | 1,800,000 | 11/6/2020 | 1M/2M | 11/1/2020 | 5M |
| 03. 325 Franklin LLC | | 8/26/2020 | 1,073,852 | 8/26/2020 | 1M/2M | 11/1/2020 | 5M |
| 04. 119 Rogers LLC | | 9/7/2020 | 423,004 | 9/7/2020 | 1M/2M | 9/7/2020 | 5M |
| 05. 127 Rogers LLC | | 9/7/2020 | 2,267,470 | 9/7/2020 | 1M/2M | 9/7/2020 | 5M |
| 06. 167 Hart LLC | | 1/8/2020 | 850,000 | 1/8/2020 | 1M/2M | 11/1/2020 | 5M |
| 07. 106 Kingston LLC | | 1/9/2020 | 694,000 | 1/9/2020 | 1M/2M | 11/1/2020 | 5M |
| 08. C & YSW, LLC | | 3/17/2020 | 1,863,750 | 3/17/2020 | 1M/2M | 11/1/2020 | 5M |
| 09. Natzliach LLC | | 6/21/2020 | 1,219,600 | 6/21/2020 | 1M/2M | 11/1/2020 | 5M |
| 10. Eighteen Homes LLC | | 9/23/2020 | 870,000 | 9/23/2020 | 1M/2M | 11/1/2020 | 5M |
| 11. 1213 Jefferson LLC | | 1/7/2020 | 459,000 | 1/7/2020 | 1M/2M | 11/1/2020 | 5M |
| 12. 92 South 4th St LLC | | 7/8/2020 | 754,200 | 7/8/2020 | 1M/2M | 11/1/2020 | 5M |
| 13. 834 Metropolitan Avenue LLC | | 11/19/2020 | 638,664 | 11/19/2020 | 1M/2M | 11/1/2020 | 5M |
| 14. 1125-1133 Greene Ave LLC | | 11/5/2020 | 1,987,345 | 11/5/2020 | 1M/2M | 11/1/2020 | 5M |
| 15. 618 Lafayette LLC | | 11/19/2020 | 600,000 | 11/19/2020 | 1M/2M | 11/1/2020 | 5M |
| 16. APC Holding 1 LLC | | 11/5/2020 | 1,400,000 | 11/5/2020 | 1M/2M | 11/1/2020 | 5M |
| 17. D & W Real Estate Spring LLC | | | | | | | |
| | 1) 130 South 2nd Street, B | 4/1/2020 | 825,055 | 4/1/2020 | 1M/2M | 1/28/2020 | 5M |
| | 2) 318 Bedford A venue, B | 4/1/2020 | 624,000 | 4/1/2020 | 1M/2M | 1/28/2020 | 5M |
| | 3) 740 Driggs Avenue, Bro | 4/1/2020 | 651,882 | 4/1/2020 | 1M/2M | 1/29/2020 | 5M |
| | 4) 144 Huntington Street, | 4/1/2020 | 324,039 | 4/1/2020 | 1M/2M | 1/28/2020 | 5M |
| | 5) 68 Carroll Street, Brook | 4/1/2020 | 546,800 | 4/1/2020 | 1M/2M | 1/28/2020 | 5M |
| | 6) 342 Rodney Street, Bro | 4/1/2020 | 1,016,138 | 4/1/2020 | 1M/2M | 1/28/2020 | 5M |
| 18. Meserole and Lorimer LLC | | | | | | | |
| | 7) 178 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot | | | 3/9/2020 | 1M/2M | 1/28/2020 | 5M |
| | 8) 180 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot | | | 3/9/2020 | 1M/2M | 1/28/2020 | 5M |
| | 9) 182 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot | | | 3/9/2020 | 1M/2M | 1/28/2020 | 5M |
| | 10) 440 Lorimer Street, Brooklyn, NY 11206 (Block 2792, Lot | | | 3/9/2020 | 1M/2M | 1/28/2020 | 5M |

Exhibit D

| Entity | PROPERTY ADDRESSES | # Of DOB & ECB Violations | $ Amt Of Violations |
|---|---|---|---|
| 01. 53 Stanhope LLC | 53 Stanhope Street, Brooklyn, New York, 11221 (Block 3254 Lot | - | - |
| 02. 55 Stanhope LLC | 55 Stanhope Street, Brooklyn, New York, 11221 (Block 3254 Lot | 1 | - |
| 04. 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, New York 11216 (Block 1240 Lot | 14 | - |
| 05. 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, New York 11216 (Block 1240 Lot | 27 | - |
| 03. 325 Franklin LLC | 325 Franklin Avenue, Brooklyn, New York, 11238 (Block 1954, Lo | - | - |
| 06. 167 Hart LLC | 167 Hart Street, Brooklyn, New York 11206 (Block 1768 Lot 67) | - | - |
| 07. 106 Kingston LLC | 106 Kingston Avenue, Brooklyn, New York, 11213 (Block 1215 Lo | 7 | - |
| 15. 618 Lafayette LLC | 618 Lafayette Avenue, Brooklyn, New York 11216 (Block 1789 Lo | - | - |
| 08. C & YSW, LLC | 1) 107 South 3rd Street, Brooklyn, New York, 11249 (Block 2417, | 33 | 199,461 |
| | 2) 109 South 3rd Street, Brooklyn, New York, 11249 (Block 2417, | 4 | 2,200 |
| 09. Natzliach LLC | 129 South 2nd Street, Brooklyn, New York, 11249 (Block 2405 Lo | 4 | 600 |
| 10. Eighteen Homes LLC | 263 18th Street, Brooklyn, New York, 11215 (Block 873 Lot 68) | - | - |
| 11. 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, New York 11221 (Block 3382 L | 3 | 909 |
| 12. 92 South 4th St LLC | 92 South 4th Street, Brooklyn, New York, 11249 (Block 2443 Lot | 4 | - |
| 13. 834 Metropolitan Avenue LLC | 834 Metropolitan Avenue, Brooklyn, New York, 11211 (Block 291 | 1 | - |
| 14. 1125-1133 Greene Ave LLC | 1) 1125 Greene Avenue, Brooklyn, New York, 11221 (Block 3285 | - | - |
| | 2) 1127 Greene Avenue, Brooklyn, New York, 11221 (Block 3285 | - | - |
| | 3) 1129 Greene Avenue, Brooklyn, New York, 11221 (Block 3285 | - | - |
| | 4) 1131 Greene Avenue, Brooklyn, New York, 11221 (Block 3285 | - | - |
| | 5) 1133 Greene Avenue, Brooklyn, New York, 11221 (Block 3285 | - | - |
| 16. APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, New York, 11206 (Block 1767 | - | - |
| 17. D & W Real Estate Spring LLC | 1) 130 South 2nd Street, Brooklyn, NY 11249 (Block 2417, Lot 19 | - | - |
| | 2) 318 Bedford A venue, Brooklyn, NY 11249 (Block 2405, Lot 26 | 1 | - |
| | 3) 740 Driggs Avenue, Brooklyn, NY 11211 (Block 2418, Lot 24) | 2 | - |
| | 4) 144 Huntington Street, Brooklyn, NY 11231 (Block 381, Lot 14 | 1 | - |
| | 5) 68 Carroll Street, Brooklyn, NY 11231 (Block 353, Lot 12) | 4 | - |
| | 6) 342 Rodney Street, Brooklyn, NY 11211 (Block 2436, Lot 1) | - | - |
| 18. Meserole and Lorimer LLC | 7) 178 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot 15) | 2 | - |
| | 8) 180 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot 16) | - | - |
| | 9) 182 Meserole Street, Brooklyn, NY 11206 (Block 3053, Lot 17) | 3 | - |
| | 10) 440 Lorimer Street, Brooklyn, NY 11206 (Block 2792, Lot 1) | - | - |
| | | | |
| Total: | | $ 111.00 | $ 203,170.33 |

Exhibit E



279 Pacific Avenue, Lawrence NY 11559

9177570279

1-1-2020

To whom it may concern,

I Eli Zagelbaum of EZ Violation Services INC have been retained by Moses Lefkowitz, Property Manager
of the below refenced properties, to correct all open violations for Waterfront Property Management
LLC. I would like to provide you with more information to some open violations for their properties.

The violations for **107 South 3rd Street**, Brooklyn, New York, (Block 2417, Lot 37) are due to some
structural issues at the property. I'm currently awaiting permits which the owner is trying to obtain. As
soon as everything that's needed is received, issues will be fixed. After the repairs are completed the
penalties can be decreased.  Based on my knowledge as a professional, I believe the process will be
simple, with drastic decreases for the penalties. While it is difficult to estimate a time table, I am
confident in my ability to assist in resolving the entire matter.

**106 Kingston Avenue**, Brooklyn, New York, (Block 1215 Lot 45) has some civil penalties associated with
boiler registration violations. Currently there is no boiler in this building. The owner has already filed
OP49 which is a form to request removal of the boiler on file. It will take several months to have that
approved. Once it's approved we can file for dismissal of all open violations.

**109 South 3rd Street**, Brooklyn, New York, (Block 2417, Lot 36)-  We are waiting to obtain the requisite
permits, which have already been applied for. Once received, all violations will be resolved immediately.
**129 South 2nd Street**, Brooklyn, New York, (Block 2405 Lot 33) - We are waiting to obtain the requisite
permits, which have already been applied for. Once received, all violations will be resolved immediately.
**1213 Jefferson Street**, Brooklyn, New York, (Block 3382 Lot 48) - We are waiting to obtain the requisite
permits, which have already been applied for. Once received, all violations will be resolved immediately.
Please feel free to contact me if you have any further questions.

Sincerely,

Eli Zagelbaum

917-757-0279

Eli@EZviolations.com

NAOMI J. WEBERMAN
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in Kings County
01WE6234637
MY COMMISSION EXPIRES 08/25/2023

Sworn before me this 1 day
of January 2020

x