UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                        Chapter 11

      53 STANHOPE LLC, *et al*,[3]                 Case no.  19-23013 (RDD)
                                Jointly Administered

                     Debtors.
-----------------------------------------------------------x

## AMENDED PLAN OF REORGANIZATION

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

ATTORNEYS FOR THE DEBTORS

_____

[3] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## INTRODUCTION

53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole And Lorimer  LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, And 167 Hart LLC (each a "Debtor", and collectively, the "Debtors") submit this joint plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG EACH DEBTOR AND EACH DEBTOR'S CREDITORS AND INTEREST HOLDERS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.      "Administrative Expense" Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code.

2.      "Administrative Expense Claim" shall mean a Claim for payment of an Administrative Expense.

3.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

4.      "Allowed Amount" shall mean the amount of a Claim:  (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on a Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

5.      "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on a Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

6.      "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

7.      "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

8.      "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

9.      "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.).

10.     "Bankruptcy Court" shall mean the Court as defined below.

11.     "Bar Date" shall mean August 9, 2019.

12.     "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

3

13.    "Claim" shall have the meaning set forth in § 101(5) of the Bankruptcy Code.

14.    "Claimant" shall mean the holder of a Claim.

15.    "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

16.    "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

17.    "Confirmation Order" shall mean the order of the Court confirming the Plan.

18.    "Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

19.    "Creditor" shall mean any entity that holds a Claim against a Debtor.

20.    "Debtors" shall mean 53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC, D&W Real Estate Spring LLC, Meserole And Lorimer  LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, And 167 Hart LLC (each a "Debtor", and collectively, the "Debtors").

4

21.     "Disputed Claim" shall mean the whole or any portion of any Claim against a Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

22.     "Disputed Claim Reserve" shall mean Cash to be set aside by the Debtors on the Effective Date in an IOLA account maintained by Debtors' counsel, in an amount equal to the amount that would have been distributed to the holders of Disputed Claims had such Claims been deemed Allowed Claims on the Effective Date, or in such other amount as may be approved by the Bankruptcy Court.

23.     "Effective Date" shall mean the Date upon which the Confirmation Order is a Final Order, or such other date no later than 60 days after the Confirmation Date as may be practicable.

24.     "Estate" shall mean the estate of each Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

25.     "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

26.     "Exit Financing" shall mean that certain financing to be entered into to fund the Plan on the Effective Date substantially on the terms described in Exhibit A to the Plan.

27.     "Federal Action" shall mean the certain dismissed lawsuit captioned Jacob Schonberg, et al v. Yechezkel Strulovitch a/k/a Chaskiel Strulovitch, et al., Case No. 17-cv-02161, filed in the United States District Court for the Eastern District of New York.

5

28.    "Final Order" shall mean an order of a court that has not been reversed,

modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari

thereof has expired, and as to which no appeal, review or rehearing is pending.

29.    "Impaired" shall mean not Unimpaired.

30.    "Interest" shall mean an existing ownership interest in a Debtor.

31.    "Interest Holder" shall mean a holder and owner of an existing Interest in

a Debtor.

32.    "Legal Rate" shall mean the applicable interest rate as set forth in 28

U.S.C. §1961 as of the Petition Date.

33.    "Lien" shall mean a valid and enforceable charge against or interest in

property to secure payment of a debt or performance of an obligation.

34.    "Mortgagee" shall mean Brooklyn Lender LLC.

35.    "New Owner" shall mean, with respect to each Debtor, a newly created

special purpose entity to whom such Debtor's real property will be transferred on the Effective

Date as a condition to the Exit Financing.

36.    "New Owner Interests" shall mean the equity Interests in the New Owner.

37.    "Petition Date" shall mean May 20, 2019.

38.    "Plan" shall mean this Plan of Reorganization, and any and all

modifications and/or amendments hereto.

39.    "Plaintiffs" shall mean the Federal Action plaintiffs.

40.    "Properties" and each "Property" shall mean the real properties itemized on Exhibit D to the Plan.

41.    "Secured Claim" shall mean a Claim secured by a Lien on property included within a Debtor's Estate, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent provided in Section 506 of the Bankruptcy Code.

42.    "Secured Creditor" shall mean the owner or holder of a Secured Claim.

43.    "Unimpaired" shall mean not impaired under section 1124 of the Bankruptcy Code.

44.    "Unsecured Claim" shall mean a Claim that is not a Secured Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code, and does not include Administrative Expense Claims.

45.    "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

## CLAIMS CLASSIFICATION, TREATMENT AND VOTING

### Class 1

46.    **Classification** – Allowed Secured Claims for New York City real estate taxes and other non-Class 2 Liens.  Annexed to the Plan as Exhibit B is a breakdown of the amount due to Class 1, by Debtor. The Debtors estimate the aggregate amount of all Class 1 Claims is approximately $209,866.

47.   **Treatment** -- Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

48.   **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan.

## Class 2

49.   **Classification** – Allowed Secured Claims of the Mortgagee.  Annexed to the Plan as Exhibit B is a breakdown of the estimated Allowed Secured Claims of the Mortgagee, by Debtor.  The Debtors estimate the aggregate of all Class 2 Claims is $37,625,717.

50.   **Treatment** –On the Effective Date, pursuant to section 1124 of the Bankruptcy Code, each Debtor shall cure pre-Petition Date and post-Petition Date defaults, if any, retroactively extend the maturity dates with respect to each Debtor who could not extend due the Mortgagee's acceleration, and then pay in Cash the outstanding amounts due on the Effective Date.

51.   **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan..

## Class 3

52.   **Classification** –  Allowed Priority Claims under sections 507(a)(3),(4),(5),(6), and (7) of the Bankruptcy Code.  Annexed to the Plan as Exhibit B is a breakdown of such estimated Allowed Priority Claims, by Debtor.  The Debtors estimate that the aggregate amount of all Class 3 Claims is approximately $0.

8

53.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

54.    **Voting --** Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan..

### Class 4

55.    **Classification** – Allowed General Unsecured Claims.  Annexed to the Plan as Exhibit B is a breakdown of estimated Allowed General Unsecured Claims by Debtor. The Debtors estimate that the aggregate amount of all Class 4 Claims is approximately $4,785,330.

56.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the Legal Rate as it accrues from the Petition Date through the date of payment, provided, that each Class 4 Creditor shall be entitled to elect to take New Owner Interests in the New Owner succeeding the Debtor against which the Claimant holds an Allowed Claim as provided herein in lieu of Cash payment of its Class 4 Claim.  Annexed to the Plan as Exhibit C is a spreadsheet indicating the projected percentage New Owner Interests allocated by Debtor per $1,000 of Class 4 Claims.  The basis for the pro-rata calculation of the New Owner Interests that a Class 4 Creditor may elect to receive is its Class 4 Claim.  The calculation of the value of the New Owner Interests to be disbursed is based on each New Owner's net equity in its Property.  The net equity is calculated by subtracting the respective New Owner's post-Confirmation Date mortgage from the Property value.  For example, if a New Owner owns a $500,000 property encumbered by a $400,000 post-Confirmation mortgage, such

New Owner will have net equity of $100,000 in the Property.  If a Claimant holds a $1,000 Class 4 Claim, the Claimant shall be entitled to New Owner Interests in such New Owner equal to $1,000 of such net equity, which, in this example would equate to a 1% membership Interest representing 1% of the New Owner's $100,000 net equity.  If the dollar amount of Class 4 Claims electing to take New Owner Interests exceeds the dollar amount of the respective New Owner's net equity, such holders of Class 4 Claims shall be entitled to their Pro-Rata percentage of the New Owner Interests in such new Owner.  The procedures to elect distribution of New Owner Interests in lieu of Cash are set forth in the Amended Disclosure Statement for the Plan.

57.    **Voting** – . Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan..

### Class 5

58.    **Classification** – Interest Holders.

59.    **Treatment** – On the Effective Date, all Interests will be cancelled and Interest Holders shall be entitled to New Owner Interests under the same terms as their exiting Interests in the Debtors, but subject to dilution Pro Rata, by the New Owner Interests distributed hereunder to (a) holders of Class 4 Claims that elect to receive New Owner Interests in the respective New Owners instead of Cash payment and (b) holders of Class 6 Claims.  If the distribution of New Owner Interests to holders of Class 4 Claims and or Class 6 Claims exceeds a New Owner's net equity in its Property, existing Class 5 Interest Holders of the predecessor Debtor will be entitled to no Interests in such New Owner.

60.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

10

**Class 6**

61.    **Classification** – Allowed Claims based on facts as generally alleged in the
Federal Action in Proofs of Claim set forth in Exhibit E to the Plan.

62.    **Treatment** – Class 6 Claims shall be subordinated pursuant to section
510(b) of the Bankruptcy Code to the same priority as Class 5 Interests.  On the Effective Date,
all Class 6 Claims shall be entitled to New Owner Interests in the respective New Owners based
on the Allowed Amount of such Class 6 Claim.  The value of the Interests that a Federal Action
Claimant may elect to receive is based on the Claimant's Claim.  The calculation of the value of
the New Owner Interests to be distributed is based on each New Owner's net equity in its
Property.  The net equity is calculated by subtracting the respective Post Confirmation New
Owner's Post-Confirmation mortgage from the Property value.  The New Owner's net equity
must then be reduced further by New Owner Interests distributed to Class 4 Creditors who elect
Interests in lieu of Cash.  For example, if a Post-Confirmation New Owner owns a $500,000
property encumbered by a $400,000 Post-Confirmation mortgage, such Post Confirmation New
Owner will have net equity of $100,000 in the Property.  That net equity will then be reduced by
the Interests distributed to Class 4 Claimants that elect to take Interests in lieu of Cash.  If, in this
example, Class 4 Claimants with Claims totaling $60,000 elect to take Interests, $40,000 of New
Owner Interests will be available to Class 6 Claimants.  If a Class 6 Claimant holds a $1,000
Allowed Class 6 Claim, the Claimant shall be entitled to Interests in the Post Confirmation New
Owner equal to $1,000 of such net equity, which, in this example would equate to a 1%
membership interest representing 1% of the Post Confirmation New Owner's net equity.  But if
in this example the Allowed dollar amount of Class 6 Claims entitled to take Interests exceeds

the $40,000 dollar amount of the New Owner's net equity after distribution of Interests to electing Class 4 Claimants, such Class 6 Claimants shall be entitled to their pro-rata percentage of the remaining $40,000 of New Owner Interests.

63.   **Voting –** Impaired and entitled to vote to accept or reject the Plan.

## ADMINISTRATIVE EXPENSE CLAIMS AND STATUTORY FEES

64.   Allowed Administrative Expense Claims, including professional fees, shall be paid in full in Cash on the later of the Effective Date and the date such Administrative Expense Claim becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business or under Executory Contracts assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  The Debtors estimate that through the entry of a final decree in this case, Allowed Administrative Expenses will total approximately $15,000 per Debtor plus litigation legal fees for a total of at least $255,000.   $350,000 shall be escrowed for payment when Allowed, and then paid in the amounts Allowed.

65.   Any outstanding U.S. Trustee fees and any statutory interest thereon shall be paid in full in Cash on the Effective Date.  Thereafter, United States Trustee fees and any statutory interest thereon shall be paid until entry of final decree or until Bankruptcy Case is converted or dismissed.  The Debtors shall file quarterly post-Confirmation operating reports.

12

## MEANS FOR IMPLEMENTATION

66.    **Source of Funds** – Effective Date payments under the Plan will be paid

from the Exit Financing, the terms of which are annexed to the Plan as Exhibit A.  Under the

Exit Financing each Debtor must transfer its assets including its Property to the New Owners,

which shall assume responsibility for repayment of the Exit Financing.  The transfer of each

Property to the New Owners under the Plan shall be free and clear of all liens, claims and

encumbrances, with any such liens, claims and encumbrances to attach to Exit Financing

proceeds in the same priority, with same validity and subject to the same defenses as existed

immediately before the attachment, all as governed by the treatment of such Claims and Interests

under the Plan, and to be disbursed under the Plan; provided, however, that the Mortgagee shall

assign its mortgages to the holder of the Exit Financing in connection with the transfer of the

Properties under the Plan.

67.    The New Owners shall be formed as New York or Delaware limited

liability companies with operating agreements that comply with the terms of the Exit Financing.

All New Owner Interests to be distributed under the Plan shall be on the principle of "one share,

one vote," with no proportionate voting, class voting or the like, and otherwise in conformance

with New York law.  As a condition to receipt of New Owner Interests, each potential Interest

holder shall comply with such disclosure as may be required as a condition to the Exit Financing.

68.    **Stamp Tax** -- Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a)

the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of

any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of

any lease or sublease or the making or delivery of any deed or other instrument of transfer under

13

the Plan, including, without limitation, any deeds, bills of sale or assignments executed in

connection with the transfer of each Property to the New Owners and any other transaction under

the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors under

the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means,

and the making, delivery or recording of any deed or other instrument of transfer under the Plan,

including, without limitation, the Confirmation Order, shall not be subject any applicable

document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate

transfer tax, or other similar tax or governmental assessment.

69.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each

holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the subject

Debtor/New Owner any and all property of the Estate that secures or purportedly secures such

Claim, as pertains to such Property or such Lien shall automatically, and without further action

by such Debtor/New Owner be deemed released, and (y) execute such documents and

instruments as such Debtor/New Owner requests to evidence such Claim holder's release of such

property or Lien.

70.    **Execution of Documents** -- Each Debtor/New Owner shall be authorized

to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of

any Lien, mortgage assignment, Claim or encumbrance not expressly preserved in the Plan and

deliver such notices to any and all federal, state and local governmental agencies or departments

for filing and recordation.

71.    **Vesting of Assets** -- Except as otherwise provided in the Plan, on the

Effective Date all assets and Properties of the Estate of each Debtor shall vest in such

14

Debtor/New Owner free and clear of all Liens, Claims and encumbrances and any and all Liens,

Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed

extinguished as of such date.

72.    **Recording Documents** -- Each and every federal, state and local

governmental agency or department shall be authorized to accept and record any and all

documents and instruments necessary, useful or appropriate to effectuate, implement and

consummate the transactions contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and the Confirmation Order.

73.    **Preservation of Claims** -- All rights pursuant to sections 502, 544, 545

and 546 of the Bankruptcy Code, all preference claims pursuant to section 547 of the Bankruptcy

Code, all fraudulent transfer claims pursuant to sections 544 and 548 of the Bankruptcy Code,

and all claims relating to post-Petition Date transactions under section 549 of the Bankruptcy

Code shall be preserved for the benefit of each Debtor's estate; provided, however, that such

Debtor shall have sole authority for prosecuting any such claims.  Because all Creditors' Claims

are being paid in full under the Plan, the Debtors do not anticipate pursuing preference or

fraudulent transfer claims.  The Debtors' rights to assert claims, including without limitation,

tort, contract and lender liability claims against the Mortgagee are fully preserved.

## CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

74.    The Confirmation Order shall be a Final Order and shall provide for the

transfer of the Debtors' Property to the respective New Owners free and clear of liens, claims,

encumbrances and interests of any kind, other than the proceeds of the Exit Financing.  The

Confirmation Order shall be in a form acceptable to the Debtors. These conditions to

Confirmation of the Plan and to the occurrence of the Effective Date are for the benefit of the

Debtors. The requirement that a particular condition be satisfied may be waived in whole or part

by the Debtors.

## DISTRIBUTIONS TO CREDITORS

75.     Each Debtor shall be disbursing agent under its Plan without a bond. The

Debtors reserve the right to file objections to Claims in the event grounds exist to object to

particular Claims, for a period of 60 days after the Effective Date; or in the case of a Claim based

on the rejection of an Executory Contract, 60 days after such proof of Claim is filed. On the

initial distribution date and on each distribution date as may thereafter be necessary, the Debtors

shall maintain a Disputed Claim Reserve for the holders of Disputed Claims as of such date in a

sum not less than the amount required to pay each such Disputed Claim under the Plan if such

Claim was Allowed in full. To the extent that a Disputed Claim becomes an Allowed Claim, the

distributions reserved for such Allowed Claim, shall be released from the Disputed Claim

Reserve and paid to the holder of such Allowed Claim. After all the amounts of all Disputed

Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in

accordance with the Plan.

## EXECUTORY CONTRACTS

76.     Tenant leases shall be deemed assumed under the Plan and assigned to the

New Owners under sections 365 and 1123 of the Bankruptcy Code. Except for any other

Executory Contracts that a Debtor assumes before the Confirmation Date, all other Executory

Contracts shall be rejected under the Plan on the Effective Date pursuant to sections 365 and

16

1123 of the Bankruptcy Code.  In the event of a rejection which results in damages, a proof of

Claim for such damages must be filed by the non-Debtor party with the Court on or before sixty

(60) days after the Effective Date. All Allowed Claims arising from the rejection of any

Executory Contract shall be treated as Class 4 Claims, provided, however, that such Claimants

shall not be entitled to elect to take New Owner Interests in lieu of Cash payment.  Any Claim

arising from the rejection of any Executory Contract not filed with the Court within the time

period provided herein shall be deemed discharged and shall not be entitled to participate in any

distribution under the Plan.

## RETENTION OF JURISDICTION

77.    _Retention of Jurisdiction._  The Court shall have jurisdiction over all

matters arising under, arising in, or relating to each Debtor's Bankruptcy Case to the fullest

extent permitted including, but not limited to, with respect to section 1142 of the Bankruptcy

Code and proceedings:

- To consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

- To hear and determine all Claims, controversies, suits and disputes against the Debtors to the full extent permitted under 28 U.S.C. §§ 1334 and 157;

- To hear, determine and enforce all Claims and causes of action which may exist on behalf of the Debtors or a Debtor's Estate, including, but not limited to, any right of a Debtor or a Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

- To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

- To value assets of the Estate.

17

- To enforce the Confirmation Order, the final decree, and all injunctions therein;

- To enter an order concluding and terminating the Bankruptcy Case;

- To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

- To determine all questions and disputes regarding title to the assets of the Debtors.

- To re-examine Claims which may have been Allowed or disallowed for purposes of voting, and to determine objections which may be filed to any Claims.

## **GENERAL PROVISIONS**

78.    **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

79.    **Disputed Claims**.  The Debtors shall hold in escrow the distribution that would be due on account of any Disputed Claim.  No Disputed Claims shall be paid until such Claim becomes an Allowed Claim.

80.    **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

81.    **Other Actions**.  Nothing contained herein shall prevent the Debtors, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

82.    **Modification of Plan**.  The Debtors may seek amendments or modifications to the Plan in accordance with Section 1127 of the Bankruptcy Code at any time

18

prior to the Confirmation Date.  After the Confirmation Date, the Debtors may seek to remedy

any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order,

in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND DISCHARGE

83.   **Injunction**.  The Confirmation of this Plan shall constitute an injunction

of the Court against the commencement or continuation of any action, the employment of

process, or any act, to collect, recover or offset from the Debtors or their property or properties,

any obligation or debt except pursuant to the terms of the Plan.

84.   **Discharge.**  On the Effective Date, except as otherwise expressly provided

in this Plan or the Confirmation Order, the Plan shall:  (i) discharge each Debtor and any of its

assets from all Claims, demands, liabilities and other debts that arose on or before the Effective

Date, including, without limitation, all debts of the kind specified in Section 502 of the

Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed

filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim based on such debt is

Allowed pursuant to Section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or

has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based on

such debt has accepted this Plan; and (ii) preclude all entities from asserting against each Debtor

or any of its assets any other or further Claims based upon any act or omission, transaction or

other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to

Sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall

void any judgment obtained against each Debtor at any time, to the extent that such judgment

relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements

19

related to debts that arose on or before the Effective Date and such debts, Claims and agreements

are deemed restructured and new as set forth in the Plan.

## CLOSING THE BANKRUPTCY CASE

85.    Upon substantial consummation, the Debtors may move for a final decree

to close the Bankruptcy Case and to request such other orders as may be just.

Dated:  New York, New York
        January 21, 2020

53 STANHOPE LLC ET AL.

By:    s/ David Goldwasser, as authorized signatory of GC
Realty Advisors, LLC, as Vice President


BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for Debtors


By:    s/Mark A. Frankel
800 Third Avenue
New York, New York 10022
(212) 593-1100

20

# Exhibit A

**LIGHTSTONE**
Capital

June 19, 2019

Cheskel Strulowitz
Address: [TBA]

**Re: Loan for 31 Assets in Brooklyn (the "Property")**

**MAGUIRE**
CAPITAL GROUP

Dear Mr. Strulowitz:

The purpose of this Letter of Intent ("**LOI**") is to set forth certain of the proposed terms and conditions under which Lightstone Capital LLC (together with its affiliates, successors, assigns or designees, collectively, "**Lender**") may extend credit to a special purpose bankruptcy remote entity ("**Borrower**") in the form of a mortgage and Lender's option, mezzanine financing (the "**Loan**"), in each case relating to the Property. This LOI is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to provide the Loan or any other financing on the terms contained herein or any other terms. This LOI is not intended to set forth all of the terms and conditions of the proposed Loan, is for discussion purposes only and is non-binding for all purposes except as expressly set forth herein. Each of the provisions of this LOI which are phrased as covenants to enter into the Loan are subject to Lender's determination in its sole and absolute discretion and are subject to modification at any time by Lender.

| | |
|---|---|
| **Property:** | 31 Properties located throughout Brooklyn, New York with an aggregate gross area of 100,181 SF and 114 units (108 residential and 6 retail). See Exhibit A for summary of properties. |
| **Purpose of the Loan:** | Refinance existing loan. |
| **Borrower:** | The borrower ("**Borrower**") will consist of one or more newly formed, single purpose entities with no operations, assets, or activities other than the ownership interest in the Property and no debts or liabilities other than the Loan. Borrower will be structured as a bankruptcy-remote entity in a manner satisfactory to Lender. |
| **Closing Date:** | Subject to review of Bankruptcy proceedings. |
| **Loan Amount:** | $40,000,000 |
| **Initial Funding:** | Lender will disburse the full amount of the Loan to Borrower at closing, less the Interest Reserve and any other reserves determined by Lender to be appropriate based on the circumstances surrounding the Loan (collectively, the "**Reserves**"). |
| **Sponsor/Guarantor:** | Cheskel Strulowitz |
| **Interest Rate:** | The Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum. The Interest Rate will be charged on an actual/360 basis. |
| **Amortization:** | Interest Only |
| **Origination Fee:** | Borrower shall pay a fee equal to 2.00% of the Loan Amount to Lender or its designee at closing. |
| **Exit Fee:** | 1.00% of the Loan Amount will be due on any prepayment and/or repayment of the Loan including payoff at maturity and shall be paid, pro rata, in connection with any partial prepayments of the Loan. |

Page 1

**Term:**

12 months

**Extension Option(s):**

Subject to certain conditions then existing, including that no event of default has occurred or is continuing, a satisfactory credit check, and a replenishment of Reserves as required by Lender, the Loan may be extended for three (3) separate six (6) month periods (each an "**Extension Period**") by Borrower. In consideration for each extension of the Loan, Borrower shall pay to Lender 0.50% (the "**Extension Fee**") and the Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum (the "**Extension Interest Rate**"). The Interest Rate will be charged on an actual/360 basis.

**Loan Collateral & Loan Documents:**

The collateral for the Loan shall include, without limitation, (a) a first priority perfected mortgage, deed of trust or deed to secure debt, as applicable, encumbering the Property, (b) a first priority perfected assignment of leases and rents, (c) a first priority perfected assignment of all contracts, agreements, trademarks, licenses, goods, equipment, accounts, fixtures and all other tangible and intangible personal property located on or used in connection with the Property, (d) a first priority perfected security interest in all monies deposited into the lockbox account and cash management account, including all subaccounts, escrow accounts and reserve accounts, (e) the Guaranty of Non-Recourse Obligations, the Carry Guaranty, and the Completion Guaranty (each as defined herein), (f) UCC-1 financing statements (personal property, fixture filing and accounts and reserves), (g) an assignment of all development, design and construction contracts, and (h) any and all other agreements and assurances reasonable or customary in commercial transactions similar to the Loan. The mortgage, deed of trust or deed to secure debt liens and the priority thereof shall be insured in favor of Lender and its successors and assigns, which insurance shall be issued and underwritten by a title insurance carrier designated by Lender. The Loan shall be evidenced, secured and governed by documentation customary for similar transactions by Lender and be in form and substance acceptable to Lender in its sole discretion and consistent in all material respects with the terms and provisions hereof, including without limitation, standard loan documentation, security and insurance for mezzanine financings as Lender may require in the event Lender creates a mezzanine loan as described below (collectively, the "**Loan Documents**").

**Prepayment:**

The Loan may be prepaid at any time subject to Lender's receipt of no less than $1,550,000 (equal to 6 months of projected interest costs) of interest payments ("the "**Minimum Interest**") such that, at the time of prepayment, if Lender has not received $1,550,000 in interest payments, Borrower will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment.

**Mezzanine:**

Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt or subordinate debt, as well as participations in the foregoing, and to create component notes to reflect such conversions; provided, however, that any such conversion shall not materially affect the all-in interest cost to Borrower. If mezzanine debt is created, one or more mezzanine borrowers may be required to own 100% of the equity interests of Borrower.

**Recourse:**

Full recourse to Guarantor. Guarantor shall also execute an environmental indemnity agreement.

Page 2

| | |
|---|---|
| **Carry Guaranty:** | Guarantor must execute a carry guaranty guaranteeing (a) interest due under the Loan, and (b) operating expenses, insurance premiums and real estate taxes related to the Property. |
| **Release Pricing:** | To be determined at Closing |
| **Interest Reserve:** | $1,250,000 |
| **Other Reserves:** | To be determined by Lender at closing of the Loan. |
| **No Additional Liens:** | There shall be no financing, pledge, hypothecation or encumbrance, secured or unsecured, of the Property or of any direct or indirect ownership interests in Borrower at any level or tier of ownership, except the Loan. |
| **Due on Transfer:** | Subject to Lender's standard exceptions with respect to permitted transfers, the Loan shall immediately become due and payable upon a transfer of all or any portion of the Property or of any direct or indirect ownership interests in Borrower. |
| **Assumption:** | No assumption |
| **Financial Reporting:** | Guarantor and Borrower shall provide to Lender, in form and substance acceptable to Lender, (a) leasing and operating reports no less than monthly and more frequently upon request, (b) Borrower-certified quarterly financial statements and operating statements, within fifteen (15) days of the end of each quarter, with each report providing information regarding such quarter as well as a year-to-date analysis, contrasted against the comparable period of the previous year and the then approved budget, (c) audited annual financial statements within sixty (60) days of the end of the year, and (d) such other information as Lender may reasonably request from time to time. Additionally, any and all material financial information received by Borrower related to the Property shall be made available to Lender within five (5) days of Borrower's receipt thereof. |
| **Lease Approvals:** | All new leases and material amendments to existing leases are subject to Lender's reasonable prior approval. |
| **Title:** | Borrower must provide Lender with such searches with respect to title to the Property, Borrower, its principals and Guarantor as Lender may require from time to time, including a survey thereof certified to Lender and the applicable title company. Borrower shall purchase an ALTA title insurance policy for Lender in the Loan Amount, containing such endorsements as Lender may require in its sole discretion.   Title work will be done by Madison Title Agency. |
| **Insurance:** | Borrower shall maintain at all times, at Borrower's sole cost and expense, insurance policies with such coverages, carriers, amounts, and deductibles as are required by Lender from time to time. Each of Lender and its successors and assigns must be listed as mortgagee, loss payee and additional insured on all such policies. |
| **Due Diligence:** | Prior to closing, Lender will conduct customary due diligence with respect to the Property, Borrower and Guarantor, all of which must be satisfactory to Lender.  All third party reports shall be addressed to Lender and shall upon delivery become the sole property of Lender, its successors and assigns.  As a condition to closing, Borrower shall represent and warrant to Lender that it has |

not made, and the due diligence materials delivered to Lender have not included, any untrue statement of a material fact or any omission that makes Borrower's statements or any of the due diligence deliverables materially misleading.

**Patriot Act Disclosure:** To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that enters into a business relationship with such institution. Accordingly, Lender's due diligence will include customary background searches on the direct and indirect owners of Borrower, and Lender is hereby authorized to conduct such searches.

**Confidentiality:** In consideration of Lender's issuance of this LOI at Borrower's request, Borrower agrees not to disclose, or knowingly permit any third party to disclose, either the fact that that discussions or negotiations are taking place between the parties concerning the Loan or any of the proposed terms, conditions, or other facts relating to the Loan. The terms set forth in this LOI are proprietary to Lender and are made available to Borrower solely for the evaluation of the Loan contemplated hereby. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Broker Fee:** There is no broker associated with this transaction. Borrower agrees to indemnify, defend and hold Lender harmless from and against any claims for a broker's commission, finder's fee or other payments no matter how described, and any other costs liabilities or expenses incurred by Lender in connection with any claim asserted by a broker or other party who claims to have worked with or represented Borrower in connection with the Loan. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Good Faith Deposit:** Borrower or an affiliate thereof must remit a good faith deposit in the form of bank check or wire to Lender ("**Deposit**") in the amount of $75,000 concurrently with an executed copy of this LOI. The Deposit will be applied towards initial due diligence and 3rd party reports (Appraisals, Property Condition, Environmental Review, etc.) expected to be completed within 21 business days from receipt of Deposit. Borrower hereby agrees that its acceptance of this LOI shall constitute its unconditional agreement (a) that the Deposit may be held by Lender and used to pay all out-of-pocket expenses, fees, cost and charges actually incurred by Lender in any way relating to the Loan (including Lender's underwriting due diligence in connection therewith), including without limitation      legal      and auditing fees, appraisals, environmental and structural engineering reports for the Property, any other necessary or appropriate third party reports, recording and filing fees, taxes and other customary costs and expenses (collectively, "**Costs**"), and (b) to indemnify, defend and hold Lender harmless from and against all such Costs. All such Costs are due and payable regardless of whether a loan commitment is issued or the Loan closes. If the Loan is not consummated for any reason, the Deposit will be returned, without interest, less any Costs incurred by Lender as of such time. If the Loan is consummated, the Deposit shall be applied toward Lender's Costs. At any time prior to closing, Lender reserves the right to demand an additional or increased good faith deposit if the original Deposit has been expended. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI. Borrower shall provide an additional deposit prior to Lender engaging legal counsel with respect to further due diligence and documentation of the Loan.

**Exclusivity/Break-Up Fee:** Each of Borrower and Guarantor hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event Borrower obtains financing from a competitor of Lender. Accordingly, each of Borrower and Guarantor hereby expressly agree that, upon the execution of this LOI, it will work solely with Lender to procure the Loan for the Property and agrees not to, and will cause its principals and affiliates not to, obtain or attempt to arrange a financing for the Property with any party other than Lender. In the event Borrower, Guarantor or any affiliate thereof obtains financing for the Property from a source other than Lender, Lender shall become immediate entitled to payment of a break-up fee ("**Break-Up Fee**") equal to two percent (2.0%) of the Loan Amount, which each of Borrower and Guarantor acknowledges and agrees constitutes liquidated damages and is a reasonable estimate of Lender's damages under the circumstances. Lender may apply any remaining portion of the Deposit to the Break-Up Fee at any time after it becomes due and payable. Borrower and Guarantor shall be jointly and severally responsible for Lender's legal and other out-of-pocket fees and expenses in connection with the recovery of the Break-Up Fee. If Lender determines not to move forward with the Loan on terms materially consistent with those outlined above, no Break-Up Fee shall be required.  The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Terms Conditional/Investment Committee Review:** Borrower understands and acknowledges that Lender has not obtained internal investment committee approval for the Loan and that its agreement to make the Loan is subject to (a) investment committee approval, (b) Lender's satisfactory completion of underwriting and due diligence, and (c) final documentation of the Loan acceptable to Lender in its sole discretion.

**No Commitment:** This LOI is provided for discussion purposes only and does not constitute a contract or a commitment or agreement to lend, either express or implied, or an agreement to issue a commitment, but merely indicates Lender's willingness to proceed with its evaluation of this Loan. The terms hereof are not all-inclusive and are subject to change. Except as expressly set forth herein, this LOI shall not be binding. No agreement (whether written, oral or otherwise) that may be reached during negotiations with respect to the Loan, nor any course of dealing between the parties, shall constitute a commitment by Lender to lend or otherwise be binding upon the parties.

**Governing Law:** This LOI shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principals of conflicts of laws. Any action, suit, proceeding or litigation arising out of or relating in any way to this LOI shall commence and be maintained exclusively in the state or federal courts of the State of New York. Borrower will be responsible for Lender's legal and other out-of-pocket fees and expenses in the event Borrower is unsuccessful in any action, suit, proceeding or litigation brought against Lender. EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR LITIGATION ARISING OUT OF OR RELATING IN ANY WAY TO THIS LOI.

To commence processing of the requested Loan, please sign and return an original counterpart of this LOI together with the Deposit.  This LOI supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto. This LOI shall be null and void and shall automatically terminate if not countersigned by Borrower and returned to Lender along with the Deposit by June 26th , 2019, unless mutually extended by the parties in writing. We look forward to working with you on this transaction.

Sincerely,

LIGHTSTONE CAPITAL LLC

By: _____

Name: Joseph E. Teichman
Title:  Executive VP

Agreed to and accepted on behalf of Borrower:

[Borrower]

By: _____

Name:
Title:

## EXHIBIT A

| | Assets | | Portfolio Summary | | |
|---|---|---|---|---|---|
| # | Address | Type | Gross Sq Ft | Residential Units | Retail Units |
| 1 | 568 Willoughby Avenue, Brooklyn, NY 11206 | Multi-Family | 4,290 | 6 | 0 |
| 2 | 55 Stanhope Street, Brooklyn, NY 11221 | Multi-Family | 5,560 | 8 | 0 |
| 3 | 106 Kingston Avenue, Brooklyn, NY 11213 | Mixed-Use | 4,032 | 2 | 1 |
| 4 | 618 Lafayette Avenue, Brooklyn, NY 11216 | Four Families | 1,944 | 4 | 0 |
| 5 | 119 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,613 | 6 | 0 |
| 6 | 127 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,370 | 6 | 0 |
| 7 | 167 Hart Street, Brooklyn, NY 11206 | Three Family | 4,160 | 3 | 0 |
| 8 | 325 Franklin Ave, Brooklyn, NY 11238 | Mixed-Use | 4,050 | 3 | 2 |
| 9 | 53 Stanhope Street, Brooklyn, NY 11221 | Two Family | 1,848 | 2 | 0 |
| 10 | 107 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,080 | 4 | 0 |
| 11 | 109 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,000 | 4 | 0 |
| 12 | 129 South 2nd Street, Brooklyn, NY 11249 | Three Family | 4,000 | 3 | 0 |
| 13 | 130 South 2nd Street, Brooklyn, NY 11249 | Four Family | 4,608 | 4 | 0 |
| 14 | 318 Bedford Ave, Brooklyn, NY 11249 | Mixed-Use | 2,640 | 2 | 1 |
| 15 | 740 Driggs Ave, Brooklyn, NY 11211 | Mixed-Use | 1,995 | 2 | 2 |
| 16 | 144 Huntington Street, Brooklyn, NY 11231 | Two-Family | 1,776 | 2 | 0 |
| 17 | 68 Carroll Street, Brooklyn, NY 11231 | Three Family | 2,450 | 3 | 0 |
| 18 | 342 Rodney Street, Brooklyn, NY 11211 | Four Family | 4,275 | 4 | 0 |
| 19 | 178 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 20 | 180 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 21 | 182 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 22 | 440 Lorimer Street, Brooklyn, NY 11206 | Three Family | 1,890 | 3 | 0 |
| 23 | 263 18th Street, Brooklyn, NY 11215 | Four Family | 2,850 | 4 | 0 |
| 24 | 1213 Jefferson Ave, Brooklyn, NY 11221 | Three Family | 2,250 | 3 | 0 |
| 25 | 92 South 4th Street, Brooklyn, NY 11249 | Three Family | 4,140 | 3 | 0 |
| 26 | 834 Metropolitan Ave, Brooklyn, NY 11211 | Two-Family | 2,136 | 2 | 0 |
| 27 | 1125 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 28 | 1127 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,194 | 2 | 0 |
| 29 | 1129 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 30 | 1131 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 31 | 1133 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| Total | | | 100,181 | 108 | 6 |

Exhibit B

| Debtor | New York City | Brooklyn Lender | Brooklyn Lender | Priority | Priority | General Unsecured | General Unsecured | General Unsecured | Administrative | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Class 1 | Class 2 | Class 2 (Shared) | Class 3 | Unclassified | Class 4 | Class 4 (Shared A) | Class 4 (Shared B) | Unclassified | All Claims |
| 167 Hart LLC | $87 | $791,396 | | | | | | | | |
| 53 Stanhope LLC | $5,501 | | $2,664,019 | | | $3,000 | | | | |
| 325 Franklin LLC | $32,992 | | | | | $8,920 | $25,000 | | | |
| 55 Stanhope LLC | $61,939 | $2,038,184 | | | | $17,710 | | | | |
| 119 Rogers LLC | $11,645 | $2,077,308 | | | | $611,952 | | | | |
| 127 Rogers LLC | $12,017 | $2,121,334 | | | | $3,575 | | | | |
| 108 Kingston LLC | $3,912 | $730,949 | | | | $2,409 | | | | |
| 618 Lafayette LLC | $3,334 | $1,120,878 | | | | $144,304 | | | | |
| Eighteen Homes LLC | $3,091 | $823,347 | | | | $32,484 | $25,000 | | | |
| 1213 Jefferson LLC | $3,108 | $823,347 | | | | $8,812 | | | | |
| 92 South 4th LLC | $4,403 | $868,840 | $2,236,420 | | | $8,497 | | | | |
| 834 Metropolitan LLC | $3,336 | | | | | $6,488 | $38,000 | | | |
| 125-133 Greene Avenue, LLC | $11,121 | | | | | $13,893 | | | | |
| APC Holding 1 LLC | $263 | $3,025,661 | | | | $8,161 | $500,000 | | | |
| CA7SW LLC | $2,177 | $1,256,364 | | | | $502,699 | | | | |
| Natoma LLC | $3,768 | | | | | $6,779 | $2,500,000 | $150,400 | | |
| DW1 Real Estate Spring LLC | $28,653 | $12,897,588 | | | | $56,167 | | | | |
| Meserole & Lorimer LLC | $14,646 | | | | | $18,931 | | | | |
| Total | $209,896 | $14,884,260 | $22,741,457 | $0 | $0 | $1,548,930 | $3,086,000 | $150,400 | $0 | |
| Grand Total - All Claims | $209,896 | $14,884,260 | $37,625,717 | $0 | $0 | | $3,086,000 | $4,785,330 | $0 | $42,620,934 |

Exhibit C

| Debtor | Property Value | Post Confirmation Mortgage | Net Equity Interest Value | Entity Ownership % Per $1,000 of Cliams |
|---|---|---|---|---|
| APC Holding 1 LLC | 2,390,000 | 1,694,032 | **695,968** | 0.14% |
| 55 Stanhope LLC | 1,680,000 | 990,784 | **689,216** | 0.15% |
| 167 Hart LLC | 2,110,000 | 1,495,568 | **614,432** | 0.16% |
| 106 Kingston LLC | 2,100,000 | 1,488,480 | **611,520** | 0.16% |
| 618 Lafayette LLC | 1,124,100 | 796,762 | **327,338** | 0.31% |
| 53 Stanhope LLC | 1,000,000 | 808,800 | **191,200** | 0.52% |
| 325 Franklin LLC | 1,842,700 | 1,406,106 | **436,594** | 0.23% |
| 119 Rogers LLC | 2,000,000 | 1,417,600 | **582,400** | 0.17% |
| 127 Rogers LLC | 2,100,000 | 1,488,480 | **611,520** | 0.16% |
| Eighteen Homes LLC | 1,800,000 | 1,275,840 | **524,160** | 0.19% |
| 1213 Jefferson LLC | 1,000,000 | 708,800 | **291,200** | 0.34% |
| 92 South 4th St LLC | 2,000,000 | 1,417,600 | **582,400** | 0.17% |
| 834 Metropolitan Avenue LLC | 1,500,000 | 1,063,200 | **436,800** | 0.23% |
| 1125-1133 Greene Ave LLC | 5,325,000 | 3,774,360 | **1,550,640** | 0.06% |
| C & YSW, LLC | 4,100,000 | 2,906,080 | **1,193,920** | 0.08% |
| Natzliach LLC | 2,720,000 | 1,927,936 | **792,064** | 0.13% |
| D & W Real Estate Spring LLC | 12,190,000 | 8,640,272 | **3,549,728** | 0.03% |
| Meserole and Lorimer LLC | 9,450,000 | 6,698,160 | **2,751,840** | 0.04% |
|  | 56,431,800 | 39,998,860 | **16,432,940** |  |

# Exhibit D

| Debtor | Property | Value | Mortgage Principal |
|---|---|---|---|
| 53 Stanhope LLC<br>325 Franklin LLC<br>(Joint Owners) | 53 Stanhope Street Brooklyn NY<br>325 Franklin Avenue, Brooklyn NY | $3,500,000 | $2,664,019 |
| 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, NY | $3,000,000 | $2,077,307 |
| 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, NY | $3,500,000 | $2,121,334 |
| 167 Hart LLC | 167 Hart Street, Brooklyn, NY | $2,100,000 | $791,396 |
| 106 Kingtston LLC | 106 Kingtston Ave Brooklyn, NY | $2,100,000 | $730,949 |
| 618 Lafayette LLC | 618 Lafayette Ave<br>Brooklyn, New York | $1,900,000 | $779,122 |
| C&YSW, LLC<br><br>Natliach LLC<br>(Joint Owners) | 129 South 2nd Street, Brooklyn, NY<br>107 South 3rd Street Brooklyn, NY<br>109 South 3rd Street Brooklyn NY | $9,000,000 | $4,943,431 |
| Eighteen Homes LLC | 263 18th Street, Brooklyn, NY | $1,800,000 | $823,000 |
| 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, NY | $1,500,000 | $898,840 |
| 92 South 4th LLC<br><br>834 Metropolitan LLC<br>(Joint Owners) | 92 South 4th Street, Brooklyn, NY<br>834 Metropolitan Ave, Brooklyn, NY | $4,500,000 | $2,236,419 |
| 1125-1131 Greene Avenue, LLC | 1125 Greene Avenue, Brooklyn, NY<br>1127 Greene Avenue, Brooklyn, NY<br>1129 Greene Avenue, Brooklyn, NY<br>1131 Greene Avenue, Brooklyn, NY<br>1133 Greene Avenue, Brooklyn, NY | $6,000,000 | $3,025,651 |
| APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, NY | $3,500,000 | $1,256,364 |
| D&W Real Estate Spring LLC<br><br>Meserole & Lorimer LLC<br>(Joint Owners) | 130 South 2nd Street, Brooklyn, NY<br>318 Bedford A venue, Brooklyn, NY<br>740 Driggs Avenue, Brooklyn, NY<br>144 Huntington Street, Brooklyn, NY<br>68 Carroll Street, Brooklyn, NY<br>342 Rodney Street, Brooklyn, NY<br>178 Meserole Street, Brooklyn NY<br>180 Meserole Street, Brooklyn NY<br>182 Meserole Street, Brooklyn NY<br>440 Lorimer Street, Brooklyn NY | $26,000,000 | $12,897,588 |
| 55 Stanhope, LLC | 55 Stanhope Street, Brooklyn, NY | $5,000,000 | $2,038,183.88 |

**18 Entities**

**31 properties**

**Total Mortgage = $37,283,614.25**

# Exhibit E

| Debtor | Claimant | Claim No. | Claim Amount |
|---|---|---|---|
| 53 Stanhope LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 167 Hart | David Ryness | 2 | $60,000 |
| | Eliyahu Stern | 3 | $100,000 |
| | 110 claimants | 5 | Unliquidated |
| 106 Kingtston LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 618 Lafayette LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| Eighteen Homes LLC | 110 Claimants | 5 | Unliquidated |
| 1213 Jefferson LLC | David Ryness | 3 | $60,000 |
| | Eliyahu Stern | 4 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 92 South 4th | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 1125-1131 Greene Avenue, LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| APC Holding 1 LLC | David Ryness | 5 | $60,000 |
| | Eliyahu Stern | 6 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 55 Stanhope, LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |

| | | | |
|---|---|---|---|
| 834 Metropolitan LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 325 Franklin LLC | Shifra Stern | 4 | $6,920 |
| | Zlata Stern | 5 | $6,920 |
| | Yehuda Stern | 6 | $6,920 |
| | David Ryness | 7 | $60,000 |
| | Eliyahu Stern | 8 | $100,000 |
| | 110 claimants | 10 | Unliquidated |

2