UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                     Chapter 11

      53 STANHOPE LLC, *et al*,[1]                        Case no.  19-23013 (RDD)
                                            Jointly Administered
                          Debtors.
-----------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF 53 STANHOPE LLC, 55 STANHOPE LLC, 119 ROGERS LLC, 127 ROGERS LLC, 325 FRANKLIN LLC, 618 LAFAYETTE LLC, C & YSW LLC, NATZLIACH LLC, 92 SOUTH 4TH ST LLC, 834 METROPOLITAN AVENUE LLC, 1125-1133 GREENE AVE LLC, APC  HOLDING 1 LLC, D&W REAL ESTATE SPRING LLC, MESEROLE AND LORIMER  LLC, 106 KINGSTON LLC, EIGHTEEN HOMES LLC, 1213 JEFFERSON LLC, AND 167 HART LLC (EACH A DEBTOR, AND COLLECTIVELY, THE "DEBTORS").

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' AND INTEREST HOLDERS' DECISIONS TO SUPPORT OR OPPOSE THE PLAN OF REORGANIZATION, A COPY OF WHICH IS ANNEXED HERETO AS EXHIBIT A.

THESE CASES HAVE NOT BEEN SUBSTANTIVELY CONSOLIDATED.

ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE PLAN OF REORGANIZATION.

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## **INTRODUCTION**

1.      53 Stanhope LLC, 55 Stanhope LLC; 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole and Lorimer  LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, and 167 Hart LLC (each a "Debtor", and collectively, the "Debtors") submit this joint disclosure statement ("Disclosure Statement") in connection with their joint plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as Exhibit A.  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  All capitalized terms used but not defined shall have the meaning set forth in the Plan.

2.      This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the Plan.  To the extent a Creditor has questions, the Debtors urge you to contact Debtors' counsel and every effort will be made to assist you.

3.      THE DEBTORS WILL BE SOLICTING VOTES ON THE PLAN FROM CLASS 5 INTERESTS AND CLASS 6 CREDITORS.  ALL OTHER CREDITORS ARE DEEMED UNIMPAIRED UNDER THE PLAN.

4.      On January 21, 2020, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in sufficient detail, in light of, among other things, the nature and history of the Debtors and the

2

condition of the Debtors' books and records, to enable parties in interest make an informed

judgment on the Plan.

5.      THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT HAS BEEN SUPPLIED BY THE DEBTORS.  THE DEBTORS' BOOKS AND

RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE

DEBTORS' FINANCIAL CONDITION AS SET FORTH IN THE DISCLOSURE

STATEMENT.  BASED UPON THE INFORMATION MADE AVAILABLE, DEBTORS'

COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION

DISCLOSED HEREIN IS INACCURATE.  NEITHER THE DEBTORS NOR DEBTORS'

COUNSEL, HOWEVER, ARE ABLE TO STATE DEFINITIVELY THAT THERE IS NO

INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE

INFORMATION CONTAINED HEREIN INACCURATE.

6.      The Bankruptcy Court has entered an Order fixing February 26, 2020, at

10:00 a.m., at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New

York 10601-4140, as the date, time and place for the hearing on confirmation of the Plan and

fixing February 19, 2020, as the last date for the filing and serving of any objections to

confirmation of the Plan.  A copy of any objection to confirmation of the Plan must be delivered

to the Court's chambers on or before such date.

## **BACKGROUND**

7.      On May 20, 2019, each of the Debtors filed a Chapter 11 petition under

Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), except 167

Hart LLC which filed its petition on May 21, 2019.

8.     These cases involve loans made by Signature Bank to the Debtors in the form of 14 separate notes and mortgages covering 31 properties dating back to September 2012. All of the loans were assigned to Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") on or about May 17, 2017. At that time, each Debtor was current on its payment obligations and, they assert, not otherwise in default.  As reflected in Signature Bank loan statements, The aggregate principal amount of the loans total at the time of transfer to Brooklyn Lender was $37,283,614.25, as follows:

| Debtor | Property | Value | Mortgage Principal |
|---|---|---|---|
| 53 Stanhope LLC 325 Franklin LLC (Joint Owners) | 53 Stanhope Street Brooklyn NY 325 Franklin Avenue, Brooklyn NY | $3,500,000 | $2,664,019 |
| 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, NY | $3,000,000 | $2,077,307 |
| 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, NY | $3,500,000 | $2,121,334 |
| 167 Hart LLC | 167 Hart Street, Brooklyn, NY | $2,100,000 | $791,396 |
| 106 Kingtston LLC | 106 Kingtston Ave Brooklyn, NY | $2,100,000 | $730,949 |
| 618 Lafayette LLC | 618 Lafayette Ave Brooklyn, New York | $1,900,000 | $779,122 |
| C&YSW, LLC Natliach LLC (Joint Owners) | 129 South 2nd Street, Brooklyn, NY 107 South 3rd Street Brooklyn, NY 109 South 3rd Street Brooklyn NY | $9,000,000 | $4,943,431 |
| Eighteen Homes LLC | 263 18th Street, Brooklyn, NY | $1,800,000 | $823,000 |
| 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, NY | $1,500,000 | $898,840 |
| 92 South 4th LLC 834 Metropolitan LLC (Joint Owners) | 92 South 4th Street, Brooklyn, NY 834 Metropolitan Ave, Brooklyn, NY | $4,500,000 | $2,236,419 |
| 1125-1131 Greene Avenue, LLC | 1125 Greene Avenue, Brooklyn, NY 1127 Greene Avenue, Brooklyn, NY 1129 Greene Avenue, Brooklyn, NY 1131 Greene Avenue, Brooklyn, NY 1133 Greene Avenue, Brooklyn, NY | $6,000,000 | $3,025,651 |
| APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, NY | $3,500,000 | $1,256,364 |
| D&W Real Estate Spring LLC Meserole & Lorimer LLC (Joint Owners) | 130 South 2nd Street, Brooklyn, NY 318 Bedford A venue, Brooklyn, NY 740 Driggs Avenue, Brooklyn, NY 144 Huntington Street, Brooklyn, NY 68 Carroll Street, Brooklyn, NY 342 Rodney Street, Brooklyn, NY 178 Meserole Street, Brooklyn NY 180 Meserole Street, Brooklyn NY 182 Meserole Street, Brooklyn NY 440 Lorimer Street, Brooklyn NY | $26,000,000 | $12,897,588 |
| 55 Stanhope, LLC | 55 Stanhope Street, Brooklyn, NY | $5,000,000 | $2,038,183.88 |

9.      Brooklyn Lender LLC was created on May 9, 2017, immediately before it acquired the loans. Upon information and belief, Brooklyn Lender is affiliated with Maverick Real Estate Partners LLC. According to its website, Maverick is a private equity fund manager that acquires commercial mortgages secured by real estate in New York City.  Upon information and belief, Maverick, Brooklyn Lender and or its affiliated entities' business model involves predatory purchases of loans and mortgages for the purpose of defaulting borrowers on performing loans.[2]

**The Federal Action**

10.      On April 24, 2017 the Debtors, among others, were sued in the United States District Court for the Eastern District of New York (the "Federal Action").  The Federal Action plaintiffs sued several dozen defendants alleging a "Bernie Madoff" type scheme.  They asserted contract claims, tort claims, equitable claims, and securities law claims.  The plaintiffs included limited liability companies ("LLC Plaintiffs") and super-minority individual members of those limited liability companies ("Individual Plaintiffs," with the LLC Plaintiffs, the "Plaintiffs") who sued on their own behalf and derivatively on behalf of the LLC Plaintiffs.

11.      The LLC Plaintiffs hold profit sharing interests in four of the Debtors, each of whom was named as an "LLC Defendant":  106 Kingston LLC, 1213 Jefferson LLC, 618 LaFayette LLC and 325 Franklin LLC ("Debtor LLC Defendants").  The Individual Plaintiffs are Israeli nationals.  The managing members of the LLC Plaintiffs include Chaskiel Strulovitch.  He was named as an individual defendant.

---

[2] *See, e.g., Lenders in glass houses? Judge rules Maverick can't foreclose on Chelsea property because it violated loan agreement,* The Real Deal, May 20, 2019.

12.     Fourteen of the Debtors were named as 'relief defendants' ("Relief Defendants"):  53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole and Lorimer  LLC, Eighteen Homes LLC, and 167 Hart LLC ("Debtor Relief Defendants").  None of the Plaintiffs alleged any existing interest in the Debtor Relief Defendants.  The Plaintiffs asserted claims against the Debtor Relief Defendants that some of the money they invested may have been diverted to the Debtor Relief Defendants.  The Plaintiffs filed notices of pendency against all of the LLC Defendants and the Debtor Relief Defendants.

13.     The Debtor LLC Defendants moved to dismiss arguing that, among other things, they fulfilled their obligations under the Prospectuses by "returning the vast majority of the investment funds," and any dispute was nonetheless subject to arbitration.  On procedural grounds, the District Court dismissed the complaint on November 2, 2017 (Amon, J.) and vacated the notices of pendency, finding that as to the claims against the LLC Defendants, Plaintiffs may arbitrate any claim they may have.  No arbitration was commenced.

14.     The Debtor Relief Defendants moved to dismiss, arguing, among other things, that the Plaintiffs' allegations of diversion of funds were conclusory with no facts pled to support a constructive trust claim, and that even if the Plaintiffs properly alleged facts to support their claims, at best their claims were limited to claims against the Relief LLC Defendants' LLC membership interests as personalty and cannot serve as the basis for attaching the real property owned by the LLC Defendants.  On procedural and jurisdictional grounds, the District Court dismissed the complaint and vacated the notices of pendency, finding that as to the claims

7

against the Debtor Relief LLC Defendants, Plaintiffs may sue in State Court.  No State Court lawsuits have been filed.

15.    The Plaintiffs filed a notice of appeal which they later withdrew.  The Plaintiffs then made a motion to amend the dismissed complaint, which was pending at the time the Debtors filed these cases.

16.    Annexed to the Plan as Exhibit E is a list of claims filed against the Debtors by certain of the Plaintiffs as well as other Claimants whose Claims are based on similar allegations, including each Claimant's name and the Debtors against whom the Claims are filed (such Claims, to the extent Allowed, the "Class 6 Claims").

17.    Under section 510(b) of the Bankruptcy Code, claims arising from the "sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security. . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security."

18.    Paragraph 4 of the narrative attached to the proofs of Class 6 Claims, like the Federal Action complaint, asserts that such Claims arise from false representations in certain prospectuses that "Through the funds contributed by the investors, the investors would purchase ownership of separate limited liability companies (the "Investor LLCs"), each of which, in turn, would hold a 45% interest in a Holding Company."  At paragraph 11, the Class 6 Claimants identify Strulovitch as manager of the Holding Companies, which include the Holding Company Debtors.  At paragraph 13, the Narrative states that "Individual Fraudsters" own and control the "Secret LLCs," i.e. the named Relief Debtors.

19.     A membership interest in a limited liability company is a security under

section 101(49) of the Bankruptcy Code.  *E.g. In re Tristar Esperanza Properties, LLC*, 782 F.3d

492 (9th Cir. 2015).  The proofs of claim narrative alleges damages arising from the claimants'

intended purchase of interests (i.e. securities) in Holding Companies, including the Holding

Company Debtors.  Since Strulovitch owns or controls more than 20% of the both the Holding

Company Debtors and the named Relief Debtors, they are affiliates as defined by section 101(2)

of the Bankruptcy Code.

20.     In, *In re Lehman Bros. Inc.*, 503 B.R. 778, 782–83 (Bankr. S.D.N.Y.),

*aff'd on other grounds,* 519 B.R. 434 (S.D.N.Y. 2014), *aff'd,* 808 F.3d 942 (2d Cir. 2015) the

court explained the rules for applying section 510(b) as follows:

> The Court of Appeals for the Second Circuit along with the bankruptcy courts
> within the Second Circuit have uniformly applied a "broad interpretation of
> section 510(b)." *Rombro v. Dufrayne (In re Med Diversified, Inc.),* 461 F.3d 251,
> 255 (2d Cir.2006) (citing *In re Enron Corp.,* 341 B.R. 141, 162–63
> (Bankr.S.D.N.Y.2006) and *In re PT–1 Commc'ns, Inc.,* 304 B.R. 601, 610
> (Bankr.E.D.N.Y.2004)); *783 KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT
> Digital, Inc.),* 497 B.R. 170, 181 (Bankr.S.D.N.Y.2013) ("While I certainly agree
> that other Circuits have construed section 510(b) broadly, so has the Second
> Circuit, along with bankruptcy and district court judges in the Second Circuit.").
> The inclusion of the word "shall" in the statute mandates subordination for claims
> meeting the criteria set forth in the statute.

21.     *Lehman* concluded that where, as here, claims arise from the sale of a

"security" of an "affiliate" as defined in the Bankruptcy Code, "The language is clear on its face

and applies to these claims."  *Lehman* 503 B.R. at 788.

22.     To the extent they may be Allowed, the Plan subordinates the Class 6

Claims to the Claims of General Unsecured Creditors and they are treated under the Plan as

Interests.  To the extent such Interests are "Allowed" as of the deadline for voting on the Plan the

holders are entitled to vote to accept or reject the Plan.

**Brooklyn Lender Claims**

23.    Apparently, Maverick discovered the Federal Action against Mr.

Strulowitz and, the Debtors assert, predatorially targeted the loans on the Debtors' Properties.

Maverick then offered to purchase such loans from Bank United and Signature Bank to

implement a scheme to effectuate technical defaults on the loans.  Correspondence between

Maverick and various banks, including Bank United, indicates that Maverick requested that the

banks issue non-monetary technical defaults on the Strulovitch loans and then assign them as

defaulted loans.

24.    Evidently, Signature refused to default the Debtors, apparently because the

loans were all performing based on the Debtors' excellent payment history.  As soon as Brooklyn

Lender acquired the loans, it sent own default notices ("Acceleration Letters") primarily alleging

non-monetary defaults arising from the now-dismissed Federal Court lawsuit.

25.    The Acceleration Letters state that each of the Debtors are in default

primarily based on purported allegations in the Federal Action.  The Acceleration Letters state:

> Please be advised that Lender has been made aware of the certain lawsuit against
> Guarantor captioned Jacob Schonberg, et al v. Yechezkel Strulovitch a/k/a
> Chaskiel Strulovitch, et al., Case No. 17-cv-02161, currently pending in the
> United States District Court for the Eastern District of New York, wherein it is
> alleged, among other things, that [Mr. Stulovitch] misrepresented that he is the
> sole member of certain limited liability companies in connection with the making
> of certain mortgage loans. Pursuant to Paragraph 18(g) of the Agreement, the
> Debt "will become due at the option of the Mortgagee upon any one or more of
> the following events: (g) if any representation or warranty of the Mortgagor or of
> any person (a "guarantor") guaranteeing payment of the Debt or any portion
> thereof or the performance by the Mortgagor of any of the terms of the notes, the
> Mortgage or this Agreement, made herein or in any such guaranty or in any

10

certificate, report, financial statement or other instrument furnished in connection
with the making of the notes, the Mortgage, this Agreement or any such guaranty,
shall prove false or misleading in any material respect.

Such misrepresentation constitutes any Event of Default under the Loan
Documents. Moreover, pursuant to the terms of the Note, "any acts or omissions
constituting fraud or misrepresentation by the Maker in connection with applying
for the loan secured by the Agreement or in supplying information or
documentation to the Payee subsequent to the date hereof" shall give Lender
rights of full recourse against Borrower and Guarantor for any deficiency
remaining after a foreclosure sale of the Property.

26.    It bears repeating that as to the Debtor Relief Defendants there were no
allegations nor any affidavits concerning membership interests.  As to those fourteen Debtors,
the Federal Action Complaint contradicts the Acceleration Letters' allegation that there are
undisclosed members.

27.    As to the four Debtor LLC Defendants, at one point in time, the Federal
Action LLC Plaintiffs had an indirect membership interest in those entities under certain
operating agreements produced by the Debtor LLC Defendants in support of their dismissal
motion.  The LLC Plaintiffs actually argued that those operating Agreements were not effective.
The LLC plaintiffs argued that the operating agreements the Debtor LLC Defendants submitted
to Signature identifying Chaskiel Strulovitz as sole member controlled.

28.    The operating agreements the Debtor LLC Defendants produced in the
Federal Action evidenced the profit sharing and arbitration provisions among the parties.  When
the Debtors sought financing from Signature, the Federal Action Plaintiffs stated that they did
not want to be identified.  Thus, the Debtor LLC Defendants made Chaskiel Strulovitch sole
member but continued the profit-sharing arrangement and arbitration provisions.  In the Federal

11

Action, therefore, the Debtors insisted upon compliance with the arbitration provisions of the agreements they produced.

29.     In addition to the Mortgagee's mistaken assumption that the Debtors had misrepresented their ownership, the default letters also declared an event of default premised on other non-Debtor operating agreements for entities Mr. Strulovitch listed as wholly owned on his personal financial statements submitted to Signature.

30.     Paragraph 18(g) of the Mortgage requires that an event of default occurs only "if any representation or warranty …. shall prove false or misleading in any material respect."  According to Black's Law Dictionary, the word "prove" is defined as "to establish a fact or hypothesis as true by satisfactory and sufficient evidence."  Based on the language of the Mortgage, therefore, **before** declaring a default on that basis, the Debtors assert, there must have been proof to establish that the representation claimed by Lender was *false or misleading* and *material*.

31.     The Federal Action was dismissed.  Nothing has been adjudicated because the Plaintiffs did not submit to arbitration against the LLC Defendants, nor did they sue in State Court as the District Court permitted for the Relief Defendants.

32.     Therefore, the Debtors assert, the existence of the Federal Action alone was and is insufficient to "prove" that any representation was false or misleading in any material respect prior to declaring an event of default based on Paragraph 18(g).  In summary, the Debtors contend that the Acceleration Letters did not even allege a present default or constitute a valid notice of a present default. Instead, the letters simply notified the Debtors that IF the allegations in the Federal Complaint were determined to be true, it would constitute a potential FUTURE

12

event of default. Accordingly, the Debtors assert, the Mortgagee's demand for 24% interest

dating back to the origination of the loans on the basis of these alleged misrepresentations is at

best premature.

33.    The Debtors assert Brooklyn Lender has failed further to sufficiently

allege or establish that any such claimed misrepresentation was "material" as also required under

Paragraph 18(g), particularly with respect to Mr. Strulovitch's financial statement. The courts

have defined a "material misrepresentation" in this context to be one that is a "basic credit

consideration" that has a "direct relationship to [the borrower's] ability to repay the loan."

*Sunrise Federal Savings Bank v. Verex Assurance, Inc.*, 204 A.D.2d 617 (2d Dep't 1994).

34.    The Loans were originated by Signature Bank.  There is no evidence that

Signature required that Strulowitz have a minimum net worth as part of its basic credit

consideration, or that the allegations in the Federal Action, if proven, would drop Strulowitz' net

worth below such minimum net worth.

35.    The Debtors assert that Brooklyn Lender's allegation of an event of

default on the basis of allegedly false statements in his personal financial statement fails for the

additional reason that Mr. Strulovitch is not an entity or person covered by the relevant mortgage

provision. The Mortgage states, in pertinent part, as follows:

> The Debt will become due at the option of the Mortgagee upon any one or more
> of the following events:
>
> (g) if any representation or warranty of the Mortgagor or of any person (a
> "guarantor") **guaranteeing payment of the Debt** or any portion thereof or the
> performance by the Mortgagor of any of the terms of the notes, the Mortgage or
> this Agreement, made herein or in any such guaranty or in any certificate, report,
> financial statement or other instrument furnished in connection with the making

of the notes, the Mortgage, this Agreement or any such guaranty, shall **prove false or misleading in any material respect**;" (emphasis added).

36.     The plain reading of this section demonstrates that if a "representation or warranty" by any of three categories of person or entity proves false in a material respect then such misrepresentation shall constitute an event of default. The three categories of person or entity are the following: (i) the Mortgagor; (ii) any person (a "guarantor") guaranteeing payment of the Debt or any portion thereof; or (iii) any person (a "guarantor") guaranteeing . . . the performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement, made therein.

37.     Mr. Strulovitch is not a mortgagor. Mr. Strulovitch did not guaranty repayment of the debt.  Signature did not require Mr. Strulovitch to execute a "personal" guaranty.  The Non-Recourse Indemnity/Carve-Outs only guaranteed "losses[es], cost[s] or expense[s]" resulting from specific conditions at the mortgaged premises. Accordingly, Mr. Strulovitch did not guarantee any performance by the Debtors.

38.     Here, based on the plain language of the Mortgage, any alleged misrepresentation by Mr. Strulovitch, even if true, would not constitute an event of default under the loan documents because he is not a guarantor. Accordingly, the Debtors dispute the allegation of default by Brooklyn Lender on multiple grounds.

39.     As additional events of default, Brooklyn Lender alleged the Debtors' failure to promptly cure property violations issued by the Environmental Control Board of the City of New York ("ECB") and the New York City Department of Housing Preservation and Development ("HPD"), or pay two water and sewer bills. Separate and apart from whether the cure or payment was not  "prompt," the Debtors contend it is clear that (i) there is no "cure"

14

required of the ECB violation, (ii) the ECB violation has been paid, (iii) all of the HPD

violations have been dismissed, and (iv) the water bills have been paid. Furthermore, the alleged

monetary penalty from the violations issued by ECB are, the Debtors contend, trivial relative to

the loan balances.  Similarly, the alleged "unpaid taxes" claimed by Plaintiff as an event of

default were small Property Registration Fees. The fees were paid.  The amounts in dispute, the

Debtors contend, are trivial, and moreover, all have been "cured" or resolved, as have the

allegedly unpaid water and sewer bills.

40.    The Debtors consistently and timely made all payments of the monthly

principal and interest owned not only to Signature but also to Brooklyn Lender. Because monthly

principal and interest payments have been consistently paid, the Debtors contend Brooklyn

Lender has not and cannot show that any direct relationship existed between any trivial defaults

or alleged misrepresentation and the Debtors' ability to repay their loans.  Brooklyn Lender was

not prejudiced.  Its security was not impaired.

41.    The Debtors contend that against this background, strict enforcement

would irreparably injure the Debtors and undermine all equitable considerations.  In 1977, the

Court of Appeals adopted the dissenting opinion of Chief Judge Cardozo and applied "the

general equitable principle that 'the gravity of the fault must be compared with the gravity of the

hardship.'" *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392 (1977).  Evolving

case law has stepped away from the decision in *Graf v. Hope Building Corp.*, 254 N.Y. 1 (1930),

which held "acceleration clauses in mortgages will be strictly enforced irrespective of the

circumstances and nature of default." *Karas*, 91 A.D.2d at 812, citing to *Blomgren,* 18 A.D.2d

979; 100 Eighth Ave. Corp., 4 A.D.2d 754; More Realty Corp., 232 A.D. 705; Scelza v. Ryba,

169 N.Y.S.2d 462 (Sup. Ct. 1957); *Domus Realty Corp. v. 3440 Realty Co.,* 40 N.Y.S.2d 69

15

(Sup. Ct. 1943), aff'd, 266 A.D. 725 (1st Dep't 1943). Indeed, the dissenting opinion of Chief

Judge Cardozo, which stated that the equitable remedy of foreclosure may be denied based upon

the circumstances and nature of default, has been embraced instead. *See J.N.A. Realty Corp.*, 42

N.Y.2d at 392.

42.    Here, the Debtors contend that to the extent, if any, defaults exist, the

nature and circumstances of such defaults are such that they should not be enforced by a court of

equity.

43.    Indeed, Chief Judge Cardozo stated that strict enforcement is

unconscionable where, among other things, the default "is limited to a trifling balance." *Graf*,

254 N.Y. at 12 (Cardozo, J., dissenting). In *J.N.A. Realty Corp.*, the Court held that "[t]here

would be a forfeiture and the gravity of the loss is certainly out of all proportion to the gravity of

the fault," warranting equitable relief if there is no prejudice. 42 N.Y.2d at 399-40; accord, *4 B 's*

*Realty* 818 F.Supp.2d at 659 *(quoting* N.Y.C.P.L.R. § 500l(a)) (citing *Danielowich v. PEL Dev.,*

292 A.D.2d 414, 415, 739 N.Y.S.2d 408, 409 (2d Dep't 2002)); *See generally Blomgren v.*

*Tinton 763 Corp.*, 18 A.D.2d 979, 980 (1st Dep't 1963); *W.F.M. Restaurant, Inc. v. Austern*, 35

N.Y.2d 610 (1974); *In Rockaway Park Series Corp. v. Hollis Automotive Corp.*, 135 N.Y.S.2d

588 (Sup. Ct. 1954); *Caspert v. Anderson Apartments*, 94 N.Y.S.2d 521 (Sup. Ct. 1949);

*European American Bank v. Harper*, 163 A.D.2d 458 (2d Dep't 1990); *ING Real Estate* Finance

*(USA) LLC v. Park Ave. Hotel Acquisition LLC*, 26 Misc.3d 1226(A) (Sup. Ct. 2010); *Fifty*

*States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573 (1979)

44.    Laches is a defense as well.  In *Caspert*, a foreclosure action brought on

the basis of alleged municipal building violations, the mortgagee was not entitled to foreclosure

where it failed to **promptly** assert its rights. 94 N.Y.S.2d at 521. "Equity aids the vigilant, and he who seeks the aid of equity must show that he has used reasonable diligence in asserting his rights and demanding their protection." *Id.* at 526.  Where, as here, the basis for foreclosure is building violations that were issued months or years prior to assertion of the event of default, equity does not permit foreclosure. *See also Karas v. Wasserman*, 91 A.D.2d 812 (3d Dep't 1982) (it is a defense to foreclosure that the mortgagee failed to complain about a continuing default for five years; foreclosure was not warranted because mortgagor was entitled to rely on the absence of complaints by mortgagee); *More Realty Corp. v. Mootchnick*, 232 A.D. 705 (2d Dep't 1931) (mortgagee may be estopped from foreclosure where mortgagee did not object to mortgagor's conduct in breach of the mortgage agreement over years of dealings); *Amsterdam Sav. Bank v. City View Management Corp.*, 45 N.Y.2d 854 (1978) (three-month delay in taking action together with detriment to other parties "require[d] application of the doctrine of laches"); *Deutsche Bank Nat. Trust Co. v. Joseph*, 117 A.D.3d 982 (2d Dep't 2014) (citations omitted).

45.     In summary, the Debtors will contend at the Confirmation Hearing that default interest is disproportionate to the allegations of default, and, under such circumstances, equity requires relief to the borrower and Brooklyn Lender's claim to default interest should be disallowed.

46.     The Debtors will contend that the portion of Brooklyn Lender's Claim for "Legal Fees" of $1,337,510 should be disallowed in its entirety. At the outset, no documentation (such as attorney invoices, billing statements, time records, attorney affidavits, and the like supporting the fees and costs allegedly incurred) was submitted in support of any attorneys' fees or collection costs claimed.  As a result, it is impossible for the Debtor or the Court to properly

17

consider the purported validity of this portion of the Claim. Absent sufficient evidentiary

support, the claim for "Legal Fees" has no prima facie merit.

47.    In addition, the mortgages provide for the recovery of "reasonable"

attorneys' fees in paragraph 18(j), but only to "protect the Mortgagee's interest in the Mortgaged

Property."  Under paragraph 19, attorneys' fees are recoverable "If the Mortgagor fails to make

any payment or to do any act as herein provided. . ."  Since debt service was paid and all acts

performed, even if the Mortgagee has evidentiary support for attorneys' fees, the Debtors will

argue that the Mortgages do not permit legal fees for collection action arising from a

misrepresentation, particularly since the alleged misrepresentations were not made by

"Mortgagor."

48.    In any event, Brooklyn Lender's pre-Petition Date efforts to enforce the

Consolidated Note and the Consolidated Mortgage consisted entirely of issuing the Acceleration

Notices and, shortly thereafter, commencing the foreclosure actions in which the only

meaningful matter undertaken was the Receiver litigation and the filing of the Summary

Judgment Motion.  In that context, the Debtors contend that $1.3 million for fees appears to be

unreasonably high.

49.    Even if the $1.3 million of fees were reasonable and allowable under the

mortgages, the foreclosure action itself was improper, the Debtors contend, and thus the legal

fees incurred by Lender should be denied in their entirety, because, as noted above, the

Mortgagee incurred those fees prosecuting a bad faith foreclosure action in breach of the Loan

Agreements.

18

50.      In that regard, a failure to properly accelerate is a complete defense to a

mortgage foreclosure action.  *See,* 1 Bergman, *New York Mortgage Foreclosures*, § 4.05[1][b].

Where there is no basis for the acceleration of a mortgage obligation, an acceleration notice sent

by the lender is a nullity and constitutes a material breach of the loan agreement.  *Household Fin.*

*Realty Corp. of NY v Dunlap*, 15 Misc 3d 659, 665 (Sup Ct, N.Y. County 2007); *see also*

Bergman, B., *Strict Acceleration in New York Mortgage Foreclosure-Has the Doctrine Eroded?*,

Pace Law Review, 480 (June 1988).

51.      According to the Debtors, since there was no evidence of material default,

by wrongfully accelerating the debt, the Mortgagee materially breached.  A breach is material if

it goes to the "root" of the agreement, i.e., it defeats the object of the parties and deprives the

injured party of the benefit it justifiably expected. *Frank Felix Assoc. v Austin Drugs*, Docket

No. 96-7604, 1997 U.S. App. LEXIS 19795 at * 14 (2d Cir. Apr. 10, 1997); *Times Mirror*

*Mags., Inc. v Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000)).  Not

surprisingly, courts have found that the improper acceleration of a mortgage loan constitutes a

material breach of the loan agreement. *See Seidman v Indus. Recycling Props., Inc.*, 106 A.D.3d

983, 984-985 (2nd Dep't 2013)(the improper acceleration of a mortgage loan and

commencement of a foreclosure action constitutes a breach of the loan agreement); *see also*

*Mayo v Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 26383 at * 8 (E.D Va. Mar. 4, 2015) (a

deficient acceleration notice may constitute a material breach); *Johnson Fed. Home Loan Mortg.*

*Corp.*, No. 4:13cv163, 2013 U.S. Dist. Lexis 97713 at * 9 (W.D. Va. 2013) (same).

52.      In addition, the Debtors will argue that the actions taken by the Lender

were in breach of its implied obligation of good faith and fair dealing under the Loan Agreement.

New York law recognizes that UCC §1-203 imposes an obligation of good faith on a secured

party's enforcement of its security agreement.  *See Tudisco v Duerr*, 89 A.D.3d 1372, 1376 (4th

Dep't 2011); *Stillwater Liqudating LLC v Partner Reins. Co., Ltd.*, Index No. 652451/15, 2017

N.Y. Slip. Op 30257[U] at * 20 (Sup. Ct, N.Y. Cty. 2017).

53.     In summary, the Debtors will argue that the Mortgagee improperly noticed

alleged defaults asserting ownership misrepresentations and trivial other defaults, and utilized

those asserted defaults as the basis to accelerate the amounts due under the loan, commence a

foreclosure action and seek the appointment of a receiver.  The Mortgagee's breach was material

since it goes to the root of the contract and was intended to deprive the Debtors of the right to its

use and enjoyment of their Properties by forcing sales in a foreclosure proceeding.

54.     When one party commits a material breach of a contract, the other party to

the contract is relieved, or excused, from further performance under the contract.  *Grace v*

*Nappa*, 46 N.Y.2d 560, 567 (1979).  Having repudiated and materially breached its contract with

Debtors, the Mortgagee could not claim relief either in the form of foreclosure or damages.

*Net2Globe Intl. v Time Warner Telecom of NY*, 273 F Supp. 2d 436, 457 (S.D.N.Y 2003); *see*

*also Daniel Perla Assocs. LP v. ZLD Realty LLC*, 277 A.D.2d 115, 115 (1st Dep't

2000)(upholding lower court's dismissal of the foreclosure complaint and reducing the principal

of the mortgage based upon plaintiff's bad faith breach). The foreclosure action was improper, as

it was based on an improper acceleration.

55.     The Debtors contend that Brooklyn Lender's claimed $873,158 "Late Fee"

must also be disallowed in its entirety.  Paragraph 20 of the Mortgages provide a late fee on an

"Installment to defray the expense incurred by the Mortgagee in handling and processing such

delinquent payment and such amount."  Installment refers to monthly payments, which were paid

timely.  Presumably, the Mortgagee deems the improperly accelerated amounts due as an

installment and has imposed late fees on such amounts.

56.     It is well-settled that, under New York law, "'[i]n the absence of a

provision in the mortgage to the contrary, the collection of late fees after a mortgage note has

been accelerated is impermissible."' *Home Loan Inv. Bank v. Goodness & Mercy, Inc.*, No. 10-

CV-4677 (ADS) (ETB), 2012 U.S. Dist. LEXIS 46256 at *17 (E.D.N.Y. March 30, 2012)

(*quoting Carreras v. Weinreb*, 33 A.D.3d 953, 955 (2d Dep't 2006)); *see also Pereira v. Cogan*,

294 B.R. 449, 515 (S.D.N.Y. 2003) ("The Trustee is only entitled to a late charge up until the

time that the notes at issue were accelerated ... ") (*citing Centerbank v. D 'Assaro*, 158 Misc. 2d

92 (N.Y. Sup. Ct., Suffolk Cnty. 1993)). The basis for this general rule is that it is "inconsistent

to allow a lending institution to accelerate a note, thereby denying the debtor the right under the

mortgage note to make monthly installments and to continue to insist on its own right under the

note to impose monthly late charges." *Id*. (*citing Green Point Sav. Bank v. Varana*, 236 A.D.2d

443, 443 (2d Dep't 1997) (*quoting Centerbank*, 158 Misc. 2d at 95); *LaSalle Bank Nat'l Ass 'n v.

Shepherd Mall Partners, LLC*, 2006 OK CIV APP 91, 140 P.3d 559, 562 (Okla. Civ. App.

2005)); *see also Reis v. Decker*, 135 Misc. 2d 741, 742 (Cnty. Ct. of N.Y., Delaware Cnty. 1987)

(by electing to accelerate the mortgage debt and proceeding by foreclosure plaintiff had "elected

to seek recovery of the full amount due, rather than to sue only for those installments which are

currently due. The purpose of late charges is to compensate a creditor for the expense and

inconvenience of collecting installments. Such charges are proper and recoverable in actions to

recover installments which are due and unpaid, but are not recoverable in a foreclosure

proceeding whereat one seeks to recover a full accelerated principal debt.").  Courts have

consistently held further, that a creditor should not receive both default interest and late charges

21

as both are "designed to compensate the lender for the same injury, and awarding both amounts

to a double recovery." *In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012); *see

also In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998).

57.     In summary, the principal amount due, as reflected in Signature Bank loan

statements, is $37,283,614.25. Brooklyn Lender now seeks more than $74,515,177, claiming

$37,231,563 for default interest, late fees, and legal fees, despite, the Debtors assert, the absence

of payment defaults. The Debtors respectfully submit that contrary to Brooklyn Lender's

insinuations of Debtor misconduct, Brooklyn Lender is the true party with unclean hands.

Brooklyn Lender disagrees, and, unless the foregoing issues are consensually resolved, the

Bankruptcy Court will determine them at the Confirmation Hearing to the extent relevant to the

Debtors' request for confirmation of the Plan.

**Treatment of Brooklyn Lender**

58.     The Debtors filed these cases to obtain a determination that the

Acceleration Notices were defective, that the loans were not in default, and/or that any such

defaults were so non-material or remote in time as to be unenforceable in law and equity. As

noted in footnote 2 above, the Debtors would not be the first to defeat Maverick's attempts to

manufacture defaults.

59.     In any event, the Court may disregard a contractual provision calling for

high default interest rates when such rates would be inequitable. In *In re P. G. Realty Co.,* 220

B.R. 773 (Bankr. E.D.N.Y. 1998), the Court held that "it possesses the power to modify rights

created by state law or private agreement. Indeed, the Bankruptcy Code itself contains many

provisions which specifically modify or abrogate such rights. The Code is also replete with

instances in which Congress has made such a power explicit." *Id.,* 220 B.R. at 780 (citations

omitted). *See also In re Marfin Ready Afix Corp.,* 220 B.R. 148, 155-56 (Bankr. E.D.N. Y. 1998)

(acknowledging that Courts may take a flexible approach when considering the application of

contractual default interest rates); *accord, In re Vest Assocs.,* 217 B.R. 696, 702-703 (S.D.N.Y.

1998); *Cf. In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011); *See, In

re Northwest Airlines, Corp.*, 2007 WL 3376895, (Bankr. S.D.N.Y. 2007). Here, 24% interest is

punitive and should not be permitted under any circumstances because it bears no reasonable

relationship to the Mortgagee's actual damages.

60.   The Debtors have obtained Exit Financing, the terms of which are annexed

as Exhibit A to the Plan, to pay all creditors the Allowed Amounts their Claims under the Plan,

including Brooklyn Lender at the non-default contract rate.

61.   In the meantime, the Properties' rental income is being used to pay debt

service to Brooklyn Lender and to preserve and protect the Properties.

62.   The Plan is based on the Property values set forth on Exhibit C to the Plan.

Those values were estimated generally based on the Exit Financing amounts set forth in Exhibit

A to the Plan.

## DEBTORS' PLAN OF REORGANIZATION

## CLASSIFICATION AND TREATMENT OF CLAIMS

### Class 1

63.   **Classification** – Allowed Secured Claims for New York City real estate

taxes and other non-Class 2 Liens. Annexed to the Plan as Exhibit B is a breakdown of the

amount due to Class 1, by Debtor. The Debtors estimate the aggregate amount of all Class 1

Claims is approximately $209,866.

64.    **Treatment** -- Payment in Cash on the Effective Date of Allowed Amount

of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition

Date through the date of payment.

65.    **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and

deemed to accept the Plan.

## **Class 2**

66.    **Classification** –Allowed Secured Claims of the Mortgagee.  Annexed to

the Plan as Exhibit B is a breakdown of the estimated Allowed Secured Claims of the

Mortgagee, by Debtor.  The Debtors estimate the aggregate of all Class 2 Claims is $37,625,717.

67.    **Treatment** –On the Effective Date, pursuant to section 1124 of the

Bankruptcy Code, each Debtor shall cure pre-Petition Date and post-Petition Date defaults, if

any, retroactively extend the maturity dates with respect to each Debtor who could not extend

due the Mortgagee's acceleration, and then pay in Cash the outstanding amounts due on the

Effective Date.

68.    **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and

deemed to accept the Plan..

## **Class 3**

69.    **Classification** –  Allowed Priority Claims under sections

507(a)(3),(4),(5),(6), and (7) of the Bankruptcy Code.  Annexed to the Plan as Exhibit B is a

24

breakdown of such estimated Allowed Priority Claims, by Debtor.  The Debtors estimate that the

aggregate amount of all Class 3 Claims is approximately $0.

70.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount

of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition

Date through the date of payment.

71.    **Voting --** Unimpaired under section 1124 of the Bankruptcy Code and

deemed to accept the Plan..

## Class 4

72.    **Classification** – Allowed General Unsecured Claims.  Annexed to the

Plan as Exhibit B is a breakdown of estimated Allowed General Unsecured Claims by Debtor.

The Debtors estimate that the aggregate amount of all Class 4 Claims is approximately

$4,785,330.

73.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount

of each such Claim plus interest at the Legal Rate as it accrues from the Petition Date through the

date of payment, provided, that each Class 4 Creditor shall be entitled to elect to take New

Owner Interests in the New Owner succeeding the Debtor against which the Claimant holds an

Allowed Claim as provided herein in lieu of Cash payment of its Class 4 Claim.  Annexed to the

Plan as Exhibit C is a spreadsheet indicating the projected percentage New Owner Interests

allocated by Debtor per $1,000 of Class 4 Claims.  The basis for the pro-rata calculation of the

New Owner Interests that a Class 4 Creditor may elect to receive is its Class 4 Claim.  The

calculation of the value of the New Owner Interests to be disbursed is based on each New

Owner's net equity in its Property.  The net equity is calculated by subtracting the respective

New Owner's post-Confirmation Date mortgage from the Property value. For example, if a New

Owner owns a $500,000 property encumbered by a $400,000 post-Confirmation mortgage, such

New Owner will have net equity of $100,000 in the Property. If a Claimant holds a $1,000 Class

4 Claim, the Claimant shall be entitled to New Owner Interests in such New Owner equal to

$1,000 of such net equity, which, in this example would equate to a 1% membership Interest

representing 1% of the New Owner's $100,000 net equity. If the dollar amount of Class 4

Claims electing to take New Owner Interests exceeds the dollar amount of the respective New

Owner's net equity, such holders of Class 4 Claims shall be entitled to their Pro-Rata percentage

of the New Owner Interests in such new Owner. The Debtors believe that Claimants with Class

4 Claims totaling at least $4,331,000 will elect to receive Interests instead of Cash.

74.     Unlike Cash payment, ownership of New Owner Interests involves risks

associated with the ownership of an interest in an entity that owns real property. If a Creditor

elects to take Interest in lieu of Cash, the value of such Interests is subject change based on the

real estate market, the management of the New Owner, and the management of the New Owner's

Property. Interests may lose some or all of their value based on these and other factors. In

addition, there is no assurance that the Interests can be easily liquidated.

75.     To elect to receive Interests instead of Cash, a Class 4 Claimant must

complete the "Unsecured Creditor Election Form" annexed as Exhibit C to the Disclosure

Statement and deliver the completed form so as to be received no later than February 19, 2020 at

5:00 p.m. (EST) at the following address:

Backenroth Frankel & Krinsky, LLP
800 Third Avenue
New York, New York 10022
Attn: Mark A. Frankel, Esq.

26

(212) 593-1100

76.    **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan.

## Class 5

77.    **Classification** – Allowed Interest Holders.

78.    **Treatment** – On the Effective Date, all Interests will be cancelled and Interest Holders shall be entitled to New Owner Interests under the same terms as their exiting Interests in the Debtors, but subject to dilution Pro Rata, by the New Owner Interests distributed hereunder to (a) holders of Class 4 Claims that elect to receive New Owner Interests in the respective New Owners instead of Cash payment and (b) holders of Class 6 Claims.  If the distribution of New Owner Interests to holders of Class 4 Claims and or Class 6 Claims exceeds a New Owner's net equity in its Property, existing Class 5 Interest Holders of the predecessor Debtor will be entitled to no Interests in such New Owner.

79.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

## Class 6

80.    **Classification** – Allowed Claims based on facts as generally alleged in the Federal Action in Proofs of Claim set forth in Exhibit E to the Plan.

81.    **Treatment** – Class 6 Claims shall be subordinated pursuant to section 510(b) of the Bankruptcy Code to the same priority as Class 5 Interests.  On the Effective Date, all Class 6 Claims shall be entitled to New Owner Interests in the respective New Owners based on the Allowed Amount of such Class 6 Claim.  The value of the Interests that a Federal Action

27

Claimant may elect to receive is based on the Claimant's Claim. The calculation of the value of the New Owner Interests to be distributed is based on each New Owner's net equity in its Property. The net equity is calculated by subtracting the respective Post Confirmation New Owner's Post-Confirmation mortgage from the Property value. The New Owner's net equity must then be reduced further by New Owner Interests distributed to Class 4 Creditors who elect Interests in lieu of Cash. For example, if a Post-Confirmation New Owner owns a $500,000 property encumbered by a $400,000 Post-Confirmation mortgage, such Post Confirmation New Owner will have net equity of $100,000 in the Property. That net equity will then be reduced by the Interests distributed to Class 4 Claimants that elect to take Interests in lieu of Cash. If, in this example, Class 4 Claimants with Claims totaling $60,000 elect to take Interests, $40,000 of New Owner Interests will be available to Class 6 Claimants. If a Class 6 Claimant holds a $1,000 Allowed Class 6 Claim, the Claimant shall be entitled to Interests in the Post Confirmation New Owner equal to $1,000 of such net equity, which, in this example would equate to a 1% membership interest representing 1% of the Post Confirmation New Owner's net equity. But if in this example the Allowed dollar amount of Class 6 Claims entitled to take Interests exceeds the $40,000 dollar amount of the New Owner's net equity after distribution of Interests to electing Class 4 Claimants, such Class 6 Claimants shall be entitled to their pro-rata percentage of the remaining $40,000 of New Owner Interests.

82.   **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### UNCLASSIFIED PRIORITY TAX CLAIMS

83.   Annexed to the Plan as Exhibit B is breakdown of Priority tax Claims under Section 507(a)(8) of the Bankruptcy Code by Debtor. The Debtors estimate that the

28

amount due by all Debtors in respect of such claims total approximately $0.  The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of the Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

### ADMINISTRATIVE EXPENSES

84.     Allowed Administrative Expense Claims, including professional fees, shall be paid in full in Cash on the later of the Effective Date and the date such Administrative Expense Claim becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business or under Executory Contracts assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  The Debtors estimate that through the entry of a final decree in this case, Allowed Administrative Expenses will total approximately $15,000 per Debtor plus litigation legal fees for a total of at least $255,000.   $350,000 shall be escrowed for payment when Allowed, and then paid in the amounts Allowed.

85.     Any outstanding U.S. Trustee fees and any statutory interest thereon shall be paid in full in Cash on the Effective Date.  Thereafter, United States Trustee fees and any statutory interest thereon shall be paid until entry of final decree or until Bankruptcy Case is converted or dismissed.  The Debtors shall file quarterly post-Confirmation operating reports.

29

## **MEANS FOR IMPLEMENTATION**

86.    **Source of Funds** – Effective Date payments under the Plan will be paid
from the Exit Financing, the terms of which are annexed to the Plan as Exhibit A.  Under the
Exit Financing each Debtor must transfer its assets including its Property to the New Owners,
which shall assume responsibility for repayment of the Exit Financing.  The transfer of each
Property to the New Owners under the Plan shall be free and clear of all liens, claims and
encumbrances, with any such liens, claims and encumbrances to attach to the Exit Financing in
the same amount and order of priority, and subject to the same defenses as existed before the
Effective Date, and to be disbursed under the Plan, provided, however, that the Mortgagee shall
assign its mortgages to the holder of the Exit Financing in connection with the transfer of the
Properties under the Plan.  The financing is short term hard money bridge financing which the
Debtors intend to replace with conventional financing.  To the extent that the Debtors' net
operating income is insufficient to pay debt service, the interest reserve under the Exit Financing
will be applied.  The Debtors shall have no separate responsibility for Post-Confirmation debt
service.  The New Owners are responsible for repayment of the Exit Financing.

87.    The New Owners shall be formed as New York or Delaware limited
liability companies with operating agreements that comply with the terms of the Exit Financing.
All New Owner Interests to be distributed under the Plan shall be on the principle of "one share,
one vote," with no proportionate voting, class voting or the like, and otherwise in conformance
with New York law.  As a condition to receipt of New Owner Interests, each potential Interest
holder shall comply with such disclosure as may be required as a condition to the Exit Financing.

88.     **Vesting** -- Except as otherwise provided in the Plan, on the Effective Date all assets and Properties of the Estate of each Debtor shall vest in such Debtor/New Owner free and clear of all Liens, Claims and encumbrances and any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.

89.     **Execution of Documents** -- Each Debtor/New Owner shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, mortgage assignment, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

90.     **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

91.     **Preservation of Claims** -- All rights pursuant to sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to sections 544 and 548 of the Bankruptcy Code, and all claims relating to post-Petition Date transactions under section 549 of the Bankruptcy Code shall be preserved for the benefit of each Debtor's estate, provided, however, that such Debtor shall have sole authority for prosecuting any such claims.  Because all creditors are being

31

paid in full under the Plan, the Debtors do not anticipate preference or fraudulent claims.  The

Debtors' rights to assert claims, including without limitation, tort, contract and lender liability

claims against Brooklyn Lender are fully preserved.

92.    **Stamp Tax** -- Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a)

the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of

any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of

any lease or sublease or the making or delivery of any deed or other instrument of transfer under

the Plan, including, without limitation, any deeds, bills of sale or assignments executed in

connection with the transfer of each Property to the New Owners and any other transaction under

the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors under

the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means,

and the making, delivery or recording of any deed or other instrument of transfer under the Plan,

including, without limitation, the Confirmation Order, shall not be subject any applicable

document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate

transfer tax, or other similar tax or governmental assessment.

93.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each

holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the subject

Debtor/New Owner any and all property of the Estate that secures or purportedly secures such

Claim, as pertains to such Property or such Lien shall automatically, and without further action

by such Debtor/New Owner be deemed released, and (y) execute such documents and

instruments as such Debtor/New Owner requests to evidence such Claim holder's release of such

property or Lien.

## LIQUIDATION ANALYSIS

94.     In a liquidation under Chapter 7 of the Bankruptcy Code, each Debtor's

assets would be sold and the sale proceeds distributed to creditors in their order of priority.  The

Debtors believe that the Plan provides at least an equivalent return for each Debtor's estate as

could be achieved in a liquidation.  As set forth on Exhibit B hereto, each Debtor projects that in

a Chapter 7 liquidation the return to such Debtor's Estate would be reduced by an additional

layer of administration legal expenses and commissions, which the Debtors estimates would total

at least 15% of the sale proceeds.

## LITIGATION ANALYSIS

95.     The Debtors are aware of no litigation with third parties, except (a) the

Mortgagee's foreclosure which will be moot upon payment under the Plan, (b) motion to reopen

a dismissed Federal Court action interposed by certain alleged Interest Holders, and (c) in the D

& W Real Estate Spring LLC case, a contract dispute and personal injury lawsuit.  Since the Plan

leaves all creditors unimpaired, the Debtors have no avoidance actions to pursue.

## PAYMENT OF CLAIMS AND OBJECTIONS TO CLAIMS

96.     Each Debtor shall be disbursing agent under its Plan without a bond.  The

Debtors reserve the right to file objections to Claims in the event grounds exist to object to

particular Claims, for a period of 60 days after the Effective Date; or in the case of a Claim based

on the rejection of an Executory Contract, 60 days after such proof of Claim is filed.  On the

initial distribution date and on each distribution date as may thereafter be necessary, the Debtors

shall maintain a Disputed Claim Reserve for the holders of Disputed Claims as of such date in a

sum not less than the amount required to pay each such Disputed Claim under the Plan if such

Claim was Allowed in full.  To the extent that a Disputed Claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the Disputed Claim Reserve and paid to the holder of such Allowed Claim.  After all the amounts of all Disputed Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

97.     Tenant leases shall be deemed assumed under the Plan and assigned to the New Owners under sections 365 and 1123 of the Bankruptcy Code.  Except for any other Executory Contracts that a Debtor assumes before the Confirmation Date, all other Executory Contracts shall be rejected under the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.  In the event of a rejection which results in damages, a proof of Claim for such damages must be filed by the non-Debtor party with the Court on or before sixty (60) days after the Effective Date. All Allowed Claims arising from the rejection of any Executory Contract shall be treated as Class 4 Claims, provided, however, that such Claimants shall not be entitled to elect to take New Owner Interests in lieu of Cash payment.  Any Claim arising from the rejection of any Executory Contract not filed with the Court within the time period provided herein shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## MANAGEMENT OF THE DEBTORS

98.     Each Debtor is managed by David Goldwasser, as authorized signatory of GC Realty Advisors, LLC, as Vice President.  Post-confirmation management shall remain unchanged.

34

## TAX CONSEQUENCES

99.    The Debtors do not believe that there will be any negative tax consequences to the Debtors or to Creditors under the Plan.  To the extent that a creditor is not paid in full under the Plan, such creditor may be entitled to a bad debt deduction.  To the extent that a creditor has taken a bad debt deduction, Plan distributions may be taxable as income.

100.    THE DEBTORS DO NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE CREDITORS OR INTEREST HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE PLAN.

## VOTING PROCEDURES AND REQUIREMENTS

101.    Since all creditor classes are Unimpaired, there will be no voting on the Plan by Creditors except holders of Class 6 Claims which are deemed to be Interests in the Allowed Amount of their Claims.  Interest Holders are impaired and are entitled to vote to accept or reject the Plan.  These cases have not been substantively consolidated.  Each Interest Holder may vote to accept the Plan with respect to each Debtor in which it holds an Interest.

102.    A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement.  Interest Holders must specify on the ballot the Debtor in which Interests are held.  Each Interest Holder is entitled to execute the ballot, and return it to the undersigned to be considered for voting purposes with respect to such Debtor.  The Bankruptcy Court has directed that to be counted for voting purposes, ballots for the acceptance or rejection of the Plan

must be received no later than February 19, 2020 at 5:00 p.m. (EST) (the "Voting Deadline") at

the following address:

> Backenroth Frankel & Krinsky, LLP
> 800 Third Avenue
> New York, New York 10022
> Attn: Mark A. Frankel, Esq.

103.    Each Interest Holder impaired under the Plan is entitled to vote, if either

(i) its Interest has been scheduled by the Debtor, or (ii) it has filed a proof of Claim on account of

its Interest on or before the last date set by the Bankruptcy Court for such filings.

104.    Class 5 and Class 6 Interest Holders are impaired under the Plan and are

eligible, subject to the limitations set forth above, to vote to accept or reject the Plan with respect

to each Debtor in which it holds an Interest.

105.    Any Interest as to which an objection has been filed (and such objection is

still pending) is not entitled to vote, pursuant to Section 1126(a) of the Bankruptcy Code, unless

the Bankruptcy Court temporarily allows the interest, pursuant to Bankruptcy Rule 3018 for the

purpose of accepting or rejecting the Plan, upon motion by an Interest Holder subject to an

objection.  Such motion must be heard and determined by the Bankruptcy Court prior to the

voting deadline in order for any such Interest Holder's vote to be counted.

106.    An Interest Holder's vote may be disregarded pursuant to Section 1126(e)

of the Bankruptcy Code if the Bankruptcy Court determines that the Creditor's acceptance or

rejection was not solicited or procured in good faith or in accordance with the provisions of the

Bankruptcy Code.

107.     Section 1126(d) of the Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

## CRAMDOWN

108.     In the event that an impaired class of Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

109.     A plan is fair and equitable with respect to a nonaccepting class of Interests in two instances.  First, a plan is fair and equitable with respect to a nonaccepting class of Interests if the plan provides that each Interest Holder will receive or retain property of a value, as of the effective date of the plan, equal to the greatest of: (1) the allowed amount of any fixed liquidation preference to which the interest holder is entitled, (2) any fixed redemption price to which the interest holder is entitled or (3) the value of such interest. Second, a plan is fair and equitable with respect to a nonaccepting class of interests if the plan provides that the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan.

110.     In the event that Class 5 or Class 6 rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against that Class.

## CONFIRMATION OF THE PLAN

111.    Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy

Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing").

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

112.    By order of the Bankruptcy Court, the Confirmation Hearing, (as

subsequently adjourned) has been scheduled for February 26, 2020, at 10:00 a.m., in the

Honorable Robert D. Drain's Courtroom, United States Bankruptcy Court, 300 Quarropas Street,

White Plains, NY 10601−5008.  The Confirmation Hearing may be adjourned from time to time

by the Bankruptcy Court without further notice except for an announcement made at the

Confirmation Hearing or any adjourned Confirmation Hearing.  Any objection to confirmation of

the Plan must be made in writing and filed with the Bankruptcy Court with proof of service and

served upon the following on or before February 19, 2020 at 5:00 p.m.:  Backenroth Frankel &

Krinsky, LLP, 800 Third Avenue, New York, New York  10022, Attn:  Mark A. Frankel, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

113.    At the Confirmation Hearing, the Bankruptcy Court will determine with

respect to each Debtor whether the requirements of Section 1129 of the Bankruptcy Code have

been satisfied to enter an order confirming the Plan.  For each Debtor, the applicable

requirements are as follows:  (a)  The Plan complies with the applicable provisions of the

Bankruptcy Code, (b) the Debtor has complied with the applicable provisions of the Bankruptcy

Code; (c) the Plan has been proposed in good faith and not by any means forbidden by law, (d)

any payment made or promised or by a person issuing securities or acquiring property under the

Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in

38

connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the

Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable,

or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the

approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and

affiliations of any individual proposed to serve, after confirmation of the Plan, as a director,

officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the

Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in,

such office of such individual, is consistent with the interests of Creditors and equity security

holders and with public policy, and the Debtor has disclosed the identity of any insider that will

be employed or retained by the reorganized Debtor, and the nature of any compensation for such

insider, (f) with respect to each class of impaired Claims, either each holder of a Claim or

interest of such class has accepted the Plan, or will receive or retain under the Plan on account of

such Claim or interest property of a value, as of the Effective Date of the Plan, an amount that is

not less than the amount that such holder would so receive or retain if the Debtor was liquidated

on such date under Chapter 7 of the Bankruptcy Code, (g) each class of Claims or interests has

either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder

of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that

Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least

one class of impaired Claims has accepted the Plan, determined without including any

acceptance of the Plan by any insider holding a Claim of such class, and (j) confirmation of the

Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization of the Debtor or any successors to the Debtor under the Plan unless such

liquidation or reorganization is proposed in the Plan.

114.     The Debtors believe that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that each Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

## CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

115.     The Confirmation Order shall be a Final Order and shall provide for the transfer of the Debtors' real property to the respective New Owners free and clear of liens, claims, encumbrances and interests of any kind, other than the Exit Financing.  The Confirmation Order shall be in a form acceptable to the Debtors.  These conditions to confirmation of the Plan and to the occurrence of the Effective Date are for the benefit of the Debtors.  The requirement that a particular condition be satisfied may be waived in whole or part by the Debtors.

## **CONCLUSION**

The Debtors urge the Debtors' Creditors to support the Plan.

Dated: New York, New York
          January 21, 2020

<div style="margin-left:40%">

53 STANHOPE LLC ET AL.
Debtors and Debtors in Possession

By:      s/ David Goldwasser, as authorized
signatory of GC Realty Advisors, LLC, as Vice
President

**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Debtors**

By:      s/Mark Frankel
          800 Third Avenue
          New York, New York 10022
          (212) 593-1100

</div>

41

## Exhibit A to Disclosure Statement

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re                                                        Chapter 11

      53 STANHOPE LLC, *et al*,[3]                    Case no.  19-23013 (RDD)
                                       Jointly Administered

                             Debtors.

-----------------------------------------------------------x

## AMENDED PLAN OF REORGANIZATION

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

ATTORNEYS FOR THE DEBTORS

---------------------------------

[3] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## INTRODUCTION

53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole And Lorimer  LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, And 167 Hart LLC (each a "Debtor", and collectively, the "Debtors") submit this joint plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG EACH DEBTOR AND EACH DEBTOR'S CREDITORS AND INTEREST HOLDERS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.    "Administrative Expense" Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code.

2.    "Administrative Expense Claim" shall mean a Claim for payment of an Administrative Expense.

3.    "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

2

4. "Allowed Amount" shall mean the amount of a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on a Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

5. "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on a Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

6. "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

7. "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

8. "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

9. "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.).

10. "Bankruptcy Court" shall mean the Court as defined below.

11. "Bar Date" shall mean August 9, 2019.

12. "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

3

13.    "Claim" shall have the meaning set forth in § 101(5) of the Bankruptcy Code.

14.    "Claimant" shall mean the holder of a Claim.

15.    "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

16.    "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

17.    "Confirmation Order" shall mean the order of the Court confirming the Plan.

18.    "Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

19.    "Creditor" shall mean any entity that holds a Claim against a Debtor.

20.    "Debtors" shall mean 53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC, D&W Real Estate Spring LLC, Meserole And Lorimer  LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, And 167 Hart LLC (each a "Debtor", and collectively, the "Debtors").

4

21.    "Disputed Claim" shall mean the whole or any portion of any Claim against a Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

22.    "Disputed Claim Reserve" shall mean Cash to be set aside by the Debtors on the Effective Date in an IOLA account maintained by Debtors' counsel, in an amount equal to the amount that would have been distributed to the holders of Disputed Claims had such Claims been deemed Allowed Claims on the Effective Date, or in such other amount as may be approved by the Bankruptcy Court.

23.    "Effective Date" shall mean the Date upon which the Confirmation Order is a Final Order, or such other date no later than 60 days after the Confirmation Date as may be practicable.

24.    "Estate" shall mean the estate of each Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

25.    "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

26.    "Exit Financing" shall mean that certain financing to be entered into to fund the Plan on the Effective Date substantially on the terms described in Exhibit A to the Plan.

27.    "Federal Action" shall mean the certain dismissed lawsuit captioned Jacob Schonberg, et al v. Yechezkel Strulovitch a/k/a Chaskiel Strulovitch, et al., Case No. 17-cv-02161, filed in the United States District Court for the Eastern District of New York.

5

28.     "Final Order" shall mean an order of a court that has not been reversed,

modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari

thereof has expired, and as to which no appeal, review or rehearing is pending.

29.     "Impaired" shall mean not Unimpaired.

30.     "Interest" shall mean an existing ownership interest in a Debtor.

31.     "Interest Holder" shall mean a holder and owner of an existing Interest in

a Debtor.

32.     "Legal Rate" shall mean the applicable interest rate as set forth in 28

U.S.C. §1961 as of the Petition Date.

33.     "Lien" shall mean a valid and enforceable charge against or interest in

property to secure payment of a debt or performance of an obligation.

34.     "Mortgagee" shall mean Brooklyn Lender LLC.

35.     "New Owner" shall mean, with respect to each Debtor, a newly created

special purpose entity to whom such Debtor's real property will be transferred on the Effective

Date as a condition to the Exit Financing.

36.     "New Owner Interests" shall mean the equity Interests in the New Owner.

37.     "Petition Date" shall mean May 20, 2019.

38.     "Plan" shall mean this Plan of Reorganization, and any and all

modifications and/or amendments hereto.

39.     "Plaintiffs" shall mean the Federal Action plaintiffs.

6

40.     "Properties" and each "Property" shall mean the real properties itemized on Exhibit D to the Plan.

41.     "Secured Claim" shall mean a Claim secured by a Lien on property included within a Debtor's Estate, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent provided in Section 506 of the Bankruptcy Code.

42.     "Secured Creditor" shall mean the owner or holder of a Secured Claim.

43.     "Unimpaired" shall mean not impaired under section 1124 of the Bankruptcy Code.

44.     "Unsecured Claim" shall mean a Claim that is not a Secured Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code, and does not include Administrative Expense Claims.

45.     "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

## CLAIMS CLASSIFICATION, TREATMENT AND VOTING

### Class 1

46.     **Classification** – Allowed Secured Claims for New York City real estate taxes and other non-Class 2 Liens.  Annexed to the Plan as Exhibit B is a breakdown of the amount due to Class 1, by Debtor. The Debtors estimate the aggregate amount of all Class 1 Claims is approximately $209,866.

7

47.    **Treatment** -- Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

48.    **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan.

## Class 2

49.    **Classification** – Allowed Secured Claims of the Mortgagee.  Annexed to the Plan as Exhibit B is a breakdown of the estimated Allowed Secured Claims of the Mortgagee, by Debtor.  The Debtors estimate the aggregate of all Class 2 Claims is $37,625,717.

50.    **Treatment** –On the Effective Date, pursuant to section 1124 of the Bankruptcy Code, each Debtor shall cure pre-Petition Date and post-Petition Date defaults, if any, retroactively extend the maturity dates with respect to each Debtor who could not extend due the Mortgagee's acceleration, and then pay in Cash the outstanding amounts due on the Effective Date.

51.    **Voting** – Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan..

## Class 3

52.    **Classification** –  Allowed Priority Claims under sections 507(a)(3),(4),(5),(6), and (7) of the Bankruptcy Code.  Annexed to the Plan as Exhibit B is a breakdown of such estimated Allowed Priority Claims, by Debtor.  The Debtors estimate that the aggregate amount of all Class 3 Claims is approximately $0.

8

53.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

54.    **Voting --** Unimpaired under section 1124 of the Bankruptcy Code and deemed to accept the Plan..

### Class 4

55.    **Classification** – Allowed General Unsecured Claims.  Annexed to the Plan as Exhibit B is a breakdown of estimated Allowed General Unsecured Claims by Debtor. The Debtors estimate that the aggregate amount of all Class 4 Claims is approximately $4,785,330.

56.    **Treatment** – Payment in Cash on the Effective Date of Allowed Amount of each such Claim plus interest at the Legal Rate as it accrues from the Petition Date through the date of payment, provided, that each Class 4 Creditor shall be entitled to elect to take New Owner Interests in the New Owner succeeding the Debtor against which the Claimant holds an Allowed Claim as provided herein in lieu of Cash payment of its Class 4 Claim.  Annexed to the Plan as Exhibit C is a spreadsheet indicating the projected percentage New Owner Interests allocated by Debtor per $1,000 of Class 4 Claims.  The basis for the pro-rata calculation of the New Owner Interests that a Class 4 Creditor may elect to receive is its Class 4 Claim.  The calculation of the value of the New Owner Interests to be disbursed is based on each New Owner's net equity in its Property.  The net equity is calculated by subtracting the respective New Owner's post-Confirmation Date mortgage from the Property value.  For example, if a New Owner owns a $500,000 property encumbered by a $400,000 post-Confirmation mortgage, such

9

New Owner will have net equity of $100,000 in the Property.  If a Claimant holds a $1,000 Class

4 Claim, the Claimant shall be entitled to New Owner Interests in such New Owner equal to

$1,000 of such net equity, which, in this example would equate to a 1% membership Interest

representing 1% of the New Owner's $100,000 net equity.  If the dollar amount of Class 4

Claims electing to take New Owner Interests exceeds the dollar amount of the respective New

Owner's net equity, such holders of Class 4 Claims shall be entitled to their Pro-Rata percentage

of the New Owner Interests in such new Owner.  The procedures to elect distribution of New

Owner Interests in lieu of Cash are set forth in the Amended Disclosure Statement for the Plan.

57.    **Voting** – . Unimpaired under section 1124 of the Bankruptcy Code and

deemed to accept the Plan..

### Class 5

58.    **Classification** – Interest Holders.

59.    **Treatment** – On the Effective Date, all Interests will be cancelled and

Interest Holders shall be entitled to New Owner Interests under the same terms as their exiting

Interests in the Debtors, but subject to dilution Pro Rata, by the New Owner Interests distributed

hereunder to (a) holders of Class 4 Claims that elect to receive New Owner Interests in the

respective New Owners instead of Cash payment and (b) holders of Class 6 Claims.  If the

distribution of New Owner Interests to holders of Class 4 Claims and or Class 6 Claims exceeds

a New Owner's net equity in its Property, existing Class 5 Interest Holders of the predecessor

Debtor will be entitled to no Interests in such New Owner.

60.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

10

## **Class 6**

61.    **Classification** – Allowed Claims based on facts as generally alleged in the
Federal Action in Proofs of Claim set forth in Exhibit E to the Plan.

62.    **Treatment** – Class 6 Claims shall be subordinated pursuant to section
510(b) of the Bankruptcy Code to the same priority as Class 5 Interests.  On the Effective Date,
all Class 6 Claims shall be entitled to New Owner Interests in the respective New Owners based
on the Allowed Amount of such Class 6 Claim.  The value of the Interests that a Federal Action
Claimant may elect to receive is based on the Claimant's Claim.  The calculation of the value of
the New Owner Interests to be distributed is based on each New Owner's net equity in its
Property.  The net equity is calculated by subtracting the respective Post Confirmation New
Owner's Post-Confirmation mortgage from the Property value.  The New Owner's net equity
must then be reduced further by New Owner Interests distributed to Class 4 Creditors who elect
Interests in lieu of Cash.  For example, if a Post-Confirmation New Owner owns a $500,000
property encumbered by a $400,000 Post-Confirmation mortgage, such Post Confirmation New
Owner will have net equity of $100,000 in the Property.  That net equity will then be reduced by
the Interests distributed to Class 4 Claimants that elect to take Interests in lieu of Cash.  If, in this
example, Class 4 Claimants with Claims totaling $60,000 elect to take Interests, $40,000 of New
Owner Interests will be available to Class 6 Claimants.  If a Class 6 Claimant holds a $1,000
Allowed Class 6 Claim, the Claimant shall be entitled to Interests in the Post Confirmation New
Owner equal to $1,000 of such net equity, which, in this example would equate to a 1%
membership interest representing 1% of the Post Confirmation New Owner's net equity.  But if
in this example the Allowed dollar amount of Class 6 Claims entitled to take Interests exceeds

11

the $40,000 dollar amount of the New Owner's net equity after distribution of Interests to electing Class 4 Claimants, such Class 6 Claimants shall be entitled to their pro-rata percentage of the remaining $40,000 of New Owner Interests.

63. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

## ADMINISTRATIVE EXPENSE CLAIMS AND STATUTORY FEES

64. Allowed Administrative Expense Claims, including professional fees, shall be paid in full in Cash on the later of the Effective Date and the date such Administrative Expense Claim becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business or under Executory Contracts assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction. The Debtors estimate that through the entry of a final decree in this case, Allowed Administrative Expenses will total approximately $15,000 per Debtor plus litigation legal fees for a total of at least $255,000. $350,000 shall be escrowed for payment when Allowed, and then paid in the amounts Allowed.

65. Any outstanding U.S. Trustee fees and any statutory interest thereon shall be paid in full in Cash on the Effective Date. Thereafter, United States Trustee fees and any statutory interest thereon shall be paid until entry of final decree or until Bankruptcy Case is converted or dismissed. The Debtors shall file quarterly post-Confirmation operating reports.

12

## **MEANS FOR IMPLEMENTATION**

66.   **Source of Funds** – Effective Date payments under the Plan will be paid

from the Exit Financing, the terms of which are annexed to the Plan as Exhibit A.  Under the

Exit Financing each Debtor must transfer its assets including its Property to the New Owners,

which shall assume responsibility for repayment of the Exit Financing.  The transfer of each

Property to the New Owners under the Plan shall be free and clear of all liens, claims and

encumbrances, with any such liens, claims and encumbrances to attach to Exit Financing

proceeds in the same priority, with same validity and subject to the same defenses as existed

immediately before the attachment, all as governed by the treatment of such Claims and Interests

under the Plan, and to be disbursed under the Plan; provided, however, that the Mortgagee shall

assign its mortgages to the holder of the Exit Financing in connection with the transfer of the

Properties under the Plan.

67.   The New Owners shall be formed as New York or Delaware limited

liability companies with operating agreements that comply with the terms of the Exit Financing.

All New Owner Interests to be distributed under the Plan shall be on the principle of "one share,

one vote," with no proportionate voting, class voting or the like, and otherwise in conformance

with New York law.  As a condition to receipt of New Owner Interests, each potential Interest

holder shall comply with such disclosure as may be required as a condition to the Exit Financing.

68.   **Stamp Tax** -- Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a)

the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of

any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of

any lease or sublease or the making or delivery of any deed or other instrument of transfer under

13

the Plan, including, without limitation, any deeds, bills of sale or assignments executed in

connection with the transfer of each Property to the New Owners and any other transaction under

the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors under

the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means,

and the making, delivery or recording of any deed or other instrument of transfer under the Plan,

including, without limitation, the Confirmation Order, shall not be subject any applicable

document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate

transfer tax, or other similar tax or governmental assessment.

69.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each

holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the subject

Debtor/New Owner any and all property of the Estate that secures or purportedly secures such

Claim, as pertains to such Property or such Lien shall automatically, and without further action

by such Debtor/New Owner be deemed released, and (y) execute such documents and

instruments as such Debtor/New Owner requests to evidence such Claim holder's release of such

property or Lien.

70.    **Execution of Documents** -- Each Debtor/New Owner shall be authorized

to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of

any Lien, mortgage assignment, Claim or encumbrance not expressly preserved in the Plan and

deliver such notices to any and all federal, state and local governmental agencies or departments

for filing and recordation.

71.    **Vesting of Assets** -- Except as otherwise provided in the Plan, on the

Effective Date all assets and Properties of the Estate of each Debtor shall vest in such

14

Debtor/New Owner free and clear of all Liens, Claims and encumbrances and any and all Liens,

Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed

extinguished as of such date.

72.      **Recording Documents** -- Each and every federal, state and local

governmental agency or department shall be authorized to accept and record any and all

documents and instruments necessary, useful or appropriate to effectuate, implement and

consummate the transactions contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and the Confirmation Order.

73.      **Preservation of Claims** -- All rights pursuant to sections 502, 544, 545

and 546 of the Bankruptcy Code, all preference claims pursuant to section 547 of the Bankruptcy

Code, all fraudulent transfer claims pursuant to sections 544 and 548 of the Bankruptcy Code,

and all claims relating to post-Petition Date transactions under section 549 of the Bankruptcy

Code shall be preserved for the benefit of each Debtor's estate; provided, however, that such

Debtor shall have sole authority for prosecuting any such claims.  Because all Creditors' Claims

are being paid in full under the Plan, the Debtors do not anticipate pursuing preference or

fraudulent transfer claims.  The Debtors' rights to assert claims, including without limitation,

tort, contract and lender liability claims against the Mortgagee are fully preserved.

## CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

74.      The Confirmation Order shall be a Final Order and shall provide for the

transfer of the Debtors' Property to the respective New Owners free and clear of liens, claims,

encumbrances and interests of any kind, other than the proceeds of the Exit Financing.  The

15

Confirmation Order shall be in a form acceptable to the Debtors.  These conditions to

Confirmation of the Plan and to the occurrence of the Effective Date are for the benefit of the

Debtors.  The requirement that a particular condition be satisfied may be waived in whole or part

by the Debtors.

## DISTRIBUTIONS TO CREDITORS

75.     Each Debtor shall be disbursing agent under its Plan without a bond.  The

Debtors reserve the right to file objections to Claims in the event grounds exist to object to

particular Claims, for a period of 60 days after the Effective Date; or in the case of a Claim based

on the rejection of an Executory Contract, 60 days after such proof of Claim is filed.  On the

initial distribution date and on each distribution date as may thereafter be necessary, the Debtors

shall maintain a Disputed Claim Reserve for the holders of Disputed Claims as of such date in a

sum not less than the amount required to pay each such Disputed Claim under the Plan if such

Claim was Allowed in full.  To the extent that a Disputed Claim becomes an Allowed Claim, the

distributions reserved for such Allowed Claim, shall be released from the Disputed Claim

Reserve and paid to the holder of such Allowed Claim.  After all the amounts of all Disputed

Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in

accordance with the Plan.

## EXECUTORY CONTRACTS

76.     Tenant leases shall be deemed assumed under the Plan and assigned to the

New Owners under sections 365 and 1123 of the Bankruptcy Code.  Except for any other

Executory Contracts that a Debtor assumes before the Confirmation Date, all other Executory

Contracts shall be rejected under the Plan on the Effective Date pursuant to sections 365 and

16

1123 of the Bankruptcy Code.  In the event of a rejection which results in damages, a proof of

Claim for such damages must be filed by the non-Debtor party with the Court on or before sixty

(60) days after the Effective Date. All Allowed Claims arising from the rejection of any

Executory Contract shall be treated as Class 4 Claims, provided, however, that such Claimants

shall not be entitled to elect to take New Owner Interests in lieu of Cash payment.  Any Claim

arising from the rejection of any Executory Contract not filed with the Court within the time

period provided herein shall be deemed discharged and shall not be entitled to participate in any

distribution under the Plan.

## **RETENTION OF JURISDICTION**

77.    <u>Retention of Jurisdiction</u>.  The Court shall have jurisdiction over all

matters arising under, arising in, or relating to each Debtor's Bankruptcy Case to the fullest

extent permitted including, but not limited to, with respect to section 1142 of the Bankruptcy

Code and proceedings:

- To consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

- To hear and determine all Claims, controversies, suits and disputes against the Debtors to the full extent permitted under 28 U.S.C. §§ 1334 and 157;

- To hear, determine and enforce all Claims and causes of action which may exist on behalf of the Debtors or a Debtor's Estate, including, but not limited to, any right of a Debtor or a Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

- To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

- To value assets of the Estate.

17

- To enforce the Confirmation Order, the final decree, and all injunctions therein;

- To enter an order concluding and terminating the Bankruptcy Case;

- To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

- To determine all questions and disputes regarding title to the assets of the Debtors.

- To re-examine Claims which may have been Allowed or disallowed for purposes of voting, and to determine objections which may be filed to any Claims.

## **GENERAL PROVISIONS**

78.    **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

79.    **Disputed Claims**.  The Debtors shall hold in escrow the distribution that would be due on account of any Disputed Claim.  No Disputed Claims shall be paid until such Claim becomes an Allowed Claim.

80.    **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

81.    **Other Actions**.  Nothing contained herein shall prevent the Debtors, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

82.    **Modification of Plan**.  The Debtors may seek amendments or modifications to the Plan in accordance with Section 1127 of the Bankruptcy Code at any time

prior to the Confirmation Date.  After the Confirmation Date, the Debtors may seek to remedy

any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order,

in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND DISCHARGE

83.   **Injunction**.  The Confirmation of this Plan shall constitute an injunction

of the Court against the commencement or continuation of any action, the employment of

process, or any act, to collect, recover or offset from the Debtors or their property or properties,

any obligation or debt except pursuant to the terms of the Plan.

84.   **Discharge.**  On the Effective Date, except as otherwise expressly provided

in this Plan or the Confirmation Order, the Plan shall:  (i) discharge each Debtor and any of its

assets from all Claims, demands, liabilities and other debts that arose on or before the Effective

Date, including, without limitation, all debts of the kind specified in Section 502 of the

Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed

filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim based on such debt is

Allowed pursuant to Section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or

has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based on

such debt has accepted this Plan; and (ii) preclude all entities from asserting against each Debtor

or any of its assets any other or further Claims based upon any act or omission, transaction or

other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to

Sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall

void any judgment obtained against each Debtor at any time, to the extent that such judgment

relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements

19

related to debts that arose on or before the Effective Date and such debts, Claims and agreements

are deemed restructured and new as set forth in the Plan.

## CLOSING THE BANKRUPTCY CASE

85.     Upon substantial consummation, the Debtors may move for a final decree

to close the Bankruptcy Case and to request such other orders as may be just.

Dated:  New York, New York
         January 21, 2020

                            53 STANHOPE LLC ET AL.

                     By:     s/ David Goldwasser, as authorized signatory of GC
                             Realty Advisors, LLC, as Vice President


                             BACKENROTH FRANKEL & KRINSKY, LLP
                             Attorneys for Debtors


                     By:     s/Mark A. Frankel
                             800 Third Avenue
                             New York, New York 10022
                             (212) 593-1100

20

Exhibit A

# LIGHTSTONE
## Capital

June 19, 2019

Cheskel Strulowitz
Address: [TBA]

**Re: Loan for 31 Assets in Brooklyn (the "<u>Property</u>")**

## MAGUIRE
CAPITAL GROUP

Dear Mr. Strulowitz:

The purpose of this Letter of Intent ("**<u>LOI</u>**") is to set forth certain of the proposed terms and conditions under which Lightstone Capital LLC (together with its affiliates, successors, assigns or designees, collectively, "**<u>Lender</u>**") may extend credit to a special purpose bankruptcy remote entity ("**<u>Borrower</u>**") in the form of a mortgage and Lender's option, mezzanine financing (the "**<u>Loan</u>**"), in each case relating to the Property. This LOI is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to provide the Loan or any other financing on the terms contained herein or any other terms. This LOI is not intended to set forth all of the terms and conditions of the proposed Loan, is for discussion purposes only and is non-binding for all purposes except as expressly set forth herein. Each of the provisions of this LOI which are phrased as covenants to enter into the Loan are subject to Lender's determination in its sole and absolute discretion and are subject to modification at any time by Lender.

| | |
|---|---|
| **Property:** | 31 Properties located throughout Brooklyn, New York with an aggregate gross area of 100,181 SF and 114 units (108 residential and 6 retail). See Exhibit A for summary of properties. |
| **Purpose of the Loan:** | Refinance existing loan. |
| **Borrower:** | The borrower ("**<u>Borrower</u>**") will consist of one or more newly formed, single purpose entities with no operations, assets, or activities other than the ownership interest in the Property and no debts or liabilities other than the Loan. Borrower will be structured as a bankruptcy-remote entity in a manner satisfactory to Lender. |
| **Closing Date:** | Subject to review of Bankruptcy proceedings. |
| **Loan Amount:** | $40,000,000 |
| **Initial Funding:** | Lender will disburse the full amount of the Loan to Borrower at closing, less the Interest Reserve and any other reserves determined by Lender to be appropriate based on the circumstances surrounding the Loan (collectively, the "**<u>Reserves</u>**"). |
| **Sponsor/Guarantor:** | Cheskel Strulowitz |
| **Interest Rate:** | The Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum. The Interest Rate will be charged on an actual/360 basis. |
| **Amortization:** | Interest Only |
| **Origination Fee:** | Borrower shall pay a fee equal to 2.00% of the Loan Amount to Lender or its designee at closing. |
| **Exit Fee:** | 1.00% of the Loan Amount will be due on any prepayment and/or repayment of the Loan including payoff at maturity and shall be paid, pro rata, in connection with any partial prepayments of the Loan. |

| | |
|---|---|
| **Term:** | 12 months |
| **Extension Option(s):** | Subject to certain conditions then existing, including that no event of default has occurred or is continuing, a satisfactory credit check, and a replenishment of Reserves as required by Lender, the Loan may be extended for three (3) separate six (6) month periods (each an "**Extension Period**") by Borrower. In consideration for each extension of the Loan, Borrower shall pay to Lender 0.50% (the "**Extension Fee**") and the Loan will bear interest at a floating rate of One Month LIBOR + 5.25% with a floor of 7.75% per annum (the "**Extension Interest Rate**"). The Interest Rate will be charged on an actual/360 basis. |
| **Loan Collateral & Loan Documents:** | The collateral for the Loan shall include, without limitation, (a) a first priority perfected mortgage, deed of trust or deed to secure debt, as applicable, encumbering the Property, (b) a first priority perfected assignment of leases and rents, (c) a first priority perfected assignment of all contracts, agreements, trademarks, licenses, goods, equipment, accounts, fixtures and all other tangible and intangible personal property located on or used in connection with the Property, (d) a first priority perfected security interest in all monies deposited into the lockbox account and cash management account, including all subaccounts, escrow accounts and reserve accounts, (e) the Guaranty of Non-Recourse Obligations, the Carry Guaranty, and the Completion Guaranty (each as defined herein), (f) UCC-1 financing statements (personal property, fixture filing and accounts and reserves), (g) an assignment of all development, design and construction contracts, and (h) any and all other agreements and assurances reasonable or customary in commercial transactions similar to the Loan.  The mortgage, deed of trust or deed to secure debt liens and the priority thereof shall be insured in favor of Lender and its successors and assigns, which insurance shall be issued and underwritten by a title insurance carrier designated by Lender.  The Loan shall be evidenced, secured and governed by documentation customary for similar transactions by Lender and be in form and substance acceptable to Lender in its sole discretion and consistent in all material respects with the terms and provisions hereof, including without limitation, standard loan documentation, security and insurance for mezzanine financings as Lender may require in the event Lender creates a mezzanine loan as described below (collectively, the "**Loan Documents**"). |
| **Prepayment:** | The Loan may be prepaid at any time subject to Lender's receipt of no less than $1,550,000 (equal to 6 months of projected interest costs) of interest payments ("the "**Minimum Interest**") such that, at the time of prepayment, if Lender has not received $1,550,000 in interest payments, Borrower will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment. |
| **Mezzanine:** | Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt or subordinate debt, as well as participations in the foregoing, and to create component notes to reflect such conversions; provided, however, that any such conversion shall not materially affect the all-in interest cost to Borrower.  If mezzanine debt is created, one or more mezzanine borrowers may be required to own 100% of the equity interests of Borrower. |
| **Recourse:** | Full recourse to Guarantor. Guarantor shall also execute an environmental indemnity agreement. |

Page 2

**Carry Guaranty:** Guarantor must execute a carry guaranty guaranteeing (a) interest due under the Loan, and (b) operating expenses, insurance premiums and real estate taxes related to the Property.

**Release Pricing:** To be determined at Closing

**Interest Reserve:** $1,250,000

**Other Reserves:** To be determined by Lender at closing of the Loan.

**No Additional Liens:** There shall be no financing, pledge, hypothecation or encumbrance, secured or unsecured, of the Property or of any direct or indirect ownership interests in Borrower at any level or tier of ownership, except the Loan.

**Due on Transfer:** Subject to Lender's standard exceptions with respect to permitted transfers, the Loan shall immediately become due and payable upon a transfer of all or any portion of the Property or of any direct or indirect ownership interests in Borrower.

**Assumption:** No assumption

**Financial Reporting:** Guarantor and Borrower shall provide to Lender, in form and substance acceptable to Lender, (a) leasing and operating reports no less than monthly and more frequently upon request, (b) Borrower-certified quarterly financial statements and operating statements, within fifteen (15) days of the end of each quarter, with each report providing information regarding such quarter as well as a year-to-date analysis, contrasted against the comparable period of the previous year and the then approved budget, (c) audited annual financial statements within sixty (60) days of the end of the year, and (d) such other information as Lender may reasonably request from time to time. Additionally, any and all material financial information received by Borrower related to the Property shall be made available to Lender within five (5) days of Borrower's receipt thereof.

**Lease Approvals:** All new leases and material amendments to existing leases are subject to Lender's reasonable prior approval.

**Title:** Borrower must provide Lender with such searches with respect to title to the Property, Borrower, its principals and Guarantor as Lender may require from time to time, including a survey thereof certified to Lender and the applicable title company. Borrower shall purchase an ALTA title insurance policy for Lender in the Loan Amount, containing such endorsements as Lender may require in its sole discretion.  Title work will be done by Madison Title Agency.

**Insurance:** Borrower shall maintain at all times, at Borrower's sole cost and expense, insurance policies with such coverages, carriers, amounts, and deductibles as are required by Lender from time to time. Each of Lender and its successors and assigns must be listed as mortgagee, loss payee and additional insured on all such policies.

**Due Diligence:** Prior to closing, Lender will conduct customary due diligence with respect to the Property, Borrower and Guarantor, all of which must be satisfactory to Lender.  All third party reports shall be addressed to Lender and shall upon delivery become the sole property of Lender, its successors and assigns.  As a condition to closing, Borrower shall represent and warrant to Lender that it has

not made, and the due diligence materials delivered to Lender have not included, any untrue statement of a material fact or any omission that makes Borrower's statements or any of the due diligence deliverables materially misleading.

**Patriot Act Disclosure:**     To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that enters into a business relationship with such institution. Accordingly, Lender's due diligence will include customary background searches on the direct and indirect owners of Borrower, and Lender is hereby authorized to conduct such searches.

**Confidentiality:**     In consideration of Lender's issuance of this LOI at Borrower's request, Borrower agrees not to disclose, or knowingly permit any third party to disclose, either the fact that that discussions or negotiations are taking place between the parties concerning the Loan or any of the proposed terms, conditions, or other facts relating to the Loan. The terms set forth in this LOI are proprietary to Lender and are made available to Borrower solely for the evaluation of the Loan contemplated hereby. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Broker Fee:**     There is no broker associated with this transaction. Borrower agrees to indemnify, defend and hold Lender harmless from and against any claims for a broker's commission, finder's fee or other payments no matter how described, and any other costs liabilities or expenses incurred by Lender in connection with any claim asserted by a broker or other party who claims to have worked with or represented Borrower in connection with the Loan. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Good Faith Deposit:**     Borrower or an affiliate thereof must remit a good faith deposit in the form of bank check or wire to Lender ("**Deposit**") in the amount of $75,000 concurrently with an executed copy of this LOI. The Deposit will be applied towards initial due diligence and 3rd party reports (Appraisals, Property Condition, Environmental Review, etc.) expected to be completed within 21 business days from receipt of Deposit. Borrower hereby agrees that its acceptance of this LOI shall constitute its unconditional agreement (a) that the Deposit may be held by Lender and used to pay all out-of-pocket expenses, fees, cost and charges actually incurred by Lender in any way relating to the Loan (including Lender's underwriting due diligence in connection therewith), including without limitation    legal    and auditing fees, appraisals, environmental and structural engineering reports for the Property, any other necessary or appropriate third party reports, recording and filing fees, taxes and other customary costs and expenses (collectively, "**Costs**"), and (b) to indemnify, defend and hold Lender harmless from and against all such Costs. All such Costs are due and payable regardless of whether a loan commitment is issued or the Loan closes. If the Loan is not consummated for any reason, the Deposit will be returned, without interest, less any Costs incurred by Lender as of such time. If the Loan is consummated, the Deposit shall be applied toward Lender's Costs. At any time prior to closing, Lender reserves the right to demand an additional or increased good faith deposit if the original Deposit has been expended. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI. Borrower shall provide an additional deposit prior to Lender engaging legal counsel with respect to further due diligence and documentation of the Loan.

**Exclusivity/Break-Up Fee:** Each of Borrower and Guarantor hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event Borrower obtains financing from a competitor of Lender. Accordingly, each of Borrower and Guarantor hereby expressly agree that, upon the execution of this LOI, it will work solely with Lender to procure the Loan for the Property and agrees not to, and will cause its principals and affiliates not to, obtain or attempt to arrange a financing for the Property with any party other than Lender. In the event Borrower, Guarantor or any affiliate thereof obtains financing for the Property from a source other than Lender, Lender shall become immediate entitled to payment of a break-up fee ("**Break-Up Fee**") equal to two percent (2.0%) of the Loan Amount, which each of Borrower and Guarantor acknowledges and agrees constitutes liquidated damages and is a reasonable estimate of Lender's damages under the circumstances. Lender may apply any remaining portion of the Deposit to the Break-Up Fee at any time after it becomes due and payable. Borrower and Guarantor shall be jointly and severally responsible for Lender's legal and other out-of-pocket fees and expenses in connection with the recovery of the Break-Up Fee. If Lender determines not to move forward with the Loan on terms materially consistent with those outlined above, no Break-Up Fee shall be required. The obligations of Borrower under this paragraph shall survive the expiration or termination of this LOI.

**Terms**
**Conditional/Investment**
**Committee Review:** Borrower understands and acknowledges that Lender has not obtained internal investment committee approval for the Loan and that its agreement to make the Loan is subject to (a) investment committee approval, (b) Lender's satisfactory completion of underwriting and due diligence, and (c) final documentation of the Loan acceptable to Lender is its sole discretion.

**No Commitment:** This LOI is provided for discussion purposes only and does not constitute a contract or a commitment or agreement to lend, either express or implied, or an agreement to issue a commitment, but merely indicates Lender's willingness to proceed with its evaluation of this Loan. The terms hereof are not all-inclusive and are subject to change. Except as expressly set forth herein, this LOI shall not be binding. No agreement (whether written, oral or otherwise) that may be reached during negotiations with respect to the Loan, nor any course of dealing between the parties, shall constitute a commitment by Lender to lend or otherwise be binding upon the parties.

**Governing Law:** This LOI shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principals of conflicts of laws. Any action, suit, proceeding or litigation arising out of or relating in any way to this LOI shall commence and be maintained exclusively in the state or federal courts of the State of New York. Borrower will be responsible for Lender's legal and other out-of-pocket fees and expenses in the event Borrower is unsuccessful in any action, suit, proceeding or litigation brought against Lender. EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR LITIGATION ARISING OUT OF OR RELATING IN ANY WAY TO THIS LOI.

To commence processing of the requested Loan, please sign and return an original counterpart of this LOI together with the Deposit.  This LOI supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto. This LOI shall be null and void and shall automatically terminate if not countersigned by Borrower and returned to Lender along with the Deposit by June 26th , 2019, unless mutually extended by the parties in writing. We look forward to working with you on this transaction.

Sincerely,

LIGHTSTONE CAPITAL LLC

By: _____

Name:  Joseph E. Teichman
Title:   Executive VP

Agreed to and accepted on behalf of Borrower:

[Borrower]

By: _____
  Name:
  Title:

**EXHIBIT A**

| | Assets | | Portfolio Summary | | |
|---|---|---|---|---|---|
| # | Address | Type | Gross Sq Ft | Residential Units | Retail Units |
| 1 | 568 Willoughby Avenue, Brooklyn, NY 11206 | Multi-Family | 4,290 | 6 | 0 |
| 2 | 55 Stanhope Street, Brooklyn, NY 11221 | Multi-Family | 5,560 | 8 | 0 |
| 3 | 106 Kingston Avenue, Brooklyn, NY 11213 | Mixed-Use | 4,032 | 2 | 1 |
| 4 | 618 Lafayette Avenue, Brooklyn, NY 11216 | Four Families | 1,944 | 4 | 0 |
| 5 | 119 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,613 | 6 | 0 |
| 6 | 127 Rogers Avenue, Brooklyn, NY 11216 | Multi-Family | 5,370 | 6 | 0 |
| 7 | 167 Hart Street, Brooklyn, NY 11206 | Three Family | 4,160 | 3 | 0 |
| 8 | 325 Franklin Ave, Brooklyn, NY 11238 | Mixed-Use | 4,050 | 3 | 2 |
| 9 | 53 Stanhope Street, Brooklyn, NY 11221 | Two Family | 1,848 | 2 | 0 |
| 10 | 107 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,080 | 4 | 0 |
| 11 | 109 South 3rd Street, Brooklyn, NY 11249 | Four Family | 3,000 | 4 | 0 |
| 12 | 129 South 2nd Street, Brooklyn, NY 11249 | Three Family | 4,000 | 3 | 0 |
| 13 | 130 South 2nd Street, Brooklyn, NY 11249 | Four Family | 4,608 | 4 | 0 |
| 14 | 318 Bedford Ave, Brooklyn, NY 11249 | Mixed-Use | 2,640 | 2 | 1 |
| 15 | 740 Driggs Ave, Brooklyn, NY 11211 | Mixed-Use | 1,995 | 2 | 2 |
| 16 | 144 Huntington Street, Brooklyn, NY 11231 | Two-Family | 1,776 | 2 | 0 |
| 17 | 68 Carroll Street, Brooklyn, NY 11231 | Three Family | 2,450 | 3 | 0 |
| 18 | 342 Rodney Street, Brooklyn, NY 11211 | Four Family | 4,275 | 4 | 0 |
| 19 | 178 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 20 | 180 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 21 | 182 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 22 | 440 Lorimer Street, Brooklyn, NY 11206 | Three Family | 1,890 | 3 | 0 |
| 23 | 263 18th Street, Brooklyn, NY 11215 | Four Family | 2,850 | 4 | 0 |
| 24 | 1213 Jefferson Ave, Brooklyn, NY 11221 | Three Family | 2,250 | 3 | 0 |
| 25 | 92 South 4th Street, Brooklyn, NY 11249 | Three Family | 4,140 | 3 | 0 |
| 26 | 834 Metropolitan Ave, Brooklyn, NY 11211 | Two-Family | 2,136 | 2 | 0 |
| 27 | 1125 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 28 | 1127 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,194 | 2 | 0 |
| 29 | 1129 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 30 | 1131 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| 31 | 1133 Greene Ave, Brooklyn, NY 11221 | Two-Family | 2,195 | 2 | 0 |
| Total | | | 100,181 | 108 | 6 |

Exhibit B

| Debtor | New York City | Brooklyn Lender | Brooklyn Lender | Priority | Priority | General Unsecured | General Unsecured | General Unsecured | Administrative | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Class 1 | Class 2 | Class 2 (Shared) | Class 3 | Unclassified | Class 4 | Class 4 (Shared A) | Class 4 (Shared B) | Unclassified | All Claims |
| 167 Hart LLC | $57 | | | | | $30,000 | | | | |
| 53 Stanhope LLC | $5,501 | | $2,664,019 | | | $8,920 | $25,000 | $150,400 | | |
| 325 Franklin LLC | $32,992 | | | | | $17,710 | | | | |
| 55 Stanhope LLC | $61,939 | $2,038,184 | | | | $611,952 | | | | |
| 119 Rogers LLC | $11,645 | $2,077,308 | | | | $3,575 | $25,000 | | | |
| 127 Rogers LLC | $12,017 | $2,121,334 | | | | $2,409 | | | | |
| 106 Kingston LLC | $3,912 | $730,949 | | | | $144,304 | | | | |
| 618 Lafayette LLC | $3,334 | $1,120,878 | | | | $32,484 | | | | |
| Eighteen Homes LLC | $3,091 | $823,347 | | | | $9,812 | $36,000 | | | |
| 1213 Jefferson LLC | $3,106 | $898,840 | | | | $8,497 | | | | |
| 92 South 4th LLC | $4,403 | | $2,236,420 | | | $6,488 | $500,000 | | | |
| 834 Metropolitan LLC | $3,338 | | | | | $13,893 | | | | |
| 1125-1131 Greene Avenue, LLC | $11,121 | $3,025,661 | | | | $8,161 | | | | |
| APC Holding 1 LLC | $263 | $1,256,364 | | | | $502,699 | | | | |
| C&YSW, LLC | $2,177 | | $4,943,431 | | | $6,750 | $2,500,000 | | | |
| Natliach LLC | $9,793 | | | | | $66,179 | | | | |
| D&W Real Estate Spring LLC | $26,553 | | $12,897,588 | | | $56,167 | | | | |
| Meserole & Lorimer LLC | $14,646 | | | | | $18,931 | | | | |
| **Total** | **$209,886** | **$14,884,260** | **$22,741,457** | **$0** | **$0** | **$1,548,930** | **$3,086,000** | **$150,400** | **$0** | |
| **Grand Total - All Claims** | **$209,886** | | **$37,625,717** | | | | | **$4,785,330** | **$0** | **$42,620,934** |

Exhibit C

| Debtor | Property Value | Post Confirmation Mortgage | Net Equity Interest Value | Entity Ownership % Per $1,000 of Cliams |
|---|---|---|---|---|
| APC Holding 1 LLC | 2,390,000 | 1,694,032 | 695,968 | 0.14% |
| 55 Stanhope LLC | 1,680,000 | 990,784 | 689,216 | 0.15% |
| 167 Hart LLC | 2,110,000 | 1,495,568 | 614,432 | 0.16% |
| 106 Kingston LLC | 2,100,000 | 1,488,480 | 611,520 | 0.16% |
| 618 Lafayette LLC | 1,124,100 | 796,762 | 327,338 | 0.31% |
| 53 Stanhope LLC | 1,000,000 | 808,800 | 191,200 | 0.52% |
| 325 Franklin LLC | 1,842,700 | 1,406,106 | 436,594 | 0.23% |
| 119 Rogers LLC | 2,000,000 | 1,417,600 | 582,400 | 0.17% |
| 127 Rogers LLC | 2,100,000 | 1,488,480 | 611,520 | 0.16% |
| Eighteen Homes LLC | 1,800,000 | 1,275,840 | 524,160 | 0.19% |
| 1213 Jefferson LLC | 1,000,000 | 708,800 | 291,200 | 0.34% |
| 92 South 4th St LLC | 2,000,000 | 1,417,600 | 582,400 | 0.17% |
| 834 Metropolitan Avenue LLC | 1,500,000 | 1,063,200 | 436,800 | 0.23% |
| 1125-1133 Greene Ave LLC | 5,325,000 | 3,774,360 | 1,550,640 | 0.06% |
| C & YSW, LLC | 4,100,000 | 2,906,080 | 1,193,920 | 0.08% |
| Natzliach LLC | 2,720,000 | 1,927,936 | 792,064 | 0.13% |
| D & W Real Estate Spring LLC | 12,190,000 | 8,640,272 | 3,549,728 | 0.03% |
| Meserole and Lorimer LLC | 9,450,000 | 6,698,160 | 2,751,840 | 0.04% |
| | 56,431,800 | 39,998,860 | 16,432,940 | |

Exhibit D

| Debtor | Property | Value | Mortgage Principal |
|---|---|---|---|
| 53 Stanhope LLC<br>325 Franklin LLC<br>(Joint Owners) | 53 Stanhope Street Brooklyn NY<br>325 Franklin Avenue, Brooklyn NY | $3,500,000 | $2,664,019 |
| 119 Rogers LLC | 119 Rogers Avenue, Brooklyn, NY | $3,000,000 | $2,077,307 |
| 127 Rogers LLC | 127 Rogers Avenue, Brooklyn, NY | $3,500,000 | $2,121,334 |
| 167 Hart LLC | 167 Hart Street, Brooklyn, NY | $2,100,000 | $791,396 |
| 106 Kingtston LLC | 106 Kingtston Ave Brooklyn, NY | $2,100,000 | $730,949 |
| 618 Lafayette LLC | 618 Lafayette Ave<br>Brooklyn, New York | $1,900,000 | $779,122 |
| C&YSW, LLC<br><br>Natliach LLC<br>(Joint Owners) | 129 South 2nd Street, Brooklyn, NY<br>107 South 3rd Street Brooklyn, NY<br>109 South 3rd Street Brooklyn NY | $9,000,000 | $4,943,431 |
| Eighteen Homes LLC | 263 18th Street, Brooklyn, NY | $1,800,000 | $823,000 |
| 1213 Jefferson LLC | 1213 Jefferson Avenue, Brooklyn, NY | $1,500,000 | $898,840 |
| 92 South 4th LLC<br><br>834 Metropolitan LLC<br>(Joint Owners) | 92 South 4th Street, Brooklyn, NY<br>834 Metropolitan Ave, Brooklyn, NY | $4,500,000 | $2,236,419 |
| 1125-1131 Greene Avenue, LLC | 1125 Greene Avenue, Brooklyn, NY<br>1127 Greene Avenue, Brooklyn, NY<br>1129 Greene Avenue, Brooklyn, NY<br>1131 Greene Avenue, Brooklyn, NY<br>1133 Greene Avenue, Brooklyn, NY | $6,000,000 | $3,025,651 |
| APC Holding 1 LLC | 568 Willoughby Avenue, Brooklyn, NY | $3,500,000 | $1,256,364 |
| D&W Real Estate Spring LLC<br><br>Meserole & Lorimer LLC<br>(Joint Owners) | 130 South 2nd Street, Brooklyn, NY<br>318 Bedford A venue, Brooklyn, NY<br>740 Driggs Avenue, Brooklyn, NY<br>144 Huntington Street, Brooklyn, NY<br>68 Carroll Street, Brooklyn, NY<br>342 Rodney Street, Brooklyn, NY<br>178 Meserole Street, Brooklyn NY<br>180 Meserole Street, Brooklyn NY<br>182 Meserole Street, Brooklyn NY<br>440 Lorimer Street, Brooklyn NY | $26,000,000 | $12,897,588 |
| 55 Stanhope, LLC | 55 Stanhope Street, Brooklyn, NY | $5,000,000 | $2,038,183.88 |

**18 Entities**

**31 properties**

**Total Mortgage = $37,283,614.25**

Exhibit E

| Debtor | Claimant | Claim No. | Claim Amount |
|---|---|---|---|
| 53 Stanhope LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 167 Hart | David Ryness | 2 | $60,000 |
| | Eliyahu Stern | 3 | $100,000 |
| | 110 claimants | 5 | Unliquidated |
| 106 Kingtston LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 618 Lafayette LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| Eighteen Homes LLC | 110 Claimants | 5 | Unliquidated |
| 1213 Jefferson LLC | David Ryness | 3 | $60,000 |
| | Eliyahu Stern | 4 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 92 South 4th | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 1125-1131 Greene Avenue, LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| APC Holding 1 LLC | David Ryness | 5 | $60,000 |
| | Eliyahu Stern | 6 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 55 Stanhope, LLC | David Ryness | 4 | $60,000 |
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |

| 834 Metropolitan LLC | David Ryness | 4 | $60,000 |
|---|---|---|---|
| | Eliyahu Stern | 5 | $100,000 |
| | 110 claimants | 7 | Unliquidated |
| 325 Franklin LLC | Shifra Stern | 4 | $6,920 |
| | Zlata Stern | 5 | $6,920 |
| | Yehuda Stern | 6 | $6,920 |
| | David Ryness | 7 | $60,000 |
| | Eliyahu Stern | 8 | $100,000 |
| | 110 claimants | 10 | Unliquidated |

2

Disclosure Statement

## **EXHIBIT B**

## **ASSETS AND LIABILITIES UNDER PLAN**

| Assets | |
|---|---|
| Real Property and misc. personal property | $56,431,800 |

| Liabilities | |
|---|---|
| Administrative Expense Claims | $255,000 |
| New York City Lien Claims | $209,866 |
| Brooklyn Lender LLC | $37,625,717 |
| Priority Claims | $0 |
| General Unsecured Claims | $4,785,330 |
| **Total** | $42,875,934 |

## **CHAPTER 7 LIQUIDATION ANALYSIS**

| Assets | |
|---|---|
| Real Property and misc. personal property | $56,431,800 |

| Liquidation Distributions | |
|---|---|
| Administrative Expense Claims | $5,898,180 |
| New York City Lien Claims | $209,866 |
| Brooklyn Lender LLC | $50,323,754 |
| Priority Claims | -0- |
| General Unsecured Claims | -0- |
| **Total** | $56,431,800 |

Note: All Claim amounts subject to objection.