**Hearing Date:   May 6, 2020 at 11:00 a.m.**

Yitzchak E. Soloveichik, Esq.
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
*Attorneys for the Claimants Identified in Exhibit A
(annexed hereto)*

Melissa A. Peña, Esq.
NORRIS McLAUGHLIN, P.A.
875 Third Avenue – 8th Floor
New York, New York 10022
(212) 808-0700
*Attorneys for Claimants Referenced on Notice of
Appearance, Docket No. 101*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 53 STANHOPE LLC, et al.,[1] | Case No. 19-23013 (RDD) |
| Debtors. | |

**OBJECTION TO CONFIRMATION OF
DEBTORS' AMENDED PLAN OF REORGANIZATION**

The Claimants identified in Exhibit "A" attached hereto ("Objectors" or "Claimants"), by

and through their undersigned counsel, hereby object to the First Amended Plan of Reorganization

filed by the above-captioned debtors (the "Debtors"), and in support thereof, respectfully state as

follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as
follows:  53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325
Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC
(2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding I LLC (0290); D
& W Real Estate Spring LLC (4591); Meserole and Lorimer LLC (8197); 106 Kingston LLC (2673); Eighteen Homes
LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## PRELIMINARY STATEMENT

1.        This is a case where two real estate developers defrauded over 180 mostly foreign individuals and limited liability companies of more than $20,000,000 of funds invested, through the purchase of membership interests in corporate entities, in New York residential real estate. While the developers represented that the funds were to be used for the purchase and development of specific properties, the developers utilized the money for whatever purpose they desired, inclusive of funding entities or properties in which the investors had no interest and lining the developers' own pockets.  Some of the entities owned and controlled by the developers have now filed a reorganization plan that is not viable, ignores the fraudulent activities of the entities' principals, fails to even mention causes of action which belong to certain of the Debtors, improperly subordinates claims of the Claimants against certain of the Debtors, and essentially insulates the real estate developers and affiliates from claims by reserving in the Debtors the exclusive right to commence avoidance actions.  For the reasons set forth herein, the Court should not permit the Debtors' fraudulent activities to continue and must deny confirmation of the Debtors' reorganization plan.

## PROCEDURAL HISTORY

2.        On May 20, 2019 and May 21, 2019 (the "Petition Dates"), the Debtors filed their voluntary petitions for reorganization pursuant to chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

3.        Since the Petition Dates, the Debtors have remained in possession of their properties and managed their affairs as debtors-in-possession, in accordance with the provisions of the Bankruptcy Code.

4.      No creditors committee has been selected in the Debtors' cases nor has a trustee been appointed. However, there is currently pending a motion seeking the appointment of a trustee in these proceedings.

5.      By Order of this Court, dated May 24, 2019, the Debtors' cases were consolidated for administrative purposes only.

6.      Since the Petition Dates, the Debtors have flagrantly ignored their responsibilities under the Bankruptcy Code and rules of this Court by failing to file (a) a Rule 1007 declaration required by the Local Rules of Bankruptcy Practice; (b) true and accurate Schedules and Statements of Financial Affairs; and (c) a single monthly operating report until nearly four months after the Petition Dates. To date, the Debtors' monthly operating reports are past due for December 2019 and January and February 2020.

7.      On August 1, 2019, the Debtors filed their Chapter 11 Plan and Disclosure Statement. See Docket Nos. 30 and 31.

8.      On August 6, 2019, the Debtors filed a Motion to extend their exclusive time periods to file a plan and solicit acceptances thereto (the "Exclusivity Motion"). See Docket No. 33.

9.      On August 9, 2019, Brooklyn Lender LLC ("Brooklyn Lender"), a secured creditor of the estates and the Debtors' largest single creditor, filed a preliminary objection to the Debtors' Disclosure Statement. See Docket No. 36. On September 3, 2019, Brooklyn Lender filed an Objection to the Disclosure Statement and the Exclusivity Motion. See Docket No. 39.

10.      On November 26, 2019, the Debtors filed an Omnibus Objection to Claims ("Claims Objection"), inclusive of the claims of Objectors, asserting, *inter alia*, that Objectors'

claims are subject to subordination pursuant to Section 510(b) of the Bankruptcy Code.  See Docket No. 67.

11.      On January 2, 2020, Objectors filed opposition to the Claims Objection, disputing, *inter alia*, the allegation that their claims are subject to subordination.  See Docket No.79.

12.      On January 21, 2020, the Debtors filed their Amended Plan of Reorganization (the "Plan") and Amended Disclosure Statement, which are the subject of these objections.  See Docket Nos. 93 and 94.

## CLAIMS OF THE OBJECTORS

13.      The Objectors' claims against the Debtors arise from a massive theft conducted by the Debtors' principals, Yechezkel Strulovich ("Strulovich") and Yechiel Oberlander ("Oberlander" and jointly referred to with Strulovich as the "Principal Thieves").  The Principal Thieves stole funds that the Objectors provided to them to invest in various companies.  The majority of the intended recipients of the funds are not debtors in this case.

14.      The Principal Thieves persuaded numerous individuals – mostly foreigners – to "invest" collectively over $20 million (the "Funds") in over twenty parcels of real property located in New York City (the "Investment Properties").  The individuals transferred their monies to the Principal Thieves to purchase membership interests in certain limited liability companies (the "Operations LLCs").  These funds were supposed to go into the Operations LLCs, which would, in turn, invest in various holding companies established to acquire the interest in the Investment Properties.  The Objectors consist of some of the individuals who transferred their monies into to purchase membership interests in the Operations LLCs (hereinafter the "Individual Claimants"), as well as the Operations LLCs.

4

15.    Notably, the Individual Claimants agreed to transfer their monies into specific Operations LLCs, which were to remit such funds to purchase membership interests in specific holding companies. These holding companies, in turn, were to acquire specific properties. Attached hereto as Schedule A is a diagram outlining examples of the intended flow of funds as to certain Individual Claimants who are plaintiffs in the Federal Action (as defined below).

16.    As part of their sophisticate fraud campaign, the Principal Thieves convinced the Objectors to wire the Funds to bank accounts they controlled. Rather than use the Funds to purchase and develop the Investment Properties as outlined in Schedule A[2], the Funds were commingled in accounts controlled by the Principal Thieves and then used for unrelated real estate holding companies, in which neither the Individual Claimants nor the Operations LLCs had an ownership interest, and/or other companies that the Claimants did not even know existed.

17.    Because the Funds did not reach the intended real estate holding companies and some of the Funds were diverted to the Debtors, the Objectors have asserted claims against the Debtors for, *inter alia*, unjust enrichment and conversion.[3]

18.    Prior to the Petition Dates, on April 24, 2017, the Operations LLCs[4] and some of the Individual Claimants commenced an action in the United States District Court for the Eastern District of New York entitled *Schonberg v. Strulovich, et. al.*, Case No. 17-CV-2161, asserting

_____

[2] As the merits of Claimants' claims will be adjudicated after the confirmation hearing, Claimants have yet to proceed with discovery as to which specific entities received particular portions of the Funds.

[3] The Debtors have been identified on Schedule A in bold. Significantly, as reflected on Schedule A, there was no intention or agreement for Objectors (either directly by the Operations LLCs or indirectly as the Individual Claimants) to invest in a majority of the Debtors. Only four of the twenty-three Objectors agreed to invest in any of the Debtors. Kingston Operations LLC, Jefferson Operations, LLC, 618 Lafayette Operations LLC and 325 Franklyn Operations LLC agreed to invest in Debtors, 106 Kingston LLC, 1213 Jefferson LLC, 618 Lafayette LLC and 325 Franklin LLC, respectively. These claimants have not asserted claims for unjust enrichment and conversion against the specific Debtor in which they intended to invest. Nonetheless, these Operations LLCs have asserted claims against the Debtors that they did not specifically agree to invest in as, to the extent that non-targeted Debtors received their Funds, they maintain claims against them for conversion and unjust enrichment.

[4] One of the Operations LLCs  – 1285 Bushwick – was not a plaintiff in the Federal Action.

claims against the Principal Thieves, multiple non-debtors and the Debtors for securities fraud claims, conversion and unjust enrichment and for the imposition of a constructive trust (the "Federal Action").  A motion by the plaintiffs in the Federal Action for leave to amend the Complaint is now pending; the proposed amended pleading does not assert any claims against the Debtors because of the automatic stay.

## **RELEVANT PLAN PROVISIONS**

19.    According to the Plan, the Debtors own 31 buildings utilized as residential apartment buildings, which the Debtors contend have a value in excess of the mortgage debt encumbering the respective properties.  The Debtors propose to obtain replacement financing in the amount of $40,000,000 from Lightstone Capital ("Lightstone"), which funds are to be utilized to pay the claims of Brooklyn Lender and other creditors.  No provision is made for the payment of Objectors' claims.

20.    Under the liquidation analysis provided by the Debtors under their Plan, their real properties and "misc. personal property" have a value of $56,431,800.00 against total claims, inclusive of administrative expense claims of $42,875,934.00.[5]

21.    The Plan provides treatment of creditor claims and interests as follows:

- Class 1 consists of secured claims for real estate taxes due on the Debtors' properties, which aggregate approximately $209,866.  This class will be paid in cash the allowed amount of their claims on the Effective Date of the Plan.

- Class 2 consists of the allowed secured claim of Brooklyn Lender, which the Debtors estimate is approximately $38 million.  Brooklyn Lender shall receive the full amount of its allowed claim on the Effective Date of the Plan.

- Class 3 consists of allowed priority claims under Sections 507(a)(3), (4), (5), (6) and (7) of the Bankruptcy Code, which the Debtors estimate at $0.  This

---

[5] The Debtors claim of substantial equity in their properties is disputed by Brooklyn Lender, which asserts a claim based upon an alleged non-monetary default by the Debtors in approximately double the amount acknowledged by the Debtors.

class will receive the allowed amount of their claims plus applicable statutory interest.

- Class 4 consists of the claims of general unsecured creditors, which the Debtors estimates aggregate approximately $4,785,330. Under the Plan, the general unsecured creditors may elect to either (a) receive payment of the full amount of their claims plus interest; or (b) take New Owner Interest in the New Owner succeeding the Debtor against which the Claimant holds an allowed claim.

- Class 5 consists of allowed interest holders. The Plan provides that all of their interests will be cancelled and Interest Holders shall be entitled to New Owner Interest under the same terms as their existing interest in the Debtors, but subject to dilution pro rata by New Owner Interest distributed to the general unsecured creditors and Class 6 Claims.

- Class 6 consists of the claims of the Objectors, which the Plan provides will be subordinated pursuant to Section 510(b) of the Bankruptcy Code to the same priority as Class 5 interests. On the Effective Date of the Plan, the Objectors will be entitled to New Owner Interests in the respective New Owners based on the allowed amount of their claims and reduced by the Class 4 creditors who elect to receive an equity interest in lieu of cash.

22.    The Debtors have alleged that the claims of Objectors, which are placed in Class 6 of the Plan, are subject to subordination pursuant to Section 510(b) of the Bankruptcy Code. While non-subordinated unsecured creditors will receive payment of 100% of their claims unless they (in the case of unsecured creditors) opt to receive equity interests in the New Owners to be created under the Plan to own the Debtors' current real estate holdings, Class 6 Creditors will receive equity interests in the New Owners based upon the allowed amount of their claims. However, the value of their claims, or the calculation of the value of the equity interests they will receive in the New Owners is nowhere set forth in the Plan or the Debtor's Disclosure Statement.

23.    In fact, given that the properties will be burdened by substantially greater secured debt if the Plan is confirmed, coupled with the possibility that other unsecured creditors may opt to obtain equity interests in the new entities, the value of Objectors' interests in the new entities will presumably be far less than the value of their claims.

24.    Certain Objectors – in particular, four of the Operations LLCs – are equity interest holders in four of the Debtors.[6]  Each of those Debtors own properties in which the Debtors allege there is substantial equity.  It is unclear how these Objectors' equity interests are to be valued and treated under the Plan.

25.    The Debtors' Plan provides that only the Debtors will have the ability to commence fraudulent conveyance and preference claims.  As the Debtors are believed to be controlled by the Principal Thieves, the Principal Thieves have effectively insulated themselves from exposure for claims by any of the Debtors who received diverted funds.[7]  If the Court does not appoint a trustee in this case, which Objectors urge be done, Objectors should be given standing to pursue said claims.

## OBJECTION TO CONFIRMATION

26.    Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all of the applicable requirements of Section 1129(a).  A debtor bears the burden of proof with respect to the confirmation requirements by a preponderance of the evidence."  In re Armstrong World Industries, Inc., 348 B.R. 111, 120 (D. Del. 2006).

27.    Objectors submit that the Plan fails to comply with the provisions of Section 1129 of the Bankruptcy Code and cannot be confirmed for the following reasons:

(a) The plan has not been proposed in good faith.  (Section 1129(a)(3).)

(b) The Debtors have not disclosed the identity and affiliations of individuals proposed to serve as management members of the "new owners" nor the identity of insiders

---

[6] They are: 106 Kingston, LLC, 1213 Jefferson, LLC, 618 Lafayette, LLC and 325 Franklin, LLC.
[7] There remain, however, direct claims by Objectors against certain of the non-debtors and the Principal Thieves, which are unaffected by the Plan.

to be employed or retained and the nature of any compensation paid thereto. (Section 1129(a)(5).)

(c) The Debtors have not shown that creditors and equity interest holders will receive or retain under the Plan an amount that is at least as much as they would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. (Section 1129(a)(7).)

(d) The Debtors have not shown that the Plan is feasible or that confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors' successor.  (Section 1129(a)(11).)

(e) The Debtors' Plan cannot be confirmed because the Plan discriminates unfairly and is not fair and equitable with respect to a dissenting class of claims or equity interests. (Section 1129(b)(1).)

28.     Furthermore, the Plan improperly provides for the subordination of the Objectors' claims under Section 510(b) of the Bankruptcy Code.  As set forth below, Section 510(b) does not require the subordination of Objectors' claims.  The Debtors have acknowledged that, absent subordination, the Plan cannot be confirmed.

## A. THE PLAN FAILS TO COMPLY WITH THE FEASABILITY REQUIREMENT UNDER SECTION 1129(b)(11) OF THE BANKRUPTCY CODE.

29.     In order to prove the feasibility of a plan of reorganization, a plan proponent is required to prove that the plan is not likely to be followed by liquidation and a need for further reorganization.  The Debtors' Plan fails to show that they may emerge from bankruptcy as viable entities.  As a result, liquidation is almost certain to follow liquidation.

30.     Preliminarily, Brooklyn Lender has asserted a claim against the Debtors in the aggregate amount of not less than $74,515,177.43.

31.     If the Court allows Brooklyn Lender's claim in the amount asserted, the Plan, which provides that the claim amount is roughly one half of the amount asserted, is not feasible.  In fact, the Debtors acknowledge that if default interest is awarded, the Plan fails.

32.     In the event that the Debtors prevail in obtaining a determination of the Brooklyn Lender's claim in the amount stated by the Debtors, which Objectors respectfully submit would be the correct determination, the Plan remains non-feasible for the reasons set forth hereinafter.

(a) *The Debtors have not established that exit funding is in place.*

33.     The Debtors have not established that their proposed exit funding is realistic or sufficient.

34.     In order to confirm a plan to be funded by exit financing, a plan proponent must show that the necessary exit financing will be available.  In re Made in Detroit, Inc., 299 B.R. 170, 179–80 (Bank. E.D. Mich. 2003).  Courts have refused to confirm a plan dependent on future financing absent a showing that financing is likely to occur.  See, e.g., In re Whispering Pines Estate, Inc., No. 05-56003-MWV, 2008 WL 5156429, at *3 (Bankr. D.N.H. Dec. 8, 2008).

35.     Objectors submit that the Debtors are woefully deficient in meeting that standard.

36.     The Debtors received and produced a letter of intent from Lightstone to lend the sum of $40,000,000.00, collateralized by the 31 properties in Brooklyn, New York constituting properties of the estate.

37.     Notwithstanding the fact that the letter of intent was signed in June 2019, the Debtors do not appear to have moved any closer toward obtaining a loan commitment in the subsequent ten months.

38.     The letter of intent was provided "for discussion purposes only" and does not constitute a contract or even a commitment or agreement to lend.  (See page 5 of Letter of Intent).

10

39.    One would have thought that, by now, the Debtors would have obtained at least a conditional commitment from Lightstone to lend.  Its failure to do so calls into question whether the Debtors have procured financing.

*(b) The proposed loan amount under the letter of intent is inadequate.*

40.    Even if the Debtors establish that the purported funding is available, the proposed loan amount is woefully inadequate to enable them to emerge from bankruptcy as viable entities.

41.    According to the liquidation analysis attached to the Debtors' Disclosure Statement, total claims against the Debtors are $42,875,934.00, exclusive of Objectors' claims, which are sought to be subordinated.  However, the total financing to be provided by the Debtors lender is only $40,000,000.00.  Thus, the Plan, which purports to be a "100% plan," will have insufficient funding to even satisfy existing uncontested creditor claims.

42.    On top of that, the loan's financial requirements place an additional substantial burden upon the Debtors.  Lightstone requires payment of a loan origination fee equal to 2% of the loan amount, or $800,000.00.  Further, Lightstone requires that the Debtors establish an interest reserve of $1,250,000.00.  Thus, more than $2,000,000.00 is required in connection with the placement of the purported loan.

43.    The Debtors' liquidation analysis does not reflect any cash on hand to cover these expenditures nor does it provide for any new capital contributions.  Thus, even assuming the Court determines that Brooklyn Lender's claim is limited to an aggregate of approximately $37,000,000.00, and not even considering Objectors' claims, the Plan is not feasible.

44.    Based on a review of the Debtors' Schedules and the post-confirmation mortgages that the Debtors claim will be placed on their properties, it does not appear that there are sufficient funds to pay the claims of creditors in full.  In addition, while the Debtors do not specify whether

11

they intend to obtain separate mortgage loans for the entities owning each of their properties or a single loan collateralized by all of the properties, it appears from figures in their Plan that they intend to take a single loan collateralized by all of the properties.  Doing so would be patently improper.  The Debtors cannot use the assets of one Debtor entity to finance the reorganization of another Debtor entity.

45.     To make matters worse, the schedule attached to the Debtors' Disclosure Statement listing the balances due under Brooklyn Lender's mortgages only list the principal amount of the mortgages.  The Schedules ignore interest, late fees, attorneys' fees and other charges that have accrued, which render meaningless the numbers provided by the Debtors for payment of outstanding mortgages.

*(c) The Debtors' cash flows reveal that post-petition income will be inadequate to fund operating expenses and debt service.*

46.     Feasibility is often tested by comparing a plan's anticipated payments with projected cash flows on emergence from bankruptcy.  Section 1129(a)(11) requires that a plan proponent produce concrete evidence that a debtor will have sufficient cash flow to fund post-confirmation operations.

47.     In this matter, the Debtors have provided no cash flow projection upon which the Court can base a determination that the Plan is feasible.  This factor alone renders the Plan non-confirmable.

48.     Even in the event that the Debtors' projected cash flow supports the debt service required under the proposed exit financing, which it does not, it appears clear that the Debtors will be unable to fund operating expenses and debt service payments going forward.

49.     A review of the last Monthly Operating Report filed by the Debtors in this case clearly establishes this deficiency.  For the month of November 2019, the most recent financial

12

information provided by the Debtors, their combined income was $325,864 and combined expenses were $366,959, a deficit of over $45,000 monthly or approximately $540,000 on an annualized basis.

50.    Thus, during the course of this case, the Debtors have been unable to meet their debt service obligations on loans with lower principal amounts.  How then can the Debtors legitimately assert that they can meet their debt service requirements on a going forward basis, when the requirements will presumably be even greater?[8]

> *(d) The Plan is Not Feasible as it is Contingent on the Subordination of the Objectors'*
> *Claims, which Claims are Not Subject to Subordination Under Section 510(b).*

51.    In addition to the Plan infirmities resulting from the speculative nature of the Debtors' proposed financing, the apparent inadequacy thereof, and the viability of post-confirmation operations, the Debtors' Plan, which provides for payment of 100% of non-subordinated claims, is contingent on obtaining a subordination of Objectors' claims.  As the Debtors have acknowledged, absent subordination of the Objectors' claims, the Plan is not feasible.  As set forth hereinafter below, the Objectors' claims are not subject to subordination under Section 510(b) of the Bankruptcy Code.  Accordingly, the Plan is not feasible.

## B.   THE PLAN FAILS TO SHOW THAT CREDITORS AND EQUITY INTEREST HOLDERS WILL RECEIVE MORE UNDER THE PLAN THEN THEY WOULD RECEIVE UPON LIQUIDATION OF THE DEBTORS' ASSETS

52.    Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part, that unless each holder of a claim or interest in each impaired class has voted to accept a plan, the Plan must provide that each impaired class:

> will receive or retain under the plan on account of such claim or interest property
> of a value, as of the effective date of  the plan, that is not less than the amount that

---

[8] It should be noted that these cases are only administratively consolidated and are not to be substantively consolidated under the Plan.  However, the Debtors appear to treat them as substantively consolidated.  They do not allocate unsecured or secured debts to individual Debtors.

> such holder would so receive or retain if the Debtor were liquidated under chapter
> 7 of this title on such date . . .

11 U.S.C. § 1128(a)(7)(A).[9]  The statute, which codifies what is commonly known as the "best interest of creditors test," is intended to assure creditors and equity interest holders that they will receive more than they would otherwise receive in the event that assets of the estate were liquidated and they were to receive payment of their claims from the liquidation proceeds.

53.    Here, the Debtors' Plan fails to satisfy section 1129(a)(7) of the Bankruptcy Code. First, the Debtors have only manufactured compliance with Section 1128(a)(7)(A).  The liquidation analysis, attached as Exhibit B to the Debtors' Disclosure Statement, provides that the Debtors have total assets of $56,431,800.  It goes on to state the following liabilities in the context of the Chapter 11 Plan:  (a) $255,000 in administrative expense claims; (b) $209,866 in New York City Lien Claims; and (c) $37,625,717 as Brooklyn Lender's claim.  If the Plan is confirmed, the Debtors maintain that there are sufficient funds to pay the general unsecured creditors, whose claims aggregate $4,785,330, in full and there is approximately $14 million in equity remaining.

54.    In a Chapter 7 liquidation, the Debtors maintain that Brooklyn Lender's claim will increase to $50,323,754, leaving no monies available to general unsecured creditors.  Setting aside the fact that it is unclear how the Debtors arrived at the $50,323,754 number,[10] the liquidation analysis assumes that the Debtors would prevail on objecting to Brooklyn Lender's claim for default interest, yet a Chapter 7 Trustee would simply allow the claim in full despite the fact that the Debtors did not have a monetary default on their loans with Brooklyn Lender.  Thus, there has been no showing that general unsecured creditors would be worse off in liquidation.

---

[9] Objectors have all voted to reject the Plan.

[10] Debtors claim that the amount owed to the Brooklyn Lender is approximately $37,000,000 while the Brooklyn Lender claims double that amount.

55.     Second, the Debtors conveniently fail to recognize that the requirement of section 1129(a)(7) of the Bankruptcy Code equally applies to equity interest holders.  The Debtors' liquidation analysis simply shows that general unsecured creditors will be paid in full in Chapter 11.  It does not set forth what equity interest holders will receive under the Plan.  While the Debtors will likely argue that equity interest holders will receive approximately $14 million (the difference between their assets and liabilities), this does not take into account the new financing being provided to the Debtors, the substantial accompanying fees, and how the financing and fees will dilute equity.

56.     It cannot be disputed that equity interests will be diluted as a consequence of the Plan.  However, there is no indication of the extent of dilution and the value of the equity interests upon dilution.  It is not enough to state, as the Debtors do in their liquidation analysis, that, upon conversion of the case, liquidation expenses would exceed 15% of sale proceeds[11] and, therefore, creditors and equity interest holders will receive more under the Plan than upon liquidation.  Thus, the liquidation analysis provided is insufficient to show compliance with section 1129(a)(7).

57.     Third, it should not be lost on this Court that the Debtors have failed to account for the assets of their estates.  The Debtors' Statements of Financial Affairs are devoid of any information concerning preferential transfers (to creditors or insiders) as well as any other avoidance actions, including potential claims against the Principal Thieves.  Instead, to avert any possibility that the claims will survive the bankruptcy proceeding, the Debtors have crafted language in Paragraph 91 of their Disclosure Statement that preserves avoidance claims and claims relating to post-Petition (but not pre-Petition activities) activities.  As to those ostensibly preserved claims, however, the Debtors will have sole authority to prosecute them.  Logic dictates that actions

---

[11] Given the fact that the value of assets according to the Debtors, is approximately $56 million, a 15% reduction would result in liquidation expenses totaling more than $7.5 million, an inconceivable number.

against insiders are not going to be pursued by insiders or those they have selected to act in their stead.  The Debtors' failure to acknowledge or take action to collect on the claims of the Debtors against non-Debtors or the Principal Thieves, which are believed to have significant value, also establishes that creditors will receive less under the Plan then they will receive upon liquidation, as the Plan ignores an important source of recovery for creditors.

58.     The absence of any valuation of the claims against insiders is particularly disturbing given the claims being litigated in the Federal Action.  Four of the Debtors are owned, in part, by four of the Operations LLCs who are plaintiffs in the Federal Action.  Some of the invested Funds reached these four Debtors but were subsequently diverted to other entities, as well as the Principal Thieves, resulting in claims by those four Debtors against the improper recipients of the money. The Debtors have apparently not pursued these claims, which would likely produce funds available for distribution to creditors and possibly equity interest holders.  Confirmation of the Plan will result in the disappearance of these claims.  And all of this will occur without any review of the claims by an impartial fiduciary.

## C. THE PLAN FAILS TO COMPLY WITH SECTION 1129(a)(5) OF THE BANKRUPTCY CODE WITH RESPECT TO THE IDENTITY AND COMPENSATION OF POST-CONFIRMATION OFFICERS AND INSIDERS.

59.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the plan proponent disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the Debtor."  While directors, officers or voting trustees must be disclosed, courts have read this statute to include others involved in management of the Debtor.  See In re Beyond.com Corp., 289 B.R. 138 (Bankr. N.D. Cal. 2003).  The Bankruptcy Code also requires, under subsection (ii) of the statute, that the continuance in office of such individual be consistent with the interest of creditors and equity security holders and with public policy.  Finally, section 1129(a)(5)(B) requires that the plan proponent disclose "the identity

of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

60.     The Debtors' Plan does not comply with these statutory requirements.

61.      Paragraph 98 of the Disclosure Statement states that "[e]ach Debtor is managed by David Goldwasser ('Goldwasser'), an authorized signatory of GC Realty Advisors, LLC, as Vice President.  Post confirmation management shall remain unchanged."  This single provision purports to be the Debtors' sole attempt at compliance with the statute.

62.     No other information is given as to the identity and affiliation of post-confirmation management.  No explanation is given as to why management of the Debtors was changed from the Principal Thieves to Goldwasser.  As the Letter of Intent from Lightstone was addressed to Strulovich, it is clear that he remained in management as of June 2019, notwithstanding the fact that Goldwasser was ostensibly managing the Debtors at that time.  One is left in the dark as to who is actually running the show.  Is it Strulovich, Oberlander, or Goldwasser?  What is the connection between Strulovich and Oberlander and Goldwasser?[12]  Strulovich has stated under oath that he owns nearly 100% of the equity in the Debtors and that he, not Goldwasser, makes all of the important decisions.  Surely, that is not going to change if the Plan is confirmed.

63.     The Plan makes no attempt to comply with the disclosure requirement for insider compensation.  No information regarding compensation is provided.  Notwithstanding, documentation has been provided during discovery that reflects extremely large distributions to Strulovich or his entities.

---

[12] Notwithstanding the fact that Objectors comprise 46% of the equity interests in the sole equity interest holders in four of the Debtors, they have never been provided with any information regarding a change in management prior to the Petition Dates or during the course of this proceeding.

64.    Even had the Debtors made proper disclosures of post-confirmation management, the employment of insiders, and their compensation, the Plan would still fail to meet the statutory requirement that the continuation in office of such individuals be in the best interest of creditors and equity interest holders.

65.    The fraud perpetrated upon the Objectors is documented in their proofs of claim. Suffice it to say, at least $20,000,000.00 of the Objectors' funds were given to the Principal Thieves for ultimate investment in specific pieces of property.  Rather than utilize the contributions for their required purposes, the monies were diverted to other entities, some of which were devoid of any equity interest by the objectors.  Other funds were diverted to the Principal Thieves or their entities for their own use and benefit.

66.    Likewise, Brooklyn Lender's Objection to the Debtors' Motion for an order extending exclusivity details the mismanagement of the Debtors.  <u>See</u> Objection, Docket No. 39, ¶¶ 7–9.  Among other things, the same individuals who presumably will remain in control of the operations of the "New Owners" made fraudulent misrepresentations to Brooklyn Lender's predecessor in interest as to their ownership in the Debtors.  The Debtors were also "consistently late in paying their taxes and other fees and expenses to various governmental agencies and incurred numerous uncured violations from, among others, the environmental control board of the City of New York (the '<u>ECD</u>'), the New York City Department of Housing Preservation and Development ('<u>HPD</u>'), and the New York City Department of Buildings ('<u>DOB</u>')."  <u>Id.</u> at ¶ 7. Management also allowed mortgages to mature without obtaining replacement financing.

67.    If, as the Debtors suggest, Goldwasser will manage the New Owners, the Court needs to consider the fact that he is a convicted felon, as set forth in the Brooklyn Lender's Objection to the Debtors' Disclosure Statement.

68.    Thus, even if the Debtors had made the proper disclosures as to post-confirmation management as required by the Bankruptcy Code, it clearly is not in the best interest of creditors and equity interest holders to allow persons who have committed fraud on their investors or crimes resulting in incarceration to remain in place as management.

**D.  THE PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH.**

69.    Section 1129(a)(3) of the Bankruptcy Code provides that a plan of reorganization can only be confirmed if it "has been proposed in good faith and not by any means prohibited by law."

70.    The term "good faith" is not defined under the Bankruptcy Code.  One Court has interpreted the term to mean "that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re Madison Hotel Associates, 749 F. 2d 410, 415 (7th Cir. 1984).  The important point is "whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  Id. at 424-25.

71.    Good faith has been found when a plan will enable a debtor to pay its debts and continue its business operations.  Search Market Direct, Inc v. Jubber (In re Paige), 685 F. 3d. 1160, 1178–79 (10th Cir. 2012).  Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.  In re Sun Country Dev., Inc., 764 F. 2d 406, 408 (5th Cir. 1985).

72.    By these standards, the Plan has been filed in bad faith.  As set forth above, the Plan proposed by the Debtors is simply not viable.  Despite the fact that the Debtors have been operating at a substantial deficit, they now intend to burden themselves with even more debt that they will not be able to pay.  No magic jump in rental income is projected.  No additional capital is being invested.  The Plan will not, as required for a showing of good faith, allow the Debtors to continue in operations and pay their debts as they come due.  Secondly, the Debtors have been honest with

19

neither their creditors nor the Court in their actions in this case.  Contrary to the full disclosure required to obtain the privileges of debtor-in-possession status, the Debtors have failed to account to the Objectors regarding the disposition of their funds, have failed to list as assets claims resulting from the improper diversion of the Debtors' funds, and have filed a Plan that not only fails to provide a road to a successful reorganization, but which shields the Principal Thieves from substantial claims resulting from their wrongdoing.  Such a blatant exercise of self-dealing and breach of fiduciary duty as the Debtors have exhibited in this case constitutes sufficient basis alone to deny confirmation on bad faith grounds.

### E.   THE PLAN VIOLATES SECTION 1129(b)(1) OF THE BANKRUPTCY CODE AS IT UNFAIRLY DISCRIMINATES AGAINST OBJECTORS' CLASS.

73.    Section 1129(b)(1) of the Bankruptcy Code provides that, "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirement of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan." 11 U.S.C §1129(b)(1).

74.    The above section applies in a case where a debtor seeks to confirm a plan over a dissenting class of creditors and is intended to provide extra protection for the class by requiring that the debtor prove that, as to the rejecting class, the plan is fair and equitable and does not discriminate unfairly.    In re Aegerion Pharmaceuticals, Inc., 605 B.R. 22, 31 (Bank. S.D.NY 2019).

75.    "The Bankruptcy Code does not define unfair discrimination, but it is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents against nonconsensual vertical discrimination.  In other words, the unfair discrimination test

assures fair treatment among classes of the same priority level while the fair and equitable
requirement ensures fair treatment among classes of different priority levels." In re SunEdison,
575 B.R. 220, 226 (Bankr. S.D. N.Y. 2017), citing Bruce A. Markell, A New Perspective on Unfair
Discrimination in Chapter 11, 72 Am. Bankr L.J. 227, 227–28 (Spring 1998).

76.     In this case, Objectors' Claims fall within two or three classes of creditors as set
forth in the Plan: (a) Class 4 Unsecured Creditors; (b) Class 5 Equity Security Holders; or (c) Class
6 Subordinated Claims.

77.     Objectors have all voted to reject the Debtors' Plan.  Since the Debtors have not
reported balloting as of yet, Objectors cannot confirm whether their rejecting votes will result in
class 4 or class 6 rejections of the Plan, or even Class 5 for that matter.   However, by the sheer
size of their claims, Objectors believe that there will be at least one dissenting class of creditors or
equity holders, thereby obliging the Debtors comply with the non-discrimination requirement of
Section 1129(b)(1).

78.     While Objectors have asserted that they have unsecured claims against the Debtors,
the Debtors have taken the position that their claims are subject to subordination under Section
510(b) of the Bankruptcy Code.

79.     The Debtors have asserted that Objectors' claims are premised on a profit-sharing
agreement and are, thus, subject to subordination under Section 510(b) of the Bankruptcy Code.
There are, however, other unsecured claims against the Debtors that are premised on the right to
receive profit sharing from the Debtors.  However, these claims have not been the subject of a
motion to subordinate or any claims objection.

80.     On January 21, 2020, Brooklyn Lender conducted the deposition of Strulovich (the
"Strulovich Deposition").  The Strulovich Deposition and the Debtors' schedules demonstrate that

21

the Debtors are granting preferential treatment to their relatives and close associates. Specifically, Strulovich testified that Moses Guttman, a business associate or partner of Strulovich, received profit sharing interests in Debtors 834 Metropolitan Avenue LLC and 92 South 4th St LLC. See Excerpt of Strulovich Deposition Tr., attached as Exhibit A to Pena Declaration, submitted herewith ("Pena Dec.") at 47:8–11, 56:14–57:9. Mr. Gutman is scheduled as holding a $500,000 general unsecured claim against each of these debtors. Strulovich testified that Joshua Wagshal and Strulovich's son Moses have profit sharing interests, as does Mici Oberlander. Id. at 62:23–25 ("I owed them money so I told him you could take the profits from ABC Holdings, 568 Willoughby."). An individual by the name of Amrum Oberlander is listed on the schedules of APC Holdings 1 LLC as holding a $500,000 claim against that Debtor. Furthermore, Mr. Wagshal is identified on the schedules as holding general unsecured claims of $2,500,000 against debtors, Natzliach LLC and 92 South 4th St., LLC. Strulovich confirmed that the debt was on account of profit-sharing interests. Id. at 72:3–24.

81.     Herman Greenfield, Strulovich's brother Nachman, Allan Stein, Imre Oberlander, Chave Rosenberg and Ari Wittenstein also apparently own profit sharing interests in Strulovich-controlled entities, including some of the Debtors. Id. at 73:4–75:19.

82.     Most or all of the aforementioned persons are believed to be relatives or close business associates of the Principal Thieves, yet any claims they may have for their profit sharing interests are not being challenged by the Debtors.

83.     Thus, it appears that if a person who is a relative or close associate of the Principal Thieves has a claim against one or more of the Debtors, then the Debtor will not seek to subordinate the claim, even if it is based on entitlements to profit sharing. In fact, the Debtors will treat such claims as Class 4 claims that may be paid in full. Meanwhile, the Objectors' claims, which –

according to the Debtors – are similarly based on their right to profits, are being subordinated. This preferential treatment for insider or related party claims is not only discriminatory; it supports a finding that the Debtors' Plan has been proposed in bad faith.

84.     While the claims of Guttman and others are to be paid in full unless they accept alternative treatment, Objectors, if their claims are subordinated, are not given such right and have no choice but to receive equity interests in entities to be created with undetermined value.

85.     There is no legitimate basis to treat the claims of Guttman and others, which, according to Strulovich, are based upon the same profit sharing business model that the Debtors contend was utilized Objectors' transactions, differently from and preferentially to the claims of Objectors.

86.     Based on the foregoing, confirmation of the Debtors' Plan should be denied as it unfairly discriminates against Objectors in contravention of Section 1129(b)(1) of the Bankruptcy Code.

## F.  THE PLAN CANNOT BE CONFIRMED AS IT IMPROPERLY SUBORDINATES THE CLAIMS OF THE CLAIMANTS.

87.     Section 510(b) of the Bankruptcy Code provides:

For the purpose of distribution under this title, *a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security,* or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

88.     While the Debtors' Plan contemplates that the Claimants' claims should be subordinated pursuant to Section 510(b) of the Bankruptcy Code, as demonstrated below, Section 510(b) does not apply because (a) with respect to the Individual Claimants, the Debtors cannot

establish that such claimants sought to invest in the Debtors or affiliates of the Debtors; and (b) as to *all* Claimants, the claims for unjust enrichment and conversion do not *arise from the purchase or sale of a security* and subordination would not further the Congressional intent behind the statute.

> (a) *Section 510(b) of the Bankruptcy Code Does Not Apply to the Claims of the Individual Claimants, as Such Claimants Did Not Seek to Invest in the Debtors or Affiliates of the Debtors.*

89.    The unequivocal language of Section 510(b) provides that subordination is appropriate *only* if a claim arises from the "purchase or sale of a security of the debtor or of an affiliate of the debtor . . ." 11 U.S.C. § 510(b). True to the language of the statute, courts have recognized its inapplicability if the securities at issue were not those of a debtor or of an affiliate of the debtor. See In re FAH Liquidating Corp., 563 B.R. 160, 167-71 (Bankr. D. Del. 2017). Here, none of the Individual Claimants invested in the Debtors. While the Individual Claimants acquired a security interest in the Operation LLCs, none of the Operations LLCs are "affiliates of the Debtor(s)."

90.    The Bankruptcy Code defines "affiliate" as follows:

(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities— (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; [or]

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities— (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

(D) <u>entity</u> that operates the business or substantially all of the property of the <u>debtor</u> under a lease or operating agreement.

11 U.S.C. § 101(2) (emphasis added).

91.    The Operations LLCs do not fall within the definition of "affiliate" under the Bankruptcy Code.  At all times since their formation, the Operations LLCs were wholly owned by the Individual Claimants and other individual investors.  Nor is 20 percent or more of the voting interests in the Operations LLC owned or controlled by the Debtors or by any entity that directly or indirectly owns 20 percent or more of the voting interests in the Debtors.  The Debtors do not contend otherwise.

92.    To be sure, four Operations LLCs – Kingston Operations LLC, Jefferson Operations LLC, 618 Lafayette Operations LLC, and 325 Franklin Operations LLC – did acquire more than 20 percent of the voting interests in one of four Debtors – 106 Kingston LLC, 1213 Jefferson LLC, 618 Lafayette LLC, and 325 Franklin LLC.  But this detail does not help salvage the Debtors' Plan.  As an initial matter, the remaining nineteen Operations LLCs are not affiliates of the Debtors.  Furthermore, even as to those four Operations LLCs, each would be an affiliate *only* of the respective Debtor in which it acquired a membership interest.  Each of those four Operations LLCs is not an affiliate of the other Debtors.  Thus, with respect to claims against the other Debtors, the Individual Claimants who purchased interests in those four Operations LLCs would not have been purchasing interests in those Debtors *or* affiliates of those Debtors.  Finally, the Debtors contend that the Operations LLCs never owned voting interests in the Debtors; instead, according to the Debtors, the Operations LLCs acquired only profit sharing interests in the Debtors.  Thus, even these four Operations LLCs would not be affiliates of their respective four Debtors.

93.     That the Individual Claimants intended for their monies to be invested in the Operations LLCs, which would, in turn, invest such monies in one of the Debtors or an affiliate of the Debtors does not change this result.  For Section 510(b) to apply, the debtor or the affiliate must be the issuer of the securities.  See In re: FAH Liquidating Corp., 536 B.R. 160 (Bankr. D. Del. 2017); see also In re Washington Mutual, Inc., 462 B.R. 137, 146–47 (Bankr. D. Del. 2011).

94.     In In re: FAH Liquidating Corp., 536 B.R. 160 (Bankr. D. Del. 2017), the Bankruptcy Court considered whether securities fraud claims of certain investors who purchased membership units in special purpose vehicles that held stock in the debtor were subject to subordination under Section 510(b).  Because the special purpose vehicles were not debtors, the Court found Section 510(b) inapplicable and the investor's claims were not subordinated.  In reaching such conclusion, the Court reasoned as follows:

> Here, [the debtor] enter into the Placement Agreement allowing for a layer of insulation between itself and potential investors by allowing investors, who became creditors, here to obtain equity interest in Special Purpose Vehicles that in turn held interests in the Debtors, instead of actual ownership interests in the Debtors . . . As such, the Membership Unit Purchaser Claims arising from the purchase of Membership Units in Special Purpose vehicles do not arise from the purchase or sale of a security of the Debtors.

Id. at 167.

95.     Similarly, here the Debtors structured the investment transactions so that the Individual Claimants would invest in the Operations LLCs, which are one layer removed from the Debtors.  As the Individual Claimants' claims do not arise from sale of securities of the Debtors or their affiliates, Section 510(b) does not apply.

96.     Furthermore, it bears emphasizing that the Individual Claimants are not seeking to assert the *same* claims held by the Operations LLCs to either obtain a double recovery or circumvent Section 510(b) of the Bankruptcy Code.  Some of the monies advanced by the

Individual Claimants were diverted by the Principal Thieves before even reaching the Operations LLCs. Thus, to the extent that such funds were diverted to the Debtors, the Individual Claimants have independent claims against the Debtors.

97.      The fact that Individual Claimants did not directly invest in the Debtors and their affiliates has already had substantial negative legal consequences to the Individual Claimants. In the Federal Action, the Individual Claimants, who are plaintiffs in such action, asserted securities fraud claims against the Debtors and their affiliates with respect to the purchase of membership interests in the Debtors and their affiliates. The complaint filed in such action specified that the Individual Claimants invested in the Operations LLCs, who, in turn, invested in the Debtors.

98.      The Debtors filed a motion to dismiss the securities fraud claim, contending, in part, that Individual Claimants could not sustain their claims because they were not the purchasers of Debtors' securities that were alleged to be manipulated. The Debtors and their affiliates argued as follows:

> The entire premise for the § 10(b) claim, which is now only brought by the Individual Plaintiffs against the Individual Defendants, fails. (Compare SAC ¶¶ 125-35 with FAC ¶¶ 99-109). The "securities" that form the basis of the revised § 10(b) claim are the "membership interests in the Holding Company Defendants." (SAC ¶ 126). The Individual Plaintiffs never purchased membership interests in the Holding Company Defendants, however; only the LLC Plaintiff Claimants did.

Reply Memorandum of Law, attached as Exhibit B to Pena Dec., at 13 (emphasis added).

99.      Adopting the argument by the Debtors and their affiliates, the Honorable Carol Bagley Amon found that the individuals could not "interpose claims for securities fraud for securities [of Debtors] that they did not purchase…." Memorandum and Order dated November 2, 2017, attached as Exhibit C to Pena Dec., at 10-11.

100.     Finally, with respect to one of the Operations LLCs – 1285 Bushwick Operations LLC – no affiliate of the Debtors was ever formed to hold title to any property, because the

proposed property was never purchased. Thus, for the Individual Claimants whose claims arise

out of the transfer of funds for the purchase of membership interests in 1285 Bushwick Operations

LLC, their funds were not even indirectly related to the purchase of securities in an affiliate of the

Debtors. For this additional reason, their claims for unjust enrichment and conversion do not arise

from the purchase of securities in an affiliate of the Debtors.

> (b) *Section 510(B) Does Not Apply to the Claims for Unjust Enrichment and Conversion*
> *As Such Claims Do Not Arise From the Purchase and Sale of Securities and*
> *Subordination Does Not Further Congressional Intent.*

101.    In determining whether a claim should be subordinated under Section 510(b) of the

Bankruptcy Code, the Bankruptcy Court must first address whether the claim "aris(es) from . . . a

purchase or sale of a security of the debtor or an affiliate of the debtor." If, when applied to the

facts surrounding the claim, the phrase "arising from," is ambiguous, the Court may only

subordinate the claim if subordination is consistent with Congressional intent. In re Med

Diversified, Inc., 461 F.3d 251, 256 (2d Cir. 2006).

102.    "Section 510(b) . . . represents a Congressional judgment that, as between

shareholders and general unsecured creditors, it is shareholders who should bear the risk of

illegality in the issuance of stock in the event the issue enters bankruptcy." Id. (quoting In re

Telegroup, Inc., 821 F.3d 133, 141 (3d Cir. 2002)). Subordination is required only if the claimant

"(1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks

to recover a contribution to the equity pool presumably relied upon by creditors in deciding

whether to extend credit to the debtor." Med Diversified, 461 F.3d at 256.

103.    While the Second Circuit has interpreted Section 510(b) broadly, it recognizes that

the statute has limits. Id. at 259. ("[W]e acknowledge the outer boundaries of the statute's text

and purpose."). Subordination is not required "simply because the identity of the claimant happens

to be a shareholder or one who completed a bargain to become a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claim would not further the policies underlying § 510(b).") (quoting Telegroup, 281 F.3d at 144, n.2).  A causal connection between the claim and a securities purchase is insufficient to establish grounds for subordination if subordination would not further the statutory purposes of section 510(b).  See In re CIT Grp. Inc., 460 B.R. 633, 638–39 (Bankr. S.D.N.Y. 2011), aff'd, 479 F. App'x 393 (2d Cir. 2012).

104.    Further, "where the claim is for a fixed amount and does not arise in parallel with the fortunes of the share price, the courts are inclined to read section 510(b) narrowly."  See In re Enron Corp., 341 B.R. 141, 157 (Bankr. S.D.N.Y. 2006).

105.    Here, Section 510(b) does not mandate subordination of the Individual Claimants' claims for unjust enrichment and conversion (jointly the "Tort Claims").  The factual predicates for the Individual Claimants' Tort Claims are that the Principal Thieves took their money and proceeded to do whatever they wished with their money, including providing such funds to one or more of the Debtors, and, thus, the claims arise from theft.

106.    While the Debtors argue, in conclusory fashion, that Claimants' claims should be subordinated under Section 510(b), the Debtors have not pointed to a single case where a Bankruptcy Court has found that Section 510(b) requires the subordination of the claims for conversion and unjust enrichment.

107.    At a minimum, when the phrase "arising from a . . . sale of securities" is applied to the instant facts, the Court should find that it is ambiguous as to whether the Tort Claims arise from the sale of securities and, thus, must consider whether the Congressional intent behind the

statute would be furthered by subordinating the Tort Claims.    As demonstrated below, subordinating the Claimants' claims does not further the policy behind the statute.

108.    First, the risk allocation rationale does not apply here.    For a claim to be subordinated based upon risk allocation, while the claimant need not be a shareholder, the court must ask whether the claimant "had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities."  Med Diversified, 461 F.3d at 256–57 (quoting In re Betacom of Phoenix, Inc., 240 F.3d 823, 830 (9th Cir. 2001)).

109.    When one considers the Tort Claims, there can be no finding that Claimants took on the risk of a shareholder vis-a-vie the creditors.  For example, claimant, Bushwick Operations LLC agreed to invest in non-debtor, 901 Bushwick Avenue, LLC.  Assume that instead of investing the Claimants funds in Bushwick Operations LLC's, to be used for investment in non-debtor, 901 Bushwick Avenue, LLC, the Principal Thieves diverted the funds to the debtor, 53 Stanhope LLC (the "Stanhope Debtor").  Why should the general unsecured creditors of the Stanhope Debtor be placed in a better position than Bushwick Operations LLC when such claimant did not take on the risk of investing in the Stanhope Debtor?  If the Stanhope Debtor realized a profit on the sale of real property, Bushwick Operations LLC would not be entitled to the profit.

110.    Similarly, if the Principal Thieves stole monies from an individual and provided the monies (without the individual's consent) to the Stanhope Debtor, the individual would have a general unsecured claim against the Stanhope Debtor.  This theft is akin to what occurred to the Claimants.  Nothing in the Congressional intent of Section 510(b) is furthered by subordinating the Claimants' claim to that of the individual where both were the victims of theft.  Accordingly, the Court cannot find that the risk allocation rationale is furthered by subordinating the Tort Claims.

111.    Claimants did not "assume the risk" that their funds would be stolen even before their investment had been made, as a shareholder in a corporation assumes the risk of fluctuation of the value of their stock or that management of the company would act criminally or negligently.

112.    Second, the Claimants do not seek to recover a contribution to an equity pool presumably relied upon by creditors in order to extend credit to the Debtors.  The second policy rationale for Section 510(b) is that claimants who contributed equity should not be entitled to recover at the same level of priority as creditors, because "creditors regard the security holders' equity investment in an enterprise as a form of collateral.  The equity cushion effectively assures creditors that, in the case of insolvency, at least some assets of the insolvent enterprise will be available to repay the debt to some degree." In re Enron Corp., 341 B.R. 141, 165 (Bankr. S.D.N.Y. 2006).   Although courts consider the equity cushion rationale, it is considered less important than the risk allocation rationale. Med Diversified, 461 F.3d at 258–59.

113.    When the debtor does not receive the infusion from the claimant, the Second Circuit has found that the equity cushion rationale does not support subordination under Section 510(b) of the Bankruptcy Code. Id. (finding equity cushion rationale inapplicable where the debtor never issued stock to the claimant).  As the Tort Claims arise from the fact that none of the intended holding companies received the Funds provided by the Claimants as such funds were diverted from their targets, the equity cushion rationale does not justify subordinating such claims.

114.    As to the four Claimants who agreed to invest in one of the Debtors, such four Claimants are not recovering on an equity pool that creditors relied upon.  The below chart reflects which Claimants invested in the Debtors.

| Debtor | Claimant Who Agreed to Invest in Debtor | Investment Property |
|---|---|---|
| 106 Kingston LLC | Kingston Operations LLC | 106 Kingston Avenue, Brooklyn, New York 11213 |
| 1213 Jefferson LLC | Jefferson Operations LLC | 1213 Jefferson Avenue, Brooklyn, New York 11221 |
| 618 Lafayette LLC | 618 Lafayette Operations LLC | 618 Lafayette Avenue, Brooklyn, New York 11216 |
| 325 Franklin LLC | 325 Franklin Operations LLC | 325 Franklin Avenue, Brooklyn, New York 11238 |

115.    If Kingston Operations LLC's investment was converted and deposited into the account of debtor, 1213 Jefferson LLC, there can be no showing that any creditor of 1213 Jefferson LLC relied upon Kingston Operations LLC's "investment" because Kingston Operations LLC never agreed to provide 1213 Jefferson LLC with an investment.

116.    Furthermore, while the creditors of 106 Kingston LLC could have relied upon an investment from Kingston Operations LLC, Kingston Operations LLC does not have an unjust enrichment and conversion claim against 106 Kingston LLC. Thus, even with respect to the four Claimants (Kingston Operations LLC, Jefferson Operations LLC, 618 Lafayette Operations LLC and 325 Franklin Operations LLC) who agreed to invest in specific Debtors, their claims do not seek to recover from the equity pool creditors relied upon.

## CONCLUSION

117.    Based upon the Debtors' failure to comply with multiple provisions of Section 1129 of the Bankruptcy Code, the Debtors' Plan cannot be confirmed.

118.    This case cries out for an independent party to take control of the Debtors' assets, determine whether a viable plan can be presented, and commence actions on behalf of the estates based on the allegations of wrongdoing set forth above.

119.    In light of the above, Objectors urge that this Court, rather than confirming the

Debtors' Plan, grant Brooklyn Lender's Motion for the appointment of a trustee.

WHEREFORE, Objectors respectfully request the entry of an order denying confirmation

of the Debtors' Plan and granting such further relief as the Court deems just and equitable.

Respectfully submitted,

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC

-and-

NORRIS McLAUGHLIN, P.A.
*Attorneys for Claimants Referenced on Notice of*
*Appearance, Docket No. 101*

Dated: April 22, 2020                    By:    /s/ Melissa A. Pena
                                                Melissa A. Peña, Esq.

**EXHIBIT A**

Angel Boruch

Baddiel Dovid

Baddiel Hannah

Ball Alex

Bamberger Maurice

Bamberger Meir

Ben-David Yechiel

Benedikt Nomi

Benedikt Yosef Zvi

Ben-Shimon Yaakov

Ben-Zimra Avraham

Ben-Zimra Rachel

Berenshtein Shlomo Zalman

Biedermann Michael

Binyamini Efraim

Biton Yehudit

Brandwein Moshe Yom Tov

Cohen Israel Meir

Cohen-Arazi Netanel

Daskal Shlomo Pinchas

Elias Sholom Mordechai

Elkaim Isaac

Elkaim Jakob

Elkaim Raphael Barouch

Ernster David Dov

Fischer Samuel

Frenkel Batsheva

Gabai Shmuel

Galinsky Elimelech

Gelber Moshe Chaim

Geller Anthony

Glatstein Yosef

Goldman Ester

Goldschmied Gabriel

Grinfeld Chezkel

Groskopf Pinchas

Gross Nathan

Grossnass Abraham Joshua

Gutman Yisrael David

Halpern Binyomin Mordechai

Halpern David

Halpern Ya'akov Mordechai

Hertzig Yedidya

Hirsch Israel

Hirsch Tzivia

Hirsch-Grunwald Yvonne

Honigsberg Shmaryahu

Itzkowitch Raizl

Jaffe Esther Selma

Jaffe Gavriel Aryeh

Jelen Debra Gail

Kahn Pinchos

Kahna Haim Shmuel

Kaplan Israel J

Katabi Yinon

Keyak Rachel Bracha

Klein Elisheva

Kohen Hinda

Koninski Isaac

Kraus Moshe Bunim

Kruskal Dina Dvora

Kruskal Yisrael Meir

Lavkovitch Yechiel

Lev (Ben-Simon) Miriam Chaya

Lev Avraham Yeshayahu

Levi Oved

Levin Yaakov

Lichtig Benzion

Maimon Simha

Maimon Yosef

Masher Meshulem

Merel Yakov Israel

Merl Ely

Meyer Mordechai Yaakov

Meyer Sara

Michael Elhanan

Motzen (Rosenbaum) Hana

Mozgo Gavriel

Muller Michael

Neufeld Pinhas Dov

Ollech Burech

Ollech Duvid

Ollech Heini

Ollech Jakob

Orlanchik Mordechai Zeev

Paskas Abraham

Posen Daniel

Rubnitz Haim Menachem

Ryness David

Ryness Rivka

Schmerler Naftali Zvi

Schonberg Benjamin

Schonberg Bertha Sara

Schonberg Jacob

Schwarz Abraham J.

Schwarz David Meir

Shapiro Chaim Bezalel

Shaya Itamar

Shenker Shimon

Shtauber Avinoam

Shlezinger Elazar David

Shlezinger Yosef Shlomo

Shlomo Avishai Mishael

Shtauber (Henig) Malka

Shtern Yossef

Siata Dishmaya LLC

Spitzer Abraham

Spingarn Ishak Aron

Spingarn Lionel

Stein Fishel

Stein Menachem

Stein Moshe

Stein Moshe David

Stein Netanel

Steinhaus Debora Sara

Stern Eliyahu

Stern Shifra [Yosef Shimon Stern]

Stern Yosef Shimon

Stern Zvi [Yosef Shimon Stern]

Stewart Rachel

Stewart Samuel

Strasser David Shalom

Veichelder Zevulun

Vinberg Abraham

Weil Elyashiv Menachem

Weingold Yisrael Meir

Weiniger Moshe Dovid

Weisman Yosef Zvi

Weiss Meir

Winegarten Yehuda

Wizman Yaakov

Yitshaki David

Zakuta Avraham

Zelivansky Yehoshua Natan

Zwiebel Chaja Chava

Bushwick Operations LLC

1285 Bushwick Operations LLC

Kingston Operations LLC

Jefferson Operations LLC

369 Gates Operations LLC

853 Lexington Operations LLC

945 Park Place Operations LLC

1078 Dekalb Operations LLC

618 Lafayette Operations LLC

74 Van Buren Operations LLC

325 Franklin Operations LLC

348 St Nicholas Operations LLC

760 Willoughby Operations LLC

Slope Equities Operations LLC

454 Central Avenue Operations LLC

855 Dekalb Avenue Operations LLC

Willoughby Estates Operations LLC

73 Empire Development Operations LLC

980 Atlantic Holdings Operations LLC

720 Livonia Operations LLC

8 Maple Avenue Operations LLC

1301 Putman Operations LLC

908 BERGEN OPERRATIONS LLC