BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue, Floor 11
New York, New York 10022
(212) 593-1100

Attorneys for the Debtors


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                          Chapter 11

      53 Stanhope LLC, *et al*,[1]                          Case no.  19-23013 (RDD)
                                                                               Jointly Administered

                          Debtors.

--------------------------------------------------------x


**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO THE DEBTORS' JOINT PLAN OF REORGANIZATION ("PLAN"), (B) RESPONSES TO THE DEBTORS' OBJECTIONS TO (I) THE CLAIMS OF BROOKLYN LENDER, LLC, AND (II) THE INVESTOR CLAIMS IDENTIFIED ON EXHIBIT E TO THE PLAN AND (C) IN <u>OPPOSITION TO SUCH INVESTORS' MOTION TO AMEND THEIR CLAIMS</u>**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND.......................................................................................................................2

THE PLAN................................................................................................................................2

    a.  The sources and uses analysis establishes plan feasibility ...........................................11

    b.  The liquidation analysis establishes a better return for equity than in a liquidation .................12

    c.  Mr. Goldwasser's post-confirmation management is in the best interests of the Debtors' estates
      ...............................................................................................................................13

    d.  Name calling and speculation is not evidence of bad faith nor is it prima facie evidence for the
      existence of a claim...................................................................................................16

    e.  Class 6 Claimants' allegation that claims have been misclassified may be a basis for claims
      objections, but not for misclassification under the Plan..................................................16

THE INVESTOR CLAIMS SHOULD BE EQUITABLY SUBORDINATED ...........................19

    a.  Since the Class 6 Claims arise from an equity investment, the claims should be
      the same as if the claimants acquired an equity investment.........................................19

    b.  Even if legitimate claims exist, they belong to the feeder funds ...................................22

BROOKLYN LENDER IMPROPERLY ACCELERATED ITS LOANS AND IS NOT
ENTITLED TO DEFAULT INTEREST .......................................................................................25

    a.  Violations on New York City real property are business as usual and cannot be deemed
      a material default where, as here, violations are cured in the ordinary course of
      business....................................................................................................................25

    b.  The liens against the Debtors' Properties constitute a non-material default because the
      lienholders disclaimed them........................................................................................28

    c.  Brooklyn Lender has identified no misrepresentation in any documents that required the
      Debtors to identify profit sharing interest holders so there was no basis to default the
      Debtors for failing to identify the profit-sharing interest holders...........................29

    d.  Even if the Debtors failed to disclose beneficial owners, it was not a material default
      because it did not affect the Debtors' creditworthiness, nor are there any cases holding
      such non-disclosure to be a material default where it is unrelated to creditworthiness...34

    e.  Even if the Court finds that non-disclosure of profit sharing interests was a material
      default, equitable relief from acceleration based on such a non-monetary default is
      regularly granted to borrowers on performing loans ......................................................39

    f.  Even if Brooklyn Lender is entitled to default interest, 24% is an unenforceable penalty
      rate given the 19% point spread and no evidence of corresponding actual damages.....44

    g.  The Debtors' Chapter 11 filing does not entitle Brooklyn Lender to 24% post-filing
      interest since (i) Brooklyn Lender forced the filing by its wrongful acceleration, and (ii)
      payment of post-petition 24% default interest would interfere with the Debtors' fresh
      start..........................................................................................................................47

h.   Brooklyn Lender's demand for millions of dollars of legal fees is unreasonable since the fees were incurred for the improper purpose of enforcing a non-monetary, non-existent defaults on loans with little risk of non-payment…………………………………………52

i.   The Plan rightly preserves the Debtors' ability to retroactively extend the mortgages that matured during the time they could not be extended because of Brooklyn Lender's wrongful acceleration……………………………………………………………………..55

THE CLASS 6 CLAIMANTS' MOTION TO AMEND THEIR CLAIMS SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENTS ALLEGE DEFECTIVE BASES FOR RELIEF………………………………………………………………………………………..57

CONCLUSION ...........................................................................................................................62

## PRELIMINARY STATEMENT

53 Stanhope LLC, *et al.* (the "Debtors"), as and for their memorandum (a) in support of confirmation of the Debtors' joint plan of reorganization ("Plan"), (b) in reply to the responses to the Debtors' objections to (i) the claims of Brooklyn Lender, LLC, and (ii) the investor claims identified on Exhibit E to the Plan and (c) in opposition to the Class 6 Claimants' motion to amend their claims, respectfully represent as follows:

(a) **The Debtors' sources and uses analysis establishes Plan feasibility,**

(b) **Since the Class 6 Claims arise from an equity investment, the clai should be the same as if the claimants acquired an equity investment**

(c) **The Class 6 Individual Claimants invested through feeder funds' so the Claims must be asserted by the feeder funds,**

(d) **The Mortgagee's alleged loan defaults are almost entirely non-existent or non-material, and in all events, unrelated to the Debtors' creditworthiness,**

(e) **Even if the Court finds that non-disclosure of profit-sharing interests was a material default, Courts regularly grant equitable relief from acceleration on performing loans for such a default,**

(f) **Even if Brooklyn Lender is entitled to default interest, 24% is an unenforceable penalty rate given (i) the minimum 19% point spread from the contract rate and no evidence of corresponding actual damages and (ii) that the these cases, and the post-petition 24% default interest rate they triggered, were the result of wrongful acceleration,**

(g) **Similarly, Brooklyn Lender's demand for millions of dollars of legal fees is unreasonable since the fees were incurred improperly to enforce a non-monetary, non-existent defaults on loans with little risk of non-payment,**

(h) **The Plan rightly preserves the Debtors' ability to retroactively extend the mortgages that matured during the time they could not be extended because of Brooklyn Lender's wrongful acceleration and**

(i) **The Class 6 Claimants' motion to amend their claims should be denied because the proposed amendments allege defective bases for relief.**

## BACKGROUND

1.      On May 20, 2019, each of the Debtors filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), except 167 Hart LLC which filed its petition on May 21, 2019.

2.      These cases involve loans made by Signature Bank to the Debtors in the form of 14 separate notes and mortgages covering 31 properties dating back to September 2012. All of the loans were assigned to Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") on or about May 17, 2017. At that time, each Debtor was current on its payment obligations and, they assert, not otherwise in default and have since continued to pay the monthly installment payments, notwithstanding the pending action and prior foreclosure actions.

## THE PLAN

3.      The Debtors have obtained Exit Financing, the proposed terms of which are annexed to the Plan, to pay all creditors the Allowed Amounts of their Claims under the Plan, including Brooklyn Lender at the non-default contract rate.  The Debtors believe a full binding commitment will be issued before the confirmation hearing with the only condition being Plan confirmation.

4.      The proposed sources and uses of funds to pay creditors under the plan will be included in the Debtors' Plan exhibit book as document DX63 ("Sources and Uses Exhibit).

5.      The Sources and Uses Exhibit and documents DX64, 65 and 66 in the Debtors' Plan exhibit book will include a breakdown by Debtor of the amounts due to Class 1, the City of New York, for lien claims.  The Debtors estimate the aggregate amount of all Class 1

2

Claims is $209,866.  The Allowed Amount of each such Claim, if any, shall be paid plus interest

at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

6.      The Sources and Uses Exhibit will also include a breakdown by Debtor of

of the estimated Allowed Secured Claims of the Mortgagee, by Debtor.  The Debtors estimate

the aggregate of all Class 2 Claims is $37,625,717.

7.      On the Effective Date, pursuant to section 1124 of the Bankruptcy Code,

each Debtor shall cure pre-Petition Date and post-Petition Date defaults, if any, retroactively

extend the maturity dates with respect to each Debtor who could not extend due the Mortgagee's

acceleration, and then pay in Cash the outstanding amounts due on the Effective Date.

8.      The Sources and Uses Exhibit will include a breakdown by Debtor of

Allowed Priority Claims.  The Debtors are aware of no Class 3 Claims.  The Allowed Amount of

each such Claim, if any, shall be paid plus interest at the applicable statutory rate as it accrues

from the Petition Date through the date of payment.

9.      The Sources and Uses Exhibit will include a breakdown by Debtor of the

estimated Allowed General Unsecured Claims.  The Debtors estimate that the aggregate amount

of all Class 4 Claims is approximately $4,785,330.  On the Effective Date, the Allowed Amount

of each such Claim shall be paid plus interest at the Legal Rate as it accrues from the Petition

Date through the date of payment, but subject to having made an election at the time the Debtors

solicited votes on the Plan, each Class 4 Creditor is entitled to elect to take New Owner Interests

in the New Owner succeeding the Debtor in lieu of Cash payment of its Class 4 Claim.  Annexed

to the Plan as Exhibit C is a spreadsheet indicating the projected percentage New Owner

Interests allocated by Debtor per $1,000 of Class 4 Claims.  The basis for the pro-rata calculation

3

of the New Owner Interests that a Class 4 Creditor may elect to receive is its Class 4 Claim.  The calculation of the value of the New Owner Interests to be disbursed is based on each New Owner's net equity in its Property.  The net equity is calculated by subtracting the respective New Owner's post-Confirmation Date mortgage from the Property value.  For example, if a New Owner owns a $500,000 property encumbered by a $400,000 post-Confirmation mortgage, such New Owner will have net equity of $100,000 in the Property.  If a Claimant holds a $1,000 Class 4 Claim, the Claimant shall be entitled to New Owner Interests in such New Owner equal to $1,000 of such net equity, which, in this example would equate to a 1% membership Interest representing 1% of the New Owner's $100,000 net equity.  If the dollar amount of Class 4 Claims electing to take New Owner Interests exceeds the dollar amount of the respective New Owner's net equity, such holders of Class 4 Claims shall be entitled to their Pro-Rata percentage of the New Owner Interests in such new Owner.  The Sources and Uses Exhibit will include a breakdown by Debtor of the of the Claimants with Class 4 Claims totaling $4,331,000 that have elected to receive Interests instead of Cash.

10.    On the Effective Date, all Interests will be cancelled and Interest Holders shall be entitled to New Owner Interests under the same terms as their exiting Interests in the Debtors, but subject to dilution Pro Rata, by the New Owner Interests distributed hereunder to (a) holders of Class 4 Claims that elect to receive New Owner Interests in the respective New Owners instead of Cash payment and (b) holders of Class 6 Claims.  If the distribution of New Owner Interests to holders of Class 4 Claims and or Class 6 Claims exceeds a New Owner's net equity in its Property, existing Class 5 Interest Holders of the predecessor Debtor will be entitled to no Interests in such New Owner.

4

11.    Class 6 Claims are the Allowed Claims based on facts as generally alleged in the Federal Action in the Proofs of Claim identified as Claims J through U in the Class 6 Claimants' exhibit book.  They are subordinated pursuant to section 510(b) of the Bankruptcy Code to the same priority as Class 5 Interests.  On the Effective Date, all Class 6 Claims shall be entitled to New Owner Interests in the respective New Owners based on the Allowed Amount of such Class 6 Claim.  The value of the Interests that a Federal Action Claimant may elect to receive is based on the Claimant's Claim amount that may be awarded if the claimant establishes Claim against a Debtor.  The calculation of the value of the New Owner Interests to be distributed is based on each New Owner's net equity in its Property.  The net equity is calculated by subtracting the respective Post Confirmation New Owner's Post-Confirmation mortgage from the Property value.  The New Owner's net equity must then be reduced further by New Owner Interests distributed to Class 4 Creditors who elect Interests in lieu of Cash.  For example, if a Post-Confirmation New Owner owns a $500,000 property encumbered by a $400,000 Post-Confirmation mortgage, such Post Confirmation New Owner will have net equity of $100,000 in the Property.  That net equity will then be reduced by the Interests distributed to Class 4 Claimants that elect to take Interests in lieu of Cash.  If, in this example, Class 4 Claimants with Claims totaling $60,000 elect to take Interests, $40,000 of New Owner Interests will be available to Class 6 Claimants.  If a Class 6 Claimant holds a $1,000 Allowed Class 6 Claim, the Claimant shall be entitled to Interests in the Post Confirmation New Owner equal to $1,000 of such net equity, which, in this example would equate to a 1% membership interest representing 1% of the Post Confirmation New Owner's net equity.  But if in this example the Allowed dollar amount of Class 6 Claims entitled to take Interests exceeds the $40,000 dollar amount of the New Owner's

net equity after distribution of Interests to electing Class 4 Claimants, such Class 6 Claimants shall be entitled to their pro-rata percentage of the remaining $40,000 of New Owner Interests.

12.    The Sources and Uses Exhibit will include a breakdown by Debtor of the Priority tax Claims under Section 507(a)(8) of the Bankruptcy Code by Debtor.  The Debtors are aware of no such Claims.  The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of the Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

13.    Allowed Administrative Expense Claims, including professional fees, shall be paid in full in Cash on the later of the Effective Date and the date such Administrative Expense Claim becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment; provided, however, that Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business or under Executory Contracts assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  The Debtors estimate that through the entry of a final decree in this case, Allowed Administrative Expenses and United States Trustee fees will total approximately $1,000,000.

14.    Any outstanding U.S. Trustee fees and any statutory interest thereon shall be paid in full in Cash on the Effective Date.  Thereafter, United States Trustee fees and any statutory interest thereon shall be paid until entry of final decree or until Bankruptcy Case is converted or dismissed.  The Debtors shall file quarterly post-Confirmation operating reports.

6

15.     Effective Date payments under the Plan will be paid from the Exit Financing, the terms of which are annexed to the Plan and will be updated with a commitment letter and other documentation as available and included as document DX67 in the Debtors' Plan exhibit book.  Under the Exit Financing each Debtor must transfer its assets including its Property to the New Owners, which shall assume responsibility for repayment of the Exit Financing.  The transfer of each Property to the New Owners under the Plan shall be free and clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the Exit Financing in the same amount and order of priority, and subject to the same defenses as existed before the Effective Date, and to be disbursed under the Plan, provided, however, that the Mortgagee shall assign its mortgages to the holder of the Exit Financing in connection with the transfer of the Properties under the Plan.  The financing is short term hard money bridge financing which the Debtors intend to replace with conventional financing.  If the New Owners' net operating income cannot pay debt service, the interest reserve under the Exit Financing will be applied.  The Debtors shall have no separate responsibility for Post-Confirmation debt service.  The New Owners are responsible for repayment of the Exit Financing.

16.     The New Owners shall be formed as New York or Delaware limited liability companies with operating agreements that comply with the terms of the Exit Financing to be included as part of the Exit Financing documentation to be included as exhibit DX 67 in the Debtors' Plan exhibit book.  All New Owner Interests to be distributed under the Plan shall be on the principle of "one share, one vote," with no proportionate voting, class voting or the like, and otherwise in conformance with New York law.  As a condition to receipt of New Owner

7

Interests, each potential Interest holder shall comply with such disclosure as required as a condition to the Exit Financing.

17.     Because all creditors are being paid in full under the Plan, the Debtors do not anticipate preference or fraudulent claims.  The Debtors' rights to assert claims, including without limitation, tort, contract and lender liability claims against Brooklyn Lender are preserved.

18.     Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the transfer of each Property to the New Owners and any other transaction under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors under the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment.

19.     Except as otherwise provided for in the Plan, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the subject Debtor/New Owner any and all property of the Estate that secures or purportedly secures such Claim, as pertains to such Property or such Lien shall automatically, and without further action by such Debtor/New

8

Owner be deemed released, and (y) execute such documents and instruments as such

Debtor/New Owner requests to evidence such Claim holder's release of such property or Lien.

20.     In a liquidation under Chapter 7 of the Bankruptcy Code, each Debtor's

assets would be sold and the sale proceeds distributed to creditors in their order of priority.  The

Debtors believe that the Plan provides at least an equivalent return for each Debtor's estate as

could be achieved in a liquidation.  As shown on Exhibit B to the Disclosure Statement, the

Debtors project that in a Chapter 7 liquidation the return to each Debtor's Estate would be

reduced by an additional layer of administration legal expenses and commissions, which the

Debtors estimates would total at least 15% of the sale proceeds.

21.     The Debtors are aware of no litigation with third parties, except (a) the

Mortgagee's foreclosure which will be moot upon payment under the Plan, (b) motion to reopen

a dismissed Federal Court action interposed by certain alleged Interest Holders.  Since the Plan

leaves all creditors unimpaired, the Debtors have no avoidance actions to pursue.

22.     Each Debtor shall be disbursing agent under its Plan without a bond.  The

Debtors reserve the right to file objections to Claims in the event grounds exist to object to

particular Claims, for a period of 60 days after the Effective Date; or in the case of a Claim based

on the rejection of an Executory Contract, 60 days after such proof of Claim is filed.  On the

initial distribution date and on each distribution date as may thereafter be necessary, the Debtors

shall maintain a Disputed Claim Reserve for the holders of Disputed Claims as of such date in a

sum not less than the amount required to pay each such Disputed Claim under the Plan if such

Claim was Allowed in full.  To the extent that a Disputed Claim becomes an Allowed Claim, the

distributions reserved for such Allowed Claim, shall be released from the Disputed Claim

9

Reserve and paid to the holder of such Allowed Claim.  After all the amounts of all Disputed

Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in

accordance with the Plan.

23.    Tenant leases shall be deemed assumed under the Plan and assigned to the

New Owners under sections 365 and 1123 of the Bankruptcy Code.  Except for any other

Executory Contracts that a Debtor assumes before the Confirmation Date, all other Executory

Contracts shall be rejected under the Plan on the Effective Date pursuant to sections 365 and

1123 of the Bankruptcy Code.  In the event of a rejection which results in damages, a proof of

Claim for such damages must be filed by the non-Debtor party with the Court on or before sixty

(60) days after the Effective Date. All Allowed Claims arising from the rejection of any

Executory Contract shall be treated as Class 4 Claims, provided, however, that such Claimants

shall not be entitled to elect to take New Owner Interests in lieu of Cash payment.  Any Claim

arising from the rejection of any Executory Contract not filed with the Court within the time

period provided herein shall be deemed discharged and shall not be entitled to participate in any

distribution under the Plan.

24.    Each Debtor is managed by David Goldwasser, as authorized signatory of

GC Realty Advisors, LLC, as Vice President.  Post-confirmation management shall remain

unchanged.

25.    The Debtors believe that the Plan satisfies all of the statutory requirements

of Chapter 11 of the Bankruptcy Code, that each Debtor has complied or will have complied

with all of the requirements of Chapter 11, and that the proposals in the Plan are made in good

faith.

26.     The Class 6 Claimants argue that the Plan and should not be confirmed because the Debtors have failed to establish (a) feasibility, (b) that the return under the Plan is greater than in a liquidation, (c) that post-confirmation management is appropriate (d) good faith, and (e) the cram down elements as to equity security holders.

**(a) The Sources and Uses Exhibit Establish Plan Feasibility**

27.     On feasibility, the Sources and Uses Exhibit shows that the Exit Financing is sufficient to fund the Plan on the Effective Date assuming the Debtors' motion to reduce the Brooklyn Lender claim is granted and if the Debtors' motion to subordinate the Class 6 Claimants' claims are granted.  Exhibit DX67 in the Debtors' Plan exhibit book will show that the Exit Financing is ready to close subject only to entry of a Final Confirmation Order.

28.     Post-confirmation, interest on the Exit Financing will be satisfied from an interest reserve.  Even if post-confirmation cash flow is less than projected, therefore, post-confirmation debt service will be paid for the term of the financing, at which time the Debtors may refinance or sell the Properties without the baggage of these cases.

**(b) The liquidation analysis establishes a better return for equity than in a liquidation**

29.     Interest Holders will do better under the Plan than in a liquidation because under the Plan the following Chapter 7 disbursements are avoided:  $4,500,000 for general unsecured claims are being voluntarily subordinated to equity, $1,551,874 for transfer tax, $1,700,000 for real estate brokerage fees, $1,700,000 of Chapter 7 Trustee commissions, and $1,700,000 estimated for Chapter 7 legal fees, for a grand total of $10,551,874.  In addition, the

Plan provides for Brooklyn's Lender's mortgages to be assigned to the New Owners which constitutes an additional $1,110,000 closing expense that the Plan avoids.

30.     By way of contrast, the Debtors estimate the transaction costs under the Plan, as set forth in the Sources and Uses Exhibit will be $2,610,000 for closing costs for the Exit Financing.

31.     Moreover, since filing the Disclosure Statement, the value of the Properties, the availability of mortgage financing and the timing of any Chapter 7 sale make a market sale at the Properties in a prompt Chapter 7 liquidation uncertain.

32.     Finally, the Debtors project that a Chapter 7 trustee could obtain a steep discount to the amounts Brooklyn Lender claims, but given that Chapter 7 trustees are unlikely to be as motivated as the Debtors, the Debtors do not believe that a Trustee would achieve the same result.

33.     The Class 6 Claimants complain that the Debtors are unlikely to prosecute avoidance actions, whereas avoidance actions would be an additional asset for a Chapter 7 trustee.  But the Debtor is solvent so there are no fraudulent conveyance or preference claims for a trustee to prosecute.  Nor, aside from colorful defined terms for the Debtors' principals, have the Class 6 Claimants alleged facts, as opposed to legal conclusions, to support such Claims.

   (c) **Mr. Goldwasser's post-confirmation management is in the best interests of the Debtors' estates**

34.     Class 6 Claimants argue that David Goldwasser's continued management of the Debtors and the New Owners is based on the Class 6 Claimants' claims against the

12

Debtors and the allegations Brooklyn Lender made in its motion for a trustee that (a) the Debtor

had historically made late payments to creditors and incurred violations from ECB, HPD and

DOB and (b) Mr. Goldwasser was convicted of a crime.

35.    Like the explanation for their claims, Class 6 Claimants bad faith

allegations are based on speculation and name calling.  Despite years of litigation by many

talented lawyers in multiple forums, and the opportunity for arbitration, the Class 6 Claimants

have produced no evidence of misconduct or theft of assets by pre-petition management, let

alone under Mr. Goldwasser's watch.  All such allegations are disputed.

36.    Similarly, pre-petition late payments are not grounds to deny a post-

confirmation debtor's choice of new management.

37.    Indeed, David Goldwasser's experience rescuing troubled single asset real

estate entities makes him an ideal post-confirmation manager.  Under Mr. Goldwasser's

management during this case, the Debtors have remained current with post-petition obligations,

including debt service, and have reduced the balance due on New York City lien claims.  The

Debtors documented the results of Mr. Goldwasser's management in their objection to Brooklyn

Lender's trustee motion, and the Debtors' performance continues to improve despite pandemic

conditions.

38.    The Sources and Uses Exhibit and exhibit DX66 in the Debtor's exhibit

book will include a breakdown of outstanding amount of property taxes across all 31 Properties,

totaling $167,995.  As of the Petition Date, the outstanding amount of property taxes was

$175,938.  The reason for the large balance due on the petition date was that the taxes were being

13

escrowed and paid by Signature Bank.  Brooklyn Lender, however, failed to pay the taxes due after it acquired the loans, with no notice to the Debtors.

39.    Brooklyn Lender is the child who murders his parents and then begs for mercy because he is an orphan.  Had Brooklyn Lender paid the taxes from the Signature Bank escrows it acquired, the taxes would have been paid and the Debtors would not have been unfairly burdened with New York City interest and fees.

40.    In any event, the two buildings with the largest balances, 55 Stanhope Street, Brooklyn, New York, 11221 & 325 Franklin Avenue, Brooklyn, New York, 11238 made up $101,738 (61%) of the total outstanding amount.  Both are on payment plans with the city.

41.    The Sources and Uses Exhibit and exhibit DX64 in the Debtor's exhibit book will include a breakdown of outstanding amount of water bills.  The outstanding water bills across all 31 Properties total $40,189.  As of the Petition Date, the outstanding amount was $88,000.  325 Franklin Avenue, Brooklyn, New York, 11238, the Property with the largest balance, makes up 23% of the total outstanding amount.  Due to the nature of the commercial tenant's business, water bills for this Property are consistently higher than comparable buildings. This Property has an arrangement with the commercial tenant for 80% reimbursement of the water charges.  The reimbursement schedule does not sync with the payment schedule.  The Debtors expect receipt from the tenant in two months.  Upon receipt, the overdue amount due will be reduced significantly.

42.    Every owner of real estate in New York City deals with ongoing violations.  The Debtor has been resolving them in the ordinary course.  The Sources and Uses

14

Exhibit and exhibit DX64 in the Debtor's exhibit book will include a breakdown of the outstanding violations on the Debtors' Properties.

43.     There are currently 123 open HPD and ECB violations across 31 properties.  9 of those 31 Properties have no open violations.  Of the 22 with violations, 16 buildings have 5 or fewer.  Only 4 of the 123 violations involve monetary amounts.  The dollar amount of these violations is $434,659 with $430,710 (99.1%) on the Property at 107 South 3rd Street, Brooklyn, New York, 11249.

44.     Annexed to the Debtors' objection to Brooklyn Lender's motion for a trustee was a letter from the Debtors' violations expediter.  On the violations at 107 South 3rd Street, the expediter explained that the Debtor is awaiting permits to make necessary structural repairs, following which the penalties are likely to be drastically decreased.

45.     Finally, David Goldwasser's record from 2003 is not grounds to exclude him from post-confirmation management.  Mr. Goldwasser suffered the consequences of his actions in his younger days and moved on.  His performance in these cases is evidenced by the Debtors' post-petition operating success and the financing that will fund the Debtors' emergence from bankruptcy against determined well-funded adversaries with a bottomless appetite for litigation.  Mr. Goldwasser operates a successful real estate consulting and investment business specializing in distressed assets in bankruptcy.  His success in these cases is emblematic of his career in the bankruptcy courts.  Over the past 10 years, he has directed 30 unique Chapter 11 cases through plan confirmation, undoubtedly more than any other workout specialist in the Southern and Eastern Districts of New York.

15

**(d) Name calling and speculation is not evidence of bad faith nor is it prima facie evidence for the existence of a claim**

46.    The Class 6 Claimants allege the Plan has been filed in bad faith citing dishonesty in failing to disclose improper diversion of the Debtors' funds by the "Principal Theives." But again, the argument is based on nothing but speculation and name-calling. The allegations are disputed in their entirety.

**(e) Class 6 Claimants' allegation that claims have been misclassified may be a basis for claims objections, but not for misclassification under the Plan**

47.    The Class 6 Claimants argue that the Plan unfairly discriminates against Class 6 subordinated Claims because they filed their claims as unsecured creditor claims, but the Plan treats the Claims are treated as Class 5 Interest Holder equity interests. The Class 6 Claimants argue that several Class holders of Class 4 general unsecured claims should also be treated as equity interests because deposition testimony allegedly suggests that certain Class 4 Claimants were entitled to repayment from profits.

48.    Specifically, Class 6 Claimants cite claims asserted by Moses Gutman, Moses Strulovitch, Mici Oberlander and Amrum Oberlander (the "Scheduled Loan Claims") as based on "profit sharing agreements." They contend that the Scheduled Loan Claims should be subordinated to Class 5.

49.    It should be noted at the outset that the Debtors did not schedule the Class 6 Claimants as holding profit sharing agreements. The Debtors objected to the Claims as failing to state any claim since they merely plead legal conclusions through speculation and name-calling. The Debtors contend that at best the Class 6 Claimants allege damages arising from the

16

breach of agreements to purchase securities. The Class 6 Claims, therefore, cannot be equated with cash flow type loans.

50.     More to the point, if the Class 6 Claimants believe that the Scheduled Loan Claims are subject to subordination, they have standing and the right to object to those Claims. Indeed, certain of the Class 6 Claimants recently prevailed in a related case among the parties in the Bankruptcy Court for the Eastern District of New York making that very argument.

51.     By way of background, in addition to these cases and the Federal Action, the Class 6 Claimants have since filed three other cases (but have not submitted to arbitration). One is a Supreme Court case in Kings County discussed in more detail below. The other two cases are Chapter 11 cases in the Eastern District of New York before Judge Craig: In re Willoughby Estates LLC, Case No. 19-45886 ("Willoughby") and 657-665 5th Avenue LLC, Case No. 19-45884 ("Fifth Avenue").

52.     In Willoughby and Fifth Avenue, the Class 6 Claimants asserted that they had displaced Strulovitch from management of the Debtors and replaced him with Raphael Elkaim, one the Class 6 Claimants. They filed Chapter 11 petitions for those underwater single asset real estate entities. Willoughby's plan provides for the transfer of the Debtor's real property to the mortgagee, payment of the sole $16,000 general unsecured claim, and post-confirmation prosecution of claims against Strulovitch and CSRE, with the proceeds to be paid to the Class 6 Claimants, before any distribution to equity.

53.     CSRE, as Willouby's 48% membership interest holder, objected to Plan classification. CSRE argued unfair discrimination because the Class 6 Claimants' claims should be subordinated to equity status – not paid as a creditor class ahead of equity.

17

54.     CSRE pointed out that as in these cases, the Class 6 Claimants' claims should be subordinated under section 510(b) of the Code.  The Bankruptcy Court adopted Willoughby's argument that CSRE was not prejudiced by the classification under the plan because CSRE could file an objection to the Class 6 Claimants' Claims, and if successful, equitably subordinate those claims to shareholder status.

55.     Under the principle that 'what is good for the goose is good for the gander,' the Class 6 Claimants are not prejudiced by the placement of the Scheduled Loan Claims in Class 4 because the Class 6 Claimants could file an objection to the Scheduled Loan Claims, and if successful, equitably subordinate those Claims to shareholder status.

56.     In summary, the confirmation objections lack merit and should be overruled.

18

## THE CLASS 6 CLAIMS SHOULD BE EQUITABLY SUBORDINATED

**(a) Since the underlying transaction was to acquire an equity investment, the damages should be the same as if the claimants acquired an equity investment**

57.     On April 24, 2017 the Debtors, among others, were sued in the United States District Court for the Eastern District of New York (the "Federal Action").  A copy of the amended complaint will be included as Exhibit CX264 in the Plan joint exhibit book.  The Class 6 Claimants sued several dozen defendants alleging a "Bernie Madoff" type scheme.  They asserted contract claims, tort claims, equitable claims, and securities law claims.  The Class 6 Claimants included limited liability companies ("LLC Class 6 Claimants") and super-minority individual members of those limited liability companies ("Individual Class 6 Claimants") who sued on their own behalf and derivatively on behalf of the LLC Class 6 Claimants.

58.     Four of the LLC Class 6 Claimants hold profit sharing interests in respective Debtors, each of whom was named as an "LLC Defendant":  106 Kingston LLC, 1213 Jefferson LLC, 618 LaFayette LLC and 325 Franklin LLC ("Debtor LLC Defendants").  The Class 6 Claimants correctly alleged that the managing members of the LLC Class 6 Claimants included Chaskiel Strulovitch at all relevant times.  He was named as an individual defendant.

59.     Fourteen of the Debtors were named as 'relief defendants' ("Relief Defendants"):  53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, Greene Ave LLC, APC  Holding 1 LLC, D&W Real Estate Spring LLC, Meserole and Lorimer  LLC, Eighteen Homes LLC, and 167 Hart LLC ("Debtor Relief Defendants").  None of the Class 6 Claimants alleged any existing interest in the Debtor Relief Defendants.  The Class 6 Claimants

19

asserted constructive trust claims against the Debtor Relief Defendants, contending that some of the money they invested may have been diverted to the Debtor Relief Defendants. The Class 6 Claimants filed notices of pendency against all of the LLC Defendants and the Debtor Relief Defendants.

60.    The Debtor LLC Defendants moved to dismiss arguing that, among other things, they fulfilled their obligations under the prospectuses (which they did not prepare) by "returning the vast majority of the investment funds," and any dispute was nonetheless subject to arbitration. On procedural grounds, the District Court dismissed the complaint on November 2, 2017 (Amon, J.) and vacated the notices of pendency, finding that as to the claims against the LLC Defendants, the Class 6 Claimants may arbitrate any claim they may have. No arbitration was commenced.

61.    The Debtor Relief Defendants moved to dismiss, arguing, among other things, that the Class 6 Claimants' allegations of diversion of funds were conclusory with no facts pled to support a constructive trust claim, and that even if the Class 6 Claimants properly alleged facts to support their claims, at best their claims were limited to claims against the Relief LLC Defendants' LLC membership interests as personalty and cannot serve as the basis for attaching the real property owned by the LLC Defendants. On procedural and jurisdictional grounds, the District Court dismissed the complaint and vacated the notices of pendency, finding that as to the claims against the Debtor Relief LLC Defendants, the Class 6 Claimants may sue in State Court.

20

62.     The Class 6 Claimants filed a notice of appeal which they later withdrew.
The Class 6 Claimants then made a motion to amend the dismissed complaint, which was
pending when the Debtors filed these cases, and remains pending.

63.     Under section 510(b) of the Bankruptcy Code, claims arising from the
"sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the
purchase or sale of such a security. . . shall be subordinated to all claims or interests that are
senior to or equal the claim or interest represented by such security."

64.     Paragraph 4 of the narrative attached to the proofs of Class 6 Claims, like
the Federal Action complaint, asserts that such Claims arise from false representations in certain
prospectuses that "Through the funds contributed by the investors, the investors would purchase
ownership of separate limited liability companies (the "Investor LLCs"), each of which, in turn,
would hold a 45% interest in a Holding Company."  At paragraph 11, the Class 6 Claimants
identify Strulovitch as manager of the Holding Companies, which include the Holding Company
Debtors.  At paragraph 13, the Narrative states that "Individual Fraudsters" own and control the
"Secret LLCs," i.e. the named Relief Debtors.

65.     A membership interest in a limited liability company is a security under
section 101(49) of the Bankruptcy Code.  *E.g. In re Tristar Esperanza Properties, LLC*, 782 F.3d
492 (9th Cir. 2015).  The proofs of claim narrative allege damages arising from the claimants'
intended purchase of interests (i.e. securities) in Holding Companies, including the Holding
Company Debtors.  Since Strulovitch owns or controls over 20% of both the Holding Company
Debtors and the named Relief Debtors, they, and Strulovitch himself, are affiliates as defined by
section 101(2) of the Bankruptcy Code.

21

66.    In, *In re Lehman Bros. Inc.*, 503 B.R. 778, 782–83 (Bankr. S.D.N.Y.), *aff'd on other grounds,* 519 B.R. 434 (S.D.N.Y. 2014), *aff'd,* 808 F.3d 942 (2d Cir. 2015) the court explained the rules for applying section 510(b) as follows:

> The Court of Appeals for the Second Circuit along with the bankruptcy courts within the Second Circuit have uniformly applied a "broad interpretation of section 510(b)." *Rombro v. Dufrayne (In re Med Diversified, Inc.),* 461 F.3d 251, 255 (2d Cir.2006) (citing *In re Enron Corp.,* 341 B.R. 141, 162–63 (Bankr.S.D.N.Y.2006) and *In re PT–1 Commc'ns, Inc.,* 304 B.R. 601, 610 (Bankr.E.D.N.Y.2004)); *783 KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT Digital, Inc.),* 497 B.R. 170, 181 (Bankr.S.D.N.Y.2013) ("While I certainly agree that other Circuits have construed section 510(b) broadly, so has the Second Circuit, along with bankruptcy and district court judges in the Second Circuit."). The inclusion of the word "shall" in the statute mandates subordination for claims meeting the criteria set forth in the statute.

67.    *Lehman* concluded that where, as here, claims arise from the sale of a "security" of an "affiliate" as defined in the Bankruptcy Code, "The language is clear on its face and applies to these claims." *Lehman* 503 B.R. at 788.

68.    To the extent they may be Allowed, the Plan subordinates the Class 6 Claims to the Claims of General Unsecured Creditors and they are treated under the Plan as Interests.  To the extent such Interests are "Allowed" as of the deadline for voting on the Plan, the holders were entitled to vote to accept or reject the Plan.

**(b) The Individual Class 6 Claimants claim to have invested through feeder funds' claims which invested in the Debtors or Debtor affiliates, so even if legitimate claims exist, they can't be asserted by the Individual Class 6 Claimants in their personal capacity**

69.    Certain Investor LLCs were organized to purchase securities of 4 Debtors, and in each case, securities of affiliates of the Debtors, since all Investor LLCs were organized to purchase securities in entities owned or controlled by Strulovitch.

22

70.     The Individual Claimants don't assert direct claims against the Debtors since they assert that their claims arise from investments in Investor LLCs.  The Individual Claimants assert that the Debtors participated in a scheme to convert Investor LLC funds from the purchase of securities in certain named entities controlled by Strulovitch to other entities owned or controlled by Strulovitch.  Thus, the Individual Claimants claims duplicate the Investor LLC claims and feeder funds claims, and may only be brought by the Operations LLC and feeder fund claimants as subordinated claims under section 510(c).

71.     Even if it is true, as the Individual Claimants allege, that the "Individual Fraudsters" accepted their money, gave them interests in the Investor LLC's, and then took some of the proceeds to benefit themselves, they are bound by the rule in this exact scenario, that only a derivative action to be brought.  *See, e.g.*, *Rodolico v. Rubin & Licatesi, P.C.*, 112 A.D.3d 608, 610 (2d Dep't 2013) (dismissing claims because plaintiff does not have standing, individually, to seek the return of funds purportedly borrowed by the defendants); *Elenson v. Wax*, 215 A.D.2d 429, 429 (2d Dep't 1995) ("Allegations of mismanagement or diversion of assets by officers or directors for their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually"); *Maldonado v. DiBre*, 140 A.D.3d 1501, 1504 (3d Dep't 2016) (finding claims were derivative, not direct "because any right that plaintiffs have to an accounting of monies due to and diverted from the LLCs is derived from their membership in the LLCs").

72.     Similarly, courts in the Second Circuit routinely find that where an individual plaintiff sues derivatively and at the same time alleges direct claims, an impermissible conflict of interest arises. *See Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005)

23

(stating that "[a]ny individual claims raised by a shareholder in a derivative action present an impermissible conflict of interest."); *Wall St. Sys., Inc. v. Lemence*, No. 04 CIV. 5299 (JSR), 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005) (stating that "an individual shareholder has a conflict of interest, and therefore cannot adequately represent other shareholders, when he simultaneously brings a direct and derivative action, as Lemence has done here"); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06CIV688(SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) ("Courts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest."); *Priestley v. Comrie*, No. 07 CV 136l(HB), 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2007) (holding that "[h]er attempt to advance derivative and direct claims in the same action is an impermissible conflict of interest that disqualifies her from maintaining this action").

73.     Here, there is no creditor representative, but rather the Individual Claimants are improperly asserting both direct and derivative claims. All of the Claims could be expunged, therefore, since they were filed in violation of binding conflict of interest rules and cannot be undifferentiated as filed.

74.     The Individual Claimants' argument that they have standing to assert direct claims because their investment funds allegedly went to the "Individual Fraudsters," rather than through an Investor LLC bank account, is a red herring. They admit that they purchased interests in Investor LLC's. An entity can only act through its managers. It was the Investor LLC's, therefore, that would have suffered the harm. There has been no harm suffered by the Individual Claimants independent of any duty owed to the Investor LLC.

24

75.     The Individual Claimants assert that the Principal Thieves could have diverted the Individual Claimants' funds before the funds reached the Investor LLCs.  The Class 6 Claimants argue that "if" their money was stolen and therefor they did not get the securities they bargained for, they are the victims of theft, and the damages for theft should are different than damages arising from a securities purchase.

76.     The Class 6 Claimants' reliance on the case law they cite is misplaced. Indeed, in most cases, the claimant never received their promised shares and thus argue that their claim should not be deemed to be an equity investment claim.

77.     The rule in the Second Circuit and elsewhere is that, since the underlying transaction was to acquire an equity investment, the damages should be the same as if the claimant acquired an equity investment.  The Class 6 Claims, to the extent they exist therefore, must be subordinated under section 510(b) of the Code.

## **BROOKLYN LENDER IMPROPERLY ACCELERATED ITS LOANS**

**(a) Violations on New York City real property are business as usual and cannot be deemed a material default where, as here, violations are cured in the ordinary course of busines**

78.     Brooklyn Lender asserts that the Debtors failed to promptly cure property violations issued by the Environmental Control Board of the City of New York ("ECB"), Department of Sanitation ("DOS"), Department of Buildings ("DOB") and/or the New York City Department of Housing Preservation and Development ("HPD"), or pay two water and sewer bills.

25

79.     As to whether Brooklyn Lender had the right to accelerate based on such defaults, besides self-serving statements in their default letters, Brooklyn Lender has provided no actual evidence of such defaults, and therefore, the Court need not even consider them as a basis for acceleration.

80.     Nonetheless, the Debtor established in both the Foreclosure Action and in opposition to Brooklyn Lender's Trustee Motion in this Court that all violations and municipal charges are being resolved and paid on in the ordinary course.  In its objection Brooklyn Lender therefore relies more on the speed of the cure rather than the existence of the violations.

81.     Separate and apart from whether the cure or payment was not "prompt," it must be emphasized that (i) there is no "cure" required of the many violations cited by Brooklyn Lender, (ii) all violations cited as events of default are being resolved and/or were dismissed, as will be shown in Exhibits DX63 and DX64 in the Debtors' Plan confirmation exhibit book and (iii) the water bills have been paid or will be paid as shown in Exhibits DX63 and DX65 in the Debtors' Plan confirmation exhibit book.

82.     Furthermore, the alleged monetary penalty from the violations issued by the various agencies are, the Debtors contend, trivial relative to the loan balances will be shown in Exhibit DX63 in the Debtors' Plan confirmation exhibit book.  Similarly, the alleged "unpaid taxes" claimed by Plaintiff as an event of default were merely $13 Property Registration Fees and not actual unpaid taxes as Brooklyn Lender wants the Court to believe.  These minor fees have been paid as will be shown in Exhibits DX63 and DX66 in the Debtors' Plan confirmation exhibit book.  In fact, while Signature Bank was the Mortgagee on this loan, Signature Bank was escrowing for the real estate taxes and paying them directly.

83.    In summary, the amounts in dispute, the Debtors contend, are trivial, and all have been "cured" or resolved.

84.    As will be shown in Exhibits DX63 in the Debtors' Plan confirmation exhibit book, the Debtors consistently made all payments of the monthly principal and interest owned not only to Signature but also to Brooklyn Lender. Because monthly principal and interest payments have been consistently paid, the Debtors contend Brooklyn Lender has not and cannot show that any direct relationship existed between any trivial defaults or alleged misrepresentations, and the Debtors' ability to repay their loans.  Brooklyn Lender was not prejudiced.  Its security was not impaired.  It suffered no injury.

85.    In support of its argument that acceleration was nonetheless permissible in these circumstances, Brooklyn Lender cited *Peny & Co. v. Food First Hous. Dev. Fund Co.*, 39 Misc. 3d 1234(A), at *4, 972 N.Y.S.2d 145 (Sup. Ct. Kings Cty. 2013) and *Jamaica Sav. Bank v. Cohan*, 36 A.D.2d 743, 743-44 (2d Dep't 1971).

86.    In *Peny*, the borrower owed $400,000 in overdue real estate taxes and $400,000 in overdue water charges as against mortgage debt of $2,600,000. That is the opposite of the facts here.  Here, the taxes alleged to have been owed were $13 and the water charges, if anything, was generally nominal.  The only factual similarity is that the Borrower in *Peny* was also current on the monthly mortgage payments.  However, that is where the similarities end. The holding in *Peny* is irrelevant.

87.    *Jamaica* is a one paragraph decision with no relevant facts recited, except that the default was declared based on the borrower's non-payment of taxes.

27

88.     Factually, these cases should not be controlling since the alleged "monetary" default declared by Brooklyn Lender for taxes and water charges pale compared to the cases cited.  Neither of the Brooklyn Lender cases discuss violations being the basis for acceleration and, therefore, are irrelevant.

**(b) The liens against the Debtors' Properties constitute a non-material default because the lienholders disclaimed them**

89.     Brooklyn Lender complains that Greenfield and Schwimer placed liens on the Properties owned by Debtors Eighteen Homes LLC and 618 Lafayette LLC, but at the same time Brooklyn Lender acknowledges that the Greenfield and Schwimer disclaimed the liens in filed pleadings in the Foreclosure Action.

90.     There were no enforcement actions filed by these junior lien holders. Each of the alleged liens has been removed.  On or about February 20, 2020, the accidental Schwimmer mortgage was satisfied by the execution of a satisfaction of mortgage filed on April 20, 2020 under CRFN 2020000127685.  And Herman Greenfield and Cheskiel Strulovitch both executed a Termination of Declaration of Restriction, which discharged of record the Greenfield restriction which either has or will be filed in short order.

91.     Brooklyn Lender is not entitled to default interest based on liens on the Properties that the lienholders themselves have disclaimed. While failing to formally expunge the liens may be a technical default, it did not prejudice Brooklyn Lender because the liens were admittedly unenforceable and subordinate to Brooklyn Lender's interest.  The existence of these potential liens, although removed now, did not affect Brooklyn Lender's security in the respective Properties.

28

**(c) Brooklyn Lender has identified no misrepresentation in any documents that required the Debtors to identify profit sharing interest holders so there was no basis to default the Debtors for failing to identify the profit sharing interest holders**

92.    Brooklyn Lender declared a default based on Paragraph 18(g) of the loan documents claiming that the lawsuit entitled *Schonberg et al. v. Strulovitch et al.* alleged that Strulovitch as guarantor misrepresented that he is the sole member of certain limited liability companies.  However, Brooklyn Lender's argument has since morphed into a new undeclared event of default.

93.    In May 2017 when Brooklyn Lender first declared a default based on Paragraph 18(g), it had no evidence to support its material misrepresentation allegation.  As cited in the default letters, Brooklyn Lender relied on the mere existence of a pending lawsuit.  To declare a default based on non-payment of a monthly installment payment, there must actually be a failure to pay, not just a mere allegation of nonpayment.

94.    The same standard should apply with respect to Brooklyn Lenders alleged Paragraph 18(g) violation.  Not only does Brooklyn Lender seek default interest from the time it served a notice of default, it seeks default interest retroactive to the loan origination, representing five years of default interest in some instances, in a total amount exceeding the principal amount of the loans.  This, despite there being no monetary default.

95.    After defaulting the Debtors, filing foreclosure actions, and forcing the Debtors into bankruptcy, Brooklyn Lender developed a new argument – that the existence of profit-sharing interests of various individuals equates to constructive transfers of ownership and or ownership misrepresentations at loan origination.  The Debtors, however, misrepresented

30

nothing nor has ownership changed.  Nor would such a default, if it existed, constitute a

legitimate basis for the penalty Brooklyn Lender has imposed upon the Debtors.

96.    The case law Brooklyn Lender relies upon for acceleration and imposing

default interest does not apply.

97.    For example, in *GKK 2 Herald LLC v. City of New York Tax Appeals

Tribunal*, 154 A.D.3d 213, 226-227, 63 N.Y.S.3d 20 (N.Y. App. Div. 2017), a case involving

taxation on an ownership change, the court found that there was a beneficial ownership change

because the prior owner had no interest in the property after the change, unlike here where only

profit sharing interests exist.  In *GKK-2* the court distinguished that ownership change from the

circumstances of this case where, at worst, there was a "mere change in form of ownership."  *Id.*

98.    The same analysis applied in *Yelencsics v. Comm'r of Internal Revenue*,

74 T.C. 1513, 1527 (1980), *acq. recommended by RE: ANTHONY YELENCSICS AND NORMA

YELENCSICS, ET AL V. COMMISSIONER*, AOD-1981-41 (IRS AOD Jan. 30, 1981), *and acq,

IRS Announcement Relating to: Rawson, Yelencsics* (IRS ACQ Dec. 31, 1981), where the Tax

Court determined that, unlike here, an ownership change had occurred because of the transfer of

incidents of beneficial ownership, despite the prior owner remaining as owner of record.

99.    The other cases Brooklyn Lender cited make the same analysis in other

contexts – none however in the context of a mortgage default for misrepresentation.

100.    Against this background, as evidence of an ownership misrepresentation at

the time of loan inception, Brooklyn Lender cited several documents.

31

101.    Most prominently, Brooklyn Lender copied into its objection a schedule ("Strulovitch Schedule") that was prepared at closing showing all membership interests held by Strulovitch.  That was not a misrepresentation.  Strulovitch held the listed membership interests.

102.    In addition, Brooklyn Lender cited the "Ownership Certification," organizational documents and Mr. Stulovitch's personal financial statement ("PFS").  At best, these documents are ambiguous.

103.    The Ownership certifications simply state that the "undersigned hereby certifies and warrants to Signature Bank that the ownership schedule previously submitted to the Bank is true, accurate and complete."  It is unclear whether the Ownership Certification refers to the Debtors' ownership of the Properties, or to the Strulovitch Schedule.  Brooklyn Lender asserts that it refers to the Strulovitch Schedule, but that is speculative.

104.    Since "ownership schedule" is not a capitalized defined term, Brooklyn Lender's assertion that it refers to the commitment letters is speculative.  Mr. Strulovitch was not even the signatory on many certifications.[1]  These documents were undisputedly drafted by Signature Bank and therefore any ambiguity is to be construed against the drafter.  Here, Brooklyn Lender is deemed to be the drafter after stepping into the shoes of Signature Bank and the ambiguity should be construed in the Debtors' favor

---

[1] Moses Strulovitch signed for 127 Rogers LLC and 119 Rogers LLC; Joshua Wagschal signed for D&W Real Estate Spring LLC and Meserole and Lorimer LLC.

32

105.    Even assuming that the Ownership Certification referred to the Strulovitch Schedule, it merely certifies the accuracy of the Schedule.  And again, the Strulovitch Schedule identified the ownership of "membership" interests.

106.    Brooklyn Lender also relies heavily on the PFS where Mr. Strulovitch had to identify who was entitled to the Debtors' cash flow.  Mr. Strulovitch identified himself as entitled to 100% of the cash flow.  That PFS question, however, makes no sense because it did not ask for the identity of the parties entitled to *profit*.  Cash flow is not profit.  Cash flow is cash on hand at a given time.  Profit, by way of contrast, is the cash left after all expenses have been paid including mortgage payments, taxes, insurance, etc.  They are different.

107.    The best answer to this irrelevant question is that Mr. Strulovitch was entitled to the cash flow *to manage as the managing member*.  That is probably the closest to the correct answer given the question asked.  Even if not the best answer, to say that "profit" sharing participants were entitled to "cash flow" would be wrong.

108.    More to the point, the PFS did **_not_** ask Mr. Strulovitch to identify who is entitled to "profit" which differs from cash flow.  Were that the question, the correct answer would be different.

109.    As noted in more complete detail in the Debtors' claim objection, even if the court found that the PFS contained misrepresentations, those mistakes would not be a basis to trigger a loan default because it was not a breach by the Debtor or a "guarantor" of the "Debt" as specified in paragraph 18(g) of the Mortgage.  Strulovitch is not a guarantor because his guarantee was non-recourse as to the Debt and limited to certain damages that may accrue for specified acts.

33

110.    Whether or not a profit participant is a formal member, tax must be paid on profits.  Thus, the Debtors' tax returns evidenced the profit-sharing arrangements.  Those returns have become the core of Brooklyn Lender's argument that it is entitled to default interest retroactive to the loans' origination.  The filed tax returns, however, merely identify the taxpayers with tax consequences stemming from the profit-sharing agreements.

111.    Similarly, Brooklyn Lender argues that the profit-sharing arrangements are booked as equity interest on the Debtors' books and records.  Again, the profit-sharing arrangements were booked as equity because they are a form of equity for tax purposes.  To that extent, the *form* of ownership changed from membership interests to profit sharing interests when the Signature loans were made.

112.    Buried in the Debtors' form operating agreements is a provision that profits must be allocated solely to the Member.  But Brooklyn Lender does not contend that Signature relied on that provision in the operating agreements when it made the loans.  Standing alone, failing to correct a boilerplate provision in an operating agreement can hardly be the basis for $40,000,000 of default interest and millions of dollars of legal fees.  Indeed, the operating agreements did not prohibit Mr. Strulovitch from sharing profits.  Nor should it matter.  Profits were distributed after payment of Property expenses and Brooklyn Lender's debt service.  It did not affect Brooklyn Lender.

113.    In yet another attempt to manufacture a misrepresentation, Brooklyn Lender contends that on the loan commitment letters, Strulovitch misrepresented that he owned the Debtors' interests.  But he did own the Debtors' membership interests.  Ownership of membership interests is not inconsistent with also having profit sharing participants.  Again,

34

Strulovitch gave the most correct answer to the question asked.  The answer was not wrong or misleading.  He owned the Debtors' interests.

114.    In summary, Brooklyn Lender identified no material misrepresentations when it called its default, nor when it filed it foreclosure actions nor in these cases.  It has still identified nothing that required the Debtors to identify holders of profit-sharing interests.

**(d) Even if the Debtors failed to disclose beneficial owners, it was not a material default because it did not affect the Debtors' creditworthiness, nor are there any cases holding such non-disclosure to be a material default where it is unrelated to creditworthiness**

115.    Even if the Court finds that there was a misrepresentation, the loan documents require that any misrepresentation be "material" to justify a default.  Here, no alleged misrepresentation was material.  In determining whether a breach is material, courts consider the particular facts and circumstances existing at the time a mortgage was accelerated, including: (i) whether plaintiff sustained damages; (ii) whether the collateral had been impaired; (iii) whether the obligors were viable and capable of paying debt service; (iv) "whether the essential part of the bargain -- timely payment of the installments due under the note -- has been and is being satisfied;" and (v) whether the lender's actions were inequitable under the particular facts and circumstances. *See Tunnell Publishing Co. v. Straus Communications, Inc.*, 160 A.D.2d at 1032-1033; *Home Savings Bank of Upstate New York v. Baer Properties, Ltd.*, 92 A.D.2d at 99-100.

116.    Brooklyn Lender argues that the identity of the profit-sharing participants is material because the commitment letters state "that the identity of the persons with whom [Signature] deals with is of material importance to it."  In these cases, however, the Debtors did not misrepresent the persons whom Signature would deal with.  That person was Cheskiel

35

Strulovitch (or in some instances Moses Strulovitch or Joshua Wagschal) all of whom were disclosed to Signature Bank.  The non-member profit sharing participants lacked authority to deal with Signature and lacked authority to replace Cheskiel Strulovitch as the managing member with authority to deal with Signature.

117.    Brooklyn Lender nonetheless relies on case law the Debtors cited for the principle that a 'material misrepresentation' is one that is a 'basic credit consideration' that has a 'direct relationship to [the borrower's] ability to repay the loan.'  But Brooklyn Lender cited no cases that find that non-disclosure of an alleged beneficial owner would constitute a material misrepresentation at loan origination for purposes of accelerating a mortgage.

118.    The case law Brooklyn Lender cited is either irrelevant, or involves an obvious relationship between a breached representations and a party's creditworthiness and ability to pay, albeit generally in contexts irrelevant to mortgage acceleration.  *Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 289 F. Supp. 3d 484 (S.D.N.Y. 2018) (breach of contract for dumping risky loans into securitized loan package); *Katz v. Berisford Int'l PLC*, No. 96-cv-8695 (JGK), 2000 WL 959721 (breach of contract for taking $3,000,000 dividend paid while loan unpaid in violation of loan documents); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (whether information used constituted insider trading in securities fraud case); *In re Hawker Beechcraft, Inc.*, 486 B.R. 264 (Bankr. S.D.N.Y. 2013) (on executory contract assumption can't cherry pick contract obligations to avoid indemnification for crew training); and *Loan Am. Fin. Corp. v. Talboom,* 163 Misc. 2d 199, 201, 620 N.Y.S.2d 221 (Sup. Ct. Suffolk Cty. 1994) (foreclosure action based on non-payment and misrepresentation of employment status on loan application).

36

119.     Where a misrepresentation is not directly linked to creditworthiness and ability to pay, but merely supplemental to non-payment, the result is different.

120.     In *Tunnell Publishing Co. v. Straus Communications, Inc.*, 169 A.D.2d 1031 (3d Dep't 1991), for example, plaintiffs sought to accelerate a promissory note given by defendant Straus Communications, Inc. ("SCI") as part of a newspaper acquisition. The promissory note provided for the acceleration of the principal balance upon certain events, including a dissolution, merger, consolidation, reorganization, business failure, insolvency or termination of existence of the borrower. *Id*. at 1031.

121.     After the closing, SCI sold one of its assets, a radio station.  For tax reasons, SCI transferred its remaining assets and liabilities to a limited partnership that would continue SCI's business. Some of SCI's liabilities were satisfied and SCI's cash assets were distributed to the individual shareholders, whose interests in the limited partnership were in the same proportion as their interests in SCI.  The limited partners also contributed approximately $1,000,000 in cash to the partnership.  The partnership immediately took over SCI's business, including publication of the newspapers, which continued uninterrupted. SCI's obligation on the promissory note held by plaintiffs was assigned to the partnership, which made all required payments to plaintiffs.  *Id*. at 1031.

122.     The plaintiffs asserted that the note was properly accelerated because the restructuring of defendants' business resulted in the dissolution and insolvency of SCI. Defendants claimed that (i) the partnership was a substantially similar entity to SCI, "distinguishable only by its business structure;" (ii) the restructuring "was not an attempt to strip SCI of its assets, but a legitimate tax-planning device similar to the one used by plaintiffs after

37

their sale of the newspapers to SCI;" (iii) the security for the note "was not impaired by the restructuring;" (iv) the partnerships could pay the note and other obligations to plaintiffs and had been paying those obligations; and (v) plaintiffs continued to do business with the partnership, "including the acceptance of payments on the note without reservation." *Id.* at 1031-32.

123.    The Appellate Division, Third Department, affirmed the lower court and held that questions of fact precluded an award of summary judgment to plaintiffs. The Court held:

> Agreements providing for the acceleration of the entire debt upon the default of the obligor are often enforced in accordance with their terms, but where the breach asserted as the basis for the acceleration is trivial or inconsequential, the forfeiture may be viewed as an unconscionable penalty and equitable principles come into play. Each case must be decided on its own particular facts. Defendants' factual allegations, if true, establish that plaintiffs have sustained no damages, that the security bargained for by plaintiffs has not been impaired, that the successor obligor on the note is a viable, financially stable entity carrying on the business of the original obligor and that the essential part of the bargain -- timely payment of the installments due under the note -- has been and is being satisfied. Plaintiffs contend that since they bargained for and SCI executed a note providing for acceleration upon SCI's dissolution and such dissolution has occurred, the note must be enforced according to its terms without regard to whether the dissolution had any actual impact on plaintiffs. We disagree and conclude that defendants' allegations are sufficient to require denial of plaintiffs' motion for summary judgment since equitable principles may preclude enforcement of an unconscionable penalty.

*Id.* at 1032 (citations omitted).

124.    Similarly, in *Home Savings Bank of Upstate New York v. Baer Properties, Ltd.*, 92 A.D.2d 98 (3d Dep't 1983), the disputed mortgage contained a "due-on-sale clause" providing that the mortgage would be accelerated and be immediately due upon a sale of the mortgaged premises. *Id.* at 98-99.  When the mortgagor, Baer Properties, Ltd. ("Ltd."), transferred the property to its president, Kenneth J. Baer ("Baer"), plaintiff notified Ltd. that it

was exercising its rights under the due-on-sale clause and demanded immediate payment of the entire principal balance.  Ltd. failed to respond, and plaintiff filed a foreclosure action. *Id*. at 99.

125.    Baer alleged that the due-on-sale clause was unenforceable because: (i) "plaintiff knew or should have known that Baer himself and not Ltd. was in fact the owner of the property and had to be in order to take advantage of certain individual tax deductions;" (ii) "title was placed in Ltd. at the insistence of plaintiff so that plaintiff could charge 9 1/2% interest and not the 8 1/2% which was the maximum then allowed for loans to private individuals;"  (iii) title remained in Ltd. for only one day; (iv) the mortgage was not in default; (v) "plaintiff's security had not been impaired by the transfers;" and (vi) if requested by plaintiff, the property would be re-conveyed to Ltd. *Id*. at 99.

126.    The Appellate Division, Third Department held:

> Because of these allegations we believe that Special Term was correct in denying plaintiff's motion for summary judgment. The courts of this State have not exercised their equitable powers to permit forfeiture in every instance when a due-on-sale clause has been violated. Instead, it has been recognized that under certain circumstances it may be inequitable to enforce a due-on-sale provision and that each case must be decided on its own particular facts. If, as contended, plaintiff knew that the true owner of the property was to be Baer individually, and if plaintiff wanted Ltd. to be the mortgagor only long enough to obtain a higher rate of interest on its loan, then the court sitting in equity in this action for foreclosure can restrict or restrain the due-on-sale clause provision if a contrary determination would be unconscionable or result in unfairness to defendants.

*Id*. at 99-100. (citations omitted; emphasis added).

127.    *In re Northwest Airlines Corp*., No. 05-19730, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2009), the bankruptcy court denied default interest based upon a concealed breach of a loan agreement because no prior notice was given and the lender could identify no actual harm or injury, explaining:

39

> UBS asserts that it should be permitted default interest on the entire accelerated amount of the debt even though it did not declare a default, because the Debtors allegedly concealed a breach of the applicable loan documents which put it in default prior to the filing of their chapter 11 cases.  On this record, UBS has not supported the proposition that the Debtors incurred liability when they replaced one engine with a similar engine or that any failure to disclose would justify the imposition of default interest.  Although UBS quibbles that the Debtors did not act quickly enough and asserts that it would be inequitable to deny it default interest on all of the debt, UBS identifies no harm or damage from the engine substitution, other than legal fees.

Id., at *5.

128.    The deposition testimony of Signature Bank's representative, which will be heard at trial, indicates that the loans were made based on the Properties, not the guarantor. The loan evaluation hinged on the rental income and whether the properties could financially sustain the debt, not the ability of Strulovitch or his other business entities to pay, since each Property was owned and operated by a separate LLC.  Contrary to Brooklyn Lender's assumption, the Strulovitch PFS was only incidental to the loan underwriting.  Indeed, Kenneth Stagnari, Signature Bank's representative, testified that he was not aware of Signature Bank ever defaulting a borrower solely due to a non-monetary default.

**(e) Even if the Court finds that non-disclosure of profit sharing interests was a material default, equitable relief from acceleration based on such a non-monetary default is regularly granted to borrowers on performing loans**

129.    Default interest may be denied based on equitable principles.  The Debtor's claim objection traced the evolution of the law in New York State from strict compliance with mortgage acceleration clauses to foreclosure as an equitable remedy which may be denied based upon the circumstances and nature of default.

40

130.    In its response, Brooklyn Lender does not deny that it is subject to such equitable considerations under New York law, nor does it deny that such equitable considerations would preclude acceleration if the Court finds that the alleged defaults were relatively minor.

131.    Instead Brooklyn Lender doubles down on its rhetoric to elevate the Debtor's alleged misrepresentations and alleged late cures of violations to "a massive fraud on Signature and Brooklyn Lender, on the claimants in the Federal Action, on taxing authorities, and on this Court" justifying the denial of equitable relief based on the doctrine of unclean hands.

132.    In support, Brooklyn Lender cites *Holm v. First Unum Life Ins. Co.*, 7 F. App'x 40, 41 (2d Cir. 2001) and *Med. Soc'y of the State of N.Y. v. UnitedHealth Grp. Inc.*, 332 F.R.D. 138, 150 (S.D.N.Y. 2019).  Once again Brooklyn Lender's reliance on the case law it cites is misplaced.

133.    In *Med. Soc'y*, the conduct alleged to be "unclean hands" was insurance fraud by (1) using deceptive coding in billing claims; (2) ignoring regulatory statements that it was not entitled to facility fees; (3) billing for services not provided; (4) deliberately inflating bills; and (5) employing a specific billing service because it would inflate bills. *Id.*  The Court held that unclean hands applies where the misconduct that supports the defense is directly related to the interests at stake.  The court concluded that unclean hands was not applicable as against the insurance company.

134.    In *Holm,* an insurance company denied Holm disability benefits because Holm missed the deadline for filing an administrative appeal.  Holm argued that the insurance

41

company had unclean hands because it was late in notifying him that his claim was denied, and

that it would be inequitable for First Unum to defeat his cause of action based on his

untimeliness when it also did not meet the deadlines proscribed in the plan.  The court found no

unclean hands as to the insurance company.  *Id.*

135.    The result should be same here.  The alleged defaults asserted by

Brooklyn Lender, even if true, were not material to the Debtors' ability to repay the Signature

loans, as demonstrated by the absence of any material payment default or outstanding material

violations or material outstanding real estate tax and water claims.  Such allegations cannot be

equated to insurance fraud by an insurance company against its policyholders, which itself is

inadequate to justify unclean hands.

136.    Not only do courts look to the borrower's conduct, the Appellate Division,

Second Department applied the same principles when it reversed the trial court's granting of a

plaintiff's motion for summary judgment in a foreclosure action and held that "appellant is

entitled to its day in court to explore the possibility that the mortgagees' conduct in accelerating

the mortgage debt may have constituted overreaching." *Berman v. Blooming Farms Joint

Venture*, 50 A.D.2d 558, 558 (2d Dep't 1975).

137.    Outside of the mortgage acceleration context, courts in New York have

similarly held that whether to enforce an acceleration clause depends on the particular facts of

the case. In *Karabu v. Pension Benefit Guaranty Corp.*, No. 96 Civ. 4960 (BSJ), 1997 WL

759462, *15 (S.D.N.Y. 1997), for example, the Court declined to enforce an acceleration clause

in a security agreement because of TWA's failure, as required by a security agreement, to seek

the trustee's consent before obtaining F.A.A. short term extensions over 150 hours for 21

maintenance operations on a specific plane. The Court noted that TWA had performed thousands

of maintenance operations and that the value of the plaintiff's collateral "has held steady or, in

fact, increased. In this context, the trivial or inconsequential failure to obtain prior consent for 21

short term extensions cannot -- equitably -- form the basis for acceleration of TWA's debt." *Id*. at

*14.

138.    Courts in other jurisdictions follow the same rule.  For example, the Ninth

Circuit explained in the context of a loan acceleration for leasing an aircraft without the lender's

consent:

> Acceleration clauses are designed to protect the creditor from actions by the
> debtor which jeopardize or impair the creditor's security. They are not to be used
> offensively, e. g., for the commercial advantage of the creditor. Acceleration is a
> harsh remedy with draconian consequences for the debtor. Acceleration is a
> matter of equity and the courts, including those of Texas, have historically been
> careful to evaluate the fairness of acceleration in the particular facts of a case.

*Brown v. AVECMO Inv. Corp.*, 603 F.2d 1367, 1376 (9th Cir. 1979).

139.    In *Brown*, the Ninth Circuit held that "the facts before the trial court

demanded the incorporation of equity considerations into the instructions to the jury. The facts

sufficiently suggested the possibility that . . .the creditor accelerated not out of a reasonable fear

of security impairment but rather from an inequitable desire to take advantage of a technical

default." *Id.* at 1370; *see also Neuro-Rehab Associates, Inc. v. AMRESCO Commercial Finance,

L.L.C.*, No. CIVA 05–12338–GAO, 2006 WL 1704258, *4 (D. Mass. June 19, 2006)

("Specifically, acceleration and foreclosure have been barred as inequitable in circumstances

where the default relied upon to accelerate was technical or minor and resulted in no prejudice or

impairment to the lender's security interest or where the acceleration was not being exercised as

a means to protect the lender's security interest but instead was motivated by inequitable

43

considerations, such as the lender's desire to take advantage of a technical default to coerce full

payment."); *Mills v. Nashua Federal Savings and Loan Assoc.*, 121 N.H. 722 (S. Ct. New

Hampshire 1981) (in the context of a borrower's violation of a due on sale clause, "a court in

equity may refuse to allow a mortgage to be foreclosed when acceleration of the due date would

amount to unconscionable or inequitable conduct by a lender. . . . We suggest that there may be a

number of situations . . . which should be considered . . . as possible exceptions to the strict

enforcement of due-on-sales clauses." (citation omitted)); *Consolidated Capital Properties, II,*

*LTD. v. National Bank of North America*, 420 So.2d 618, 620 (Fla. 5th DCA 1982) (in the

context of a due on sale clause following an ownership change, "Whether an acceleration

provision of a mortgage may be utilized as a basis for foreclosure is dependent upon the facts

and upon whether the invocation of the acceleration clause would be inequitable under the

circumstances.") (citation omitted).

140.    Brooklyn Lender argues that equitable relief is nonetheless rare following

acceleration.  That is probably because loan acceleration for a non-monetary default on a

performing loan is even rarer.  Signature Bank's representative testified that he knew no non-

monetary default declared on any Signature commercial loans.

141.    Predictably, and contrary to the facts of this case, almost all of the cases

Brooklyn Lender cited follow acceleration against a borrower deep in **monetary** default.  *Fed.*

*Home Loan Mortg. Corp. v. Bronx New Dawn Renaissance VII, L.P.*, No. 93 CIV. 7970 (CSH),

1995 WL 412399 (S.D.N.Y. July 11, 1995); *In re Downtown Athletic Club of New York City,*

*Inc.*, 1998 WL 898226, at *11 (Bankr. S.D.N.Y. Dec. 21, 1998)*Nassau Trust Co. v. Montrose*

*Concrete Prods. Corp.,* 56 N.Y.2d 175, 183, 451 N.Y.S.2d 663 (1982); *Key Int'l Mfg. Inc. v.*

44

*Stillman*, 103 A.D.2d 475, 477, 480 N.Y.S.2d 528, 530-31 (2d Dep't 1984), *aff'd as modified,* 66 N.Y.2d 924, 489 N.E.2d 764 (1985); *Fifty States Mgt. Corp. v. Pioneer Auto Parks*, 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 803 (1979); *Deutsche Bank Nat. Tr. Co. v. Pascarella*, 39 Misc. 3d 1227(A), at *6, 971 N.Y.S.2d 70 (Sup. Ct. Suffolk Cty. 2013).

142.    Bay way of contrast, it is not rare, absent the existence of a monetary default, for a court to grant equitable relief following acceleration for on a **<u>non-monetary</u>** default.  As the case law in the non-monetary default context cited above illustrates, this is particularly so where, as here, the lender's predatory intent was apparent.  Based on the case law, the alleged defaults here, even if proven, are too technical and non-material to justify acceleration and imposing 24% interest.

**(f)  Even if Brooklyn Lender is entitled to default interest, 24% is an unenforceable penalty rate given the 19% point spread and no evidence of corresponding actual damages**

143.    Brooklyn Lender cited several cases where 24% default interest was allowed under New York law with little analysis.  The issue deserves analysis.

144.    The rule is that default interest that is significantly higher than the nondefault rate can be considered a penalty under New York law, absent a corresponding relationship to a lender's actual damages.  *See, Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 424 (1977) ("A liquidated damage provision has its basis in the principle of just compensation for loss. A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion.").

45

145.    The Debtors concede Brooklyn Lender's point that there is a presumption that a secured creditor is entitled to be paid interest at the rates in the loan documents. But this presumption is rebuttable and remains subject to adjustment based upon equitable considerations, including that the stated default rate constitutes a penalty because it is not a reasonable reflection of the lender's potential or actual losses. *In re Vest Associates,* 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998) ("[t]he presumption [of validity] may be rebutted if the rate is significantly higher without any justification offered for the spread or where the default rate appears inordinately high in relation to the non-default rate."); *See also, In re Bavmetree, LLC.* 2009 WL 2226107 (Bankr. E.D.N.Y. 2009); *In re Liberty Warehouse Assoc. L.P.,* 220 B.R. 546, 552 (Bankr. S.D.N.Y. 1998); *In re General Growth Props., Inc.,* 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011) ("there is a rebuttable presumption in favor of granting an oversecured creditor interest at the [default] rate specified in the contract, subject to equitable considerations"); *In re Milham,* 141 F.3d 420, 423 (2d Cir. 1998) ("Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate").

146.    Here, Brooklyn Lender asserts that it is entitled to default interest, without analysis.  But Brooklyn Lender has not even tried to explain why the default interest rate should not be deemed disproportionate, given the disparity between the non-default rate of 4 to 5% for the Debtors' loans, and the default rate of 24%.  This 19% point spread suggests that the default rate is penal.

46

147.    For example, the Court in *Rowntree* disallowed a default rate of 25%, as compared to a pre-default rate of 12%, finding that the default rate "inequitable" and the difference between the two rates "significant" and "unexplained":

> the majority of courts require a factual and equitable analysis prior to the application of a contractual default rate of interest. *See In re Johnson,* 184 B.R. at 572.  In particular, courts have considered the following factors when deciding whether to enforce a contractual default rate as opposed to a non-default rate: (1) The difference between the default and non-default rates; (2) the reasonableness of the differential between the rates; (3) the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and (4) the purpose of the higher interest rate. *Id.* at 573.

*In re Bownetree, LLC,* 2009 WL 2226107 at 4.

148.    Many bankruptcy cases disallow default interest based upon similarly wide disparities. *See, In re Liberty Warehouse Assoc. L.P., supra,* 220 B.R. at 552 (noting that "[a]bsent contrary evidence, a default interest that is inordinately high relative to the non-default rate will be found to be a penalty"); *In re Kalian,* 178 B.R. 308, 309 (Bankr. D.R.I. 1995) (18% spread rejected); *In re The Boardwalk Partners,* 171 B.R. 87, 92 (Bankr. D.Az. 1994) (14.5% differential disallowed); *In re Hallstrom,* 133 B.R. 535, 537 n. 3 (Bankr. D.Col. 1991) (24% spread unreasonable); *In re DWS Investments,* 12.1 B.R. 845, 849 (Bankr. C.D.Calif. 1990) (10-11% differential not permitted); *In re White,* 88 B.R. 498, 499 (Bankr. D.Mass. 1988) (35% spread not allowed).

149.    Here, the default rate exceeds any reasonably anticipated damages to its collateral arising out of the fact that the Debtors' had silent profit-sharing participants.  This did not impact the underwriting of the mortgage nor the Debtor's performance in making payments. Given the absence of a Signature Bank default declaration, coupled with the history of payments

of monthly principal and interest, and the great disparity between the non-default rate and the

default rate, the Court should disallow default interest, much less at a 24% rate.

   **(g) The Debtors' Chapter 11 filing does not entitle Brooklyn Lender to 24% post-filing
interest since (i) Brooklyn Lender forced the filing by its wrongful acceleration, and
(ii) payment of post-petition 24% default interest would interfere with the Debtors'
fresh start**

    150.    In the alternative, Brooklyn Lender demands 24% default interest in the

amount of $6,791,484 for the period since these cases were filed, in addition to the regular post-

petition debt service paid to date.  But there is no rule requiring such payment as Brooklyn

Lender suggests.  Rather, the rule under Section 506(b) of the Code is that the allowance of post-

petition interest is subject to equitable considerations, and here the equitable considerations show

that Brooklyn Lender is not entitled to default interest.

    151.    The right to pendency interest under the Bankruptcy Code is governed by

Section 506(b), which provides in relevant part that:

> To the extent that an allowed secured claim is secured by property the value of
> which, after any recovery under subsection (c) of this section, is greater than the
> amount of such claim, there shall be allowed to the holder of such claim, interest
> on such claim, and any reasonable fees, costs, or charges provided for under the
> agreement or State statute under which such claim arose.

    152.    The Supreme Court examined Section 506(b) in *United States v. Ron Pair*

*Enterprises, Inc.,* 489 U.S. 235, 109 S. Ct. 1026, 1030-1031 (1989), which permitted payment of

post- petition interest on an oversecured nonconsensual tax lien. According to the Supreme

Court:

> The phrase "interest on such claim" is set aside by commas, and separated from
> the reference to fees, costs, and charges by the conjunctive words "and any."  As a
> result, the phrase "interest on such claim" stands independent of the language that

48

follows. "[I]nterest on such claim" is not part of the list made up of "fees, costs, or charges," nor is it joined to the following clause so that the final "provided for under the agreement" modifies it as well.  The language and punctuation Congress used cannot be read in any other way. By the plain language of the statute, the two types of recovery are distinct.  (Internal citations and footnotes omitted).

153.    While *Ron Pair* made clear that oversecured creditors are entitled to post-petition interest, the Supreme Court did not address which rate applies.  In the years following, case law indicates that the contract default rate is a presumptive rate subject to adjustment based on "equitable considerations."  *See, e.g. In re General Growth Props., Inc.,* 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011).

154.    Courts have developed four factors: (i) whether there was creditor misconduct, (ii) whether application of the default interest rate would cause harm to the unsecured creditors, (iii) whether the default interest rate constitutes a penalty, and (iv) whether the default interest rate would impair debtor's fresh start. *General Growth, Id* at 328; *In re Vest Assoc.,* 217 B.R. 696 (Bankr. S.D.N.Y. 1998).

155.    At first blush, these factors appear to help Brooklyn Lender since the value of the Debtors' Properties exceeds the claims against the Debtors' estates.  But the Debtors' reorganization is contingent upon refinancing the Brooklyn Lender debt. Reorganization would be jeopardized by refinancing an additional $6,792,000 of debt because there is not enough value in the Properties in today's market, particularly during the post-Covid credit squeeze, to finance another $7,00,000.  Thus, payment of post-petition default interest would interfere with the Debtor's reorganization and ultimately payment to creditors.  For this reason alone, Brooklyn Lender is not entitled to post-petition default interest.

156.   In addition, Brooklyn Lender's misconduct is the cause of the Chapter 11

filing.  It declared a default based on defaults that did not exist in a predatory attempt to either

effectuate a forfeiture or earn 24% interest, despite the fact that it lacked evidence of the alleged

defaults and despite the fact that the loans were performing loans. Misconduct can take many

forms, and common sense dictates that improperly forcing a debtor to invoke its statutory right to

file Chapter 11 to free-up its Properties is one of them.

157.   *In re Bowntree, LLC,* 2009 WL 2226107, at *5 (Bankr. E.D.N.Y. 2009)

is persuasive authority to deny default interest when the default involves commencement of a

Chapter 11 case.  After noting that the lender was paid the full amount of its bargain under the

loan, the Court declined to impose default rate interest, stating "Any default on the part of the

debtor was a technical default under the terms of the contract ... Therefore, it would be

inequitable to enforce the default rate under these circumstances."

158.   As to the penalty criteria, Section 506(b) turns on proportionality. A

default rate significantly higher and disproportionate to the non-default rate is viewed with

skepticism in bankruptcy and treated as a penalty. *In re White,* 88 B.R. 498, 511 (Bankr. D.Mass.

1988) ("default rate at issue here is nothing more than a device (akin to a sledgehammer) to

coerce the Debtors into prompt payment.").  As the Second Circuit Court of Appeals pointed out

in *In re Milham,* 141 F.3d 420, 423 (2d Cir 1998), "Most courts have awarded pendency interest

at the contractual rate; but nevertheless, however widespread this practice may be, it does not

reflect an entitlement to interest at the contractual rate."

159.   In *In re Kalian,* 178 B.R. 308 (Bankr. D.R.I. 1995), for example, the loan

was current until the filing of the bankruptcy petition, and was paid in full following the sale of

the Debtor's real property. The Court found that the loan was never at risk, negating the basis for imposing default rate interest even without post-petition payments:

> Fischer's claim to default interest fails because to honor it would be inimical to federal bankruptcy law's concern for the fair and equitable distribution of the debtor's assets.
>
> The time value of money lent has been paid to Fischer through the . . . interest rate. Fischer has not argued that the base rate has not been (at least) comparable to prevailing market rates at and following default. Although Fischer asserts that "a less creditworthy borrower must pay a premium to obtain the continued use of money," it must be remembered that the default here was a payment default triggered by bankruptcy. Throughout the course of Kalian's bankruptcy Fischer's collateral's value was protected and its claim was adequately protected by an equity cushion. Had the collateral been threatened, Fischer could have sought adequate protection or moved for relief from stay for cause. § 362(d)(l). There was never any cognizable risk that Fischer would go unpaid, or even underpaid.
>
> To the extent that default interest might be justified by the increased cost of administering and collecting a defaulted loan, it cannot be so justified here. In as much as it has requested them, and its agreement provides for them, Fischer will recover its *reasonable* 'fees, costs and charges.'

160.    The same analysis should apply here, since the Lender cannot point to any cognizable risk that the loan would go unpaid.  From day one of these cases, Brooklyn Lender was never in doubt about getting repaid.  The Debtor missed no payments during the Chapter 11 case, even in a pandemic lockdown.  Given the absence of risk of non-payment, the default rate is disproportionately high.  These factors distinguish this case from most decisions involving post-petition default interest by a non-paying borrower.

161.    Against this background, Brooklyn Lender relies on *In re Moshe*, 567 B.R. 438, 449 (Bankr. E.D.N.Y. 2017), *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 331 (Bankr. S.D.N.Y. 2011), and *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729 (Bankr. S.D.N.Y. 2019).

162.    *General Growth* is distinguishable for two reasons. First, the parties there

stipulated that the default rate under the contract of 3 points (as opposed to the 19 points here)

was not a penalty. Second, the reorganization plan in *General Growth* provided for a cure and

reinstatement of the mortgage under Section l123(d). The Court found that Section l123(d)

specifically requires the cure to be determined "in accordance with the underlying agreement and

applicable nonbankruptcy law." *In re General Growth Props., Inc.*, 451 B.R. at 331).  Section

l123(d) differs from Section 506(b).  Under Section 506(b), the pendency rate of interest is

guided by, but not always governed by, the underlying note.  *In re Moshe*, 567 B.R. 438 (Bankr.

E.D.N.Y. 2017), also cited by the Lender, contain similar holdings that the Section 1123(d) cure

and reinstate provisions require payment of default interest under state law, and is likewise

distinguishable on the ground that the Lender here will be paid in full without reinstatement.

163.    In summary, Brooklyn Lender's demand for default interest is based on a

self-created default despite there being no cognizable risk that the these fully performing loans

would go unpaid.

164.    Last, but not least, Brooklyn Lender cited *Ruskin v. Griffiths*, 269 F.2d

827, 832 (2d Cir. 1959) and *In re 785 Partners LLC,* 470 B.R. 126 (Bankr. S.D.N.Y. 2012).

Those were solvent debtor cases.  Where, as here, "the application of the contractual interest rate

would harm the unsecured creditors or impair the debtor's fresh start," the court has the "power

to modify the contract rate based on notions of equity." *Id. at* 134.  Since payment of default

interest in this case would cripple the Debtor's fresh start and wipe out all value for any party

except Brooklyn Lender, the Bankruptcy Code provides an additional basis for this Court to

exercise equitable jurisdiction to strike default interest.

**(h) Brooklyn Lender's demand for millions of dollars of legal fees is unreasonable since the fees were incurred for the improper purpose of enforcing a non-monetary, non-existent defaults on loans with little risk of non-payment**

165.    In the claim objection, the Debtors objected to Brooklyn Lender's demand for $1,337,510 for legal fees based in part on the absence of any documentation.  Brooklyn Lender has still not documented the fees despite the fact this it is on its trial exhibit list.

166.    "Attaching supporting documentation is a mandatory prerequisite to establishing a claim's prima facie validity." *In re Taylor*, 363 B.R. 303, 308 Bankr. M.D. Fla. 2007). Bankruptcy Rule 3001(a) requires that "[a] proof of claim shall conform substantially to the appropriate Official Form." Fed. R. Bankr.P. 3001(a). Moreover, Bankruptcy Rule 9009 requires that the Official Forms "shall be observed." Fed. R. Bankr. P. 9009. Form 10—the official proof of claim form—instructs creditors to "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages and security agreements" or a summary of such documents. Form 10 also instructs that "[i]f the documents are not available, please explain." Considering the specificity of these instructions, a creditor cannot substantially comply with Form 10 by filing a proof of claim without any documentation or, at the very least, an explanation for why such documents are unavailable." *See In re Gilbreath*, 395 B.R. at 362–63. "The rules rightfully require creditors to attach minimal supporting documentation for their claims so that a debtor can evaluate their validity without discovery or extraordinary expense." *In re Armstrong*, 320 B.R. 97, 104 (Bankr.N.D.Tex.2005).

167.    Brooklyn Lender's continued refusal, even after the Debtors raised the issue, to disclose the basis for remarkably high legal fees is reason alone to expunge that portion

53

of the claim.  The defaults were declared in May 2017 and therefore any documentation to

support their claim has been in their possession for over three (3) years.  Failing to disclose any

part of the claimed legal fees should be fatal to their allowance.

168.    Besides the Debtors' substantive arguments for denial of legal fees,

(which will not be repeated herein), the Debtors note further that a Chapter 11 filing is a not an

open invitation for the Lender to "over-lawyer" the case.  In reviewing the reasonableness of a

secured creditor's claim for legal fees under Section 506(b), "courts must also consider

reasonableness within the general policies and provisions of the Bankruptcy Code, and the

bankruptcy court's inherent discretion to review fee claims for potential abuse." *In re Glazier*

*Group, Inc.,* 2013 WL 1856305, *3 (Bankr. S.D.N.Y. 2013).

169.    While the standard has long been defined as "whether the creditor

reasonably believed the services were necessary to protect its interest in the debtor's property," *In*

*re PCH Assocs.,* 122 B.R. 181,204 (Bankr. S.D.N.Y. 1990), it has also been held  that:

> Secured creditors are not entitled to be reimbursed for fees incurred in every
> action taken by their counsel . . . It is unreasonable to seek reimbursement for fees
> that are not cost jutified either by the economics of the situation or necessary to
> preservation of the creditor's interest in light of the legal issues involved. (internal
> citations omitted)

*In re Woods Auto Gallery, Inc.,* 379 B.R. 875, 884-885 (Bankr. W.D.Mo. 2007).  As one Court

cautioned, "creditors are entitled to engage counsel and pay for constant, comprehensive, and

aggressive representation, but where services are not reasonably necessary or where action is

taken because of an attorney's excessive caution or overzealous advocacy, courts have the right

and the duty, in the exercise of their discretion, to disallow fees and costs under§ 506(b)." *In*

*re Wonder Corp. of America,* 72 B.R. 580, 591 (Bankr. D.Conn. 1987), *affirmed* 82 B.R. 186

(D.Conn. 1988).

170.    In addition, the mortgages provide for the recovery of "reasonable"

attorneys' fees in paragraph 18(j), but only to "protect the Mortgagee's interest in the Mortgaged

Property."  Under paragraph 19, attorneys' fees are recoverable "If the Mortgagor fails to make

any payment or to do any act as herein provided. . ."  Since debt service was paid and all acts

performed, even if the Mortgagee has evidentiary support for attorneys' fees, the Mortgages do

not permit legal fees for collection action arising from a misrepresentation, particularly since the

alleged misrepresentations were not made by "Mortgagor."

171.    In any event, Brooklyn Lender's pre-Petition Date efforts to enforce the

loan documents consisted of issuing acceleration notices and, shortly thereafter, commencing the

foreclosure actions in which the only meaningful matter undertaken was receiver litigation.  In

that context, the Debtors contend that $1.5 million for pre-petition fees is just as excessive as the

$2.5 million for post-petition fees.

172.    Consistent with the loan documents, the necessity of the services must be

geared to collection, and where, as here, the risk of non-payment is slim, the Court should not

accept the fees as billed without a sound justification for the services performed. *See, e.g. In re

Glazier Group, Inc.*, supra, 2013 WL at *3 ("the reasonableness of counsel's activities in

representing a secured creditor may depend on the extent to which the creditor's secured position

is jeopardized. . . When there is only minimal risk, circumstances will generally require that

counsel respond only to issues of material concern".) (Internal citations and quotation marks

omitted).

173.    As explained in *In re Canal Asphalt, Inc*., 2017 WL 1956849, at *7

(Bankr. S.D.N.Y. 2017)

> a secured creditor is not entitled to compensation for its attorneys' fees for every
> action it takes by claiming that its rights have been affected. Time billed for
> services not related to protecting the claimant's secured position is not allowed.
> The services employed have to be necessary to protect creditor's interest in the
> debtor's property. A secured creditor can recover only attorneys' fees which are
> incurred to achieve the objective of payment, or reasonably necessary to enforce a
> debtor's obligations to collect the amount remaining due pursuant to those
> obligations. Thus, where it is clear that the claimant is requesting fees that a
> typical secured creditor in its position would not have incurred to protect
> orrecover on its secured claim-for example, to acquire the collateral-such fees are
> not allowable under section 506(b).  (Internal citations and quotation marks
> omitted).

174.    Even if the millions of dollars of fees were otherwise reasonable and

allowable under the mortgages, the legal fees incurred by Brooklyn Lender should be denied in

their entirety, because, as noted above, the Mortgagee incurred those fees prosecuting a bad faith

foreclosure action in breach of the loan documents, followed by a bad faith bankruptcy strategy.

**(i)  The Plan rightly preserves the Debtors' ability to retroactively extend the mortgages
that matured during the time they could not be extended because of Brooklyn
Lender's wrongful acceleration**

175.    Brooklyn Lender argues that even if this Court finds it wrongly

accelerated its loans, it may profit from certain Debtors' inability to extend their loans following

the wrongful acceleration.  But that would unfairly reward Brooklyn Lender with 24% default

interest for throwing the Debtors into turmoil.

176.    Brooklyn Lender is correct in observing that the Debtors' overall

bankruptcy strategy is to avoid default interest based on the merits of their objection to Brooklyn

Lender's Claims rather than relying on the Debtors' right to unwind default interest under section 1124 of the Bankruptcy Code.

177.    But the Plan nonetheless preserved the Debtors' right to avoid default interest under section 1124 of the Bankruptcy Code, and made specific reference to reinstating the Debtors' right to cure the Debtor's failure to extend following wrongful acceleration.

178.    Brooklyn Lender contends that the Debtors cannot reinstate in this context under section 1124 of the Code since the Debtors intend to pay Brooklyn Lender in full immediately following de-acceleration.  But Brooklyn Lender cited no case law to support the argument because there is none.  Section 1124 of the Bankruptcy Code does not preclude a debtor from curing and reinstating a loan before paying it off.

179.    Alternatively, Brooklyn Lender argues that, to cure and reinstate, an ostensibly solvent debtor must pay default interest.  The case law is not uniform on that issue and there is no binding Second Circuit authority.

180.    But the Court need not reach that general issue because the case law is uniform in holding that creditor misconduct is independent grounds to permit a debtor to cure a default arising from lender misconduct and to reinstate an obligation without payment of default interest in connection therewith.  *E.g. In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011); *See In re Northwest Airlines, Corp.*, 2007 WL 3376895, (Bankr. S.D.N.Y. 2007).

181.    Here, therefore, even if Brooklyn Lender has found yet another technical trap that would enable it to profit from wrongful acceleration, the Court has discretion under section 1124(2) of the Code, and the power in equity, to avoid that unfair result.

57

**THE CLASS 6 CLAIMANTS' MOTION TO AMEND THEIR CLAIMS SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENTS ALLEGE DEFECTIVE BASES FOR RELIEF**

182.    As stated by the Court in *In re Drexel Burnham Lambert Grp., Inc.*, 159

B.R. 420, 426 (S.D.N.Y. 1993) a motion to amend a claim may be denied if it would be futile:

> The Supreme Court has stated that "futility of amendment" is an appropriate basis for denying a motion to amend. *See Foman*, 371 U.S. at 182, 83 S.Ct. at 230. *See also Albany Ins. Co. v. Esses*, 831 F.2d 41, 45 (2d Cir.1987), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) ("the district court may deny leave to replead if the proposed amendments would be futile."). In this case, allowing Appellant to amend his proof of claim to state an entirely new, not merely an insufficiently pleaded claim, viz:, a breach of a contract of settlement, would have been futile. The purported contract claim was barred by the bankruptcy bar date and moreover is unenforceable because it is not in writing.

183.    The Class 6 Claimants' proofs of claim stated that they were the victims of

a fraudulent scheme.  The Claims lack specific facts and legal bases for relief.  The central

allegation made by Claimants – that funds invested to acquire and improve the property were

diverted by Yechezkiel Strulovitch to himself or other projects – remains remains unsupported

by facts.  It has been categorically denied by Mr. Strulovitch.  The proposed amendments add no

relevant specific facts.  The proposed amendments identify the following new legal theories of

liability, which the Debtors assert are futile:  constructive trust, conversion, unjust enrichment

and securities fraud.

184.    This is not the only forum in which the Class 6 Claimants and/or allegedly

similarly situated parties have made claims.  Besides the Federal Action and the Eastern District

of New York bankruptcy cases referred to above, certain of the Class 6 Claimants and other

alleged parties sued in the New York Supreme Court, King County, Index No. 500827/2020 (the

"State Court Action") that alleges substantially similar claims to those asserted here. By

decision dated July 1, 2020, a copy of which is included as exhibit CX72 in the Debtors' trial

exhibit book, the Supreme Court dismissed almost of the claims including claims against "Secret

LLCs" which are substantially the same as the clams proposed herein.

185.    Justice Rucheslman dismissed the constructive trust claims because, as

here, the "Secret LLC" properties were never promised to the Claimants. In connection

therewith, the lis pendens placed on the properties were vacated. The Class 6 Claimants have no

connection to the Debtors' Properties, were promised no interest in those Properties, and have no

right to impose a constructive trust on those Properties.

186.    Similarly, they have no conversion claims. Even if it were true that the

Class 6 Claimants' funds were received by a Debtor, a plaintiff must have legal ownership or a

superior right of possession to the moneys allegedly converted. *See Nugent v. Hubbard*, 130

A.D.3d 893, 895 (2d Dep't 2015) (requiring "legal ownership or an immediate superior right of

possession to a specific identifiable thing and…defendant exercised an unauthorized dominion

over the thing in question...to the exclusion of the plaintiff's rights"); *926 Port Chester Mgmt.*

*Grp. LLC v. Slabakis*, 38 N.Y.S.3d 831 (Sup. Ct. 2016) (dismissing conversion claim over funds

that were not "specifically identifiable").

187.    Here, the Class 6 Claimants do not have legal ownership or a superior

right of possession to the moneys allegedly converted. Once the Individual Class 6 Claimants

invested, they acquired interests in the LLC Class 6 Claimants who then acquired interests in

holding companies, including the Debtors. Because the funds purportedly converted are not

specifically identifiable within the meaning of the law, the conversion claims fail.

188.    The conversion claim is also barred by the statute of limitations. "New York applies a three-year statute of limitations for conversion." *USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F.Supp.3d 244, 278 (E.D.N.Y. 2014). "A cause of action for conversion is complete when the party in possession of the property openly interferes with the true owner's rights in it." *Id.* "Significantly, the statute of limitations on a claim of conversion begins to accrue at the moment of conversion, regardless of when the conversion is discovered." *Id.* at 278-79.

189.    These cases were commenced in May 2019, so any act of conversion would have to have occurred no earlier than May 2016. The Class 6 Claimants do not allege dates in their Claims or proposed Claim amendments, but based on the Judge Amon and Justice Rucheslman opinions, it appears that the Class 6 Claimants' investments were made no later than 2015. No act of "conversion" occurred, but even if it did, the statute of limitations had run when these bankruptcy cases were commenced.

190.    Unjust enrichment has a longer six year statute of limitations. But even if that time had not expired by 2019, the equitable remedy of unjust enrichment cannot be substituted for a legal tort remedy such as conversion.

191.    As the Court held in *Corsello v. Verizon NY Inc.*, 18 N.Y.3d 777, 790 (2012):

> [U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled

60

*Corsello v. Verizon NY Inc.*, 18 N.Y.3d 777, 790 (2012).

192.    Where, it is alleged that the defendant committed some wrongdoing, then there is no claim for unjust enrichment.  *Id.*  "To the extent that [other claims of wrongdoing] succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects."  *Id.* at 791.  In this situation, an unjust enrichment claim must be dismissed.  *Id.  See Hughes v. Ester C Co.*, 330 F.Supp.3d 862, 877 (E.D.N.Y. 2018) ("Unjust enrichment claims should be dismissed where the violative conduct alleged is conterminous with a conventional tort or contract claim, regardless of whether the tort or contract claim is dismissed.")

193.    Here, Class 6 Claimants allege wrongdoing by or on behalf of Debtors. Their unjust enrichment claim duplicates their other claims and must be dismissed.

194.    The Class 6 Claimants' securities fraud claim was dismissed in the Federal Action.  Nothing has changed except the passage of time.  The securities fraud statute of limitations is "two years after the fraud has been discovered and not more than five years after the fraud has occurred."  The securities fraud claim lacks merit for the additional reason that the statute of limitations appears to have passed on almost of the alleged investments.

195.    In their initial proofs of claim, the Class 6 Claimants alleged fraud.  Fraud is not asserted in the proposed amended proofs of claim.  Either way, the fraud claim is defective because it fails to plead fraud with particularity.

196.    "Federal pleading standards apply when assessing the validity of a proof of claim."  *In re Residential Capital LLC*, 518 B.R. 720, 731 (Bankr.S.D.N.Y. 2014).  To support claims grounded in fraud, "Rule 9(b) of the Federal Rules of Civil Procedure provides that [the

Claimant] "must state with particularity the circumstances constituting fraud or mistake." *Id.* at

732. "In order to meet the particularity requirement of Rule 9(b), a plaintiff [must] allege the

time, place, and content of the misrepresentations on which he or she relied; the fraudulent

scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.*

197.    The Class 6 Claims fail to meet these requirements. They vaguely allude

to false representations that the "Individual Malefactors" made in prospectuses, including the

properties' purchase prices, and that investor funds would be used solely to purchase and

renovate specific properties. But they did not specify what representations were made, how they

were false, when they were made, and to whom. Further, they alleged false representations by

the "Individual Malefactors" and then conclude that these alleged representations were made on

the Debtors' behalf without explaining how the alleged misrepresentations were made on

Debtor's "behalf."

198.    In summary, it would be an exercise in futility to permit the Class 6

Claimants to amend their Claims to assert defective claims for relief. Indeed, now that the

defective bases for the Class 6 Claims have been smoked out, further prosecution of such Claims

would be an exercise in futility as well.

199.    Finally, narrative to the initial proof of claims alleged no claim against

Eighteen Properties, LLC. The Class 6 Claimants seek to amend their proofs of claim to add

Eighteen Properties LLC as a debtor.

200.    Generally, late filed claims are disallowed in bankruptcy absent excusable

neglect. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 113 S. Ct. 1489,

123 L. Ed. 2d 74 (1993); *In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005). Since the Class 6

Claimants' narrative neglected to name Eighteen Homes LLC, amending the narrative equates to filing a late claim and should be subject to the same rules.  Here, the record reflects no basis upon which to allow the Claim under the *Pioneer* excusable neglect standard.

201.    The motion to amend, therefore, should be denied in its entirety.

## **CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that the Court grant the Debtors' objection to Brooklyn Lenders' Claims, find that the Class 6 Claimants' Claims are subordinated under section 510(b) of the Code, confirm the Plan, and grant such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
       July 17, 2020

**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Debtors**


By:      s/Mark Frankel
         800 Third Avenue
         New York, New York 10022
         (212) 593-1100

63