UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
|  |  |
|---|---|
| In re | Chapter 11 |
|  | Case No. 19-23013 (RDD) |
| 53 STANHOPE LLC, *et al.*, |  |
| Debtors. |  |

-------------------------------------------------------------- x

# DEBTORS' POST-CONFIRMATION TRIAL MEMORANDUM OF LAW ADDRESSING REPORTING REQUIREMENTS OF SIGNATURE BANK WITH RESPECT TO THE DEBTORS' LOANS

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
Telephone: (212) 603-6300
*Special Counsel to the Debtors*

**BACKENROTH FRANKEL & KRINSKY, LLP**
800 Third Avenue, Floor 11
New York, New York 10022
(212) 593-1100
*Attorneys for Debtors*

**ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP**
1 MetroTech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
*Special Counsel to the Debtors*

{01069160.DOCX;1 }

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 5

THE INFORMATION PROVIDED BY THE DEBTORS TO SIGNATURE BANK COMPLIED WITH THE BANKING LAWS IN EFFECT AS OF THE DATE OF ORIGINATION OF EACH LOAN AND ENABLED SIGNATURE BANK TO COMPLY WITH ALL APPLICABLE REGULATORY DISCLOSURES ................................................ 5

    A.   The History and Origin of "Know Your Customer" Regulations ................................... 5

    B.   Purpose of Know Your Customer Regulations ............................................................... 7

    C.   Customer Information Required (Prior to May 11, 2018) .............................................. 8

    D.   Customer Information Required (After May 11, 2018 to Present) Does Not Require Additional Disclosure ..................................................................................................... 11

    E.   Office of Foreign Asset Control (OFAC) Check Not Required for Non-Customers .... 13

CONCLUSION ............................................................................................................................ 15

Debtors[1] by and through their undersigned counsel, respectfully submit this post-confirmation trial memorandum of law addressing the banking regulatory requirements for Signature Bank, the predecessor to Brooklyn Lender LLC ("Brooklyn Lender") with respect to the Debtors' loans (the "Loans")[2], and whether those Loans required Signature Bank to obtain information from the Debtors regarding the holders of profit participation interests in the Debtors.

## PRELIMINARY STATEMENT

From August 3, 2020 through August 7, 2020, the Bankruptcy Court conducted a hearing on, among other things, (i) the confirmation of the Debtors' Plan (the "Confirmation Hearing"), and (ii) the Debtors' objections to the claims filed by Brooklyn Lender. On August 7, 2020, after closing arguments, the Court requested that the parties provide additional briefing on whether the failure to disclose the holders of profit participations to Signature Bank at the time the Loans were originated violated the banking laws.[3]

During the period from September 2012 through August 2016, the Debtors obtained Loans from Signature Bank. During that time period, there was no banking requirement to provide the identity of the borrowers' beneficial owners or profit participants. The trial record shows Signature Bank sent commitment letters to the borrowers requesting certain information but did not seek the identity of the borrowers' equity holders[4] and profit participants.

---

[1] The Debtors are 53 Stanhope LLC, 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, 325 Franklin LLC, 618 Lafayette LLC, C & YSW, LLC, Natzliach LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC, D&W Real Estate Spring LLC, Meserole and Lorimer LLC, 106 Kingston LLC, Eighteen Homes LLC, 1213 Jefferson LLC, and 167 Hart LLC (each a "Debtor", and collectively referred to herein as the "Debtors".
[2] The Loans are identified in a table starting at page 2, *infra.*
[3] Trial Tr. dated 8/7/20 (the Court) (hereinafter, "Tr. [date of trial] at __") at 197:6:17. "CX___" designates Brooklyn Lender Trial Exhibit in the Joint Trial Binder.
[4] Notwithstanding that Signature did not request the identity of the borrowers' equity holders, the Debtors provided that information. See CX089, Exhibit B.

{01069160.DOCX;1 }                     1

Based on the record of the Confirmation Hearing (including the Signature Bank commitment letters to the Debtors), the relevant banking requirements as of the date of origination of each of the relevant loans, and new "Customer Due Diligence" ("CDD") banking regulations that require covered financial institutions to identify and verify the identity of the beneficial owners of all legal entity customers[5] at the time a new account is opened, there was no requirement for the Debtors to disclose its profit participants' identities to Signature Bank. Thus, the borrowers' disclosure to Signature Bank was appropriate as it accurately complied with both applicable law and the bank's request for information.

## BACKGROUND

Chaskiel Strulovitch ("Strulovitch") began his relationship with Signature Bank in or around year 2000. Strulovitch Trial Declaration at ¶3 ("Strulovitch Decl"). Starting in September 2012, Debtors obtained loans from Signature Bank, which are the subject of Brooklyn Lender's claim in this bankruptcy case. Except for six of the Debtors, Strulovitch was and is the 100% equity owner of each Debtor borrower. Id. at ¶7. The relevant data for each loan are as follows:[6]

| Borrower Entity | Loan Origination Date and Principal Amount |
|---|---|
| APC Holding 1 LLC | Restated Mortgage Note September 4, 2012 $1,400,000.00 |
| 1213 Jefferson LLC | Restated Mortgage Note March 22, 2013 $1,000,000.00 |
| Eighteen Homes LLC | Restated Mortgage Note August 14, 2013 $900,000.00 |

---

[5] Other than those entities specifically excluded by the CDD regulations.
[6] See generally, CX294 (APC), CX295 (1213 Jefferson), CX296 (Eighteen Homes), CX298 (167 Hart), CX297 (618 Lafayette), CX299 (106 Kingston), CX301 (1125-1133 Greene), CX300 (325 Franklin/53 Stanhope), CX302 (92 S 4th/834 Metropolitan), CX303 (D&W), CX304 (119 Rogers), CX305 (127 Rogers), CX306 (55 Stanhope), and CX307 (C&YSW).

{01069160.DOCX;1}    2

| | |
|---|---|
| 618 Lafayette LLC | Restated Mortgage Note<br>September 4, 2013<br>$1,240,000.00 |
| 167 Hart LLC | Mortgage Note<br>September 4, 2013<br>$865,000.00 |
| 106 Kingston LLC | Restated Mortgage Note<br>September 17, 2013<br>$799,900.00 |
| 1125-1133 Greene Ave LLC | Mortgage Note<br>November 4, 2013<br>$3,300,000.00 |
| 325 Franklin LLC<br>53 Stanhope LLC | Restated Mortgage Note<br>December 2, 2013<br>$2,900,000.00 |
| 92 South 4th St LLC<br>834 Metropolitan LLC | Restated Mortgage Note<br>April 7, 2014<br>$2,420,000.00 |
| D&W Real Estate Spring LLC<br>Meserole and Lorimer LLC | Restated Mortgage Note<br>June 2, 2015<br>$13,600,000.00 |
| 55 Stanhope LLC | Restated Mortgage Note<br>July 27, 2016<br>$2,100,000.00 |
| 119 Rogers LLC | Restated Mortgage Note<br>September 17, 2015<br>$2,175,000.00 |
| 127 Rogers LLC | Restated Mortgage Note<br>September 17, 2015<br>$2,225,000.00 |
| C&YSW LLC<br>Natzliach LLC | Restated Mortgage Note<br>August 4, 2016<br>$5,100,000.00 |

During the application process on each of the fourteen (14) Loans, Signature Bank sent a commitment letter to the borrowers. Section 21 of each commitment letter was entitled "USA Patriot Act Compliance."[7] This section contained Signature Bank's request for information to comply with the requirements of the USA PATRIOT Act (defined below). Accordingly, Signature Bank requested the following information be provided by the borrower: (A) Complete Name of

---

[7] *See* CX52, CX65, CX77, CX89, CX104, CX117, CX130, CX154, CX166, CX185, CX204, CX216, CX227, CX238.

{01069160.DOCX;1}                3

Entity; (B) Type of Entity; (C) Physical Address of Principal Office; (D) Mailing Address; and (E) Employer Identification Number (EIN). *Id.* Each borrower was required to provide organization documents including a filing receipt. *Id.* All requested information was provided to Signature Bank, including a copy of each borrower's operating agreement identifying the members of each entity.

Sometime prior to closing, Strulovitch entered into profit sharing agreements with certain individuals, including, Moses Guttman and Joshua Wagschal, which Strulovitch confirmed in his testimony on August 3, 2020. Strulovitch Decl. at ¶8; Tr. 8/3/20 at 102:17-21 (Docket No. 165). The profit participants also confirmed this arrangement. Trial Declaration of J. Wagschal, ¶¶ 13-14 ("Wagschal Decl."). Signature Bank never requested in the commitment letters or otherwise the identities of any profit participants.

In May 2017, Signature Bank assigned each of the above fourteen (14) Loans, which were in good standing without any defaults, to Brooklyn Lender. Shortly thereafter, on or about May 22, 2017, Brooklyn Lender mailed to the Debtors a series of default and acceleration letters asserting a default for each of the Loans.[8] The defaults letters, in addition to other events of default, each asserted an alleged misrepresentation by the borrowers under paragraph 18(g) of the mortgage or consolidation and extension agreement, as applicable.[9] None of the notices of default alleged a monetary default for the borrower failing to make an installment payment of a monthly installment of debt service on the loan.

In 2017, Brooklyn Lender commenced fourteen separate foreclosure actions in New York Supreme Court, Kings County against each of the Debtors.

---

[8] CX308-CX350.
[9] See, e.g., CX308.

{01069160.DOCX;1 }    4

**ARGUMENT**

**THE INFORMATION PROVIDED BY THE DEBTORS TO SIGNATURE BANK COMPLIED WITH THE BANKING LAWS IN EFFECT AS OF THE DATE OF ORIGINATION OF EACH LOAN AND ENABLED SIGNATURE BANK TO COMPLY WITH ALL APPLICABLE REGULATORY DISCLOSURES**

Brooklyn Lender contends that the Debtors failed to fully disclose the membership interest of each Debtor at the time that the Loans were originated or refinanced with Signature Bank. Contrary to these assertions, (i) the Debtors disclosure of the members of the Debtor entities was accurate, (ii) the Debtors complied with Signature Bank's Customer Identification Program ("CIP") requirements in existence at that time of the origination or refinancing of each of the loans, and (iii) the enactment of the new customer due diligence ("CDD")[10] regulations, where compliance was not required until the regulations became effective as of May 11, 2018, did not require any additional disclosure by the Debtors to Signature Bank or to Brooklyn Lender (who purchased the Loans in 2017). Thus, there was no violation of the banking laws or any applicable regulations.

A. **The History and Origin of "Know Your Customer" Regulations**

The term "Know Your Customer" or "KYC" is a term used in various financial industries and most often by banks when referring to their CIP program, which was mandated by the USA PATRIOT Act (defined below). A bank must have a "Know Your Customer Policy" which is implemented to comply with CIP regulations.

The origins of CIP regulations stem from the U.S. Government's response to the September 11, 2001 terrorist attacks. In response, Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (more commonly known as "USA PATRIOT Act"). Title III of the USA PATRIOT Act is the

---

[10] In both instances, the CIP program and the CDD program are focused on the banks knowing their customer. Information is sought from their customer about his or its activities and not from third parties the customers may do business with such as profit participants, who are not bank customers and who the bank has no privity with.

{01069160.DOCX;1}    5

International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, which became enforceable on June 9, 2003.

The USA PATRIOT Act is arguably the single most significant Anti-Money Laundering law that Congress has enacted since the 1970 Bank Secrecy Act ("BSA") itself.[11] Among other things, the USA PATRIOT Act and its implementing regulations (i) criminalized the financing of terrorism and augmented the existing BSA framework by strengthening customer identification procedures; (ii) prohibited financial institutions from engaging in business with foreign shell banks; (iii) required financial institutions to have due diligence procedures and, in some cases, enhanced due diligence ("EDD") procedures for foreign correspondent and private banking accounts; (iv) improved information sharing between financial institutions and the U.S. government; (v) expanded the Anti-Money Laundering ("AML") program requirements to all financial institutions; (vi) increased the civil and criminal penalties for money laundering; (vii) provided the Secretary of the Treasury with the authority to impose "special measures" on jurisdictions, institutions, or transactions that are of "primary money-laundering concern"; (viii) facilitated records access and required banks to respond to regulatory requests for information within 120 hours; and (ix) required federal banking agencies to consider a bank's AML record when reviewing bank mergers, acquisitions, and other applications for business combinations.[12]

The USA PATRIOT Act "which is implemented by 31 CFR § 103.121 requires banks . . . to implement a written Customer Identification Program (CIP) appropriate for its size and type of

---

[11] The BSA required banks to track customer activity and prepare Currency Transaction Reports for large deposits in excess of $10,000. FinCEN "History of Anti-Money Laundering Laws", https://www.fincen.gov/history-anti-money-laundering-laws (last visited August 27, 2020)(hereinafter "*BSA/AML Examination Manual*")

[12] Federal Financial Institutions Examination Council (FFIEC), *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual,* https://bsaaml.ffiec.gov/manual/Introduction/01, (Background)(last visited August 27, 2020).

business."[13]  These rules were implemented in October 2003[14] and remained in effect until 2018, and thus were in effect at the time of origination of the Loans at issue.

The 2003 CIP requirements were expanded by "Customer Due Diligence" ("CDD") Requirements for Financial Institutions' policies issued by the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCen") in May 2016.  Beginning on May 18, 2018 (the applicability date), covered financial institutions were required to verify the identity of the beneficial owners of all legal entity customers at the time the account is opened.[15]  The CDD beneficial owner requirement was added to address the risk that seemingly legitimate business could shelter bad actor stakeholders.

B. **Purpose of Know Your Customer Regulations**

The BSA is intended to safeguard the U.S. financial system and the financial institutions that make up that system from the abuses of financial crime, including money laundering, terrorist financing, and other illicit financial transactions.  Money laundering and terrorist financing are financial crimes with potentially devastating social and financial effects.  From the profits of the narcotics trafficker to the assets looted from government coffers by dishonest foreign officials, criminal proceeds have the power to corrupt and ultimately destabilize communities or entire economies.  Terrorist networks are able to facilitate their activities if they have financial means and access to the financial system.  In both money laundering and terrorist financing, criminals can exploit loopholes and other weaknesses in the legitimate financial system to launder criminal

---

[13] Federal Reserve Board, Testimony of Herbert A Biern, Senior Associate Director,  "The Bank Secrecy Act and the USA Patriot Act", https://www.federalreserve.gov/boarddocs/testimony/2004/20041117/default.htm (November 17, 2004) (last visited August 27, 2020)

[14] See, e.g., OCC Bulletin 2003-43, "Bank Secrecy Act", https://occ.gov/news-events/newsroom/news-issuances-by-year/news-releases/2003/2003-news-releases.html  (October 20, 2003) (last visited August 27, 2020)

[15] Federal Register Vol 81, No. 91, May 11, 2016 31, I.B, "Summary of the Major Provisions of the Rule Making", https://www.govinfo.gov/content/pkg/FR-2016-05-11/pdf/2016-10567.pdf (last visited August 28, 2020)

{01069160.DOCX;1 }                              7

proceeds, finance terrorism, or conduct other illegal activities, and, ultimately, hide the actual purpose of their activity.

The CIP is intended to enable the bank to form a reasonable belief that it knows the true identity of each customer. The CIP must include account opening procedures that specify the identifying information that is obtained from each customer. It must also include reasonable and practical risk-based procedures for verifying the identity of each customer. It is critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering, and other financial crimes.[16]

C. **Customer Information Required (Prior to May 11, 2018)**

CIP rules, which became effective October 1, 2003, apply to substantially all bank accounts opened after that date. The CIP rules apply to a "customer." A customer is a "person" (an individual, a corporation, partnership, a trust, an estate, or any other entity recognized as a legal person) who opens a new account, an individual who opens a new account for another individual who lacks legal capacity, and an individual who opens a new account for an entity that is not a legal person (e.g., a civic club).[17] A customer does not include a person who does not receive banking services, such as a person whose loan application is denied. The definition of "customer" also does not include an existing customer as long as the bank has a reasonable belief that it knows the customer's true identity.[18]

---

[16] *BSA/AML Examination Manual.* https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf at p. 47 ¶2 (last visited August 27, 2020)
[17] 31 CFR §1020.100(c)(1)
[18] *BSA/AML Examination Manual.* https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf at 48 ¶2 (last visited August 27, 2020)

With the enactment of the CDD Regulations[19], covered financial institutions[20] were, for the first time, now "required to know the identity of the individuals who own or control their legal entity customers (also known as beneficial owners)." CDD Regulations, 2016 WL 2643654, 81 Fed Reg. at *29398.  Previously, they only needed to comply with the CIP requirements.  31 C.F.R. § 1020.220.  The CIP requirements for banks were <u>minimal</u>.[21]   31 C.F.R. § 1020.220[22] provides that the bank must obtain, at a minimum, the following information from the customer prior to opening an account:

(1) Name;

(2) Date of birth, for an individual;

(3) Address, which shall be:

    (i) For an individual, a residential or business street address;

    (ii) For an individual who does not have a residential or business street address, an Army Post Office (APO) or Fleet Post Office (FPO) box number, or the residential or business street address of next of kin or of another contact individual; or

    (iii) For a person other than an individual (such as a corporation, partnership, or trust), a principal place of business, local office, or other physical location; and

(4) Identification number, which shall be:

    (i) For a U.S. person, a taxpayer identification number; or

---

[19] The CDD Regulations became effective July 11, 2016, but compliance was not required until May 11, 2018.

[20] The term "covered financial institution" is defined at 31 C.F.R. § 1010.605(e)(1), and includes, among other things, an insured bank, a commercial bank, a savings association, a trust bank or trust company that is federally regulated and is subject to an anti-money laundering program requirement.

[21] Minimum requirements of a CIP are as follows:

(1) A bank must implement a written Customer Identification Program (CIP) appropriate for its size and type of business.  If a bank is required to have an anti-money laundering compliance program under the regulations implementing 31 U.S.C. 5318(h), 12 U.S.C. 1818(s), or 12 U.S.C. 1786(q)(1), then the CIP must be a part of the anti-money laundering compliance program.

(2) Identity verification procedures.  The CIP must include risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable.  The procedures must enable the bank to form a reasonable belief that it knows the true identity of each customer.  These procedures must be based on the bank's assessment of the relevant risks, including those presented by the various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base…. 31 CFR § 1020.220(a).

[22] *See also,* BSA/AML Examination Manual, https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf , 48-49 (last visited August 27, 2020)

> (ii) For a non-U.S. person, one or more of the following: A taxpayer identification number; passport number and country of issuance; alien identification card number; or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

The verified customer information must be used to determine "whether the customer appears on any list of known or suspected terrorists or terrorist organizations issued by the Treasury in consultation with other Federal functional regulators."[23]

The CIP requirements were targeted at the borrower. Non-borrowing entities, such as profit participants, were not included in the CIP. The CIP does not require any disclosure of equity ownership or profit participation of a borrower.

Signature Bank's loan commitment letters demonstrate that Signature Bank complied with CIP requirements in effect during that period. Paragraph 21 of the July 12, 2013 loan commitment letter[24] at pages 10-12, entitled "USA PATRIOT Act Compliance" sets forth customer identification requirements beyond the minimum requirements previously mentioned above. Each commitment letter for the relevant Loans contained this paragraph. Specifically, a bold warning appears at the bottom of paragraph 21 advising the customer that, it must "strictly comply" with the documentation required by the USA PATRIOT Act, and other documentation required by the bank or the loan account will not be funded. All of the information which was requested by Signature Bank was submitted by the borrowers, which is evident through the fact that each of the Loans closed. Through those submissions, the Debtors complied with the informational mandates of Signature Bank's customer information program.

---

[23] FDIC Manual of Examination Policies, https://www.fdic.gov/regulations/safety/manual/section8-1.pdf, at 8.1-12, BANK SECRECY ACT, ANTI-MONEY LAUNDERING, AND OFFICE OF FOREIGN ASSETS CONTROL (12-04) (last visited 08/27/2020)

[24] CX089, pages 10-12.

{01069160.DOCX;1 }                                    10

D.  **Customer Information Required (After May 11, 2018 to Present) Does Not Require Additional Disclosure**

The enactment of further regulations did not require any additional disclosures by the Debtors. Before May 11, 2018, there was no requirement to verify or identify the beneficial owners/profit participants. Current CDD Regulations became effective on July 11, 2016, but compliance was not required until May 11, 2018, well after the origination of all the relevant loans herein. Rules and Regulations Department of the Treasury, Financial Crimes Enforcement Network, 81 Fed. Reg. 29398-01, 2016 WL 2643654 (F.R.) (the "CDD Regulations").

The CDD Regulations clarify and strengthen customer due diligence requirements for U.S. banks, mutual funds, brokers or dealers in securities, futures commission merchants, and introducing brokers in commodities. The CDD Regulations require these covered financial institutions to identify and verify the identity of the natural persons (known as beneficial owners) of legal entity customers who own, control, and profit from companies when those companies open accounts.[25]

The CDD Regulations have four core requirements. It requires covered financial institutions to establish and maintain written policies and procedures that are reasonably designed to:

1. identify and verify the identity of customers
2. identify and verify the identity of the beneficial owners of companies opening accounts (including loan accounts)
3. understand the nature and purpose of customer relationships to develop customer risk   profiles
4. conduct ongoing monitoring to identify and report suspicious transactions and, on a risk- basis, to maintain and update customer information[26]

---

[25] Financial Crimes Enforcement Network, Information on Complying with the Customer Due Diligence (CDD) Final Rule https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule (last visited August 27, 2020)
[26] *Id.*

Under the current CDD Regulations, financial institutions are required to comply with new CDD standards, including obtaining the beneficial ownership information whenever an entity opens an account. 31 C.F.R. § 1010.230 (a) and (b)[27]. "Account" means a formal banking relationship including an extension of credit or loan. 31 C.F.R. § 1020.100(a)(1). There are two prongs to the beneficial ownership analysis: (1) any individual who directly or indirectly owns 25% or more of the equity interests of a legal entity customer, and (2) a single individual with significant responsibility who controls, manages, or directs the entity. 31 C.F.R. § 1010.230(d).

These CDD Regulations are consistent with the testimony of Kenneth Stagnari, a Group Director and Vice President in Commercial Real Estate Officer at Signature Bank, who testified that Signature Bank would need to be notified of an equity stake owner. Mr. Stagnari testified that he lacked any knowledge of requirements to disclose profit-sharing interests during the mortgage application process. Tr. 8/6/20 at 105:13-23 (Docket No. 168). He made clear distinctions between what the Court was asking about profit-sharers and the Bank's need for equity ownership information. Tr. 8/6/20 at 106:2-3 (Docket No. 168). Signature Bank never requested any information about profit participants, but only membership information for each Borrower entity, which was provided.

It is undisputed that none of the loans herein originated after compliance with the current CDD Regulations was required on May 11, 2018, but rather all fell under prior regulations. The CDD Regulations are not retroactive, and thus they do not apply to the loans at issue as all the

---

[27] 31 C.F.R § 1010.230 provides, in pertinent part, as follows:
  (a) In general. Covered financial institutions are required to establish and maintain written procedures that are reasonably designed to identify and verify beneficial owners of legal entity customers and to include such procedures in their anti-money laundering compliance program required under 31 U.S.C 5318(h) and its implementing regulations.
  (b) Identification and verification. With respect to legal entity customers, the covered financial institution's customer due diligence procedures shall enable the institution to:
    (1) Identify the beneficial owner(s) of each legal entity customer at the time a new account is opened, unless the customer is otherwise excluded pursuant to paragraph (e) of this section or the account is exempted pursuant to paragraph (h) of this section….

loans originated prior to May 11, 2018. *See* Steven Mark Levy, Federal Money Laundering Regulation: Banking, Corporate and Securities Compliance, § 7A.02 Beneficial Ownership Rule (1010.230) Walter Kluwer Law and Business, Aspen Publishers, 2nd Edition 2020 (citing 81 Fed. Reg. 29398, 29404 (May 11, 2016) ("There is no retroactive requirement to obtain beneficial ownership information for all existing accounts."). Since the regulations are not retroactive, covered financial institutions are not obligated to obtain beneficial information on existing accounts.[28] This means banks were not required to conduct retroactive reviews to obtain beneficial ownership information from customers with accounts opened prior to May 11, 2018.[29] By the time the current CDD Regulation took effect, Brooklyn Lender had purchased all the borrower's loans, placed them in default, and commenced 14 separate foreclosure actions in the New York Supreme Court, Kings County, against the Debtors.

Based on the foregoing, the 2018 CDD requirements are not applicable to any of the Loans at issue herein since each of the Loans originated prior to compliance being required for the 2018 CDD Regulations and the 2018 CDD Regulations having no retroactive effect.

E. **Office of Foreign Asset Control (OFAC) Check Not Required for Non-Customers**

Although there was brief testimony regarding OFAC during trial, OFAC was not required for non-customers or any profit-participants of the Debtors. OFAC is an office of the U.S. Treasury established in the 1950's that administers and enforces economic and trade sanctions based on

---

[28] Question 16: Application to Existing Accounts
Q: Does a covered financial institution have to obtain beneficial information on existing accounts?
A: No. The rule does not cover existing accounts that were opened before the applicability date.
United States Department of the Treasury Financial Crimes Enforcement Network Guidance, FIN -2016-G003, https://www.fincen.gov/sites/default/files/2016-09/FAQs_for_CDD_Final_Rule_%287_15_16%29.pdf (Frequently Asked Questions Regarding Customer Due Diligence Requirements for Financial Institutions.)(last visited August 27, 2020)

[29] FinCen Guidance FIN 2018-G001. "Frequently Asked Questions Regarding Customer Due Diligence Requirements for Financial Institutions", https://www.fincen.gov/resources/statutes-regulations/guidance/frequently-asked-questions-regarding-customer-due-0 (Question 13: Collection of beneficial ownership information: Existing accounts) (last visited August 27, 2020)

{01069160.DOCX;1 }    13

U.S. foreign policy and national security goals against entities such as targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction.

In general, banks are required to screen (i) account owners who may be individuals or legal entities prior to opening any account, including a loan, and (ii) transactions, including the originator and originating bank, beneficiary, and beneficiary bank involved in incoming or outgoing payments, against several different OFAC screening lists provided by OFAC to banks.

From September 4, 2012 to August 4, 2016, Signature Bank was not required to conduct an OFAC search on individuals or legal entities who (i) the bank was not aware of, (ii) were not a "Customer", or (iii) were not a counterparty to an incoming or outgoing payment order. Signature Bank was not required to conduct an OFAC search on any profit-sharers due to the fact that the profit-sharers did not fall within the definition of a "customer" of the bank. Federal regulation state that: A "customer" is a person (an individual, a corporation, partnership, a trust, an estate, or any other entity recognized as a legal person) who opens a new account. A customer does not include a person who does not receive banking services.[30]

Accordingly, an OFAC check was not required for the profit-participants.

---

[30] BSA/AML Examination Manual, https://bsaaml.ffiec.gov/docs/manual/BSA_AML_Man_2014_v2_CDDBO.pdf at 48¶ 2 (last visited August 27, 2020)

{01069160.DOCX;1 }    14

**CONCLUSION**

The Loans or "accounts" that were opened for the Debtors by Signature Bank between September 4, 2012 and August 4, 2016, were governed by the CIP Regulations in effect at that time and not the subsequently passed CDD Regulations which lacked retroactive effect. Based upon the CIP regulations in effect at the time the Loans originated, Signature Bank was <u>not</u> required to obtain information from the Debtors regarding any profit participations held in them. As a result, no disclosure of the borrowers' profit participants was required and thus no banking law or regulations were violated by the disclosures which were made at loan origination by the Debtors.

DATED: New York, New York
August 28, 2020

**BACKENROTH FRANKEL & KRINSKY, LLP**

By: s/Mark Frankel
Mark Frankel
800 Third Avenue, Floor 11
New York, New York 10022
(212) 593-1100
*Attorneys for Debtors*

**ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP**

By: /s/ Andrea J. Caruso
Andrea J. Caruso
1 MetroTech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
*Special Counsel to the Debtors*

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**

By: /s/ Fred B. Ringel
Fred B. Ringel
Steven B. Eichel
875 Third Avenue
New York, New York 10022
Telephone: (212) 603-6300
*Special Counsel to the Debtors*