UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
In re:                           :
                                     Case #19-23013-rdd
            53 STANHOPE LLC       :
                                     300 Quarropas Street
                                 : White Plains, New York
        For Chapter 11
                                 : December 17, 2020
                                     4:17 p.m.
--------------------------------- :
                                     TELEPHONE CONFERENCE
```

TRANSCRIPT OF BENCH RULING ON CONFIRMATION OF THE DEBTOR'S
AMENDED PLAN (RELATED DOCUMENT #93) VIA COURT SOLUTIONS
BEFORE JUDGE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For Debtors:              BACKENROTH FRANKEL & KRINSKY, LLP
                          BY:  MARK FRANKEL, ESQ.
                          800 Third Avenue, 11th Floor
                          New York, New York  10022

                          ABRAMS, FENSTERMAN, FENSTERMAN,
                          EISMAN, FORMATO, FERRARA, WOLF
                          & CARONE, LLP
                          BY:  ANDREA CARUSO, ESQ.
                          1 MetroTech Center, Suite 1701
                          Brooklyn, New York  11201

For Brooklyn Lender:      KASOWITZ BENSON TORRES LLP
                          BY:  JENNIFER RECINE, ESQ.
                               ANDREW GLENN, ESQ.
                          1633 Broadway
                          New York, New York  10019

Transcription Service:      Carole Ludwig,
                            Transcription Services
                            155 East Fourth Street, #3C
                            New York, New York 10009
                            Phone:  (212) 420-0771
                            Email:  Transcription420@aol.com
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (Continued):

For Israeli Claimants:       NORRIS MCLAUGHLIN, P.A.
                             BY:  MELISSA PENA, ESQ.
                             7 Times Square, 21st Floor
                             New York, New York  10036

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| NONE | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| NONE | | | | |

1   (Proceedings commence at 4:17 p.m.)

2           THE COURT:  All right, I think those that have

3   joined the call for the In re: 53 Stanhope cases understand

4   why I moved the call that I originally thought would be at

5   2:30 to 4. I think we're all on the phone at this point.  I

6   see Ms. Recine from the Kasowitz firm, Mr. Frankel, Ms.

7   Pena, Ms. Caruso, Mr. Glenn, okay, and I told you all that I

8   would giving you a bench ruling following the trial that

9   took place this summer on two related issues.  First, the

10  debtor's request for confirmation of their Chapter 11 plan,

11  and relatedly the debtor's objection to a substantial

12  portion of the proofs of claim filed by Brooklyn Lender in

13  these cases. Those are related issues because the plan would

14  not be feasible if the Brooklyn Lender claims were allowed

15  in the full amount sought and, frankly, allowed in

16  potentially lesser amounts but greater than the amount that

17  the debtor contends should be the allowed amount in the

18  claim.

19          The plan also sought a determination that the

20  claims of the so-called Israeli investors, which comprise

21  claims both of what I refer to as investor LLCs against the

22  debtor's potential interests of the investor LLCs in four of

23  debtors, and claims by individual investors, i.e. people who

24  invested in the investor LLCs against all of the debtors,

25  should be subordinated under Section 510(B) of the

1   Bankruptcy Code, which is how they were to be treated under

2   the plan in Class 6 of the plan.

3           I, of course, would have preferred to have given

4   you a written decision on the issues that were raised, but

5   given my calendar and given my belief that the parties need

6   a ruling promptly one way or the other on these issues, I'm

7   instead going to give you a fairly lengthy bench ruling.

8   When I give such a ruling, I reserve the right to go over

9   the transcript and correct it not only for typos of

10  citations that the court reporter didn't put in the correct

11  citation format, but also for content to the extent I

12  believe I said something ungrammatically, wanted to

13  supplement what I said, or the like. My rulings won't change

14  but if I do make those types of changes, I will file a

15  modified bench ruling, which is not at that point a

16  transcript, but rather a ruling.

17          Before I get into the ruling, itself, I just want

18  to confirm that you are not going to be wasting the next

19  roughly hour and a half.  Mr. Frankel, are the debtors still

20  looking to confirm the Chapter 11 firm?

21          MR. MARK FRANKEL:  Yes, Judge, and we have an

22  extension on the financing to February 1.

23          THE COURT:  Okay, very well.  All right, so let me

24  give you my ruling.  The Chapter 11 plan proposes to finance

25  the debtor's exist from Chapter 11 with an exit loan from an

 1  entity known as Lightstone Capital.  The exit loan would be

 2  in itself sufficient to pay in full and in cash the

 3  estimated allowed claims of the debtor's secured lender,

 4  Brooklyn Lender, LLC, in the debtors contend the allowed

 5  amount of roughly $35.3 million.  After paying allowed

 6  administrative expenses, and general unsecured claims that

 7  would be paid in full in cash, as well, and without any

 8  payment in cash in respect of the Israeli investor claims,

 9  the exit financing would have a little under $2 million left

10  over.  The debtors acknowledge that in each of their estates

11  Brooklyn Lender is over secured and, therefore, under

12  Section 506(B) of the Bankruptcy Code, it would have an

13  entitlement, not only the payment of post-petition interest,

14  but also its reasonable attorneys' fees as provided for in

15  the various loan agreements that the debtors have with a

16  different lender, a successor to the original lender,

17  Signature Bank.

18        The debtors assume that some portion of the

19  excess over the allowed claims that would be paid in

20  full in cash would go to pay the allowed additional

21  portion of Brooklyn Lender's attorneys' fees claim,

22  with potentially some surplus left over for interest

23  payments going forward.

24        The plan has been objected to and the debtor's

25  claim objections have been objected to by Brooklyn

1   Lender and the Israeli investors, respectively.  The

2   objection to the Brooklyn Lender claims was the

3   subject of the trial that the Court held this summer

4   in July and August.  The Israeli investors and the

5   debtors determined not to litigate the merits of the

6   claims asserted by the Israeli investors, with the

7   exception of the plan's treatment of those claims as

8   being subject to mandatory subordination under Section

9   510(B) of the Bankruptcy Code.

10          The plan is an unimpaired plan. That is, it

11   provides for cash payment in full of the

12   (indiscernible) claims against the debtor's estate,

13   and relies upon Section 1124(1) of the Code for its

14   contention that such payment in full renders the

15   claimants unimpaired, and consistent with Section 1126

16   of the Code means that they are deemed to incent the

17   plan.  And that is Section 1126 down to F of the Code.

18          Section 1124(1) provides that a claim is

19   impaired unless the plan leaves unaltered the legal

20   equitable and contractual rights to which such claim

21   or interest entitles the holder of such claim or

22   interest.  As I said, if, however, the allowed amount

23   of the Brooklyn Lender claims exceeds the cushion

24   under the exit financing, the debtors, I believe,

25   concede that the plan would not be feasible under

 1  Section 1129(A)(11) really just getting out of the

 2  gate since the cash would not be sufficient to leave

 3  Brooklyn Lender unimpaired, it would be owed more

 4  money, in other words.

 5           Similarly, even if Brooklyn Lender's allowed

 6  claims are in the amounts asserted by the debtors or

 7  within the $2 million excess cap under the exit

 8  financing, if the Israeli investors' claims are not

 9  subordinated under Section 510(B) and/or the Court

10  concludes that not being subordinated those claims

11  would be in excess of the $2 million cap, the plan

12  also wouldn't be confirmed because, again, those

13  claims are said to be unimpaired as claims under the

14  debtor's plan.

15           I will address first the issues raised with

16  respect to the claim objection to Brooklyn Lender's

17  claims and turn to the Israeli investors.  The point

18  has been alluded to but I should reinforce it,

19  although this is a joint plan for many debtors, the

20  plan is, in effect, a separate plan for each debtor.

21  Each debtor deals with its own creditors and interest

22  holders under the plan, and the plan is not a

23  substantive consolidation.

24           That being said, the documents at issue are

25  basically standard when one deals with Brooklyn

1  Lender's claims against each debtor. There's a

2  substantially similar note and mortgage with respect

3  to each loan.  The fundamental dispute between the

4  debtors and Brooklyn Lender is over the interest

5  component with respect to each loan, both with respect

6  to Brooklyn Lender's claim for pre-bankruptcy or pre-

7  petition interest and it's claims for post-petition,

8  or sometimes referred to as pendency interest, i.e.

9  interest accruing after the petition date and before

10 confirmation and the effective date of the plan.

11         The bankruptcy code and case law addresses

12 those claims differently.  One looks to state law to

13 determine a creditor's claim for pre-petition

14 interest. *Key Bank National Association v. Milham* (*In

15 Re: Milham)*, 141 F3d 420-423 (2d Cir. 2011) and *In Re:

16 Residential Capital LLC,* 508 B.R. 851, 858 (Bankr.

17 S.D.N.Y. 2014).  New York Courts, and the law of New

18 York governs here given the location of the properties

19 and the parties, will enforce unambiguous contract

20 provisions for post-default interest at a higher rate

21 than pre-default interest, generally.

22         *Pereira v. Prompt Mortgage Providers of North

23 America, LLC, (In Re: Heavey),* 608 B.R. 341, 348-49

24 (Bankr. E.D.N.Y. 2019), and the cases cited therein.

25 In that case, as here, the post-default interest rate

1  was 24 percent.  Here the pre-petition rate varies

2  among the debtors, but is generally somewhere between

3  3.625 percent and 4.35 percent.  See also *In Re:*

4  *Campbell,* 513 B.R. 846, 850 (Bankr. S.D.N.Y. 2014),

5  also dealing with the 24 percent post-default rate on

6  a pre-petition basis.

7          Of course, there has to be a proper default

8  under the parties' contracts for a post-default rate

9  to be owed, see *In Re:  Northwest Airlines Corp.*, 2007

10 Bankr. LEXIS 3919 at *5 (Bankr. S.D.N.Y. Nov. 9,

11 2007).  Moreover, under New York law there are certain

12 circumstances, not worded as appropriate, for a Court

13 to refrain from enforcing a loan contract, as noted by

14 the *Heavey* Court's 608 B.R. 349 and the cases cited

15 therein.  And here the debtors have raised both of

16 those defenses to pre-petition contract rate default

17 interest at 24 percent.

18          I will note, however, that if, in fact, I do

19 not accept those defenses, the loan agreements are

20 clear and I believe the debtors have conceded that

21 post-default interest under the loan agreement begins

22 to run from the date of the default rather than date

23 of the noticing of the default.

24          As noted by Brooklyn Lender in its submissions

25 to the Court, since certain of the defaults that it

1  has asserted here would, if enforceable, relate back

2  to the initial issuance of each loan, the accrual of

3  the additional interest at the post-default rate would

4  nearly double the amount of the claim at issue. In

5  fact, slightly more than double the amount of the

6  claim.

7        Post-petition interest, or pendency interest,

8  is governed by the Bankruptcy Code. First, Section

9  502(B)(2) of the Bankruptcy Code disallows claims for

10 unmatured interest, i.e. post-petition interest,

11 though the Courts have recognized an exception to that

12 statutory provision based on various theories for

13 unsecured creditors.  Namely either under Section

14 1129(A)(7), the best interest test, since a Chapter 7

15 case waterfall distribution scheme includes, at a

16 lower priority, payment of post-petition interest at

17 the legal rate.  Or alternatively, under the fair and

18 equitable test of section 1129(B), or a general

19 equitable exception as laid out in the case law, which

20 states that for solvent debtors, before any return to

21 the debtor's interest holders, they should receive

22 post-petition interest at a rate to be determined by

23 the Court.

24        In addition, in Section 506(B) of the

25 Bankruptcy Code, (indiscernible) provides that to the

1  extent that an allowed secured claim is secured by

2  property, the value of which after any recovery under

3  Subsection C of this section, which is relevant here,

4  is greater than the amount of such claim, there shall

5  be allowed to the holder of such claim interest on

6  such claim and any reasonable fees, costs or charges

7  provided for in the agreement or state statute under

8  which such claim arose.

9         It is well established that Section 506(B)

10 does not require interest for an over secured creditor

11 to be paid at any particular rate.  The grammar of

12 that section means that the rate of interest is within

13 the limited discretion of the Court.  *In Re:  Milham,*

14 141 F3d at 423 or, as Judge McMahon held in *In Re:*

15 *139-41 Owners Corp.*, 313 B.R. 364-368, at the sole

16 discretion of the Court, (S.D.N.Y. 2004).

17        However, there is a presumption, and in a

18 number of cases it's stated to be a strong

19 presumption, that the contract rate will apply subject

20 to equitable considerations.  Whether that contract

21 rate includes default interest of just contract

22 interest is less clear in the case law.  See generally

23 *In Re: Heavey,* 608 B.R. 353, *In Re: 1111 Myrtle Avenue*

24 *Group, LLC,* 408 B.R. 729, 736 (Bankr. S.D.N.Y. 2019),

25 and *In Re: General Growth Properties, Inc.*, 451 B.R.

1   323, 326 (Bankr. S.D.N.Y. 2011).

2           I noted earlier that the plan provides here

3   for unimpairment under Section 1121, I'm sorry,

4   1124(1) of the Bankruptcy Code.  That section has been

5   interpreted by the Courts, including specifically on

6   this issue by the 5th Circuit, to be subject to the

7   requirements of the Bankruptcy Code as it pertains, as

8   they pertain to the allowability of a claim.  Namely,

9   although the section states that a claim is impaired

10  unless the plan leaves unaltered the legal equitable

11  and contractual rights to which such claim or interest

12  entitles the holder of such claim or interest, the

13  congress contemplated that those rights include the

14  limitations on them imposed by the Bankruptcy Code's

15  own limitations on claim allowance. Including

16  limitations on the allowance of post-petition

17  interest. See *In Re: Ultra Petroleum Corp.,* 943 F.3d

18  758, 763-65 (5th Cir. 2019) and the cases cited

19  therein, including *In Re: PPI Enterprises USA, Inc.,*

20  324 F.3d 192, 201-02 (3rd Cir. 2003).

21          Having written the legislative history to the

22  amendment to that section, which was intended to

23  reverse the case that had provided for unimpairment of

24  a claim of an unsecured creditor of a solvent debtor,

25  I was surprised by that holding of *Ultra Petroleum,*

1  but I accept its logic having considered its

2  discussion of the legislative history generally and

3  the operation of the statute.  So, therefore, I do not

4  believe that Section 1124 eliminates consideration of

5  the factors that Courts consider when they decide

6  whether to apply a contract rate under Section 506(B)

7  or not.

8         Those factors are well established at this

9  point.  It is also generally recognized that they are

10 to be used sparingly given the importance of

11 predictability with respect to secured loan

12 transactions in bankruptcy. See *In Re: Residential*

13 *Capital,* 508 B.R. at 851.  Those factors to be

14 considered, separate and of course apart from the

15 state law factors for pre-bankruptcy interest which

16 would continue in a bankruptcy case, as well, are the

17 following:  The solvency of a debtor's estate; whether

18 the default rate of interest is considered a penalty;

19 if there has been creditor misconduct; if avoiding --

20 I'm sorry, if recording the creditor interest at the

21 default rate would harm other creditors; and lastly,

22 the adverse effect of allowing the interest at the

23 default rate on the debtor's fresh start. Again, see

24 *In Re: Heavey,* 608 B.R. at 353, and *1111 Myrtle Avenue*

25 *Group, LLC,* 736.

1           None of those factors is dispositive, it's

2   decided on a fact by fact and case by case basis,

3   including whether the debtor is solvent and/or

4   unsecured creditors would be harmed by the payment of

5   interest at the default rate, although that is an

6   important factor.  Generally where it has been applied

7   to require a default rate of interest, the plan has

8   either already been confirmed or there is no real risk

9   of insolvency. And, further, there has been no

10  creditor misconduct, and it appears likely that the

11  debtor will be able to confirm a Chapter 11 plan.

12  See, for example, *In Re: 1111 Myrtle Avenue,* 598 B.R.

13  at 741, as well as at 738.  And *In Re: General Growth*

14  *Properties, Inc.,* 451 B.R. at 330, 331, where Judge

15  Gropper found that the debtor was highly solvent and

16  there was no risk, for starters, the plan had already

17  been confirmed and (indiscernible) effective.

18          As far as whether the default rate would be

19  considered a penalty, as I noted the significant

20  spread, as is the case here, between non-default and

21  default interest has often been held not to be non-

22  enforceable or a penalty at all.  Again, see *In Re:*

23  *Heavey*, as I previously cited, and the cases cited

24  therein, where a spread of, in those cases, 18.625

25  percent, 12 percent or 8.8 percent between default and

1   non-default rates and was not viewed as a penalty.

2   See also *In Re: Urban Communicators PCS Limited*

3   *Partnership v. Gabriel Capital, LLC,* (inaudible - no

4   audio) by the same proposition.

5           Here, again, each of the debtors is solvent

6   from the debtors' claimed calculations that is, and,

7   although the spread here is quite significant, I would

8   not view it as a penalty.  On the other hand, the

9   debtors will not be able to confirm a plan and, in all

10  likelihood, unless they could find additional greater

11  financing, would either have the automatic stay

12  lifted, or go into liquidation mode, or have their

13  case be converted to a Chapter 7 case and, therefore,

14  not receive a fresh start if the default interest here

15  was allowed. In addition, in that event, at least

16  certain of the debtors' unsecured creditors, that is

17  unsecured creditors of certain of the debtors, I

18  believe would not be paid in full based on the

19  evidence before me in connection with the so-called

20  best interest analysis under 1129(A)(7).

21          The other factor in that list of factors to

22  consider and employ, albeit carefully and sparingly

23  under the case law, is creditor misconduct. And it is

24  an important point made by the debtors that needs to

25  be evaluated.  The facts here, as asserted by Brooklyn

 1  Lender, are Brooklyn Lender's assertion of several

 2  different types of default.  First and foremost, in

 3  May of 2017, Brooklyn Lender asserted a default based

 4  on Section 18.I of the loan agreements that either the

 5  debtor or the debtor's principle, Mr. Strulovitch, had

 6  provided a misleading certificate or other information

 7  as part of the debtor's loan application with regard

 8  to the ownership of the debtors.  The default under

 9  the loan agreements would apply, or the

10  representations respect of, by the debtors in respect

11  of their loan application, is updated as of the date

12  of the loan.  If, in fact, the ownership information

13  was inaccurate, then the default would exist from the

14  commencement of the case.

15          In addition, Brooklyn Lender has alleged that

16  the debtors violated sections 9 and 18(Q) of the loan

17  agreements by permitting encumbrances on two debtors,

18  18 Homes, LLC, and 16 -- I'm sorry, 6118 Lafayette

19  LLC, one encumbrance being in the form of a mortgage

20  and the other in the form of an agreement that would

21  declare an impediment to sale.  In addition, each of

22  the loan agreements in paragraph 18(I), I misspoke

23  about the paragraph with respect to non-ownership,

24  that's 18(G), 18(I) have as an event of default a

25  bankruptcy filing and the loan agreement provides that

1  that would constitute and event of default.

2        Finally, the loan agreements all provide for a

3  stated maturity date for the loan and provide in

4  paragraph 36 that until paid following maturity, those

5  default interest will accrue on the unpaid balance. I

6  will also note that the lender has alleged, finally,

7  defaults based upon uncured building violations on

8  many, if not all, of the properties. I'll address each

9  of these defaults as to whether they actually exist

10  and then as to whether they are enforceable under New

11  York law.  Which would apply, obviously, both for the

12  pre and post-petition period, the 506(B) analyses

13  being placed on top of the New York State law

14  analysis.

15        Let me begin with the bankruptcy default. The

16  debtor in each case here has indisputably been current

17  on making regularly scheduled non-default interest

18  payments, except with respect to the maturity defaults

19  which all occurred post-bankruptcy.  The debtor has

20  not missed a payment under the loan, except to the

21  extent that I conclude that default interest is owed

22  on top of regular interest.

23        In that circumstance, Courts have held, and I

24  agree with the holding, that the non-default rate

25  should apply when the only default was the bankruptcy

1  filing, itself, and the creditor was paid non-default

2  interest currently.  That was the holding in *In Re:*

3  *Residential Capital*, 508 B.R. at 862, see also *In Re:*

4  *Boundtree, LLC*, 2009 Bankr. LEXIS 2294 at *11-14

5  (Bankr. E.D.N.Y. July 24, 2009), and *In Re:  Northwest*

6  *Airlines Corp.*, 2007 Bankr. LEXIS 3919 at *16-18

7  (Bankr. S.D.N.Y. Nov. 9, 2007).

8         As far as those two latter cases are

9  concerned, I disagree with Judge Milton's theory that

10  payment at the default rate under such circumstances

11  would be tantamount to enforcing an ipso facto

12  provision.  And rather I believe that the correct

13  analysis is that, as Judge Glenn found in *Residential*

14  *Capital*, there is no basis to call a default where

15  here, as was the case there, there is no real issue of

16  the lender not being paid.  In *Northwest Airlines*,

17  Judge Gropper concluded that to the extent there was a

18  default other than the bankruptcy filing, it was not a

19  meaningful default that would require default

20  interest.  But the fundamental principle involved

21  there is similar to the holding in *Residential Capital*

22  which is namely a simple bankruptcy default should not

23  trigger default interest where it appears clear that

24  the debtor will be paying the non-default rate

25  currently and ultimately satisfy the claim under the

1  plan.

2         Under New York law, as I noted, there are

3  important limitations on a secured creditor which has

4  a mortgage on real properties ability to enforce,

5  including by acceleration, certain defaults.  New York

6  law defines loan defaults into two types, basically

7  principle or interest payment defaults, so-called

8  monetary defaults, and everything else so-called non-

9  monetary defaults, absent truly extraordinary

10 circumstances such as lender misconduct or a de

11 minimis delay in making a payment, lenders can

12 accelerate and enforce a borrower's monetary default.

13 See for example, *Small Business Lending Corp. v.*

14 *Crossways Holding,* 2014 N.Y. Misc. LEXIS 4175 (Sup.

15 Ct. N.Y. Cty. Aug. 29, 2014) and (1) <u>Bergman on New</u>

16 <u>York Mortgage Foreclosures</u>, Section 5.06, 2020.

17        However, with regard to, again, extraordinary

18 circumstances with regard to payment defaults and

19 nonpayment defaults, the Courts have long recognized

20 an equitable exception to enforcing the parties'

21 contract with respect to calling a default.  Generally

22 the Courts look to three factors in making that

23 analysis, has the lender suffered actual damages as a

24 result of the default, has the default impaired the

25 lender's security, that is the collateral securing the

1   debt, and does the default somehow make the future

2   payment of principle and interest less likely.  The

3   Courts also look at whether the default was

4   inadvertent or insignificant.  As far as significance,

5   generally they look at the three factors that I first

6   mentioned.  See generally *Karas v. Wasserman,* 91

7   A.D.2d 812 (3d Dep't 1982) and numerous other cases,

8   including *Empire State Building Associates v. Trump*

9   *Empire State Partners,* 245 A.D.2d 225, 226-28 (1st

10  Dep't 1997), *Bloomgarden v. Tinton 763 Corp.*, 18

11  A.D.2d 979 (1st Dep't 1963), *Rockaway Park Services*

12  *Corp. v. Hollis Automotive Corp.,* 206 Misc. 455 (Sup.

13  Ct. N.Y. Cty. 1954), *100 Eighth Avenue Corp. v.*

14  *Morgenstern,* 4 A.D.2d 754 (2d Dep't 1957), and *Tunnell*

15  *Publishing Company v. Strauss Communications,* 169

16  A.D.2d 1031, 1032 (App. Div. 1st Dep't). See also

17  Michael Giusto, "Note: Mortgage Foreclosure for

18  Secondary Breaches: A Practitioner's Guide to Defining

19  'Security Impairment,'" 26 Cardozo L. Rev. 2563 (May

20  2005), which discusses not only this general rule, but

21  also how to determine or how one should determine or

22  how the case is addressed, whether a default actually

23  impairs a lender's security or make future payment of

24  the lender less likely or cause actual damages.

25           I have evaluated each of the defaults alleged

1   here and in light of the testimony that I've heard and

2   the evidence that's been received applied to that case

3   law.  Certain of the defaults I have determined, after

4   hearing the testimony, and I should state the

5   testimony that I have heard, which is of the debtor's

6   principal, Mr. Strulovitch, debtor's manager, Mr.

7   Goldwasser, Mr. Kohn, with respect to how the debtors

8   have addressed building violations, Moses Strulovitch,

9   Joshua Wagschal and Mr. Hutman (phonetic), in addition

10  to Mr. Strulovitch, as to the issue regarding the

11  alleged nondisclosure of ownership interest. The

12  testimony of Mr. Halpern and Schoenberg with regard to

13  the nature of the ownership interest claimed by the

14  Israeli investors.  And then also the testimony by Mr.

15  Aviram, the representative of Brooklyn Lender with

16  regards to the actions it has taken with respect to

17  the alleged defaults.  Brooklyn Lender's two experts,

18  Ms. Stewart and Mr. Madison laying out the context of

19  how lenders look at defaults, including non-monetary

20  defaults. And finally, Kenneth Stagnari, the loan

21  officer at Signature Bank, that was the officer

22  responsible for the loans on Signature's side before

23  they were transferred to Brooklyn Lender, although not

24  during the entire time that Signature was the lender.

25          As I said, certain of the defaults here I

1  believe is relatively easy to determine, should not

2  serve as a basis for actually enforcing a default in

3  addition to the bankruptcy default that I've already

4  mentioned.  The easiest one to apply here, the

5  foregoing analysis to, are the various building code

6  violation defaults. The only credible witness on this

7  issue, as well as one who I believe was quite

8  knowledgeable generally, not only with regard to the

9  debtor's loans but real estate, that is commercial

10  real estate lending in the New York area, was Mr.

11  Stagnari who is in charge an extremely large, both in

12  terms of numbers and loan amount, the portfolio at

13  Signature Bank, and came across as a very

14  knowledgeable, credible and reasonable loan officer.

15        Mr. Stagnari testified that to his knowledge,

16  Signature Bank has never called a non-monetary

17  default, and within that subset has never called the

18  non-monetary default, or building violations, or

19  building code violations.  The testimony was also

20  clear that almost every, if not every building in Mr.

21  Stagnari's extensive loan portfolio, has many building

22  code violations on it.

23        The testimony of Mr. Kohn, and that's spelled

24  K-O-H-N, was also clear that the debtors have

25  successfully addressed and either cured and removed or

1  reasonably believe that they will have the violation

2  removed because of the cure, albeit that that process,

3  consistent with the process generally in New York

4  City, has taken a considerable amount of time.  In

5  light of that, I do not believe that such a default

6  with respect to any of the debtors should trigger

7  default interest, and that instead the debtor did not

8  place Brooklyn Lender at risk in respect of its

9  collateral or ultimate payment with respect to such

10  defaults.  That they were not ultimately, therefore,

11  material or were the basis for acceleration and

12  triggering the substantial increase in interest to the

13  24 percent default interest under the loan agreement.

14          I believe to the contrary that placing of a

15  mortgage on one of the debtors and an agreement to, in

16  essence, encumber the ability to sell the other debtor

17  did, in fact, in addition to violating paragraphs 9 of

18  the loan agreement and 18(Q), impair the lender's

19  security. And I do not believe, contrary to the

20  testimony of the recipients of those agreements, that,

21  and Mr. Strulovitch, that is namely Mr. Schwimmer and

22  Mr. Greenfield, that those encumbrances were

23  accidental or inadvertent.  The actual encumbrances

24  are written and signed by Mr. Strulovitch in each

25  case. It's hard to imagine, therefore, that the

1  agreements were accidents. They're not lengthy, they

2  specifically refer to these properties, and again, one

3  would have to argue mutual mistakes and that simply

4  didn't happen here.

5          It is the case that both of those individuals

6  have waived their rights under those agreements and

7  that they are no longer of record on the county

8  records. So today Brooklyn Lender's security is not

9  impaired by them, but it was impaired from the date

10 that they were recorded, and it would be appropriate,

11 therefore, to enforce the default provisions with

12 respect to those two agreements. And, therefore, the

13 default interest would need to accrue from the date of

14 the default in each case against each of those two

15 debtors.

16         The next default is the debtor's or Mr.

17 Strulovitch's disclosure contended to be inaccurate by

18 Brooklyn Lender that the debtors were owned either 100

19 percent by Mr. Strulovitch, or in some instances 50

20 percent by Mr. Strulovitch and 50 percent by another.

21 Brooklyn Lender contends that, in fact, certain

22 debtors were owned in part by third parties, namely

23 four debtors, 325 Franklin, 618 Jefferson, 106

24 Kingston, and 1213 Lafayette, were owned 45 percent by

25 the Israeli investor LLCs, and only 55 percent by Mr.

1   Strulovitch.  In addition, it is argued that Mr.

2   Wagschal, in addition to owning at least 50 percent of

3   certain debtors, also owned a substantial amount of

4   the Mesemer (phonetic) and Lorimer debtor and that his

5   ultimate ownership, wherever he has an ownership

6   interest, is not 50 percent only as disclosed in some

7   cases as part of a loan application package, but

8   rather close to 100 percent.

9         The debtors contend that each of those claimed

10  ownership interests are not ownership interests, but

11  rather have described them as profit sharing

12  interests.  Each of these debtors is a limited

13  liability company.  Limited liability companies under

14  the tax laws record any such interest, i.e. a profit

15  sharing interest, as an ownership interest or a

16  partner interest because they report income and losses

17  as a partnership.  So these debtors' owners are issued

18  K-1s that the record reflects generally show the

19  claimed ownership interests by Brooklyn Lender, with

20  the exception of the four debtors with regard to the

21  45 percent Israeli investor interests.

22        There does appear to have been operating

23  agreements for those for debtors that contemplated or

24  that provided for those 45 percent interests, and in

25  evaluating the testimony, I conclude that Mr.

1  Strulovitch's testimony that, in fact, they changed

2  the nature of the interest to a profit sharing

3  interest, they meaning the managers of those entities,

4  those entities' managers being Mr. Strulovitch and a

5  Mr. Oberlander, because the loans wouldn't work

6  without it, might be true. But I do not accept his

7  testimony that Signature Bank knew about this.  He was

8  referring to a conversation he had with the former

9  loan officer, Mr. Dietz, ono that point. There's no

10 writing to memorialize it and no disclosure, and I do

11 not accept that that ever happened.

12         It is also the case that both Mr. Strulovitch

13 and Mr. Wagschal had only the most rudimentary

14 understanding of an ownership interest in an LLC and a

15 profit sharing interest.  I conclude that the better

16 view of the facts is that where Brooklyn Lender has

17 contended that a third party, namely Mr. Wagschal, or

18 the investor, Israeli investor LLC, had an ownership

19 interest in a particular debtor, Brooklyn Lender's

20 view is the more likely one and, therefore, that the

21 debtors have not carried their burden of proof with

22 respect to disclaiming the default.

23         On the other hand, in evaluating the New York

24 case law that I previously summarized, I do not

25 believe this is the type of default that the New York

1  Courts would enforce.  First, it is not entirely

2  clearly that all that was determined here to confer

3  was only a, was an ownership interest as opposed to a

4  profits interest.  I reached that conclusion largely

5  because I don't believe that any of the parties really

6  had a clear understanding of the difference. More

7  importantly, I do not see how Brooklyn Lender or

8  Signature Bank's collateral or ability to be repaid

9  was in any way affected by the default to the extent

10 there was a default.

11       These are loans that are not recourse to the

12 owners.  Mr. Strulovitch gave what's only, as a term

13 of art that's described by Mr. Stagnari, a, quote,

14 "bad boy guarantee, not a monetary guarantee, it's

15 clear from his analysis of the loans and Signature

16 Bank's analysis of the loans and the com (phonetic)

17 reports, that signature bank relied upon the income

18 stream of the properties, i.e. rental payments, and/or

19 the value of the properties, themselves, either for

20 refinancing or sale in order to get repaid.  But it

21 did not do a credit analysis or look for a balance

22 sheet or other financial disclosure by the other

23 owners besides Mr. Strulovitch that were disclosed to

24 it, including Mr. Wagschal. And even as to Mr.

25 Strulovitch, they did not, according to Mr. Stagnari's

1  testimony, pay attention to his credit reports.  They

2  did require a relatively brief financial statement. I

3  should note that Brooklyn Lender's own representative,

4  Mr. Aviram, found the dramatic increase in value of

5  Mr. Strulovitch's net worth on that financial

6  statement to be on its face incredible, so I conclude

7  that Signature Bank also would have done so and would

8  not have relied on it, in fact, didn't rely on it.

9  This is not a question of a lender being put to a test

10 by a Court to do additional due diligence to see

11 whether a debtor was lying to it, which obviously

12 would not excuse the lie, but rather a lender seeing

13 on its face an incredible disclosure and not taking

14 any action in response to it.

15          The only possible adverse effect on the lender

16 here from the apparent failure to disclose ownership

17 or even beneficial ownership through an income or

18 profits assignment, that is the potential for

19 violation of the currency laws and regulations, and

20 know your customer rules. In the post argument

21 briefing, the parties have addressed that issue, and I

22 conclude, although it's a complex issue of law that

23 I'm not sure loan officers are aware of, and I do not

24 believe that Mr. Aviram was aware of it or Mr. Dietz,

25 I believe that the regulations do require disclosure

1  even as someone that would have a profits interest.

2  However, again, that failure to disclose has

3  apparently no bearing, whatsoever, on Brooklyn

4  Lender's being paid in full in respect to this loan or

5  on its collateral. Indeed there's no evidence that

6  upon learning of potential other owners of certain of

7  the debtors or the profits/interest argument, that

8  Brooklyn Lender did any reporting to the government

9  authorities.  And there is no suggestion that any of

10 these parties would actually be covered by the rules

11 that came into effect under the Patriot Act.

12        So ultimately I conclude that under New York

13 law the ownership defaults also would not properly be

14 enforced by the New York Courts.  And as I said, I

15 also conclude that the alleged inaccuracies in

16 reporting Mr. Strulovitch's net worth also are not the

17 type of default given their inherent and obvious,

18 obvious inaccuracy in reporting a gigantic net worth,

19 enormous increase from the original proposal and,

20 therefore, could not be something that would serve as

21 a basis to accelerate on or that anyone reasonably

22 relied on.

23        That leaves one other set of defaults.  Each

24 of the loans, as I've noted, has a maturity date.

25 None of the loans matured by their terms before the

1  bankruptcy petition date, but several of them have

2  since then.  And consistent with Judge Glenn's ruling

3  in the *Residential Capital* case and the analysis that

4  I will go through next, I believe that post maturity

5  default interest should be paid and, therefore, would

6  be allowed under the Bankruptcy Code.  Certainly,

7  there's no question that under New York law post

8  maturity interest would be allowed, that type of

9  default is a payment default and it does not fit into

10  any of the cases that in extraordinary circumstances

11  relieve a party from a payment default.

12       The debtors have argued that Brooklyn Lender's

13  own misconduct prevented them from paying the loans

14  off at maturity, and I've considered that argument

15  carefully.  Obviously, I viewed Brooklyn Lender's

16  calling the defaults that I've said should not be

17  enforced as tantamount to this conduct under the

18  506(B) case law, if a Court is not going to enforce

19  such a default under New York law then pursuing it

20  actively is improper.  I think that law is well

21  established and the cases go back to the '20s.  There

22  are not many recent cases, I think that's because as

23  of the '80s the law was well established.

24       The debtors, as I've said, have contended that

25  that fact pattern should also excuse them from having

1  to pay post default interest on the payment default

2  based on the actual maturing of the loans and the

3  loans not being paid at that point.  They also argue

4  that the loans were improperly accelerated based on

5  the other defaults and, therefore, it's hard to argue

6  that they separately matured.

7          I have the following responses to those

8  arguments.  First, as to the latter argument, the

9  acceleration would be undone based on my ruling with

10 respect to the, certain of the defaults, including the

11 across the board ones for the alleged inaccurate

12 reporting as part of the loan package.  That would

13 mean that the loans are still subject to their

14 original maturity.

15         Secondly, the misconduct here, if it rises to

16 that level, clearly does not affect the maturity of

17 the loan for two reasons. First, the debtors did not

18 exercise their right to force an extension of the loan

19 which under certain circumstances they have under each

20 of the loan documents.  That is a right that is

21 initiated by the debtors and they admittedly did not

22 do that until the plan, itself, was filed.

23         Secondly, it is not only the case that

24 Brooklyn Lender would not have extended the loans, but

25 also that it would probably, in almost all of the

1    loans, have the right to do so, or most of the loans,

2    have the right not to extend if there had been a

3    proper request because there were late payments on

4    most of the loans, even if those payments did not rise

5    to the level of a payment default. Even more

6    importantly, however, the debtors have not introduced

7    evidence that they actually had the ability to

8    refinance the matured loans post maturity.  To the

9    contrary, the only time they were able to come up with

10   such financing was in connection with the plan with

11   the Lightstone financing.  So the misconduct doesn't

12   relate to the ongoing default with respect to not

13   satisfying the loans upon their maturity date.  Once

14   that maturity occurred, it appears clear to me that

15   under the case law, both the New York case law and the

16   506(B) case law that I previously cited, post default

17   interest should apply to those debtors from the

18   maturity date forward.

19           At the oral argument on this issue, counsel

20   for Brooklyn Lender confirmed that the roughly $3.6

21   million of post default interest tied to this default

22   only ran from the maturity date.  And while the

23   debtor's counsel said that she wanted whether that

24   took into account any payments of principle that

25   should have been applied to principle or not, it

1   appears clear to me that the Brooklyn Lender is

2   calculating the default from the maturity date as

3   opposed to some earlier time.

4         So let me further state that Brooklyn Lender

5   submitted two expert witnesses on the default issue,

6   Ms. Stewart, however, proffered almost literally no

7   testimony that was relevant to a set of debtors like

8   these with commercial real estate in New York.  Her

9   experience, albeit lengthy and of a responsible nature

10  over her career, has been with consumer loans, loans

11  on residential property, although sometimes property

12  that had a few units within it that would be rented

13  out, considerations with respect to non-monetary

14  defaults and borrower character in that environment

15  are entirely different than with respect to the actual

16  loans at issue here. And I took Mr. Stagnari's

17  testimony to be of far more weight than Ms. Stewart's

18  as to what a reasonable lender would do with respect

19  to the non-monetary defaults asserted here.

20        Mr. Madison's testimony was brief, but not in

21  any way contradictory to the legal conclusions that

22  I've reached here. He simply noted the importance of a

23  default rate for monetary defaults, and noted that,

24  generally speaking, non-monetary defaults are

25  important, although the Courts have come up with

1  exceptions to that enforcement.

2        So it appears to me from the foregoing ruling

3  that the current plan cannot be confirmed based on

4  Brooklyn Lender's having an allowed claim even before

5  considering its claim for attorneys' fees. With

6  respect to those debtors whose loans have matured

7  post-petition and/or, because I think there's some

8  overlap, the two debtors where there was an

9  encumbrance, I've considered carefully whether the

10  fact that the debtor will not be able to confirm a

11  plan in those cases means that the factor that the

12  post-default interest will impair the debtors' fresh

13  start and/or that creditors of those debtors,

14  unsecured creditors, might well not receive a full

15  recovery in light of the foregoing should argue

16  against applying the post-default interest in those

17  cases.

18        This is not an easy question. Congress clearly

19  favors the reorganization of debtors; however, these

20  are debtors that don't employ many people and the

21  record is not entirely clear as to whether under my

22  ruling unsecured creditors really will be meaningfully

23  impaired here based on my ruling. So given that I am

24  not going to limit the interest rate against, in the

25  claims against those debtors by Brooklyn Lender on

1  those factors under 506(B) of the Code. And as I said,

2  the creditor misconduct factor really does not apply

3  to either of the instances where I found that post-

4  default interest should lie, because if there is any

5  misconduct in pursuing defaults that shouldn't have

6  been pursued, it doesn't pertain to those two points.

7          I will note when I refer to misconduct, that I

8  am not generally deviating from the case law that

9  deals with this issue in the context of champerty or

10 unconscionability.  The Courts, including specifically

11 a number of Courts in this district, have recognized

12 that the mere fact that a party buys a mortgage note

13 or notes with the knowledge that it will be enforcing

14 a default that it is aware of and that it may have

15 among its motives, a motive to obtain a large profit

16 and/or (indiscernible) the properties that are subject

17 to the mortgage is insufficient to limit the

18 enforceability of the loan under the Bankruptcy Code.

19 See *In Re:  Downtown Athletic Club of New York City,*

20 1998 Bankr. LEXIS 1642 at *25-26, 31-33, 34-35 (Bankr.

21 S.D.N.Y. Dec. 21, 1998).  See also *In Re: 139-141*

22 *Owners Corp.*, 313 B.R. 369, and *Bank of America*

23 *National Trust and Savings Association v. Envases*

24 *Venezolanos, SA,* 740 F.Supp. 260, 269 (S.D.N.Y).

25          (indiscernible) debtors' request for

1   confirmation of this plan, since it's a joint plan it

2   would cover those debtors. I think it is worthwhile,

3   however, to deal also with the objection by the

4   Israeli investors to the join plan so that the parties

5   can be guided with respect to any future plan in this

6   case or assertion of rights in this case.

7          With regard to the Israeli investors, again,

8   it's important to note that there are two sets of

9   Israeli investors and each of those two sets have

10  asserted two different types of claims against the

11  debtors.  First, there are the investor LLCs which

12  directly invested in the specific four debtors that I

13  previously identified, 3225 Franklin, 618 Jefferson,

14  106 Kingston and 1213 Lafayette.  Those investor LLCs,

15  with respect to their claims against those four

16  debtors, clearly would fit into the plain language of

17  Section 510(B) of the Bankruptcy Code which, for

18  purposes of distribution under Title 11, would be

19  subordinated to the level of the equity interest in

20  those debtors given that the claim as set forth in the

21  proofs of claim for those investments would be for

22  damages arising from the purchase or sale of a

23  security in the debtor or of an affiliate of the

24  debtor or for reimbursement or contribution on account

25  of such a claim.

1          In addition, those investor LLCs and other

2  Israeli investor LLCs that have filed proofs of claim,

3  allege that they have claims against all of the

4  debtors on the theory that those debtors participated

5  in a fraudulent scheme by Mr. Oberlander and Mr.

6  Strulovitch to take the investor LLCs' money would was

7  to be dedicated in investing in specific real estate

8  projects, such as the four that I just mentioned, and

9  instead used that money for other projects or other

10 uses.  Unless those other, unless the money went to an

11 affiliate of the debtor, such a claim would not be

12 covered by Section 510(B) of the Bankruptcy Code.

13 See, for example, *In Re: Washington Mutual Inc.,* 462

14 B.R. 137 (Bankr. D. Del. 2011), and *In Re: Semcrude,*

15 *L.P.,* 436 B.R. 317, 321 (Bankr. D. Del. 2010).

16          It is quite possible that the allegedly

17 fraudulently transferred funds did go to an affiliate

18 of the debtor given that Strulovitch apparently

19 controls all of the debtors, but that has not been

20 proven by the debtors in connection with confirmation.

21 I will note that Section 1012(B) defines an affiliate

22 as a corporation, and the Courts have applied that to

23 LLCs, 20 percent or more of whose outstanding voting

24 securities are directly or indirectly controlled, or

25 owned, controlled or held with power to vote, by the

1  debtor or by an entity that directly or indirectly

2  owns, controls, or holds with power to vote, 20

3  percent or more of the outstanding voting securities

4  of the debtor other than an entity that holds the

5  securities in any capacity that would not be relevant

6  here.

7          I also tend to agree with the 5th Circuit

8  ruling in *Templeton v. O'Cheskey (In Re: American*

9  *House Foundation)*, 725 F.3d 143, 155-56 (5th Cir.

10  2015), that the better view which is not followed by

11  the two Delaware cases that I previously cited, is

12  that if a party seeking to impose 510(B) on a claimant

13  shows sufficient control over the debtor or an

14  affiliate by authority, then 510(B) would apply. The

15  problem here is there is really no proof to show that

16  the allegedly transferred funds or improperly

17  transferred funds went to affiliates, including as

18  defined in the 5th Circuit case. And therefore, as to

19  claims against debtors other than the four that I

20  mentioned, the debtor has not made its case under

21  510(B).

22          That's not the end of the story, however,

23  because there is absolutely nothing in the record on

24  any credible basis to show that any such funds

25  actually went to anybody that the debtors participated

1   in or received.  The testimony of the Israeli

2   investors specifically omitted any contention to the

3   contrary. Their proofs of claim, which attach their

4   complaints in pre-bankruptcy litigation on this point,

5   are incredibly vague on the facts, including clearly

6   not satisfying Bankruptcy Rule 7009 as to the elements

7   of fraud, including when these fraudulent events

8   occurred, who the recipients were, and the like.  So

9   I've concluded that to the extent that there is a

10  feasibility objection here, the debtors have sustained

11  their burden as to feasibility notwithstanding their

12  inability on this record to establish that the Israeli

13  investors LLC investor claims should be subordinated

14  under Section 510(B) of the code.

15          The second group of Israeli investors are

16  individuals, including the two who testified, who

17  concededly did not invest in the debtors, but rather

18  invested in the investor LLCs.  They are, therefore,

19  either a creditor or a shareholder in the investor

20  LLCs. The 2nd Circuit has been clear that in that fact

21  pattern they would not have a claim against the

22  debtors. They only claim derivatively through the

23  investor LLCs.  They are simply, again, an investor in

24  or creditor of a potential creditor of the debtors.

25  And, therefore, are not parties in interest and do not

1  have a claim against these debtors.  See *In Re:*

2  *Terrestar Networks, Inc.,* 2013 WL 781613 at *1 (Bankr.

3  S.D.N.Y. Feb. 28, 2013).  See also *In Re: Refco Inc.,*

4  505 F.3d 119 (2d Cir. 2007), and *In Re: Comcoach*

5  *Corp.,* 698 F.3d 571, 574 (2d Cir. 1993).

6         They face that insurmountable hurdle, in

7  addition, their proofs of claim, like the proofs of

8  claim of the investor LLCs, are incredibly vague and

9  unsupported and inconsistent with Rule 9 and I would

10  not require any reservation or reserve for such a

11  claim given the existence of such claims. But in any

12  event, they don't have a claim because they only claim

13  through a potential claimant and not on behalf of

14  themselves directly.

15         The Israeli investors raised a number of other

16  objections to confirmation, all of which I dealt with

17  at oral argument and believe don't need to be further

18  addressed. Namely, contrary to the objection it is

19  clear to me that this plan is not a substantive

20  consolidation but merely provides for cross

21  collateralization of the exit loans in a way that's

22  beneficial to these investors just as

23  collateralization is permitted in DIP agreements,

24  which doesn't lead to any sort of substantive

25  consolidation on the debtors.

1          I've also concluded that with the exception of

2     one debtor that the debtors' counsel has agreed would

3     be separately carved out from the overarching exit

4     loan, namely 106 Kingston, the plan satisfies the best

5     interest test under Section 1129(E)(7) of the code

6     with regard to the Israeli investors for the reasons

7     stated in the transcript of the August 7, 2020,

8     hearing transcript at pages 35, 37 and 38 and 41

9     through 42.

10         The plan's classification scheme appeared to

11    me then and appears to me now to be a little off with

12    regard to the Israeli investors. They're all included

13    in class six which are descried at the 510(B) claims.

14    As I've previously ruled, it is conceivable to me, and

15    the debtors have not satisfied their burden of proof

16    to the contrary, that certain of the Israeli investor

17    LLC claims for fraudulent involvement in the taking of

18    their funds and not placing them in its specifically

19    designated investments, are not covered by 510(B) and,

20    therefore, would be unsecured claims that would be

21    included in class four. And, however, it also appears

22    to me that the debtors, themselves, assert that these

23    are profits interest, so conceivably they could be in

24    class five as far as whether the money was meant to be

25    invested in any other debtor.

1          So again, I've concluded that the claims

2     really don't assert, as far as at least feasibility

3     purposes, an unsecured claim that could be allowed.

4     And again, I have not determined that issue on the

5     merits yet, but certainly before me it does present a

6     feasibility problem.  But and also the claims were

7     objected to and, therefore, their votes would not be

8     counted in class four.  But they should be included in

9     class four to the extent they don't fit into class

10    six. The transcript reflects that I thought at one

11    point they might be included in class five, and

12    therefore that the debtors would have to satisfy the

13    cram down requirements of class five, with respect to

14    class five, however, I believe it's clear from the

15    record that the debtor would satisfy the cram down

16    requirements under 1129(B)(2)(C)(ii) since no junior

17    class is recovering anything. But having reviewed this

18    with more care, I conclude that the investor LLC

19    claims other than the four, the four entities which

20    I've already outlined which are probably in class six,

21    would not be in class five but rather would be in

22    class four.  So in a future case, to the extent that

23    there isn't a claim objection that is granted, that's

24    where they should be placed.

25          So I, the oral argument I believe also dealt

1  with all of the other plan objections raised by the

2  Israeli investors and I don't need to repeat that

3  ruling here.  I also at that ruling dealt with the

4  Israeli investors' request to appoint a Chapter 11

5  trustee.  There is absolutely no support for that

6  contention in the record and it was not actually

7  pursued, nor was it pursued by Brooklyn Lender who had

8  made a request several months before for similar

9  relief. So that relief, those motions are denied.

10         I know this is quite a very lengthy ruling and

11  I'm sorry to strain your patience for roughly two

12  hours. I am going to ask the debtors to prepare an

13  order consistent with my ruling which would, again,

14  unless I've just done the math wrong, would require

15  confirmation of the joint plan to be denied for the

16  reasons stated, namely that Brooklyn Lender's claims

17  against certain of the debtors for default interest

18  based on the maturity of the loans, again, by the

19  those debtors, and the two encumbrances permitted by

20  the two debtors, would preclude confirmation of the

21  joint plan.  It is conceivable to me that the debtors

22  can pursue confirmation of plans for other debtors

23  and/or that they and Brooklyn Lender might want to

24  negotiate a plan that would provide for payment of

25  Brooklyn Lender and not involve a third party. And

1  that as far as this plan is concerned, I believe it

2  can't be confirmed on that basis.  On the other hand,

3  I have overruled the objections by the Israeli

4  investors, albeit that I've found that the plan

5  improperly omitted their claims potentially as claims

6  in class four, but also found that they did not have a

7  right to vote in class four because their claims were

8  objected to.  And that ultimately the plan is

9  feasible, even if their claims were in class four

10  because it appears clear to me, based on at least the

11  record I have to date, that there is no merit to those

12  claims.

13          I have not addressed Brooklyn Lender's fee

14  claim. I've not done that for two reasons.  First, I

15  am sure it's incurred more fees since the time records

16  were submitted.  Secondly, I believe the debtors

17  should have the opportunity to review the time and

18  expense records in light of my ruling which, again,

19  reflected that much of the defaults called by Brooklyn

20  Lender really would not be enforceable and, therefore,

21  might reflect on the allowability of the fees related

22  to the attempt to enforce those defaults.

23          Moreover, it all might be moot given my ruling

24  and I think the parties should step back and reflect

25  upon the potential exit approaches for these cases

1   going forward. It may well be that some of the debtors

2   can't be reorganized and some can, or it may be that

3   the parties may be able to reach some sort of

4   agreement that would permit an overall approach. Or

5   that the parties on the phone may be able to reach

6   some sort of agreement among themselves with regard to

7   reorganizing some of the debtors.

8        So I'll ask Mr. Frankel, in addition to

9   preparing the order consistent with my ruling today,

10  to schedule a case conference through Ms. Lee within

11  the next 30 to 45 days where we can talk about the

12  next steps in the case. That could also be a hearing

13  date, if anyone wants to seek relief such as, for

14  example, for relief from the automatic stay or

15  conversion of the case, or the like, or a conversion

16  of cases or the like.

17       So does anyone have any questions?  Is anyone

18  on this phone?

19       MR. GLENN:  No questions on behalf of Brooklyn

20  Lender, Your Honor.

21       THE COURT:  Okay.  I just had a horrible

22  thought that I'd been speaking for two hours and the

23  line was dead.  All right, so Mr. Frankel, you don't

24  need to settle that order formally on counsel for

25  Brooklyn Lender and counsel for the Israeli investors,

1  but I do want you to circulate it to them in advance

2  so they can make sure it's consistent with my ruling.

3        MS. CARUSO:  Thank you, Your Honor, for

4  everything.

5        THE COURT:  I just want to make sure you heard

6  that, Mr. Frankel?

7        MS. CARUSO:  Yes, if he didn't hear it, this

8  is Andrea, I heard it and I will make sure that he

9  understands.

10        MR. FRANKEL:  I'm sorry, I was on mute, I

11  heard it.

12        THE COURT:  Okay, very well, so I'll look for

13  that order.  Thank you, everyone.

14        (Whereupon the matter is adjourned.)

15  I, Carole Ludwig, court approved transcriber, certify that

16  the foregoing is a correct transcript from the official

17  electronic sound recording of the proceedings in the above-

18  entitled matter.

19

20

21  _____        _____

22      CAROLE LUDWIG                December 30, 2020

23

24

25