UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------
In re:

                                        Case No.: 19-23013-rdd

53 STANHOPE LLC, et al.,
                                        Chapter 11
                                        (Jointly Administered)

          Debtors.

----------------------------------


       **MODIFIED BENCH RULING ON CONFIRMATION OF THE DEBTOR'S AMENDED**
              **JOINT CHAPTER 11 PLAN OF REORGANIZATION**

APPEARANCES:

BACKENROTH FRANKEL & KRINSKY, LLP, by Mark Frankel, Esq., for
the debtors and debtors in possession

ABRAMS, FENSTERMAN, FENSTERMAN,
EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP, by Andrea Caruso,
Esq., for the debtors and debtors in possession

KASOWITZ BENSON TORRES LLP, by Jennifer Recine, Esq. and Andrew
Glenn, Esq., for Brooklyn Lender, LLC

NORRIS MCLAUGHLIN, P.A., by Melissa Pena, Esq., for the Israeli
Investors

HON. ROBERT D. DRAIN, United States Bankruptcy Judge

          The Court gave a lengthy oral ruling on December 17,

2020 regarding the request of each of the 18 debtors and debtors

in possession herein (the "Debtors") for confirmation of their

amended joint chapter 11 plan of reorganization [Dkt. 93] (the

"Plan") and their related objection to a substantial portion of

the proofs of claim filed in each of these cases by their

primary secured creditor, Brooklyn Lender, LLC ("Brooklyn

Lender"). In requesting confirmation of the Plan, the Debtors

also sought a determination that the claims of the "Israeli

Investors" -- which comprise claims filed against the Debtors

by (a) what the parties have referred to as the "Israeli

Investor LLCs" and (b) individual investors in the Investor

LLCs (the "Individual Israeli Investors") -- should be

subordinated under section 510(b) of the Bankruptcy Code, 11

U.S.C. § 510(b), to the claims of the Debtors' other creditors

(except to the extent that certain of the Debtors' other

creditors have agreed to different treatment under the Plan).

Class 6 of the Plan provides for such treatment.  My bench

ruling also addressed that issue, as well as other confirmation

issues raised by the Israeli Investors. The Israeli

Investors and the Debtors previously agreed, however, not

to litigate at this time the merits of the Debtors'

objections to the Israeli Investors' claims with the

exception of the Plan's right to treat those claims as

subject to mandatory subordination under section 510(b)

of the Bankruptcy Code. My ruling therefore only

addressed the merits of those claims to the extent they

were relevant to the feasibility of the Plan under

section 1129(a)(11) of the Bankruptcy Code, 11 U.S.C. §

1129(a)(11).

        It was important for the parties to receive a ruling

promptly, as the Debtors had obtained exit financing for the

Plan that was time sensitive.  I informed the parties, though,
that I might review the transcript and file a modified bench
ruling, which of course would not at that point be a transcript,
if the transcript warranted improvement in grammar or clarity
for the benefit of the parties and any appellate court.  I do so
here; my underlying rulings on the Plan and confirmation-related
issues, including the Debtors' objections to Brooklyn Lender's
claims, have not changed, however.

The foregoing issues were the subject of an
evidentiary hearing held in July and August 2020, and this
Modified Bench Ruling reflects the Court's assessment of the
witnesses' testimony and exhibits admitted into evidence, as
well as the parties' post-trial briefing.

The Debtors propose to finance their exit from
Chapter 11 with a loan from an entity known as Lightstone
Capital.  The exit loan proceeds would suffice to pay in full
the claims of Brooklyn Lender in the amount that the Debtors
contend those claims should be allowed, roughly $35.3 million.
Indeed, after paying allowed administrative expenses and
general unsecured claims that the Plan also provides will be
paid in full on the Plan's effective date -- but not the
payment of any cash on account of the Israeli Investors'
claims, which the Plan contemplates satisfying, to the extent
allowed, with equity interests in the applicable reorganized

Debtors -- the exit loan would leave the reorganized Debtors
with approximately a $2 million cushion before consideration of
Brooklyn Lender's claim for attorneys fees and expenses under
section 506(b) of the Bankruptcy Code, 11 U.S.C. § 506(b).
Section 506(b)'s allowance of claims for attorneys fees and
costs, as well as for allowance of postpetition interest
notwithstanding the general rule, codified in section 502(b)(2)
of the Bankruptcy Code, 11 U.S.C. § 502(b), against the
allowance of claims for postpetition interest, comes into play
because the Debtors acknowledge that in each of their estates
Brooklyn Lender is oversecured -- that is, the value of its
collateral exceeds the amount of its claim against each Debtor
for unpaid principal and prepetition interest.  Under section
506(b), Brooklyn Lender would have an entitlement, up to the
value of its collateral, not only to the allowance of any
unpaid postpetition interest, but also to reasonable attorneys'
fees and expenses as provided in the various loan agreements
that the Debtors entered into with Brooklyn Lender's assignor
and the Debtors' original lender, Signature Bank. Even with
the payment of reasonable attorneys fees and expenses,
however, the Debtors contend that they would have a small
surplus left over, including for interest payments under
the Lightstone Capital loan after a lengthy interest
payment holiday thereunder, and could service that loan

4

or reduce it by refinancing or selling various of their properties at agreed-to release prices.

Brooklyn Lender opposes the Debtors' objections to its claims and confirmation of the Plan, as have the Israeli Investors.

The Plan is an unimpairment plan under section 1124(1) of the Bankruptcy Code because it provides for cash payment in full of the allowed claims against each Debtor's estate (except where a claimant has agreed to a lesser treatment). Section 1124(1) provides that a claim is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." Section 1126(f) of the Bankruptcy Code, 11 U.S.C. § 1126(f), provides that classes that are not impaired by a chapter 11 plan are deemed to have accepted it.

If, however, any Debtor lacks sufficient cash to pay Brooklyn Lender's ultimately allowed claims against it, the Plan cannot be confirmed with respect to such Debtor because Brooklyn Lender would be impaired and its votes in that Debtor's case would have to be counted, and, therefore, the Debtor would have to "cram down" the Plan over Brooklyn Lender's negative vote under section 1129(b) of the Bankruptcy Code, 11 U.S.C. § 1129(b) --

something that the Debtors have not tried to do -- or the
Plan would not be feasible as to such Debtor under
section 1129(a)(11) of the Bankruptcy Code, which the
Debtors appear to concede.

Even if Brooklyn Lender's allowed claims exceed
the amount of cash available only at certain of the
Debtors, moreover, the Plan cannot be confirmed, because
the Plan is a joint plan for all of the Debtors and does
not provide for the Debtors' substantive consolidation.
It also is the case that Lightstone Capital's exit
financing cannot be disaggregated from all or
substantially all of the Debtors.

If the Israeli Investors' allowed claims cannot
be subordinated under section 510(b) of the Bankruptcy
Code and more cash is required to pay them than is
provided for in the exit facility combined with the
Debtors' other sources of cash, the Plan also cannot be
confirmed unless amended to provide for such claims'
impairment and cram down, again something that the
Debtors have not sought.

I will first address the issues raised with
respect to Brooklyn Lender's claims and then turn to the
Israeli Investors.

Although Signature Bank made separate mortgage

loans to each Debtor, the underlying loan documents are
basically in the same form. Each Debtor has a
substantially similar note and mortgage, which Signature
Bank previously assigned to Brooklyn Lender. Thus
references to a provision in a loan document can apply to
the same provision in each loan document unless otherwise
noted.

The fundamental dispute between the Debtors and
Brooklyn Lender is over the amount of the interest
component of Brooklyn Lender's claims, both with respect
to claims for pre-bankruptcy, or prepetition interest and
claims for postpetition, or pendency interest, i.e.
interest accruing after the bankruptcy petition date and
before confirmation and the effective date of the Plan.
The Debtors contend that both pre- and postpetition
interest should be allowed on Brooklyn Lender's claims at
the non-default contract rate, which, because they have
consistently paid that interest, would mean that any
further claims by Brooklyn Lender for unpaid interest
would be disallowed. Brooklyn Lender, to the contrary,
contends that it has an allowed claim for a substantial
amount of unpaid default rate interest, accrued both pre-
and postpetition. Brooklyn Lender's non-default rate
varies among the Debtors, between 3.625 percent and 4.35

percent, whereas the default rate under the loan
documents is 24 percent.  Moreover, Brooklyn Lender has
asserted certain defaults against each Debtor that the
parties agree -- if default interest is enforceable --
would start the accrual of such interest from the making
of each loan. The monetary spread between the parties'
positions therefore is huge; indeed, Brooklyn Lender's
claims including its claims to default interest are more
than double the amount that the Debtors assert.

The Bankruptcy Code and case law address claims
to pre- and postpetition interest differently.  One looks
to applicable state law to determine the allowance of a
creditor's claim for prepetition interest. _Key Bank_
_National Association v. Milham_ (_In re Milham_), 141 F.3d
420, 423 (2d Cir. 1998); _In re Residential Capital LLC,_
508 B.R. 851, 858 (Bankr. S.D.N.Y. 2014).  Under New York
law, which governs here, given the location of the
mortgaged properties and the parties, will generally
enforce unambiguous contract provisions for default
interest at a higher rate than pre-default interest, even
if the default interest is at a high rate and reflects a
large spread against non-default interest. _Pereira v._
_Prompt Mortg. Providers of N. Am., LLC_ (_In re Heavey_),
608 B.R. 341, 348-49 (Bankr. E.D.N.Y. 2019), and the

cases cited therein.  In *Heavey*, as here, the lender's default rate was 24 percent, but the court nevertheless allowed the lender's claim for it. *See also In re Campbell,* 513 B.R. 846, 850 (Bankr. S.D.N.Y. 2014), *aff'd* 2015 U.S. Dist. LEXIS 129992 (S.D.N.Y. Sept. 28, 2015), also allowing a prepetition claim for 24 percent default interest.

A default under the parties' contract must of course have occurred for the default rate to be owed. *In re Northwest Airlines Corp.*, 2007 Bankr. LEXIS 3919 at *5 (Bankr. S.D.N.Y. Nov. 9, 2007).  Moreover, as noted in *In re Heavey*, 608 B.R. at 349-50, and the cases cited therein, New York law recognizes certain limited circumstances in which a court may refrain from enforcing a loan contract when it comes to acceleration and the accrual of default rate interest.  The Debtors have raised such a defense to Brooklyn Lender's claim to prepetition default interest, as well as contended that at least some of the defaults relied on by Brooklyn Lender were not, in fact, defaults at all.

Postpetition interest is governed by the Bankruptcy Code in addition to applicable non-bankruptcy law. First, section 502(b)(2) of the Bankruptcy Code disallows claims for "unmatured interest," i.e.

postpetition interest, although courts have recognized exceptions to that rule as applied to unsecured claims against chapter 11 debtors based on various theories, namely under (x) the "best interests" test in section 1129(a)(7) of the Bankruptcy Code, because under the distribution scheme in a case under chapter 7 of the Bankruptcy Code -- which Bankruptcy Code section 1129(a)(7) requires a creditor's treatment under a chapter 11 plan must at least equal -- creditors are entitled to payment of postpetition interest at the "legal rate" before distributions to the debtor's interest holders (*see* 11 U.S.C. § 726(a)(5)), or (y) the "fair and equitable" test of section 1129(b) of the Bankruptcy Code in a cram down, or (z) longstanding case law (*see, e.g., Vanston Protective Bondholders Committee v. Green*, 329 U.S. 156, 162-65 (1946); *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir. 1959)), holding that before any return to interest holders, creditors should receive postpetition interest at a rate to be determined by the Court applying equitable principles.

In addition, section 506(b) of the Bankruptcy Code provides that "to the extent that an allowed secured claim is secured by property, the value of which after any recovery under subsection (c) of this section [which

is irrelevant here] is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim and any reasonable fees, costs or charges provided for in the agreement or state statute under which such claim arose."

It is well established that section 506(b) does not require an oversecured creditor's postpetition interest to be paid at any *particular* rate, the issue here.  Under section 506(b)'s plain meaning, the rate of postpetition interest is instead within the limited discretion of the court, *In re Milham,* 141 F.3d at 423, or, as stated in *In re 139-41 Owners Corp.,* 313 B.R. 364, 368 (S.D.N.Y. 2004), at the "sole" discretion of the court, which thus returns one to pre-Bankruptcy Code caselaw holding that "[i]t is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of the equities between creditor and creditor or between creditors and the debtor." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. at 162.

There is a presumption, however -- and most cases describe it as a strong presumption -- that the "contract rate" will apply under section 506(b), subject to limited equitable considerations.  Whether that

presumption in favor of the contract rate is for default
interest of just pre-default contract interest is less
clear.  See generally *In re Heavey,* 608 B.R. at 353; *In
re 1111 Myrtle Ave. Grp., LLC,* 598 B.R. 729, 736 (Bankr.
S.D.N.Y. 2019); *In re General Growth Props., Inc.*, 451
B.R. 323, 326 (Bankr. S.D.N.Y. 2011).

    As noted, the Plan provides for unimpairment of
Brooklyn Lender's claims under section 1124(1) of the
Bankruptcy Code.  That section has been interpreted,
including specifically by the Fifth Circuit on the issue
of the allowance of a claim for postpetition interest, to
be subject to the requirements of the Bankruptcy Code as
they pertain to claim allowance.  Namely, although
section 1124(1) states that a claim is impaired unless
the plan leaves unaltered the legal, equitable, and
contractual rights to which such claim or interest
entitles the holder of such claim or interest, Congress
contemplated that those rights include the Bankruptcy
Code's own limitations on claim allowance, including
limitations on the allowance of postpetition interest.
*See Keystone Gas Gathering L.L.C. v. Ad Hoc Comm.* (*In re
Ultra Petroleum Corp.*)*,* 943 F.3d 758, 763-65 (5th Cir.
2019), and the cases cited therein, including *Solow v.
PPI Ents. (US)* (*In re PPI Enters.(US)*)*,* 324 F.3d 197,

201-02 (3d Cir. 2003).

Having written legislative history to the amendment to section 1124, H.R. Rep. 103-835 at 47-48 (1994), that was intended to supersede a case that had provided for unimpairment of the claim of an unsecured creditor of a solvent debtor without paying postpetition interest to that claimant (*In re New Valley Corp.*, 168 B.R. 73 (Bankr. D. N.J. 1994), I was at first surprised by *Ultra Petroleum*'s holding, but, having considered its discussion of the legislative history generally and the operation of the statute, I agree with it.  I therefore conclude that unimpairment under section 1124(1) does not eliminate the factors that courts consider when they decide whether to apply a contract interest rate under section 506(b) and, more specifically, the consideration of those factors when deciding whether to employ a default rate as opposed to a non-default contract rate.

Those factors are now fairly well established, and it also is generally recognized that, given the importance of predictability with respect to the treatment of secured loans in bankruptcy, they should be applied "sparingly" to diverge from the contract rate. *See In re Residential Capital,* 508 B.R. at 857.  In addition to the state law factors limiting acceleration

and the enforcement of pre-bankruptcy default interest,
which apply to postpetition interest, as well, courts
consider the following under section 506(b):  the
solvency of the debtor's estate; whether the contract
rate is considered a penalty; if there has been
misconduct by the creditor; if allowing the creditor's
claim to postpetition interest at the contract rate would
harm other creditors; and, lastly, the adverse effect
that allowing such interest would have on the debtor's
fresh start. *In re Heavey*, 608 B.R. at 352; *In re 1111
Myrtle Ave. Grp.*, 598 B.R. at 736, and the cases cited
therein.

        None of these factors is dispositive; allowance
is decided on a case-by-case basis.  It is fair to say,
however, that if the debtor is solvent and unsecured
creditors will be paid in full even if the higher
contract rate is allowed, courts will allow the claim at
the default rate under section 506(b). *See, e.g.*, *In re
1111 Myrtle Ave. Grp.,* 598 B.R. at 738, 741 (confirmed
plan, solvent debtor, unsecured creditors paid in full);
*In re General Growth Props.,* 451 B.R. at 330, 331 (plan
confirmed and effective, unsecured creditors paid in
full, debtor was highly solvent).  In such cases, the
debtor's "fresh start" also was not jeopardized by

allowance at the higher default rate. *See also Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008) (solvent debtor; debtor's "fresh start" not implicated because debtor was liquidating). Thus, the only issue was the allocation of value between the secured creditor on the one hand and the debtor's interest holders on the other, which *Ruskin v. Griffiths* long ago determined requires payment of the secured creditor at the higher default rate on equitable grounds. 229 F.2d at 831-32. *See also Official Comm. of Unsecured Creditors v. Dow Chem. Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 680 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1874 (2007).

As for whether the default rate would be considered a "penalty," a significant spread between non-default and default interest has not been construed by several courts as a penalty justifying disallowance under section 506(b), just as it generally has not under applicable New York law. *See In re Heavey*, 608 B.R. at 354, and the cases cited therein, where a spread of, in those cases, 18.625 percent, 12 percent, and 8.8 percent between default and non-default rates was not viewed as a penalty for purposes of section 506(b). *See also In re Urban Communicators PCS Ltd. P'ship. v. Gabriel Capital,*

15

394 B.R. at 341-42, in which the court noted that a 24 percent default rate was enforceable under New York law and thus also should have been allowed against a solvent liquidating debtor for purposes of section 506(b).

On the other hand, other decisions have been less tolerant of a significant spread between non-default and default interest. *See Southland Corp v. Toronto-Dominion (In re Southland Corp.*), 160 F.3d 1054, 1060 (5th Cir. 1998) (affirming allowance of default interest under section 506(b) based on trial court's findings that other, junior creditors would remain "unscathed" by the bankruptcy and "[t]he 2% spread between default and pre-default interest rates is relatively small"); *see also In re La Guardia Assocs., L.P.*, 2006 Bankr. LEXIS 4735, at *113-15 (Bankr. E.D. Pa. Sept. 13, 2006) (default interest that was 33 percent higher than non-default rate supports allowance at non-default rate); *In re Manuel Mediavilla, Inc.*, 2016 Bankr. LEXIS 3469, at *6-9 (Bankr. D. P.R. Sept. 23, 20160 (postpetition interest allowed at 5% non-default rate instead of 8% default rate, which was viewed as "a coercive penalty that affects Debtors' possibilities of reorganization"), *rev'd on other grounds, PRLP 2011 Hldgs., LLC v. Manuel Mediavilla, Inc.*, 568 B.R. 551 (B.A.P. 1st Cir. 2017). *La Guardia*

and *Manuel Mediavilla* each reasoned that because the
creditor bought the loan knowing it was in default and
would have priced the default risk in the loan purchase
agreement, allowing default interest would be
inequitable.  2006 Bankr. LEXIS 3469, at *113-15; 2016
Bankr. LEXIS 4735, at *8.  *See also* *In re Family Pharm.,*
*Inc.*, 605 B.R. 900, 912 (Bankr. W.D. Mo. 2019); *In re*
*Vest Assocs.*, 217 B.R. 696, 703-04 (Bankr. S.D.N.Y.
1998); Fischer Enters. v. Geremia (*In re Kalian*), 178
B.R. 308, 314-17 (Bankr. D. R.I. 1995).

Although the spread here between non-default and
default interest is significant, I would not view the
parties' default rate, standing on its own, as an
unenforceable penalty for purposes of section 506(b),
largely for the reasons articulated in *In re Route One*
*West Windsor Ltd. P'Ship.*, 225 B.R. 76, 87-90 (Bankr. D.
N.J. 1998).  I do not accept some courts' logic of
finding a penalty based on an analysis of what would be a
"reasonable profit" for a defaulted loan. To do so would
unduly curtail the ability to sell defaulted loans, which
might cause lenders to overprice pre-default interest and
lead courts to reduce claims based on what the claimant
paid for the loan, a proposition disavowed as early as
Hamilton's First Report on the Public Credit.

Here, each of the Debtors is solvent, at least based on the Debtors' claims calculations. On the other hand, if Brooklyn Lender's claims are allowed in full, most, if not all, of the Debtors will become insolvent, the Debtors will be unable to confirm the Plan and, more importantly, unless they find additional, materially greater financing, which appears unlikely, most, if not all, of the Debtors would either have the automatic stay lifted as to their underlying properties or liquidate either in Chapter 11 or in converted cases under Chapter 7 of the Bankruptcy Code. If Brooklyn Lender's claimed default interest were allowed in full, therefore, it appears that some, if not all, of the Debtors would not receive a fresh start. In addition, based on the evidence before me in connection with the best interest analysis of the Plan under section 1129(a)(7) of the Bankruptcy Code, unsecured creditors of most, if not all, of the Debtors would not be paid in full. Such considerations applied in both *La Guardia* and *Manuel Mediavilla*, and indeed had a greater influence on those courts' decisions to allow postpetition interest at the non-default rate than their analyses of the default rate as a "penalty." 2006 Bankr. LEXIS 4735, at *115; 2016 Bankr. LEXIS 3469, at *8-9. *See also In re Family Pharm., Inc.* 605 B.R. at

913, and *In re Vest Assocs.,* 217 B.R. at 703-04 (each
considering effect of default interest on other
creditors).  Few, if any, reported decisions have
confronted such a mix of factors arguing both in favor of
and against the allowance of default interest as exist
here.

The final factor when deciding whether to allow
postpetition interest under section 506(b) of the
Bankruptcy Code at less than the default rate is creditor
misconduct, over which the Debtors and Brooklyn Lender
are in major disagreement.

It is worth noting at the outset that "lender
misconduct" has been held not to include merely acquiring
a loan with the intention of enforcing a default
thereunder, which clearly was Brooklyn Lender's strategy
here. *See Downtown Ath. Club of N.Y. City v. Caspi Dev.
Corp.* (*In re Downtown Ath. Club of N.Y. City*), 1998
Bankr. LEXIS 1642, at *25-26, 31-33, 34-35 (Bankr.
S.D.N.Y. Dec. 21, 1998).  *See also In re 139-141 Owners
Corp.,* 313 B.R. at 369.  It is also worth noting that the
Debtors have not asserted the affirmative defense of
champerty under N.Y. Judiciary Law § 489 (McKinney 2020),
perhaps because of the safe harbor contained in N.Y.
Judiciary Law § 489(2). *Justinian Capital SPC v. WestLB*

*AG, N.Y. Branch*, 28 N.Y.3d 160, 167-70 (2016); *Phoenix
Light SF Ltd. v. United States Bank NA*, 2020 U.S. Dist.
LEXIS 46950, at *31-33 (S.D.N.Y. March 8, 2020).

Instead, the Debtors contend that Brooklyn
Lender asserted several types of default that either were
not in fact defaults or would not justify acceleration or
be enforceable under applicable non-bankruptcy law.  The
Debtors further allege that because of these wrongfully
asserted defaults, and Brooklyn Lender's continued
pursuit of default interest tied to them, Brooklyn Lender
unduly delayed the Debtors' exit from Chapter 11, which
*is* recognized as "lender misconduct" for purposes of
section 506(b).  *See, e.g.,* *In re Nixon*, 404 Fed. App'x
575, 579 (3d Cir. 2010).

The allegedly wrongfully asserted defaults are
as follows.  First, in May 2017, Brooklyn Lender called a
default based on section 18(g) of the loan agreements
against several of the Debtors on the ground that either
the borrower or its principal, Mr. Strulovitch provided a
misleading certificate or other written misinformation
regarding the borrower's ownership as part of the loan
application or the making of the loans.  In addition,
Brooklyn Lender contends that several of the Debtors have
violated the same section based on Mr. Strulovitch's

submission in connection with loan applications of a
personal financial statement that grossly overstated his
net worth. As noted, the parties agree that if Brooklyn
Lender is correct, default interest would run from the
commencement of each loan because such misrepresentations
would give rise to a default at that time. The Debtors
contend, however, that none of these defaults would be
enforceable under New York law.

In addition, Brooklyn Lender has alleged that
two of the Debtors, 618 Lafayette LLC and Eighteen Homes
LLC, breached sections 9 and 18(q) of their loan
agreements by permitting encumbrances on their respective
property securing the loans, the encumbrance on 618
Lafayette LLC's property being a mortgage to a Mr.
Schwimmer and the encumbrance on 18 Homes LLC's property
being a restriction in favor of a Mr. Greenfeld on its
sale or other transfer, each of which was publicly filed
with the county clerk.  The Debtors contend that because
Messrs. Schwimmer and Greenfeld have disavowed the
encumbrances as "mistakes" and have removed them from the
land records, the defaults are not enforceable.

The Debtors also contend that although Brooklyn
Lender has accurately alleged defaults under section
18(o) of the loan agreements based upon uncured New York

City Building Code violations on many, if not all, of the Debtors' properties, such defaults would not support acceleration and the enforcement of default interest under New York law.

Each loan agreement has a stated maturity date and provides in section 36 that until paid following maturity, default interest will accrue on the unpaid balance. Certain of the loans -- to D&W Real Estate Spring LLC, 1125-1133 Greene Ave. LLC, 325 Franklin LLC, 1213 Jefferson LLC, APC Holding 1 LLC, and 92 South 4th St. LLC -- have in fact matured, in each case postpetition. The Debtors contend, however, that Brooklyn Lender delayed payment of the loans on maturity by its misconduct in wrongfully asserting and prosecuting the other defaults, and, therefore, that the roughly $3.66 million of post-default interest accruing on the matured balances should not be allowed under section 506(b).

Finally, the Debtors contend that without other valid defaults it would be inequitable under section 506(b) to allow Brooklyn Lenders' claim for postpetition default interest merely because the Debtors filed their bankruptcy cases, which is listed as a default under section 18(i) of the loan agreements.

I will address each of these asserted defaults as to whether they actually exist, where that has been challenged by the Debtors, and then as to whether they are enforceable under New York law and, as to postpetition interest, whether Brooklyn Lender is not entitled to postpetition interest under section 506(b) of the Bankruptcy Code even if it is entitled to it under New York law

Let me begin with the defaults alleged to have occurred based on the mere commencement of the Debtors' bankruptcy cases.

Each Debtor has indisputably remained current on regularly scheduled non-default interest payments on the outstanding principal amount of each loan, before any acceleration or the loan's maturity. When the only default was the bankruptcy filing itself, courts have properly held, that post-default interests should not be allowed under section 506(b). *In re Residential Capital*, 508 B.R. at 862; *see also In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295, at *11-14 (Bankr. E.D.N.Y. July 24, 2009); *In re Northwest Airlines Corp.*, 2007 Bankr. LEXIS 3919 at *16-18.

I disagree with *Bownetree*'s rationale that allowance at the default rate under such circumstances

would be tantamount to enforcing an ipso facto provision prohibited by section 365(e)(1) of the Bankruptcy Code, 2009 Bankr. LEXIS, at *8-9; section 365(e)(2)(B) excepts loan contracts from that provision.  11 U.S.C. § 365(e). Rather, as Judge Glenn found in *Residential Capital*, there is no basis to allow a claim for postpetition default interest if there is no doubt that the lender will be paid in full and, in fact, the lender has been paid currently under its agreement.  In *Northwest Airlines*, Judge Gropper concluded that to the extent there was a default other than the bankruptcy filing, it was not a meaningful default and therefore allowance of default interest was not required, 2007 Bankr. LEXIS 3919, at *16-18; thus, the case's fundamental principle is similar to the holding in *Residential Capital*, namely that a mere bankruptcy default should not trigger default interest if it is clear that the debtor will be paying the non-default rate currently and ultimately will satisfy the claim under its chapter 11 plan.  *See also In re Vest Assocs.*, 217 B.R. at 704.  Analysis to the contrary in *In re 1111 Myrtle Ave. Grp.*, 598 B.R. at 738-39, is concededly dicta given the court's finding that the debtor had defaulted under a separate provision of the loan agreement in addition to the bankruptcy default.

*Id.* at 740.  Thus, if the only default here was a Debtor's filing for relief under the Bankruptcy Code, Brooklyn Lender's claim for postpetition default interest would be disallowed.

Turning to the other asserted defaults New York law, as noted, places certain limitations on the ability of a creditor with a mortgage on real property to enforce, including by acceleration, certain types of defaults.  New York law generally categorizes loan defaults either as (a) payment, or monetary defaults, i.e. the failure to pay principal or interest when due, or (b) non-monetary defaults, basically every other type of default.  Absent truly extraordinary circumstances such as lender misconduct or a de minimis delay in making a payment, New York law will not limit a lender's right to accelerate and enforce a loan based on its borrower's monetary default.  *See, e.g.,* *CIT Small Bus. Lending Corp. v. Crossways Holding, LLC,* 2014 N.Y. Misc. LEXIS 4175, at *6-7 (Sup. Ct. N.Y. Cty. Aug. 29, 2014); 1 Bergman on New York Mortgage Foreclosures, § 5.06 (2020).

New York has long recognized broader equitable exceptions to enforcing the parties' contract with respect to acceleration and non-monetary defaults, however.  Generally, courts look to three factors: has

the lender suffered actual damages as a result of the
default; has the default impaired the lender's security,
that is, the collateral securing the debt; and does the
default make the future payment of principal and interest
less likely?  Courts also consider whether the default
was inadvertent or insignificant, although in analyzing
whether the default was insignificant or, to the
contrary, material, they usually apply the foregoing
three factors.  See the leading case of *Karas v.
Wasserman,* 91 A.D.2d 812, 812-13 (3d Dep't. 1982), as
well as such decisions as *Empire State Bldg. Assocs. v.
Trump Empire State Partners,* 245 A.D.2d 225, 226-28 (1st
Dep't. 1997); *Tunnell Pub. Co. v. Strauss Commun., Inc.,*
169 A.D.2d 1031, 1032 (3d Dep't. 1991); *Blomgren v.
Tinton 763 Corp.,* 18 A.D.2d 979, 979-80 (1st Dep't.
1963); *100 Eighth Avenue Corp. v. Morgenstern,* 4 A.D.2d
754 (2d Dep't. 1957); and *Rockaway Park Series Corp. v.
Hollis Automotive Corp.,* 206 Misc. 955, 957-58 (Sup. Ct.
N.Y. Cty. 1954). *See also* Michael Giusto, "Note: Mortgage
Foreclosure for Secondary Breaches: A Practitioner's
Guide to Defining 'Security Impairment,'" 26 Cardozo L.
Rev. 2563 (May 2005), which discusses not only this
general rule, but also how courts determine whether a
default actually impairs a lender's security or makes

future payment less likely or causes the lender actual
harm.

Having evaluated each of the remaining defaults
alleged by Brooklyn Lender in the light of that case law
and the testimony and other evidence before me, it is
clear that certain defaults called by Brooklyn Lender
should not be enforced while others should be.

That testimony was by the following people: the
Debtors' principal, Mr. Chaskiel Strulovitch; the
Debtors' manager, Mr. Goldwasser, primarily as to the
Plan's feasibility; Mr. Kohn, with respect to how the
Debtors have addressed New York City Building Code
violations; Mr. Moses Strulovitch, Mr. Wagschal, and Mr.
Hutman, whose testimony in addition to that of Mr.
Chaskiel Strulovitch, was relevant to the alleged failure
to accurately disclose the ownership interests in certain
Debtors in connection with the loan applications; Mr.
Halpern and Mr. Schonberg, with regard to the nature of
the ownership interests and claims asserted by the
Israeli Investors; Mr. Aviram, the representative of
Brooklyn Lender, with regard to the actions it took with
respect to the alleged defaults; Brooklyn Lender's two
experts, Ms. Stewart and Mr. Madison, who opined on the
context of lenders' evaluation of defaults, including

non-monetary defaults, and the importance of enforcing
defaults; and, finally, Mr. Stagnari, the loan officer at
Signature Bank responsible for administering the Debtors'
loans before Brooklyn Lender purchased them at face,
although he was not the loan officer when the loans were
originated.

The foregoing New York law applies most clearly
to block the acceleration and enforcement of default
interest based on various New York City Building Code
violation defaults.  Mr. Stagnari's testimony on this
issue was most telling. At all times, not just on this
issue, Mr. Stagnari was not only unbiased, but also a
very knowledgeable witness, his testimony reflecting
considerable experience with loans of this type.  He
testified that he is in charge a large portfolio of
commercial real estate loans at Signature Bank -- both in
terms of the number of loans under his supervision and
their dollar amount -- having worked his way up the chain
of loan officer responsibility.  He consistently appeared
well informed and experienced regarding lending practices
from the creditor's perspective with respect to
commercial real estate loans like these in the New York
area.

Brooklyn Lender's two expert witnesses, on the

other hand, provided little to no meaningful testimony on any of the default-related issues. Ms. Stewart proffered almost literally no testimony that was relevant to commercial real estate loans secured by rental properties in New York City.  Her experience, albeit lengthy and of a responsible nature over a long career, has been with consumer loans on the consumer's own residential property, although sometimes property that had more than one or two units within it.  It is clear from her own testimony that considerations about non-monetary defaults and a borrower's moral character in that context are materially if not entirely different than when addressing the commercial real estate loans at issue here.  I therefore gave far more weight to Mr. Stagnari's testimony than Ms. Stewart's as to what a reasonable lender would do with respect to the non-monetary defaults asserted here.

       For his part, Mr. Madison's testimony did not contradict the conclusions that I reach here. He simply noted the importance of a default rate for monetary defaults and testified in general terms that non-monetary defaults are important although courts have come up with exceptions to their enforcement.

       Mr. Stagnari testified that to his knowledge

Signature Bank has *never* called a non-monetary default,
and, accordingly, has never called a non-monetary default
based on New York City Building Code violations.  He was
also clear that almost every, and perhaps every, building
in his extensive New York City loan portfolio has
Building Code violations on it.

        Mr. Kohn was also clear that the Debtors have
successfully addressed the violations and either cured
and removed them of record, or reasonably believe because
of that cure that they will remove them of record (albeit
that the process of removing violations of record,
consistent with such process generally in New York City,
has taken considerable time).  In the light of this and
Mr. Stagnari's testimony, I find that such alleged
defaults placed Brooklyn Lender at no risk with respect
to payment or impairment of its collateral.  Such
violations therefore would not warrant Brooklyn Lender's
acceleration of the loans or the enforcement of 24
percent default interest.

        On the other hand, the encumbrances placed of
record on the buildings owned by 618 Lafayette LLC and
Eighteen Homes LLC not only violated sections 9 and 18(q)
of those Debtors' loan agreements, but also serve as a
valid basis for acceleration and the enforcement of

default interest under New York law. Such encumbrances
impaired Brooklyn Lender's interest in the collateral,
and I do not believe, contrary Mr. Cheskiel Stulovitch's
testimony and the submissions by the non-Debtor parties
to those encumbrances, Messrs. Schwimmer and Greenfeld,
that those encumbrances were accidental or inadvertent.
The actual encumbrances are memorialized in simple
written agreements in each case signed by Mr. Strulovitch
on behalf of the applicable Debtor. It is hard to
imagine, therefore, that they were mere mistakes. They
are not lengthy documents, they specifically refer to the
properties at issue, and they clearly provide for the
respective encumbrances.

It is true that Messrs. Schwimmer and Greenfeld
have since waived their rights under their respective
agreements and that the encumbrances are no longer of
record. Thus, today Brooklyn Lender's security is not
impaired by them. However, it *was* impaired from the date
they were recorded until the date the waivers were filed
on the county records, and therefore the defaults support
acceleration and the accrual of default interest under
New York law as against those two Debtors from the date
of the defaults to the date of cure.

The Debtors contend that the next type of

default alleged by Brooklyn Lender -- that certain of the

Debtors or Mr. Cheskiel Stulovitch misrepresented those

Debtor's ownership in or in connection with a loan

application -- not only should not serve as a basis for

acceleration and the enforcement of default interest, but

also never occurred.  Brooklyn Lender asserts, to the

contrary, that Mr. Strulovitch was listed in connection

with the loan applications as owning 100 percent of the

following Debtors' ownership interests when, in fact, 45

percent of those interests were owned by one or more of

the Israeli Investors:  325 Franklin LLC, 1213 Jefferson

LLC, 106 Kingston LLC, and 618 Lafayette LLC. In

addition, Brooklyn Lender alleges that two other Debtors,

Meserole and Lorimer LLC and D&W Real Estate Spring LLC,

were not owned 99 percent by Mr. Strulovitch and 1

percent by Mr. Wagschal as represented, but, rather,

entirely or almost entirely by Mr. Wagschal. Finally,

Brooklyn Lender contends that the following Debtors were

not 100 percent owned by Mr. Strulovich but, instead,

only 50 percent by him -- APC Holding 1 LLC, Eighteen

Homes LLC, 167 Hart LLC, 53 Stanhope LLC, 1125-1133

Greene Ave. LLC, 92 South 4th Street LLC, 834

Metropolitan Ave. LLC, and 55 Stanhope LLC -- and that

the following Debtors were not owned 99 percent by Mr.

Strulovitch but, rather, 85 percent by him:  119 Rogers
LLC and 127 Rogers LLC.  For these latter two categories
of asserted defaults, Brooklyn Lender alleges that a Mr.
Gutman owns 50 percent of the following Debtors -- 834
Metropolitan Ave. LLC, 92 South 4th Street LLC, and 1125-
1133 Greene Ave. LLC -- Mr. Greenfeld owns 50 percent of
Eighteen Homes LLC, and limited liability companies at
least affiliated with and perhaps 100 percent owned by
Mr. Strulovitch or his family own the interests in the
other Debtors that are not directly owned by Mr.
Stuolovitch.

        Perhaps because Brooklyn Lender's identification
of these alleged defaults -- especially the first set
based on its review of pre-bankruptcy litigation between
the Israeli Investors and Mr. Stulovitch -- apparently
inspired Brooklyn Lender to buy the loans in the first
place in order to call the defaults, they have attracted
most of the parties' attention.

        The applicable Debtors contend that each of the
disputed third-party ownership interests were not, in
fact, ownership interests but, rather, "profit sharing
interests."  Each of the Debtors at issue is a limited
liability company.  Limited liability companies under the
tax laws record income with respect to any such interest,

i.e. profit sharing interests, as an ownership interest
or a partner interest on their tax returns because they
report income and losses as a partnership and such an
interest is a form of interest in the LLC, although the
two interests are different as to the entitlement to
capital in a liquidation.  *See* Rev. Proc. 93-27, 1993-2
C.BB. 343 (1993); Bradley T. Borden, "Profits-Only
Partnership Interests," 74 Brooklyn L.R. 1283, 1296-97
(2009). Accordingly, these Debtors issued K-1s that the
record reflects identify the claimed ownership interests
as alleged by Brooklyn Lender, with the exception of the
four Debtors with regard to the 45 percent Israeli
Investor interests, which do not appear on the K-1s
associated with those Debtors.

As to those four Debtors, however, Brooklyn
Lender introduced evidence that each had an operating
agreement that did recognize or provided for 45 percent
ownership interests to be held by Israeli Investors. Mr.
Strulovitch testified that the parties nevertheless
thereafter changed the nature of those interests to
"profit sharing interests" because the Signature Bank
loans would not have been made without such change. That
is conceivable, but there is no separate record of it,
and, more importantly, I do not accept Mr.Strulovitch's

testimony that Signature Bank knew about this change as reflected in a hearsay conversation he testified he had with the original loan officer, Mr. Dietz.

As a fallback, the Debtors contend that the Israeli Investors' interests in the four Debtors were at best profits sharing interests, too, and, in any event, are no more than a claim subject to subordination under section 510(b) of the Bankruptcy Code for the right to be issued ownership interests in the four Debtors, and, as to the Individual Israeli Investors, only an ownership interest in the four Israeli Investor LLCs that were to invest in them. Thus, the Debtors contend, there was no failure of disclosure in or in connection with the loan applications.

The only testimony of any Israeli Investors was vague as to the intended nature of their ownership interest in any Debtor, with the exception of their assertion that they or their family members were persuaded by a Mr. Oberlander to invest in certain unidentified single purpose limited liability companies -- the Israeli Investor LLCs – which in turn were to be managed by Mr. Oberlander and Mr. Strulovitch and would invest in single asset real estate companies controlled by Mr. Strulovitch.  The Israeli Investor witnesses could

not identify, however, which companies were to be owned
45 percent by the Israeli Investor LLCs.

Both Mr. Strulovitch and Mr. Wagschal
acknowledged that Mr. Wagschal had a greater interest in
certain of the Debtors than was disclosed in or in
connection with the loan applications for those Debtors.
One can reasonably infer from Mr. Wagschal's testimony
that titular ownership of these Debtors was transferred
in large measure by Mr. Wagschal to Mr. Strulovitch to
shield them from Mr. Wagschal's creditors, with the two
men recognizing that Mr. Wagschal nevertheless would in
effect be entitled to most or all of these Debtors' value
and would have the major say in their management.

Mr. Strulovitch, Mr. Wagschal, and Mr. Gutman
had only the most rudimentary understanding of an
ownership interest in an LLC or, for that matter, of what
they viewed to be a lesser, profit sharing interest. Such
testimony is hard to credit given the commercial
experience of these men, but, taking into account the
Jewish orthodox community in which they live and do
business -- which they credibly testified relies more on
trust among its members than legal documentation or
characterization of ownership interests for tax purposes
-- it is possible that their naivite is not feigned.

However, I conclude that the better view is that third parties -- namely Mr. Wagschal and Mr. Gutman and at least the Israeli Investor LLCs, if not the Individual Israeli Investors -- had ownership interests, broadly defined, in certain Debtors that were not disclosed when those Debtors or Mr. Strulovitch represented their ownership structure in or in connection with their loan applications. Brooklyn Lender also established that the ownership interests of Mr. Strulovich's affiliates and relatives also were not fully disclosed at that time.

On the other hand, in applying New York law that I previously summarized, I do not believe that this is the type of default that would serve as a basis for acceleration or enforcement of default interest. First, it is not clear that the loan applications sufficiently solicited disclosure of ownership interests as I have broadly defined the term above. More importantly, I do not see how Signature Bank's collateral or ability to be repaid was in any way affected by such failure to disclose, to the extent that it constituted a default.

Each of the loans was non-recourse to the Debtors' owners, including Mr. Strulovitch. Mr. Strulovitch only gave what Mr. Stagnari described as a "bad boy guarantee" to Signature Bank, not a monetary

guarantee, that would be triggered if Mr. Stolovitch caused the borrower to take certain prescribed actions. It also is clear from Mr. Stagnari's testimony, as well as his and other Signature Bank officers' analysis of the loans as reflected in the bank's Credit Offering Memoranda, that Signature Bank relied upon the Debtors' properties' income stream, i.e. rental payments, and/or the value of the properties, themselves, to support a refinancing or a sale in order to repay the loans. Neither Signature Bank nor Brooklyn Lender undertook a meaningful credit analysis of Mr. Strulovitch or any other disclosed owner.  It did not even request a balance sheet or other financial disclosure by the other actually identified owners besides Mr. Strulovitch that were disclosed to it. And even as to Mr. Strulovitch, Signature Bank did not, according to Mr. Stagnari's testimony, pay attention to his credit reports. Signature Bank did require a relatively brief financial statement from him, but Brooklyn Lender's representative, Mr. Aviram, found the dramatic increase in value of Mr. Strulovitch's net worth on that financial statement to be incredible on its face and I conclude that Signature Bank also would have done so and would not have relied on it and in fact did not rely on it.

The only possible adverse effect that might have stemmed from the apparent failure to accurately disclose the owners, broadly speaking, of certain of the Debtors would be to subject the lender to a potential violation of money laundering and Patriot Act rules and regulations or "know your customer" rules.  In post-argument briefing, the parties have addressed that issue.  Although the regulatory regime is complex, and I believe clearly beyond the knowledge of Mr. Strulovitch, I conclude that such nondisclosure, even the failure to disclose a profits interest or other similar less than full ownership interest in a borrower, might put a lender at risk of such a violation. *See* 31 C.F.R. §§ 542.315, 1010; https://www.treasury.gov/resource-center/sanctions/Documents/licensing guidance.pdf. (each focusing on the need for analysis of direct and indirect ownership interests or control).

On the other hand, there is no evidence that Signature Bank conducted any such analysis as to the Debtors' disclosed owners.  Moreover, such a risk had no bearing on it or Brooklyn Lender being paid in full or risk of impairment of the collateral. There is no evidence, either, that upon learning of potential undisclosed owners of certain of the Debtors, Brooklyn

Lender undertook any analysis or reporting to the
applicable authorities.  Indeed, Brooklyn Lender's
constant refrain that the challenged interests were full
ownership interests and not just more limited "profits
interests" strongly suggests that the regulatory risk did
not carry any weight with it, since mere profits
interests would likely trigger a review and reporting
requirement, too.  Finally, there is no suggestion that
any of the third-party owners would in fact be the types
of investor targeted by the applicable rules and
regulations.

        I therefore conclude that under New York law the
alleged defaults arising from the failure to accurately
disclose certain of the Debtors' owners, broadly
speaking, would not support acceleration or enforcement
of a default rate.  I also conclude that the obvious
inaccuracies in Mr. Strulovitch's financial statements
also would not justify acceleration or enforcement of
default interest.

        That leaves one other set of defaults.  None of
the loans matured by its terms before the bankruptcy
filing date, but, as noted, several of them have since
matured.  There is no question that under New York law
post-maturity default interest would be enforced upon the

applicable Debtor's failure to pay the matured loan
except in extremely limited circumstances such as the
lender's failure to honor a payment or other lender
misconduct preventing payment.  Courts considering the
allowance of postpetition interest under section 506(b)
also have held that default interest should be allowed
after the loan's maturity date passed, barring some
overriding equitable factor to the contrary.  *In re
Residential Capital*, 508 B.R. at 862; *see also In re
Route One West Windsor Ltd. P'Ship.*, 225 B.R. at 78, 91.

The Debtors have argued that Brooklyn Lender's
own misconduct prevented them from paying the loans at
maturity, an argument deserving careful consideration
given that I have held that many of the defaults called
by Brooklyn Lender did not warrant acceleration and the
imposition of default interest under longstanding New
York law. (And such law goes back at least to the 1920s;
there are not many recent cases, but one can reasonably
attribute this to the law being well established as of at
least the 1980s.)

The problem with the Debtors' argument is that
the Debtors have not established that they had the
ability to pay the matured loans until they obtained the
Lightstone Capital exit facility commitment, and they

have not shown that Brooklyn Lender's conduct proximately caused such inability.  It is clear, moreover, that even with the Lightstone Capital exit facility, the Debtors will not be able to confirm their Plan, because too many of the Debtors are in fact liable for post-default interest for the Plan to proceed under section 1124(1).

Brooklyn Lender also established that the Debtors did not even exercise their right to force an extension of the applicable loan' maturity dates, which under certain circumstances they have under the loan documents, until the Plan was filed, well after many of the loans had matured. There also was ample evidence that there were late payments on most of the matured loans, even if those payments did not rise to the level of a payment default, and, therefore, as to those loans it is clear that Brooklyn Lender could not be forced to grant a maturity extension under the loan agreements' extension provision.

At oral argument, counsel for Brooklyn Lender confirmed that the roughly $3.6 million of default interest tied to maturity defaults ran only from the maturity date to the confirmation hearing date.  And while the Debtors' counsel said that she was not sure whether that analysis properly took into account any

payments that should have been applied to principal and were not, it appears that Brooklyn Lender is properly calculating the default interest from the maturity date of each loan as opposed to some earlier time.

This returns us to consideration of whether the equitable factors limiting the allowance of postpetition interest at the default rate under section 506(b) of the Bankruptcy Code should apply to Brooklyn Lender's claims to such interest based on the maturity defaults and "no encumbrance" defaults under certain Debtors' loans.  As suggested above, this is a close question because while the applicable Debtors are solvent, allowance of such default interest will lead to denial of confirmation of the Plan, which may harm not only those Debtors' owners, but also other creditors besides Brooklyn Lender. For the same reason, those Debtors' fresh start would jeopardized by denial of the Plan's confirmation.

Because the Debtors are single asset real estate entities, however, their "fresh start" under the Plan would not entail the preservation of going concern value, a significant number of jobs, or supplier relationships. It would instead primarily preserve ownership of the properties in the current owners.  In addition, a debtor's insolvency has never been a per se basis for

denying an oversecured creditor's claim to postpetition interest at the default rate. *In re Residential Capital*, 508 B.R. at 857-58.  Lastly, the Israeli Investors have asserted the largest claims against the Debtors; most other creditors, besides Brooklyn Lender, appear to be insiders.  And, albeit inexplicably to the Court (because it would appear that confirmation of the Plan is the Israeli Investors' best and perhaps only chance recover from the Debtors), the Israeli Investors oppose confirmation and have not sought to reduce Brooklyn Lender's claims.

Weighing all of these facts and equitable considerations, I conclude that the record does not support further reduction of Brooklyn Lender's claims to default interest accruing during the "encumbrance period" against 618 Lafayette LLC and Eighteen Homes LLC, nor its claims for post-maturity default interest against Debtors whose loans matured or will mature prior to the filing of a viable chapter 11 plan.

Turning to the Plan's treatment of the Israeli Investors, it important to note again that there are two sets of them: the Israeli Investor LLCs and the Individual Israeli Investors. Moreover, the Israeli Investor LLCs have asserted two different types of claims

against the Debtors.  First, the Israeli Investor LLCs
claim that they were thwarted by 3225 Franklin, 618
Jefferson, 106 Kingston and 1213 Lafayette and/or Mr.
Strulovitch from investing in those Debtors' equity.  It
is easy to conclude that such claims are subordinated to
the level of those ownership interests under the plain
terms of section 510(b) of the Bankruptcy Code, as they
are for damages arising from the attempted purchase of a
security of one of such Debtors.

In addition, however, those same Israeli
Investor LLCs, as well as other Israeli Investor LLCs and
the Individual Israeli Investors, have filed proofs of
claim against the other Debtors alleging that the other
Debtors participated in a fraudulent scheme by Mr.
Oberlander and Mr. Strulovitch to take the Israeli
Investor LLCs' money intended to be invested in specific,
though unidentified (with the exception of the four
Debtors just mentioned), real estate projects, and
instead divert that money for other uses.  Unless,
however, those claimed funds were intended to be invested
in an affiliate of a Debtor (defined in section 101(2)(B)
of the Bankruptcy Code as "a corporation [applied by the
caselaw to include limited liability companies], 20
percent or more of whose outstanding voting securities

are directly or indirectly controlled, or held with power
to vote, by . . . an entity that directly or indirectly
owns, controls, or holds with power to vote, 20 percent
or more of the outstanding voting securities of the
debtor" other than in capacities that would not here
apply, 11 U.S.C. § 101(2)(B)), such a claim would *not* be
covered by section 510(b) of the Bankruptcy Code.  See,
for example, *In re Wash. Mut. Inc.,* 462 B.R. 137, 145-47
(Bankr. D. Del. 2011), and *In re Semcrude, L.P.,* 436 B.R.
317, 321 (Bankr. D. Del. 2010), each of which holds that
section 510(b) applies only to claims based on the
purchase or sale of securities of the debtor or the
debtor's affiliate, not fraud by the debtor or an
affiliate with respect to the purchase or sale of
securities of a different, non-affiliate entity.

It is quite possible that the allegedly
fraudulently transferred funds were diverted from being
invested in an affiliate of a Debtor, as defined by
section 101(2)(B), especially under the logic of
*Templeton v. O'Cheskey (In re Am. House Found.)*, 785 F.3d
143, 155-57 (5th Cir. 2015), which reads "affiliate" more
broadly than the two Delaware cases previously cited to
include entities under the control of an affiliate.
However, the Debtors have not made such a showing.  There

is really no proof that the allegedly transferred funds
or improperly transferred funds were intended to go to
any specific "affiliates," including as defined in
*Templeton*, with the exception of the four specific
Debtors already identified.  Thus, the Debtors have not
made their case as to these claims' treatment under the
Plan under section 510(b).

This is not the end of the inquiry regarding the
other Israeli Investor claims, however.  The main reason
the Debtors were not able to make the foregoing showing
is that there is nothing in the record other than wholly
conclusory allegations to show that any such funds
actually were meant to go to any specific entities or
that Debtors participated in or received any wrongful
diversion of funds.  The testimony of the Israeli
Investors specifically omitted any contention to the
contrary. The proofs of claim, which attach the
complaints in pre-bankruptcy litigation on this point,
are extremely vague on the facts, and clearly do not
satisfy Fed. R. Bankr. P. 7009, incorporating Fed. R.
Civ. P. 9(b), as to the elements of fraud, including when
these allegedly fraudulent diversions occurred, who the
recipients were intended to be and in fact were, and the
like.  Thus, the Debtors' inability to subordinate most

of the Israeli Investors' claims does not on this record
require denial of the Plan's confirmation; the Plan is
feasible notwithstanding the Debtors' inability to pay
the Israeli Investors' claims because those claims lack
support.

The second group of Israeli Investors -- the
Individual Israeli Investors -- have a second impediment
to the allowance of their claims against all of the
Debtors, as well.  As conceded by the two Individual
Israeli Investors who testified at the trial, these
claimants did not invest in the Debtors, but, rather, in
the Israeli Investor LLCs.  They are at best, therefore,
either creditors of or  shareholders in the Israeli
Investor LLCs and assert claims against the Debtors only
derivatively through the Israeli Investor LLCs and are
not even parties in interest.  See *In re Terrestar
Networks, Inc.,* 2013 Bankr. LEXIS, at *6 (Bankr. S.D.N.Y.
Feb. 28, 2013).  *See also In re Refco Inc.,* 505 F.3d 109,
118-19 (2d Cir. 2007), and *In re Comcoach Corp.,* 698 F.3d
571, 574 (2d Cir. 1993).

The Israeli Investors raised certain other
objections to confirmation of the Plan: that the Plan
provides for the substantive consolidation of the
Debtors' estates, that the Plan violates the best

interests test of 11 U.S.C. § 1129(a)(7), and that the
Israeli Investors' claims, to the extent not subordinated
under 11 U.S.C. § 510(b), were in fact impaired and
therefore entitled to vote to reject the Plan under
section 1126 of the Bankruptcy Code, forcing a cram down.
I believe that each of these objections was addressed in
detail during oral argument, and I will incorporate those
rulings into this Modified Decision.

In short, by its plain terms the Plan does not
provide for substantive consolidation of the Debtors'
estates.  The only basis for the Israeli Investors'
contention to the contrary was that the proposed exit
loans were cross collateralized, but that does not equate
with substantive consolidation, just as cross-
collateralization of DIP loans under section 364 of the
Bankruptcy Code, 11 U.S.C.  364, does not result in
substantive consolidation. For the reasons detailed on
the record of oral argument at Tr. pages, 35, 37, 38 and
41-42, the Plan in fact satisfies section 1129(a)(7) of
the Bankruptcy Code with the exception of one Debtor, 106
Kingston, which the Debtors' counsel conceded would be
separately carved out from the Lightstone Capital exit
facility, at which point that Debtor also would satisfy
section 1129(a)(7).  Finally, the Debtors have a pending

objection to the Israeli Investors' claims, which the
Israeli Investors have not sought to be temporarily
allowed for voting purposes.  Assuming, consistent with
my ruling, that the Debtors are not able to subordinate
all of the Israeli Investors' claims on this record under
section 510(b) of the Bankruptcy Code, the Israeli
Investors therefore nevertheless are not allowed to vote
on the Plan as Class 4 (General Unsecured) Claims.

        At oral argument I also denied the Israeli
Investors' request for the appointment of a Chapter 11
trustee pursuant to section 1104 of the Bankruptcy Code,
11 U.S.C. § 1104.  As noted then, there is no support for
the appointment of a trustee on this record and, indeed,
the Israeli Investors did not offer any evidence for such
relief thus clearly did not carry their burden of proof.

        I therefore direct the Debtors to prepare an
order consistent with my rulings denying confirmation of
the Plan for the reasons stated, namely that Brooklyn
Lender's claims against certain of the Debtors for
default interest based on the maturity of the loans to
those Debtors as well as against two Debtors based on the
encumbrances permitted by those Debtors would give rise
to claims that could not be rendered unimpaired by full
cash payment under the Plan.

I have not addressed Brooklyn Lender's claims
for payment of its legal fees and expenses, for three
reasons.  First, I am sure that it has incurred more fees
after those covered by the submitted time and expense
records.  Secondly, the Debtors should have the
opportunity to review those time and expense records in
the light of my ruling which, again, reflected that
certain of the defaults called by Brooklyn Lender really
would not be enforceable and, therefore, might reflect on
the reasonableness of fees and expenses related to
attempts to enforce those defaults.  Finally, such review
is best taken in a clear context where there is a
practical prospect of recovering such fees and expenses,
whereas at this time it is unclear whether that context
will ever come to pass.

It is conceivable that some or even all of the
Debtors (albeit most likely only on a consensual basis)
may still be able to confirm a plan or plans in the
future. In any event, I direct counsel for the Debtors to
schedule a case conference for within the next 30 to 45
days to address the next steps in these cases, which also
could serve as a hearing date if a party in interest
wants to seek relief, for example in the form of a motion
for relief from the automatic stay under section 362 of

the Bankruptcy Code, conversion of one or more of these

cases to a case under Chapter 7 of the Bankruptcy Code,

or the filing of its own Chapter 11 plan.

Dated:  White Plains, New York
        February 18, 2021

                        _/s/Robert D. Drain_____
                        United States Bankruptcy Judge