# ABRAMS ⒜ FENSTERMAN

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP

ANDREA J. CARUSO
Partner
acaruso@abramslaw.com

www.abramslaw.com
1 Metrotech Center - Suite 1701
Brooklyn, New York 11201
Tel: 718-215-5300
Fax: 718-215-5304

FIRM OFFICES
Brooklyn
New York
Lake Success
Rochester

May 16, 2021

**VIA ECF and email**
The Honorable Robert D. Drain
United States Bankruptcy Court
300 Quarropas Street
White Plains, New York 10601

        Re:    *In re 53 Stanhope, LLC, et al., Case No. 19-23013 (RDD) (Bankr. S.D.N.Y.)*

Dear Judge Drain:

      I am writing in response to the letter filed and emailed by Brooklyn Lender on Saturday night, May 15, 2021. The Debtors and my co-counsel will be unavailable until Wednesday because of the Jewish holiday of Shavuot, but I will be available between now and then.

      Although the Debtors are skeptical as to Brooklyn Lender's motive for seeking discovery, let alone its entitlement to discovery, the Debtors did not ignore Brooklyn Lender's demands. On May 12, 2021, I explained the Jewish holiday situation to Brooklyn Lender which is why no one would be available on Tuesday. It is worth noting however that the Notice of Deposition on the Debtors requested a deposition on *March 18, 2021*. Therefore, there was no actual date of May 18th as claimed by Brooklyn Lender. Additionally, we could not complete document production by last Friday as we intended, and were planning to provide documents today, even if Brooklyn Lender had not filed its letter with the Court.

      Simultaneously herewith, the Debtors have served the responses to the Requests for Production from Brooklyn Lender dated April 23, 2021. This is approximately three weeks after service. The Debtors respectfully submit this is "reasonable" even though the demands themselves appear to be unreasonable.

      The Debtors contend that Brooklyn Lender's discovery demands are interposed for the improper purposes of (a) interfering with the Debtors' financing for the D&W

Ltr to Hon. Drain
Page 2 of 2
May 16, 2021

and Meserole Plan, (b) delaying confirmation to permit default interest to accrue under the Liquidation Plan and the D&W and Meserole Plan, and (c) as a de-facto stay pending appeal for all Debtors.

The Debtors have proposed three (3) separate plans as follows (a) the D&W and Meserole and Lorimer Refinance Plan; (b) the Liquidation Plan and (c) the Reinstatement Plan. The Reinstatement Plan is the only Plan that has post-Effective Date Debtor obligations that would even arguably justify discovery.

The Debtors note further that Brooklyn Lender did not confer with the Debtors before demanding approval of their Proposed Schedule (Exhibit 6). Nor did Brooklyn Lender even attempt to justify to this Court an adjournment of all plans, despite the very limited post-confirmation Plan issues.

Moreover, given the extensive discovery already taken in 2019 and 2020 in these cases, not to mention the trial time on the issues for which discovery is being sought, the conclusion is inescapable that Brooklyn Lender intends to relitigate issues that have already been decided.

For example, the D&W and Meserole Plan already provide for payment in full with default interest based on this Court's prior order. There should be no delay in confirmation on that plan to take discovery because if confirmed, Brooklyn Lender will be paid off before the proposed discovery is completed.

Similarly, the Liquidation Plan provides for the sale of all of the subject 13 properties with Brooklyn Lender first in line for payment in full plus default interest based on this Court's prior order, after payment of statutorily senior obligations. Brooklyn Lender can do no better under a Chapter 11 plan regardless of any discovery.

Further discovery on these plans is unnecessary and, therefore, interposed for to obtain an improper advantage by delay.

Finally, with respect to Maguire Capital, Brooklyn Lender's discovery demands may interfere with potential exit financing. This issue was raised previously, with respect to Lightstone Capital and the Court concluded, in its email dated July 22, 2020, "[r]elatedly, no one should be interfering with the debtor's efforts to obtain exit financing. There is no need to take discovery of, or make inquiries of, prospective exit lenders." Nothing has changed. Debtors are attaching a copy of the Commitment letter from Maguire Capital, dated May 12, 2021 which is the only document that is relevant to Brooklyn Lender.

Ltr to Hon. Drain
Page 3 of 2
May 16, 2021

    In summary, the Debtors dispute any implication of Debtor misconduct, and respectfully submit that these cases are ripe for a plan confirmation hearing without further delay or discovery.

Respectfully yours,

*Andrea J Caruso*

Andrea J. Caruso

cc:    All parties (via ECF and email)



May 12, 2021

**Re: Senior Secured Loan for Strulowitz DW & Meserole Portfolio**

Dear Mr. Strulowitz:

The purpose of this Commitment Letter ("**Commitment**") is to set forth the major terms and conditions under which an affiliate of Maguire Capital Group LLC (together with their respective affiliates, successors, assigns or designees, "**Lender**") will provide credit to certain special purpose bankruptcy remote entities (collectively, "**Borrowers**") in the form of a mortgage and, at Lender's option, mezzanine financing (the "**Loan**"), in each case relating to the Properties (as defined below). This Commitment is intended to be a commitment to lend subject to the express conditions set forth herein and finalization of loan documents satisfactory to Lender in its sole and absolute discretion.

| | |
|---|---|
| **Property:** | 10 properties located in Brooklyn, New York with an aggregate gross area of 30,884 SF comprising 38 units (35 residential and 3 retail) (each a "**Property**" and collectively, the "**Properties**"), as set forth in further detail on **Exhibit A**. |
| **Purpose of the Loan:** | Refinance existing loans and provide financing sufficient to effectuate an exit from the pending chapter 11 proceedings affecting the Properties, *In re 53 Stanhope LLC, et al*., Case No. 19-23013 (S.D.N.Y.)(RDD) (the "**Bankruptcy Cases**"). |
| **Borrower:** | Borrowers will consist of ten (10) newly formed, single purpose entities with no operations, assets, or activities other than the ownership interest in their respective Property and no debts or liabilities other than the Loan. Each Borrower will be structured as a bankruptcy-remote entity in a manner satisfactory to Lender. |
| **Closing Date:** | Closing of the Loan ("**Closing**") shall occur approximately thirty (30) days after entry of a confirmation order ("**Confirmation Order**") confirming the plan of reorganization ("**Plan**") in the Bankruptcy Cases (unless stayed pending appeal). |
| **Total Loan Amount**: | $15,000,000.00 (Maguire is willing to commit $800,000 over the proposed Total Loan Amount in the event the Court rules a higher Total Payoff Amount). |
| **Loan Structure:** | Lender shall have the right to structure the Loan as multiple loan transactions (each, a "**Sub-Loan**") at Closing such that the Properties are divided into separate pools to serve as collateral for each Sub-Loan. Lender may allocate Properties to a Sub-Loan at any time in its sole discretion prior to Closing. The Loan Documents for each Sub-Loan shall provide that (a) each Sub-Loan will be cross-defaulted and cross-collateralized with the Properties encumbered by each other Sub-Loan, (b) any reserves, fees or costs contemplated herein will be allocated to the separate Sub-Loans on a prorated basis, and (c) if prepayment of any one Sub-Loan is elected, all of the Sub-Loans must be prepaid together; provided however that the applicable Borrower shall be permitted to release individual Properties from any Sub-Loan if it satisfies the conditions for release set forth herein. |
| **Initial Funding**: | Lender will disburse the full amount of the Loan to Borrowers at Closing, less |

|  |  |
|---|---|
|  | the Interest Reserve and any other reserves determined by Lender to be appropriate based on the circumstances surrounding the Loan (collectively, the "**Reserves**"). |
| **Sponsor/Guarantor:** | Cheskel Strulowitz. |
| **Interest Rate:** | The Loan will bear interest at a floating rate of One Month LIBOR + 10.00% with a floor of 10.50% per annum. The Interest Rate will be charged on an actual/360 basis. |
| **Amortization:** | Interest only. |
| **Origination Fee:** | Borrowers shall pay a fee equal to 2.00% of the Loan Amount to Lender or its designee at Closing and an additional 1.00% of the then-outstanding Loan Amount on the six (6) month anniversary of Closing. |
| **Exit Fee:** | 1.00% of the Loan Amount will be due on any prepayment and/or repayment of the Loan including payoff at maturity and shall be paid, pro rata, in connection with any partial prepayments of the Loan. |
| **Term:** | Twelve (12) months. |
| **Extension Option(s):** | Subject to certain conditions then existing, including that (1) no event of default has occurred or is continuing, (2) a satisfactory credit check is provided, (3) all Reserves are replenished to the extent required by Lender, (4) evidence of all required insurance is provided to Lender, and (4) the Properties meet the Minimum Debt Yield Threshold (as defined below), the Loan may be extended for two (2) separate six (6) month periods (each an "**Extension Period**") by Borrowers. In the event that the Properties fail to meet the Minimum Debt Yield Threshold at the time an Extension Period is requested, Borrowers may elect to make a principal pay-down of the Loan to satisfy the Minimum Debt Yield Threshold condition. In consideration for each Extension Period, Borrowers shall pay to Lender a fee equal to 0.50% of the then-outstanding Loan Amount. During the Extension Periods, the Loan will bear interest at the same rate as the Initial Term. |
| **Loan Collateral & Loan Documents:** | The collateral for the Loan shall include, without limitation, (a) a first priority perfected mortgage, deed of trust or deed to secure debt, as applicable, encumbering each Property, (b) a first priority perfected assignment of leases and rents, (c) a first priority perfected assignment of all contracts, agreements, trademarks, licenses, goods, equipment, accounts, fixtures and all other tangible and intangible personal property located on or used in connection with each Property, (d) a first priority perfected security interest in all monies deposited into the Lockbox Account and all operating accounts, including all subaccounts, escrow accounts and reserve accounts, (e) the Full Payment Guaranty and the Carry Guaranty (each as defined herein), (f) UCC-1 financing statements (personal property, fixture filing and accounts and reserves), (g) an assignment |

of all development, design and construction contracts, if any, (h) a pledge of the equity in each Borrower by such Borrower's direct and indirect owners; and (i) any and all other agreements and assurances reasonable or customary in commercial transactions similar to the Loan. The mortgage, deed of trust or deed to secure debt liens and the priority thereof shall be insured in favor of Lender and its successors and assigns, which insurance shall be issued and underwritten by a title insurance carrier designated by Lender. The equity pledges will be similarly insured by a UCC insurance carrier designated by Lender. The Loan shall be evidenced, secured and governed by documentation customary for similar transactions by Lender and be in form and substance acceptable to Lender in its sole discretion and consistent in all material respects with the terms and provisions hereof, including without limitation, standard loan documentation, security and insurance for mezzanine financings as Lender may require in the event Lender creates a mezzanine loan as described below (collectively, the "**Loan Documents**"). Each Sub-Loan will be cross-defaulted with the other Sub-Loans and will be cross-collateralized with the Properties encumbering each of the other Sub-Loans.

**Cash Management/Property Management:** Borrower shall be required to open new bank accounts with an institution selected by Borrower and acceptable to Lender (the "**Account Bank**") on or prior to Closing that will be used as the operating accounts for each of the Properties. At Closing, each Borrower and Lender shall enter into a deposit account control agreement, or similar restricted account agreement with the Account Lender (each, a "**DACA**"). Upon the occurrence of a Trigger Period (as defined below), each Borrower shall establish and maintain with the Account Bank a lockbox account (the "**Lockbox Account**") pursuant to the terms and conditions set forth in the DACA, which account shall be pledged to Lender as security for the Loan and be under the control of Lender. Upon the occurrence and during the continuation of a Trigger Period, (a) each Borrower shall cause all rents and other sums generated by the Property to be directly deposited into the Lockbox Account; (b) Lender shall be permitted to sweep all amounts from the operating accounts into the Lockbox Accounts in accordance with the terms and conditions of the DACA; (c) Lender may reserve any excess cash flow after payment of debt service and other pre-approved expenses in the Lockbox Accounts until the Trigger Period ends; and (d) Lender shall be permitted to remove the existing property manager for the Properties and replace it with a property management company of its choosing. At the end of any Trigger Period, all funds in the Lockbox Accounts shall be promptly distributed to each Borrower. All property management contracts relating to the Properties shall be required under the Loan Documents to contain market-rate fees only as determined by Lender in its sole discretion.

At Closing, each Borrower shall provide to Lender executed letters directing all tenants to deposit all sums due under their respective leases directly into the Lockbox Account or any other account designated by Lender (the "**Tenant Direction Letters**"). Each Borrower will acknowledge and agree that such account information shall be inserted into the Tenant Direction Letters by Lender prior to distribution to such tenants. Borrower shall also covenant to provide Lender with Tenant Direction Letters for each new tenant at each Property.

**Debt Yield/Trigger Period:** "**Trigger Period**" shall mean any period (A) commencing upon (i) the occurrence and continuance of an event of default, or (ii) the Debt Yield falling below 6.5%, and (B) terminating upon, as applicable (i) the cure of the applicable event of default, (ii) the Debt Yield achieving 6.5% for three (3) consecutive calendar months annualized over a trailing twelve (12) month period (the "**Minimum Debt Yield Threshold**"). Notwithstanding the foregoing, a Trigger Period shall not be deemed to cease in the event any other

|  |  |
|---|---|
|  | triggering event is then ongoing. "**Debt Yield**" shall mean, as of any date, the quotient (expressed as a percentage) obtained by dividing (a) Underwritten NOI as of such date by (b) the total Loan Amount. Lender's good faith calculation of the Debt Yield, and all component calculations, shall be conclusive and binding on Borrowers absent manifest error. "**Underwritten NOI**" shall mean "Net Rental Income plus Other Income" minus "Operating Expenses," annualized over a trailing twelve (12) months period, as such terms are defined in the Loan Documents. |
| **Prepayment:** | In addition to any Exit Fee required hereunder, the Loan may be prepaid at any time subject to Lender's receipt of not less than five (5) months of projected interest payments (the "**Minimum Interest**") such that, at the time of prepayment, if Lender has not received the Minimum Interest, Borrowers will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment. |
| **Mezzanine:** | Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt or subordinate debt, as well as participations in the foregoing, and to create component notes to reflect such conversions; provided however that any such conversion shall not materially affect the all-in interest cost to Borrowers. If mezzanine debt is created, one or more mezzanine borrowers may be required to own 100% of the equity interests of each Borrower and may be required to execute additional pledges of equity in each such Borrower as required by Lender in its sole discretion. |
| **Full Payment Guaranty:** | Guarantor must execute a Full Payment Guaranty, guaranteeing payment of all amounts due under the Loan. Guarantor shall also execute a customary environmental indemnity agreement. |
| **Carry Guaranty:** | Guarantor must execute a Carry Guaranty guaranteeing payment of (a) interest due under the Loan (including default interest if applicable), and (b) operating expenses, insurance premiums, real estate taxes and all other carry costs of every kind related to each Property. |
| **Release Pricing:** | Borrowers shall be permitted to release individual Properties as collateral for the Loan upon payment to Lender of the greater of: (a) 130% of the Loan Amount allocated to such Property or (b) if sold, the net sale price of the Property after expenses directly related to the closing, but in no event more than 5.0% of the sale price. A preliminary listing of Loan Amount allocations for each Property is set forth on **Exhibit B** hereto. |
| **Interest Reserve:** | Four (4) months of projected interest under the Loan. |
| **Environmental and Other Reserves:** | Borrowers may be required to provide an environmental reserve in an amount to be determined by Lender in its discretion, dependent upon Lender's review of the environmental reports for each of the Properties prior to Closing. Borrowers shall provide any other Reserves as are determined by Lender to be necessary and appropriate in Lender's sole discretion. |
| **No Additional Liens:** | There shall be no financing, pledge, hypothecation or encumbrance, secured or unsecured, of any Property or of any direct or indirect ownership interests in any Borrower at any level or tier of ownership, except the Loan. |

| | |
|---|---|
| **Due on Transfer/Change in Control:** | Subject to Lender's standard exceptions with respect to permitted transfers, the Loan shall immediately become due and payable upon a transfer of all or any portion of any Property or of any direct or indirect ownership interests in any Borrower or any change in control of the management of any Borrower or Property. |
| **Assumption:** | No assumption. |
| **Financial Covenants:** | Guarantor shall maintain a minimum net worth of at least $50,000,000 and minimum liquidity of at least $2,500,000 at all times during the Term of the Loan. |
| **Financial Reporting:** | Each of Guarantor and each Borrower (as applicable) shall provide to Lender, in form and substance acceptable to Lender, (a) leasing and operating reports no less than monthly and more frequently upon request, (b) certified quarterly financial statements and operating statements, within fifteen (15) days of the end of each quarter, with each report providing information regarding such quarter as well as a year-to-date analysis, contrasted against the comparable period of the previous year and the then approved budget, (c) audited annual financial statements within sixty (60) days of the end of the year, and (d) such other information as Lender may reasonably request from time to time. Additionally, any and all material financial information received by Borrowers related to the Properties shall be made available to Lender within five (5) days of Borrowers' receipt thereof. |
| **Lease Approvals:** | All commercial leases and any extensions or amendments/modifications thereto are subject to Lender's reasonable prior approval. All new residential leases or material amendments to existing residential leases shall not require prior Lender approval so long as such leases or amendments conform in all respects to Lender's pre-approved leasing parameters, which will be provided to Borrowers in connection with Closing. |
| **Title:** | Borrowers must provide Lender with such searches with respect to title to each Property, each Borrower, its respective principals and Guarantor as Lender may require from time to time, including a survey thereof certified to Lender and the applicable title company. Borrowers shall be required to deliver to Lender "clean" title, as determined in Lender's sole discretion, as a condition to Closing. Borrowers shall purchase an ALTA title insurance policy for Lender in the Loan Amount, containing such endorsements as Lender may require in its sole discretion. Title work will be done by a title company selected by Lender. |
| **Representations/Warranties/ Covenants:** | Borrowers shall provide representations, warranties and covenants customary for loan transactions of this nature. |
| **Insurance:** | Borrowers shall maintain at all times, at Borrowers' sole cost and expense, insurance policies with such coverages, carriers, amounts, and deductibles as are required by the Loan Documents. Documentation evidencing any coverages required by Lender must be delivered to Lender as a condition to Closing and as a condition to the granting of any Extension Period. Each of Lender and its successors and assigns must be listed as mortgagee, loss payee and additional insured on all such policies. |
| **Opinions:** | Borrowers' counsel must provide Lender with legal opinion(s) regarding each Borrower's (and to the extent applicable, Guarantor's) ownership structure, the enforceability of the Loan Documents, non-consolidation, authority to file |

| | |
|---|---|
| | bankruptcy, and such other matters and opinions as is customary or as Lender's counsel may require. |
| **Due Diligence:** | All third party reports shall be addressed to Lender and shall upon delivery become the sole property of Lender, its successors and assigns. As a condition to Closing, each Borrower shall represent and warrant to Lender that it has not made, and the due diligence materials delivered to Lender have not included, any untrue statement of a material fact or any omission that makes such Borrower's statements or any of the due diligence deliverables materially misleading. |
| **Bankruptcy Proceedings/Expense Reimbursement:** | Closing of the Loan is expressly conditioned upon (a) entry of the Confirmation Order in form and substance acceptable to Lender in its sole and absolute discretion; (b) no stay pending appeal having been entered with respect to the Confirmation Order and either the fourteen (14) day period staying the effectiveness of the Confirmation Order under Bankruptcy Rule 3020 has passed, or the Court has waived the same; provided that Lender has the right, in its sole and absolute discretion, to waive the requirement that the Closing cannot take place before the fourteen (14) day appeal period expires, absent a stay pending appeal; and (c) all other conditions required for consummation of the Plan having been satisfied. |
| | In the event that the conditions for Closing have not occurred as of May 31, 2021 or such later date as is determined by Lender in its sole discretion (such date, the "**Outside Date**") and Lender is ready, willing and able to close as of such Outside Date, Lender shall be permitted to terminate this Commitment on written notice to Borrowers and obtain immediate payment of its Costs (as defined herein). |
| | Each Borrower expressly acknowledges and agrees that it shall be responsible for all of Lender's out-of-pocket expenses, fees, costs and charges actually incurred by Lender in any way relating to the Loan (including Lender's underwriting due diligence in connection therewith), including without limitation legal and auditing fees, appraisals, environmental and structural engineering reports for the Properties, any other necessary or appropriate third party reports, recording and filing fees, taxes and other customary costs and expenses (collectively, "**Costs**"). Full payment or reimbursement of all such Costs shall be a condition to Closing. Borrowers shall indemnify, defend and hold Lender harmless from and against all such Costs regardless of whether the Loan closes or if Lender terminates this Commitment after the Outside Date. Borrowers acknowledge and agree that any such Costs shall constitute claims entitled to administrative priority in the Bankruptcy Cases. |

| | |
|---|---|
| **Break-up Fee:** | Borrowers and Guarantor each hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event Borrower obtains financing from a competitor of Lender. Accordingly, Borrowers and Guarantor each hereby expressly agree that, in the event Borrower Guarantor or affiliate thereof does not elect to finance the Properties, combines the Properties with other properties to be financed, elects to divide the Properties and finance them, or obtains financing for the Properties from a source other than Lender after the date hereof, Lender shall become immediately entitled to payment of a break-up fee ("**Break-Up Fee**") equal to two percent (2.0%) of the Loan Amount (i.e., $300,000), which each Borrower and Guarantor acknowledges and agrees constitutes liquidated damages and is a reasonable estimate of Lender's damages under the circumstances. Borrower and Guarantor shall be jointly and severally responsible for Lender's legal and other out-of-pocket fees and expenses in connection with the recovery of the Break-Up Fee. Borrowers acknowledge and agree that the Break-Up Fee shall constitute a claim entitled to administrative priority in the Bankruptcy Cases. |
| **Broker Fee:** | There is no broker associated with this transaction. Borrowers agree to indemnify, defend and hold Lender harmless from and against any claims for a broker's commission, finder's fee or other payments no matter how described, and any other costs liabilities or expenses incurred by Lender in connection with any claim asserted by a broker or other party who claims to have worked with or represented Borrowers in connection with the Loan. The obligations of Borrowers under this paragraph shall survive the expiration or termination of this Commitment. |
| **Governing Law:** | This Commitment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principals of conflicts of laws. Any action, suit, proceeding or litigation arising out of or relating in any way to this Commitment shall commence and be maintained exclusively in the state or federal courts of the State of New York. Borrowers will be responsible for Lender's legal and other out-of-pocket fees and expenses in the event Borrowers are unsuccessful in any action, suit, proceeding or litigation brought against Lender. EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR LITIGATION ARISING OUT OF OR RELATING IN ANY WAY TO THIS COMMITMENT. |

To commence processing of the requested Loan, please sign and return an executed counterpart of this Commitment. This Commitment supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto.

        Sincerely,

        MAGUIRE CAPITAL GROUP LLC

By: _____
        Name: Marvin V. Azrak
        Title: Authorized Signatory

Agreed to and accepted on behalf of Borrowers:


By:_____
   Name:
   Title:

**EXHIBIT A**

| Assets | | | Portfolio Summary | | |
|---|---|---|---|---|---|
| # | Address | Type | Gross Sq Ft | Residential Units | Retail Units |
| 1 | 130 South 2nd Street, Brooklyn, NY 11249 | Four-Family | 4,608 | 4 | 0 |
| 2 | 318 Bedford Ave, Brooklyn, NY 11249 | Mixed-Use | 2,640 | 2 | 1 |
| 3 | 740 Driggs Ave, Brooklyn, NY 11211 | Mixed-Use | 1,995 | 2 | 2 |
| 4 | 144 Huntington Street, Brooklyn, NY 11231 | Two-Family | 1,776 | 2 | 0 |
| 5 | 68 Carroll Street, Brooklyn, NY 11231 | Three-Family | 2,450 | 3 | 0 |
| 6 | 342 Rodney Street, Brooklyn, NY 11211 | Four-Family | 4,275 | 4 | 0 |
| 7 | 178 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 8 | 180 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 9 | 182 Meserole Street, Brooklyn, NY 11206 | Multi-Family | 3,750 | 5 | 0 |
| 10 | 440 Lorimer Street, Brooklyn, NY 11206 | Three-Family | 1,890 | 3 | 0 |
| **Total** | | | **30,884** | **35** | **3** |

**EXHIBIT B**

| # | DW & Meserole Portfolio Loan Allocation & Release Price Schedule | | | | | |
|---|---|---|---|---|---|---|
| | Property | Gross Sq Ft | Total Units | ALA | Min. Release (%) | Min. Release Price |
| 1 | 130 South 2nd Street, Brooklyn, NY 11249 | 4,608 | 4 | $2,094,000 | 130% | $2,722,200 |
| 2 | 318 Bedford Ave, Brooklyn, NY 11249 | 2,640 | 3 | $2,285,000 | 130% | $2,970,500 |
| 3 | 740 Driggs Ave, Brooklyn, NY 11211 | 1,995 | 4 | $1,234,000 | 130% | $1,604,200 |
| 4 | 144 Huntington Street, Brooklyn, NY 11231 | 1,776 | 2 | $762,000 | 130% | $990,600 |
| 5 | 68 Carroll Street, Brooklyn, NY 11231 | 2,450 | 3 | $875,000 | 130% | $1,137,500 |
| 6 | 342 Rodney Street, Brooklyn, NY 11211 | 4,275 | 4 | $1,520,000 | 130% | $1,976,000 |
| 7 | 178 Meserole Street, Brooklyn, NY 11206 | 3,750 | 5 | $1,752,000 | 130% | $2,277,600 |
| 8 | 180 Meserole Street, Brooklyn, NY 11206 | 3,750 | 5 | $1,683,000 | 130% | $2,187,900 |
| 9 | 182 Meserole Street, Brooklyn, NY 11206 | 3,750 | 5 | $1,820,000 | 130% | $2,366,000 |
| 10 | 440 Lorimer Street, Brooklyn, NY 11206 | 1,890 | 3 | $975,000 | 130% | $1,267,500 |
| **Total** | | **30,884** | **38** | **$15,000,000** | **130%** | **$19,500,000** |