UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
|     53 STANHOPE LLC, *et al*,[1] | Case no. 19-23013 (RDD)<br>Jointly Administered |
| Debtors. | **CONFIRMATION DECLARATION**[2] |

----------------------------------------------------------x

David Goldwasser states under penalty of perjury as follows:

    1.    I am submitting this supplemental declaration in support of confirmation of the Fifth Amended Plan of Reorganization ("Plan") of 55 Stanhope LLC, 119 Rogers LLC, 127 Rogers LLC, C&YSW, LLC, Natzliach LLC, 106 Kingston LLC, and 167 Hart LLC:

    2.    Annexed hereto is (a) Maguire's updated commitment letter indicating reduced legal fees holdback and interest reserve, and (b) revised sources and uses of funds for Effective Date Plan payments.

Dated: New York, New York
       October 18, 2021

                                          <u>s/ David Goldwasser, as authorized signatory of GC Realty Advisors, LLC, as Vice President</u>

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer LLC (8197); 106 Kingston LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

[2] All terms not defined herein shall have the meaning set forth in the Plan.



October 18, 2021

**Re: Senior Secured Loan for Loans In Good Standing Portfolio**

Dear Mr. Strulowitz:

The purpose of this Commitment Letter ("**Commitment**") is to set forth the major terms and conditions under which an affiliate of Maguire Capital Group LLC (together with their respective affiliates, successors, assigns or designees, "**Lender**") will provide credit to certain special purpose bankruptcy remote entities (collectively, "**Borrowers**") in the form of a mortgage and, at Lender's option, mezzanine financing (the "**Loan**"), in each case relating to the Properties (as defined below). This Commitment is intended to be a commitment to lend subject to the express conditions set forth herein and finalization of loan documents satisfactory to Lender in its sole and absolute discretion.

| | |
|---|---|
| **Property:** | 8 properties located in Brooklyn, New York with an aggregate gross area of 34,815 SF comprising 37 units (36 residential and 1 retail) (each a "**Property**" and collectively, the "**Properties**"), as set forth in further detail on **Exhibit A**. |
| **Purpose of the Loan:** | Refinance existing loans and provide financing sufficient to effectuate an exit from the pending chapter 11 proceedings affecting the Properties, *In re 53 Stanhope LLC, et al.*, Case No. 19-23013 (S.D.N.Y.)(RDD) (the "**Bankruptcy Cases**"). |
| **Borrower:** | Borrowers will consist of eight (8) newly formed, single purpose entities with no operations, assets, or activities other than the ownership interest in their respective Property and no debts or liabilities other than the Loan. Each Borrower will be structured as a bankruptcy-remote entity in a manner satisfactory to Lender. |
| **Closing Date:** | Closing of the Loan ("**Closing**") shall occur approximately thirty (30) days after entry of a confirmation order ("**Confirmation Order**") confirming the plan of reorganization ("**Plan**") in the Bankruptcy Cases (unless stayed pending appeal). |
| **Total Loan Amount**: | $13,900,000.00 |
| **Loan Structure:** | Lender shall have the right to structure the Loan as multiple loan transactions (each, a "**Sub-Loan**") at Closing such that the Properties are divided into separate pools to serve as collateral for each Sub-Loan. Lender may allocate Properties to a Sub-Loan at any time in its sole discretion prior to Closing. The Loan Documents for each Sub-Loan shall provide that (a) each Sub-Loan will be cross-defaulted and cross-collateralized with the Properties encumbered by each other Sub-Loan, (b) any reserves, fees or costs contemplated herein will be allocated to the separate Sub-Loans on a prorated basis, and (c) if prepayment of any one Sub-Loan is elected, all of the Sub-Loans must be prepaid together; provided however that the applicable Borrower shall be permitted to release individual Properties from any Sub-Loan if it satisfies the conditions for release set forth herein. |
| **Initial Funding**: | Lender will disburse the full amount of the Loan to Borrowers at Closing, less the Interest Reserve and any other reserves determined by Lender to be |

|  |  |
|---|---|
|  | appropriate based on the circumstances surrounding the Loan (collectively, the "**Reserves**"). |
| **Sponsor/Guarantor:** | Cheskel Strulowitz. |
| **Interest Rate:** | The Loan will bear interest at a floating rate of One Month LIBOR + 10.42% with a floor of 10.50% per annum. The Interest Rate will be charged on an actual/360 basis. |
| **Amortization:** | Interest only. |
| **Origination Fee:** | Borrowers shall pay a fee equal to 2.00% of the Loan Amount to Lender or its designee at Closing and an additional 1.00% of the then-outstanding Loan Amount on the six (6) month anniversary of Closing. |
| **Exit Fee:** | 1.00% of the Loan Amount will be due on any prepayment and/or repayment of the Loan including payoff at maturity and shall be paid, pro rata, in connection with any partial prepayments of the Loan. |
| **Term:** | Twelve (12) months. |
| **Extension Option(s):** | Subject to certain conditions then existing, including that (1) no event of default has occurred or is continuing, (2) a satisfactory credit check is provided, (3) all Reserves are replenished to the extent required by Lender, (4) evidence of all required insurance is provided to Lender, and (4) the Properties meet the Minimum Debt Yield Threshold (as defined below), the Loan may be extended for two (2) separate six (6) month periods (each an "**Extension Period**") by Borrowers. In the event that the Properties fail to meet the Minimum Debt Yield Threshold at the time an Extension Period is requested, Borrowers may elect to make a principal pay-down of the Loan to satisfy the Minimum Debt Yield Threshold condition. In consideration for each Extension Period, Borrowers shall pay to Lender a fee equal to 0.50% of the then-outstanding Loan Amount. During the Extension Periods, the Loan will bear interest at the same rate as the Initial Term. |
| **Loan Collateral & Loan Documents:** | The collateral for the Loan shall include, without limitation, (a) a first priority perfected mortgage, deed of trust or deed to secure debt, as applicable, encumbering each Property, (b) a first priority perfected assignment of leases and rents, (c) a first priority perfected assignment of all contracts, agreements, trademarks, licenses, goods, equipment, accounts, fixtures and all other tangible and intangible personal property located on or used in connection with each Property, (d) a first priority perfected security interest in all monies deposited into the Lockbox Account and all operating accounts, including all subaccounts, escrow accounts and reserve accounts, (e) the Full Payment Guaranty and the Carry Guaranty (each as defined herein), (f) UCC-1 financing statements (personal property, fixture filing and accounts and reserves), (g) an assignment |

of all development, design and construction contracts, if any, (h) a pledge of the equity in each Borrower by such Borrower's direct and indirect owners; and (i) any and all other agreements and assurances reasonable or customary in commercial transactions similar to the Loan. The mortgage, deed of trust or deed to secure debt liens and the priority thereof shall be insured in favor of Lender and its successors and assigns, which insurance shall be issued and underwritten by a title insurance carrier designated by Lender. The equity pledges will be similarly insured by a UCC insurance carrier designated by Lender. The Loan shall be evidenced, secured and governed by documentation customary for similar transactions by Lender and be in form and substance acceptable to Lender in its sole discretion and consistent in all material respects with the terms and provisions hereof, including without limitation, standard loan documentation, security and insurance for mezzanine financings as Lender may require in the event Lender creates a mezzanine loan as described below (collectively, the "**Loan Documents**"). Each Sub-Loan will be cross-defaulted with the other Sub-Loans and will be cross-collateralized with the Properties encumbering each of the other Sub-Loans.

**Cash Management/Property Management:** Borrower shall be required to open new bank accounts with an institution selected by Borrower and acceptable to Lender (the "**Account Bank**") on or prior to Closing that will be used as the operating accounts for each of the Properties. At Closing, each Borrower and Lender shall enter into a deposit account control agreement, or similar restricted account agreement with the Account Lender (each, a "**DACA**"). Upon the occurrence of a Trigger Period (as defined below), each Borrower shall establish and maintain with the Account Bank a lockbox account (the "**Lockbox Account**") pursuant to the terms and conditions set forth in the DACA, which account shall be pledged to Lender as security for the Loan and be under the control of Lender. Upon the occurrence and during the continuation of a Trigger Period, (a) each Borrower shall cause all rents and other sums generated by the Property to be directly deposited into the Lockbox Account; (b) Lender shall be permitted to sweep all amounts from the operating accounts into the Lockbox Accounts in accordance with the terms and conditions of the DACA; (c) Lender may reserve any excess cash flow after payment of debt service and other pre-approved expenses in the Lockbox Accounts until the Trigger Period ends; and (d) Lender shall be permitted to remove the existing property manager for the Properties and replace it with a property management company of its choosing. At the end of any Trigger Period, all funds in the Lockbox Accounts shall be promptly distributed to each Borrower. All property management contracts relating to the Properties shall be required under the Loan Documents to contain market-rate fees only as determined by Lender in its sole discretion.

At Closing, each Borrower shall provide to Lender executed letters directing all tenants to deposit all sums due under their respective leases directly into the Lockbox Account or any other account designated by Lender (the "**Tenant Direction Letters**"). Each Borrower will acknowledge and agree that such account information shall be inserted into the Tenant Direction Letters by Lender prior to distribution to such tenants. Borrower shall also covenant to provide Lender with Tenant Direction Letters for each new tenant at each Property.

**Debt Yield/Trigger Period:** "**Trigger Period**" shall mean any period (A) commencing upon (i) the occurrence and continuance of an event of default, or (ii) the Debt Yield falling below 6.5%, and (B) terminating upon, as applicable (i) the cure of the applicable event of default, (ii) the Debt Yield achieving 6.5% for three (3) consecutive calendar months annualized over a trailing twelve (12) month period (the "**Minimum Debt Yield Threshold**"). Notwithstanding the foregoing, a Trigger Period shall not be deemed to cease in the event any other

|  |  |
|---|---|
|  | triggering event is then ongoing. "**Debt Yield**" shall mean, as of any date, the quotient (expressed as a percentage) obtained by dividing (a) Underwritten NOI as of such date by (b) the total Loan Amount. Lender's good faith calculation of the Debt Yield, and all component calculations, shall be conclusive and binding on Borrowers absent manifest error. "**Underwritten NOI**" shall mean "Net Rental Income plus Other Income" minus "Operating Expenses," annualized over a trailing twelve (12) months period, as such terms are defined in the Loan Documents. |
| **Prepayment:** | In addition to any Exit Fee required hereunder, the Loan may be prepaid at any time subject to Lender's receipt of not less than five (5) months of projected interest payments (the "**Minimum Interest**") such that, at the time of prepayment, if Lender has not received the Minimum Interest, Borrowers will, as a condition to such prepayment and in addition to all other amounts that may be due under the Loan at such time, pay to Lender the difference between the Minimum Interest and the amount of interest which Lender has actually received through the date of repayment. |
| **Mezzanine:** | Lender reserves the right to convert any portion of the Loan to subordinate financing, including one or more tranches of mezzanine debt or subordinate debt, as well as participations in the foregoing, and to create component notes to reflect such conversions; provided however that any such conversion shall not materially affect the all-in interest cost to Borrowers. If mezzanine debt is created, one or more mezzanine borrowers may be required to own 100% of the equity interests of each Borrower and may be required to execute additional pledges of equity in each such Borrower as required by Lender in its sole discretion. |
| **Full Payment Guaranty:** | Guarantor must execute a Full Payment Guaranty, guaranteeing payment of all amounts due under the Loan. Guarantor shall also execute a customary environmental indemnity agreement. |
| **Carry Guaranty:** | Guarantor must execute a Carry Guaranty guaranteeing payment of (a) interest due under the Loan (including default interest if applicable), and (b) operating expenses, insurance premiums, real estate taxes and all other carry costs of every kind related to each Property. |
| **Release Pricing:** | Borrowers shall be permitted to release individual Properties as collateral for the Loan upon payment to Lender of the greater of: (a) 130% of the Loan Amount allocated to such Property or (b) if sold, the net sale price of the Property after expenses directly related to the closing, but in no event more than 5.0% of the sale price. A preliminary listing of Loan Amount allocations for each Property is set forth on **Exhibit B** hereto. |
| **Interest Reserve:** | Two (2) months of projected interest under the Loan. |
| **Environmental and Other Reserves:** | Borrowers may be required to provide an environmental reserve in an amount to be determined by Lender in its discretion, dependent upon Lender's review of the environmental reports for each of the Properties prior to Closing. Borrowers shall provide any other Reserves as are determined by Lender to be necessary and appropriate in Lender's sole discretion. |
| **No Additional Liens:** | There shall be no financing, pledge, hypothecation or encumbrance, secured or unsecured, of any Property or of any direct or indirect ownership interests in any Borrower at any level or tier of ownership, except the Loan. |

| | |
|---|---|
| **Due on Transfer/Change in Control:** | Subject to Lender's standard exceptions with respect to permitted transfers, the Loan shall immediately become due and payable upon a transfer of all or any portion of any Property or of any direct or indirect ownership interests in any Borrower or any change in control of the management of any Borrower or Property. |
| **Assumption:** | No assumption. |
| **Financial Covenants:** | Guarantor shall maintain a minimum net worth of at least $50,000,000 and minimum liquidity of at least $2,500,000 at all times during the Term of the Loan. |
| **Financial Reporting:** | Each of Guarantor and each Borrower (as applicable) shall provide to Lender, in form and substance acceptable to Lender, (a) leasing and operating reports no less than monthly and more frequently upon request, (b) certified quarterly financial statements and operating statements, within fifteen (15) days of the end of each quarter, with each report providing information regarding such quarter as well as a year-to-date analysis, contrasted against the comparable period of the previous year and the then approved budget, (c) audited annual financial statements within sixty (60) days of the end of the year, and (d) such other information as Lender may reasonably request from time to time. Additionally, any and all material financial information received by Borrowers related to the Properties shall be made available to Lender within five (5) days of Borrowers' receipt thereof. |
| **Lease Approvals:** | All commercial leases and any extensions or amendments/modifications thereto are subject to Lender's reasonable prior approval. All new residential leases or material amendments to existing residential leases shall not require prior Lender approval so long as such leases or amendments conform in all respects to Lender's pre-approved leasing parameters, which will be provided to Borrowers in connection with Closing. |
| **Title:** | Borrowers must provide Lender with such searches with respect to title to each Property, each Borrower, its respective principals and Guarantor as Lender may require from time to time, including a survey thereof certified to Lender and the applicable title company. Borrowers shall be required to deliver to Lender "clean" title, as determined in Lender's sole discretion, as a condition to Closing. Borrowers shall purchase an ALTA title insurance policy for Lender in the Loan Amount, containing such endorsements as Lender may require in its sole discretion. Title work will be done by a title company selected by Lender. |
| **Representations/Warranties/ Covenants:** | Borrowers shall provide representations, warranties and covenants customary for loan transactions of this nature. |
| **Insurance:** | Borrowers shall maintain at all times, at Borrowers' sole cost and expense, insurance policies with such coverages, carriers, amounts, and deductibles as are required by the Loan Documents. Documentation evidencing any coverages required by Lender must be delivered to Lender as a condition to Closing and as a condition to the granting of any Extension Period. Each of Lender and its successors and assigns must be listed as mortgagee, loss payee and additional insured on all such policies. |
| **Opinions:** | Borrowers' counsel must provide Lender with legal opinion(s) regarding each Borrower's (and to the extent applicable, Guarantor's) ownership structure, the enforceability of the Loan Documents, non-consolidation, authority to file |

| | |
|---|---|
| | bankruptcy, and such other matters and opinions as is customary or as Lender's counsel may require. |
| **Due Diligence:** | All third party reports shall be addressed to Lender and shall upon delivery become the sole property of Lender, its successors and assigns. As a condition to Closing, each Borrower shall represent and warrant to Lender that it has not made, and the due diligence materials delivered to Lender have not included, any untrue statement of a material fact or any omission that makes such Borrower's statements or any of the due diligence deliverables materially misleading. |
| **Bankruptcy Proceedings/Expense Reimbursement:** | Closing of the Loan is expressly conditioned upon (a) entry of the Confirmation Order in form and substance acceptable to Lender in its sole and absolute discretion; (b) no stay pending appeal having been entered with respect to the Confirmation Order and either the fourteen (14) day period staying the effectiveness of the Confirmation Order under Bankruptcy Rule 3020 has passed, or the Court has waived the same; provided that Lender has the right, in its sole and absolute discretion, to waive the requirement that the Closing cannot take place before the fourteen (14) day appeal period expires, absent a stay pending appeal; and (c) all other conditions required for consummation of the Plan having been satisfied. |
| | In the event that the conditions for Closing have not occurred as of October 31, 2021 or such later date as is determined by Lender in its sole discretion (such date, the "**Outside Date**") and Lender is ready, willing and able to close as of such Outside Date, Lender shall be permitted to terminate this Commitment on written notice to Borrowers and obtain immediate payment of its Costs (as defined herein). |
| | Each Borrower expressly acknowledges and agrees that it shall be responsible for all of Lender's out-of-pocket expenses, fees, costs and charges actually incurred by Lender in any way relating to the Loan (including Lender's underwriting due diligence in connection therewith), including without limitation legal and auditing fees, appraisals, environmental and structural engineering reports for the Properties, any other necessary or appropriate third party reports, recording and filing fees, taxes and other customary costs and expenses (collectively, "**Costs**"). Full payment or reimbursement of all such Costs shall be a condition to Closing. Borrowers shall indemnify, defend and hold Lender harmless from and against all such Costs regardless of whether the Loan closes or if Lender terminates this Commitment after the Outside Date. Borrowers acknowledge and agree that any such Costs shall constitute claims entitled to administrative priority in the Bankruptcy Cases. |

| | |
|---|---|
| **Broker Fee:** | There is no broker associated with this transaction. Borrowers agree to indemnify, defend and hold Lender harmless from and against any claims for a broker's commission, finder's fee or other payments no matter how described, and any other costs liabilities or expenses incurred by Lender in connection with any claim asserted by a broker or other party who claims to have worked with or represented Borrowers in connection with the Loan. The obligations of Borrowers under this paragraph shall survive the expiration or termination of this Commitment. |
| **Governing Law:** | This Commitment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principals of conflicts of laws. Any action, suit, proceeding or litigation arising out of or relating in any way to this Commitment shall commence and be maintained exclusively in the state or federal courts of the State of New York. Borrowers will be responsible for Lender's legal and other out-of-pocket fees and expenses in the event Borrowers are unsuccessful in any action, suit, proceeding or litigation brought against Lender. EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR LITIGATION ARISING OUT OF OR RELATING IN ANY WAY TO THIS COMMITMENT. |

To commence processing of the requested Loan, please sign and return an executed counterpart of this Commitment. This Commitment supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto.

    Sincerely,

    MAGUIRE CAPITAL GROUP LLC

By: _____
    Name: Marvin V. Azrak
    Title: Authorized Signatory

Agreed to and accepted on behalf of Borrowers:

By:_____
   Name:
   Title:

**EXHIBIT A**

| # | Address | GSF | Residential Units | Retail Units | Total # of Units |
|---|---|---|---|---|---|
| 1 | 55 Stanhope Street, Brooklyn, NY 11221 | 5,560 SF | 8 | 0 | 8 |
| 2 | 106 Kingston Avenue, Brooklyn, NY 11213 | 4,032 SF | 2 | 1 | 3 |
| 3 | 119 Rogers Avenue, Brooklyn, NY 11216 | 5,613 SF | 6 | 0 | 6 |
| 4 | 127 Rogers Avenue, Brooklyn, NY 11216 | 5,370 SF | 6 | 0 | 6 |
| 5 | 167 Hart Street, Brooklyn, NY 11206 | 4,160 SF | 3 | 0 | 3 |
| 6 | 107 South 3rd Street, Brooklyn, NY 11249 | 3,080 SF | 4 | 0 | 4 |
| 7 | 109 South 3rd Street, Brooklyn, NY 11249 | 3,000 SF | 4 | 0 | 4 |
| 8 | 129 South 2nd Street, Brooklyn, NY 11249 | 4,000 SF | 3 | 0 | 3 |
| **Total** | | **34,815 SF** | **36** | **1** | **37** |

**Loan S&U - Loans in Good Standing (Maguire Capital)**

| SOURCES & USES | | | |
|---|---|---|---|
| Loan Amount | | $13,900,000 | |
| Loan Interest Rate | | 10.5059% | *Floating, One Month LIBOR + 10.42%, floor 10.50% (as of 10/18/21)* |
| Loan Term (Mo) | | 12 | |
| Loan Type | | IO | |
| Amortization (Yr) - N/A | | 30 | |
| Monthly Payment | | $123,383.53 | *Actual/360 Basis* |
| Annual Payment | | $1,480,602.32 | |
| **Closing Costs** | | | |
| Origination Fee | 2.00% | $278,000.00 | |
| Prepaid Interest | 2 Months | $246,767.05 | |
| Stub Interest (TBD) | 0 Days | $0.00 | |
| Mortgage Broker Fee | 0.00% | $0.00 | |
| Mortgage Recording Tax (Bankruptcy) | 0.00% | $0.00 | |
| Lender Legal, Third Party Reports (TBD) | | $50,000.00 | *To be adjusted by the lender* |
| Other Reserves (TBD) | | $0.00 | *Other reserves to be determined by the lender at closing (RE taxes, Insurance)* |
| Environmental Reserve (TBD) | | $0.00 | *To be adjusted by the lender upon revision of 3rd parties reports* |
| Title (Estimate) | | $100,000.00 | |
| **Total Closing Costs** | | **$674,767.05** | |
| Total Proceeds | | $13,225,232.95 | |
| **Uses of Capital** | | | |
| Class 1 Claims - RE Taxes (as of 9/23/21) | | $209,817.05 | |
| Class 1 Claims - Open Water (as of 9/23/21) | | $46,434.80 | |
| Class 1 Claims - Violations (as of 9/23/21) | | $301,936.28 | |
| Class 1 Claims - Pest Control (as of 9/23/21) | | $2,170.61 | |
| Class 2 Claims - Brooklyn Lender, LLC Payoff (Estimated) | | $11,879,261.66 | *As of 10/31/21 + 2 PMTs for 127 Rogers and C&YSW* |
| Class 3 Claims | | $0.00 | |
| Class 4 Claims - Vendors | | $18,432.00 | |
| BK Manager | | $138,680.00 | |
| US Trustee Fees (1.00%) | | $135,773.01 | |
| Other Bankruptcy Fees (TBD) | | $0.00 | |
| Professional Fees (Estim.) - Backenroth Frankel & Krinsky | | $43,493.56 | |
| Professional Fees (Estim.) - Abrams Fensterman | | $72,916.67 | |
| Professional Fees (Estim.) - Robinson Brog | | $15,148.02 | |
| BL Legal Fees | | $174,243.07 | |
| **Total Uses** | | **$13,038,306.72** | |
| **Sources of Capital** | | | |
| Loan Proceeds | | $13,225,232.95 | |
| Less: Deposit | | $0.00 | |
| **Total Sources** | | **$13,225,232.95** | |
| **Additional Funds Available for Other Closing Costs** | | **$186,926.22** | |