Jennifer S. Recine
David S. Rosner
Matthew B. Stein
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700
Fax:  (212) 506-1800

*Counsel for Brooklyn Lender LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| 53 STANHOPE LLC, *et al.*,[1] | Case No.: 19-23013 (RDD) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF BROOKLYN LENDER LLC TO 53 STANHOPE DEBTORS'**
**PROPOSED SALE OF REAL PROPERTY ASSETS**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding 1 LLC (0290); D & W Real Estate Spring LLC (4591); Meserole and Lorimer LLC (8197); 106 Kingston LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT FACTUAL BACKGROUND ................................................................ 5

    A.    The Mortgages. .......................................................................................... 5

    B.    The Debtors File For Bankruptcy, And Seek To Confirm The First
           Amended Plan. ............................................................................................ 5

    C.    The Court Allows Certain Default Interest On Brooklyn Lender's Claims
           And Denies Confirmation. ......................................................................... 7

    D.    Confirmation of the 53 Stanhope Plan. ..................................................... 7

    E.    The 53 Stanhope Plan's Contemplated Bidding Procedures. .................. 8

    F.    Brooklyn Lender's Motion to Set Claim Amount. ................................... 9

    G.    The 53 Stanhope Debtors' Delays and Failure to Comply with Post-
           Confirmation Obligations. ....................................................................... 12

    H.    The 53 Stanhope Debtors' Failure to Comply with Auction Noticing
           Requirements and Further Delay. ............................................................ 13

    I.    The Stalking Horse Agreement. ............................................................. 14

    J.    The Highly Disorganized and Chaotic Auction. .................................... 16

           1.    Confusion Regarding Brooklyn Lender's Right to Credit Bid and
                  to Apply Same Bid to Joint and Several Loans. ......................... 19

           2.    Confusion Regarding New and Previously Undisclosed
                  Procedures for Bidding on January 7. ......................................... 20

           3.    Confusion Regarding Application of FREO Break-Up Fee and
                  FREO's Right to Credit Bid. ....................................................... 22

           4.    The Auction Concludes in Disarray. ........................................... 24

    K.    Post-Auction Problems. .......................................................................... 25

OBJECTION ............................................................................................................ 26

I.    A Sale to Individual Bidders or FREO Should not be Approved because
    Brooklyn Lender is the Highest and Otherwise Best Bidder. ........................... 26

A.      Brooklyn Lender's Credit Bid Tops FREO's and the Individual Bidders'
        Bids. ..........................................................................................................27

B.      The 53 Stanhope Debtors Have no Authority to Surcharge Brooklyn
        Lender's Collateral or to Otherwise Force Brooklyn Lender to Bid in
        Cash...........................................................................................................29

II.     Rosewood Added No Value and Payment of Fees to Rosewood Should Not Be
        Awarded in Any Amount..............................................................................32

III.    The Break-Up Fee Provided No Value to the Estates and Chilled Bidding, and
        Should Therefore be Denied. ........................................................................35

IV.     Any New Auction Must Not Violate Brooklyn Lender's Due Process Rights.................38

CONCLUSION...................................................................................................39

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Bidermann Indus. U.S.A.*,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997) .......................................................37

*In re Bronx 439 E. 135th St. D.T. Bldg. Corp.*,
    No. 11-15855 (MG), 2014 WL 200996 (Bankr. S.D.N.Y. Jan. 17, 2014) .............................33

*C & J Clark Am. Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*,
    92 B.R. 87 (Bankr. S.D.N.Y. 1988) ........................................................38

*In re Claar Cellars LLC*,
    623 B.R. 578 (Bankr. E.D. Wash. 2021) ....................................................26

*Cohen v. KB Mezzanine Fund II (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006) .............................................................28

*In re Finova Capital Corp.*,
    356 B.R. 609 (Bankr. D. Del. 2006) ......................................................28

*Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*,
    346 F.3d 31 (2d Cir. 2003) .............................................................35

*Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*,
    No. 02-0710, 2002 WL 31426344 (S.D.N.Y. Oct. 29, 2002) ...................................36

*In re Happy Wave LLC*,
    No. 14-74389 (REG), 2015 WL 7575497 (Bankr. E.D.N.Y. Nov. 25, 2015) .......................31

*In re Hotel Syracuse, Inc.*,
    275 B.R. 679 (Bankr. N.D.N.Y. 2002) .....................................................31

*In re Jon J. Peterson, Inc.*,
    411 B.R. 131 (Bankr. W.D.N.Y. 2009) .................................................26, 38

*In re Lorick*,
    No. 1-16-45645-NHL, 2018 WL 3854139 (Bankr. E.D.N.Y. Aug. 9, 2018) ........................30

*Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI Helicoptors Long Island Ltd.
(In re Waypoint Leasing Holdings Ltd.)*,
    607 B.R. 143 (Bankr. S.D.N.Y. 2019) .....................................................28

*In re Marose Corp.*,
    No. 89 B 12171 (CB), 1992 WL 33848 (Bankr. S.D.N.Y. Feb. 15, 1992) .........................35

*Meyer v. United States*,
    375 U.S. 233 (1963)...................................................................................32

*In re MSR Hotels & Resorts, Inc.*,
    No. 13-11512 (SHL), 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013)...........................36

*In re Ne. Dairy Co-op. Fed'n, Inc.*,
    74 B.R. 149 (Bankr. N.D.N.Y. 1987) ...................................................................33

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.* (*In re Integrated
Telecom Express, Inc.*),
    384 F.3d 108 (3d Cir. 2004)............................................................................26

*In re Paradigm Elizabeth, LLC*,
    No. 14-24901 (DHS), 2015 WL 435067 (D.N.J. Jan. 30, 2015) ...........................................26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012).................................................................................27, 28

*In re Reliant Energy Channelview LP*,
    594 F.3d 200 (3d Cir. 2010)...........................................................................36

*In re Sears Holding Corp.*,
    621 B.R. 563 (S.D.N.Y. 2020).........................................................................29

*In re Sears Holding Corp*,
    Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. July 31, 2019) .................................28

*Sowell v. Fed. Reserve Bank*,
    268 U.S. 449 (1925)...................................................................................32

*In re Spa Chakra*,
    No. 09-17260(SMB), 2010 WL 779270 (Bankr. S.D.N.Y. Mar. 5, 2010) ............................28

*Walther v. Bank of New York*,
    772 F. Supp. 754 (S.D.N.Y. 1991) ...................................................................32

**Statutes**

11 U.S.C. § 363(k) .............................................................................8, 27, 28

11 U.S.C. § 506(c) .............................................................................29, 30

Brooklyn Lender LLC ("Brooklyn Lender"), creditor in interest in the above-captioned jointly-administered chapter 11 cases (the "Chapter 11 Cases"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the 53 Stanhope Debtors'

[1] proposed sale of their real property assets (the "Proposed Sale") in connection with an auction that occurred on January 6, 2022 and January 7, 2022 (the "Auction"), and to any sale to the proposed successful bidders, thereby selected and noticed for a hearing on January 25, 2022 at 10:00 a.m. (the "Sale Hearing").  In support of its Objection, Brooklyn Lender respectfully represents that the 53 Stanhope Debtors' attempt to confirm the winning bidder at the Sale Hearing must be denied for each of the reasons set forth as follows:[2]

## PRELIMINARY STATEMENT[3]

1.      The 53 Stanhope Debtors' current attempt to obtain Court approval declaring that the Individual Bidders submitted the highest and best bid for each of the 53 Stanhope Debtors' properties constitutes an unlawful attempt to disregard Brooklyn Lender's Bankruptcy Code, authorized and Court sanctioned unfettered right to credit bid, which was previously consented to the by the 53 Stanhope Debtors.  The fact that the 53 Stanhope Debtors willfully ignore Brooklyn Lender's undisputed higher bid when the amount of the credit bid is not contested is without justification.  The Court must not condone such brazen conduct.

2.      Throughout the post-confirmation period, the 53 Stanhope Debtors repeatedly violated the unambiguous terms of the 53 Stanhope Plan, the Bid Procedures attendant thereto,

---

[1]      The "53 Stanhope Debtors" refers to 53 Stanhope LLC, 325, Franklin LLC, 618 Lafayette LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC, Eighteen Homes LLC, and 1213 Jefferson LLC.  The term "Debtors" refers, collectively, to the debtors and debtors in possession in the above-captioned chapter 11 cases.

[2]      Filed contemporaneously herewith is the Declaration of Matthew B. Stein ("Stein Decl."), together with attached exhibits.

[3]      Capitalized terms not defined herein shall have the meaning ascribed to them below.

and the 53 Stanhope Confirmation Order.  Indeed, the attempt to invalidate Brooklyn Lender's

credit bid is the latest action by the 53 Stanhope Debtors to rewrite these documents to provide

them with authority that they never sought and that this Court never granted.  Allowing the 53

Stanhope Debtors to proceed on this basis is not only directly contrary to existing orders of this

Court, but also would violate Brooklyn Lender's due process rights.

3.      Specifically, by selecting the lower bids submitted by the Individual Bidders for

each of the Properties, the 53 Stanhope Debtors are acting not in the best interest of their estates,

but rather to protect the payment of their own administrative expenses.  It is without question

that the alternative and inferior bids alleged to be the winning bidders by the 53 Stanhope

Debtors, upon which Brooklyn Lender is inexplicably expected to release its liens, were dwarfed

by both the bulk bid of Brooklyn Lender, which exceeded the next highest bid by at least

$2,700,000.00.  Neither the 53 Stanhope Plan, nor the Bid Procedures, nor any order of the Court

limited Brooklyn Lender's right to credit bid in any way – there was no cash requirement.  To

read one into the documents now is to engage in pure fantasy.

4.      Moreover, the 53 Stanhope Debtors failed to file any application to surcharge

Brooklyn Lender's collateral or expand the carve-out in the single cash collateral order on the

docket.  Therefore, having realized that administrative expenses are at risk, the 53 Stanhope

Debtors now seek the Court's assistance to bail them out.  No authority exists for the Court to

take such action months after confirmation of the 53 Stanhope Debtors' Plan and after the

Auction.

5.      The 53 Stanhope Debtors' selection of the Individual Bidders was far from the

only flaw in the sale process.  In the half year since the 53 Stanhope Confirmation Order was

entered, the 53 Stanhope Debtors have provided minimal notice to Brooklyn Lender as to the

marketing and sale process, and have failed to keep the Court apprised by filing timely public

notices on the docket as required.  Instead, the 53 Stanhope Debtors have handed over a

smattering of incomplete information to Brooklyn Lender after repeated demand, typically after

Brooklyn Letter is left with no choice but to file a letter with the Court due to lack of meaningful

response from the Debtors.  Relatedly, in flippant disregard of their obligations under the Bid

Procedures, the 53 Stanhope Debtors habitually failed to consult with Brooklyn Lender as to

terms of the Auction, notwithstanding repeated requests that it do so.

6.      It also appears from statements by the 53 Stanhope Debtors' counsel on the record

at the Auction, and from communications between Rosewood and Brooklyn Lender, that

notwithstanding a litany of numbers rattled off in a marketing report filed with the Sale Notice

intended to make the marketing process sound robust, the 53 Stanhope Debtors did not dedicate

any serious efforts to market the Properties to non-aggregate bidders until the beginning of 2022

– a mere one week prior to the Auction.

7.      Violations of the 53 Stanhope Plan extended to the Bid Procedures and the

Auction.  The 53 Stanhope Debtors privately announced the selection of stalking horse bidder

FREO to Brooklyn Lender approximately one week prior to the Auction, appeared to announce

the existence of the stalking horse and its break-up fee at the Auction to other bidders, and failed

to disclose the stalking horse selection, or the unapproved bid protections in the Stalking Horse

Agreement anywhere on the docket until after the Auction.  No authority to enter into the

Stalking Horse Agreement was ever obtained, let alone sought.  Given the lack of public notice

and failure to obtain Court approval, there is no basis to award a break-up fee now -- under no

circumstances was the selection of the stalking horse designed to encourage bidding and

maximize the value of the Properties.

8.    The Auction itself was a chaotic and disorganized spectacle that ran on two parallel tracks – one in which Brooklyn Lender's credit bid was highest, and another in which cash bidders were free to bid lower amounts (minimum bids were announced, if at all, not until the beginning of each round).  The 53 Stanhope Debtors also created procedures which deviated from the Bid Procedures on the fly after commencement of bidding, including the ability for FREO to obtain a 2% discount in successive rounds of bidding as a credit against its unapproved breakup fee that it contended would increase with each round and that it did not withdraw until the end of the Auction (and until the end of the Auction declared that the breakup fee would be due even if it were declared the winning bidder).  At the Auction, it was not only Brooklyn Lender that objected to the highly irregular nature of the process.  Both FREO and Individual Bidders objected at times, depending on their perception of who was favored by the 53 Stanhope Debtors' changing procedures.

9.    Moreover, the 53 Stanhope Debtors now insist upon the payment of a 5% broker fee by a broker whose retention, let alone compensation, was never approved by this Court and is manifestly unjustified.

10.    After months of delay past the latest time when an auction was expected to occur (September 3, 2021 at the latest), and a sale was to conclude (November 11, 2021 at the latest), the 53 Stanhope Debtors seek to have this Court approve a sale process that was defective at all levels, and which resulted in the 53 Stanhope Debtors' selection of Individual Bidders who, collectively, submitted bids lower than the agreed-upon amount of Brooklyn Lender's secured claims for the purposes of credit bidding.

11.    Although Brooklyn Lender has been attempting to work with the 53 Stanhope Debtors on a consensual resolution, negotiations have stalled, and will remain at an impasse

without the Court's intervention.  The 53 Stanhope Debtors are determined to consummate a non-value maximizing sale to salvage the 53 Stanhope Plan and assure the payment of retained and unretained professionals.  Any sale to a party other than Brooklyn Lender should be rejected as an effort to pervert the restructuring process to benefit a class of administrative claimants that controlled the Auction and the 53 Stanhope Debtors' attempts to overturn basic tenants of priority and security.  To the extent a new auction is necessary, Brooklyn Lender requests that it not go forward absent Court approval of revised bidding procedures and adequate notice thereof to all creditors.

## RELEVANT FACTUAL BACKGROUND

### A.    The Mortgages.

12.    Between 2012 and 2016, Signature Bank ("Signature") made loans to the 53 Stanhope Debtors (each a "Loan" and collectively, the "Loans") secured by mortgages (each a "Mortgage" and collectively, the "Mortgages") on the 53 Stanhope Debtors' real estate located in Brooklyn, New York (collectively, the "Properties").  The Mortgages set forth events of default that make the Debt (as defined in the loan documents (the "Loan Documents")) due and payable at the option of the lender.  Upon acceleration, all amounts due under the Loans must be repaid, and interest accrues at the default rate of 24% per annum (the "Default Rate") from the date of the underlying default.  On May 17, 2017, Signature assigned the Mortgages and other Loan Documents to Brooklyn Lender.  In June of 2017, Brooklyn Lender informed the Debtors that it was accelerating the Debt on account of the defaults and demanded payment in full.

### B.    The Debtors File For Bankruptcy, And Seek To Confirm The First Amended Plan.

13.    On May 20, 2019 and May 21, 2019 (with respect to 167 Hart LLC) (collectively, the "Petition Date"), the Debtors commenced their Chapter 11 Cases by filing voluntary petitions

(collectively, the "Petitions") for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Chapter 11 Cases are jointly administered for procedural purposes.  *Order Directing Joint Administration* [Dkt. 6].

14.    On August 9, 2019, Brooklyn Lender filed proofs of claim against each of the Debtors (the "Brooklyn Lender Proofs of Claim"), asserting claims against the Debtors (the "Secured Claims") in the aggregate amount of not less than $74,515,177.43, including claims for default interest on account of defaults that had occurred:  (a) because the Debtors made false and misleading statements to Signature concerning the ownership structure of the Debtors (the "Ownership Defaults"); (b) on account of encumbered mortgaged property without the lender's prior written consent (the "Encumbrance Defaults"); (c) on account of the Debtors' accrual of hundreds of building violations on their properties (the "Violation Defaults"); (d) on account of the Debtors' failure to pay the debt when the Loans matured on their own terms (the "Maturity Defaults"); and (e) on account of the Debtors' filing of the Petitions (the "Bankruptcy Defaults").  On October 27, 2019, the Debtors filed partial objections to the Brooklyn Lender Proofs of Claim.  [Dkt. 50].

15.    On January 21, 2020, the Debtors filed their *Amended Plan of Reorganization* [Dkt. 93] (the "First Amended Plan") and attendant *Amended Disclosure Statement* [Dkt. 94] (the "First Amended Disclosure Statement"), which sought to pay off Brooklyn Lender's claims without payment of default interest.

16.    On April 22, 2020, Brooklyn Lender filed *Brooklyn Lender LLC's Omnibus (I) Response to Debtors' Objection to Brooklyn Lender LLC's Claims and (II) Objection to Confirmation of Debtors' Amended Plan of Reorganization* [Dkt. 125].

6

17.     The Court held a five-day bench trial in August 2020 on, among other things, confirmation of the First Amended Plan and the Debtors' objections to Brooklyn Lender's claims.

### C.     The Court Allows Certain Default Interest On Brooklyn Lender's Claims And Denies Confirmation.

18.     On February 19, 2021, the Court issued a modified bench ruling [Dkt. 191] (the "Modified Bench Ruling") and final order [Dkt. 192] (the "February 2021 Order") allowing Brooklyn Lender's claims in part.  Specifically, the Court allowed Brooklyn Lender's claims for default interest on account of the Maturity Defaults, allowed in part Brooklyn Lender's claims for default interest as to the Encumbrance Defaults, but denied Brooklyn Lender's claims for default interest on account of the Ownership Defaults, the Violation Defaults, and the Bankruptcy Defaults.  *See* Modified Bench Ruling at 24-25, 28-29, 37, 40-42, 44.

19.     In light of its rulings allowing certain default interest, the Court determined that the exit facility proposed with the First Amended Plan was insufficient to pay Brooklyn Lender's allowed claims and upheld Brooklyn Lender's objection to the extent that it denied confirmation of the First Amended Plan, allowed certain interest at the Default Rate, and found that certain defaults for which it did not allow default interest did, in fact, occur.  *Id.* at 27, 30-31, 37, 40-42.

### D.     Confirmation of the 53 Stanhope Plan.

20.     The 53 Stanhope Debtors, in response to objections by Brooklyn Lender and the Court's concerns, filed several revised disclosure statements and plans, culminating with the *Corrected Fourth Amended Disclosure Statement for 53 Stanhope LLC, 325 Franklin LLC, 618 Lafayette LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC, Eighteen Homes LLC, and 1213 Jefferson LLC* [Dkt. 245] (the "53 Stanhope Disclosure Statement") and the *Corrected Fourth Amended Plan of Reorganization for*

*53 Stanhope LLC, 325 Franklin LLC, 618 Lafayette LLC, 92 South 4th St LLC, 834 Metropolitan*

*Avenue LLC, 1125-1133 Greene Ave LLC, APC 1 LLC, Eighteen Homes LLC, and 1213*

*Jefferson LLC* [Dkt. 245], Ex. A (the "53 Stanhope Plan").

21.    On May 4, 2021, Brooklyn Lender filed an omnibus objection to the Debtors'

three plans noticed for confirmation on May 27, 2021 [Dkt. 263] (the "Omnibus Objection").

22.    On May 27, 2021, the Court held a hearing, *inter alia*, to consider confirmation of

the 53 Stanhope Plan (the "Confirmation Hearing").  At the Confirmation Hearing, the Court

ruled that the 53 Stanhope Plan would be confirmed, but a determination as to the allowed

amount of Brooklyn Lender's Secured Claims against the 53 Stanhope Debtors was left for

another day.  *See* [Dkt. 297] ("Confirmation Hr'g Tr.") at 16:8-13, 19:2-5, 19:12-19.  On June

11, 2021, the Court entered an order confirming the 53 Stanhope Plan.  [Dkt. 285] (the "53

Stanhope Confirmation Order").[4]

**E.    The 53 Stanhope Plan's Contemplated Bidding Procedures.**

23.    The 53 Stanhope Plan and bidding procedures annexed thereto as Exhibit A

(the "Bid Procedures") provided for a post-confirmation sale pursuant to Section 363(b) of the

Bankruptcy Code, in which Brooklyn Lender's unqualified right to credit bid under Section

363(k) up to the full amount of its allowed claims was expressly preserved.  53 Stanhope Plan, ¶¶

67-68 ("The Properties shall be sold subject to . . . the 'Sale and Auction Procedures' . . . . The

Mortgagee shall have the right under section 363(k) of the Bankruptcy Code to credit bid for

each Debtors' [*sic*] property up to the Allowed Amount of its Secured Claim against the Debtors

. . . ."); Bid Procedures at 48 (providing Brooklyn Lender with unqualified credit bidding right).

---

[4]    Brooklyn Lender has perfected an appeal of the 53 Stanhope Confirmation Order and the Modified Bench Ruling and February 2021 Order.  *See In re 53 Stanhope LLC*, Case No. 7:21-cv-05867 (CSS) (S.D.N.Y.).  The appeal was fully briefed on October 13, 2021, and is currently *sub judice*.

In addition, where a cash bid requirement was referenced in the 53 Stanhope Plan Bid Procedures, Brooklyn Lender was expressly exempted from having to include cash as part of its bid. *Id.* ("All prospective bidders *except the Mortgagee* are required to deposit 10% of their opening bid . . . . Within one business day after the Successful Bidder is determined, the Successful Bidder (*except for the Mortgagee*) shall be required to increase the Qualifying Deposit.") (emphasis added); Bid Procedures at 48 (same).

24.     Moreover, the Bid Procedures' minimum aggregate bids and property-by-property bids were to be announced in consultation with Brooklyn Lender no later than 7 days prior to the auction.  Bid Procedures at 48.

25.     The Bid Procedures also provided that the 53 Stanhope Debtors would have the "option" to designate a "Qualified Bidder" (which, as defined in the Bid Procedures included, *inter alia*, that the bidder pay a 10% cash deposit prior to submission of an initial bid for all parties other than Brooklyn Lender).  *Id.* at 47-48.  The Bid Procedures also authorized Brooklyn Lender to designate a Qualified Bidder as a stalking horse bidder and provide a 2% stalking horse fee in the event of an alternative transaction.  *Id.* at 52.  However, the 53 Stanhope Plan and Bid Procedures also required court approval of any sale, *inter alia*, to ensure that the "terms and conditions of the sale are fair and reasonable," and no breakup fee has been approved by this Court to date.  53 Stanhope Plan, ¶ 74; Bid Procedures at 48.

**F.      Brooklyn Lender's Motion to Set Claim Amount.**

26.     On September 23, 2021, Brooklyn Lender filed a motion to set the amount of its Secured Claims against the 53 Stanhope Debtors [Dkt. 310] (the "Claim Determination Motion") for the purposes of credit bidding at an auction, in which Brooklyn Lender asserted that the allowed amount of its Secured Claims was $23,904,232.62 for the purposes of the submission of its credit bid as of October 31, 2021 comprised of:  (1) the principal and interest owed under the

Modified Bench Ruling; (2) legal fees and expenses and interest owed thereon; and (3) late fees. *Id.*, ¶¶ 2, 10.

27.    The 53 Stanhope Debtors opposed the Claim Determination Motion on the grounds that legal fees should be allowed at lower amounts, but acknowledged the accrual of default interest as recognized in the Modified Bench Ruling.  [Dkt. 315].  Moreover, the 53 Stanhope Debtors did not object to anything other than legal fees and legal interest, *see id.*, which totaled $4,115,435.66 of the asserted $23,904,232.62.  Claim Determination Motion, ¶¶ 2, 10, 12.  Nowhere in the 53 Stanhope Debtors' opposition to the Claim Determination Motion did they state that Brooklyn Lender should be required to submit a cash component with its credit bid.  In other words, there was never any dispute that Brooklyn Lender's allowed Secured Claims against the 53 Stanhope Debtors totaled at least $19,746,997.96, for principal and default interest the entire amount of which could be credit bid at the Auction, the entire amount of which constituted that minimum amount that Brooklyn Lender could credit bid at the Auction.  *Id.*

28.    Although Brooklyn Lender and the 53 Stanhope Debtors reached a settlement as to the allowed amount of Brooklyn Lender's Secured Claims -- **$22,390,298.66** as of December 15, 2021, comprised of principal, contract interest, default interest, late fees, and legal fees, and net of payments received and escrow -- (with interest, default interest, and to the extent applicable, late fees and legal fees shall continuing to accrue through the effective date of the 53 Stanhope Plan).  The parties, however, did not agree to the form of proposed order.  At the last minute, the Debtors proposed to include language, in an order setting the credit bid amount, requiring Brooklyn Lender to marry its credit bid with a $3 million in cash to cover asserted administrative expense payments. Brooklyn Lender objected to the incremental language /cash requirement on the basis that such requirement was unrelated to an order that solely sets the

amount of the credit bid.  Notably, the $3 million request was contrary to the 53 Stanhope

Disclosure Statement, which had disclosed only approximately $564,998.51 in estimated

administrative expenses (all for attorneys' fees), and $1,076,015.92 in estimated closing costs.

29.    Brooklyn Lender was not informed what the Debtors' asserted $3 million figure

included prior to the auction, other than that it included a 5% fee payable to the broker the

Debtor has used to market the Properties, Rosewood Realty Group ("Rosewood") (when the

broker has not been retained and the fees has not been authorized the court) and other asserted

professional fees, closing costs and funds needed for effective date payments.  Despite multiple

requests, the Debtors have failed to cite any authority in the 53 Stanhope Plan or the Bid

Procedures that required that Brooklyn Lender's credit bid be accompanied by a cash

component.

30.    Although it is obvious that effective date payments must be made for a plan to go

effective, Debtors' counsel confirmed at the Confirmation Hearing, when questioned by the

Court that the 53 Stanhope Plan was "just a waterfall plan."  Confirmation Hr'g Tr. at 16:15-16.

And the Court found at the Confirmation Hearing that the Plan "would result in all creditors

receiving at least the recovery that they would receive in a Chapter 7 liquidation if the debtors

were converted . . . today" over an objection raised in Brooklyn Lender's Omnibus Objection.

Confirmation Hr'g Tr. at 20:15-18; Omnibus Objection, ¶¶ 92-98  Further, the Court found that

Brooklyn Lender was not impaired because 53 Stanhope Plan did not fix Brooklyn Lender's

claim amount, and "Brooklyn Lender would receive the value of its . . . secured claims . . . given

the prompt liquidation procedures."  Confirmation Hr'g Tr. at 20:21-21:3.

G.      **The 53 Stanhope Debtors' Delays and Failure to Comply with
Post-Confirmation Obligations.**

31.      As the Court recognized at the Confirmation Hearing, a sale was intended to be a

fairly "prompt." Confirmation Hr'g Tr. at 21:1-3.  The 53 Stanhope Plan contemplated a twelve-

week marketing process with an auction to occur by the twelfth week, and the sale to conclude

within five months.  53 Stanhope Plan, ¶ 41; 53 Stanhope Disclosure Statement, Ex. B at 79.

Accordingly, pursuant to the 53 Stanhope Plan, which was confirmed on June 11, 2021, the

auction was expected to occur no later than September 3, 2021, and the sale was to conclude by

November 11, 2021.  However, notwithstanding the stated goals in the 53 Stanhope Plan or at

the Confirmation Hearing, the auction was delayed by over 4 months.

32.      Despite the delays in the sale process leading up to Auction, the 53 Stanhope

Debtors failed to keep Brooklyn Lender or the Court adequately apprised as to the status of the

marketing and sale process, as required under the 53 Stanhope Confirmation Order.  53 Stanhope

Confirmation Order at 5 (requiring the Debtors to file, "within 45 days after the date of this

Order, a status report detailing the actions taken by them and the progress made toward the

consummation of the Plan" and thereafter to continue such filings until entry of a final decree);

Confirmation Hr'g Tr. at 21:13-14 ("Please be sure to put in the confirmation order the

requirement for quarterly reports on the progress of implementing the plan . . . .").  No status

report was filed within 45 days of entry of the Confirmation Order (July 26, 2021), and no status

report was filed by the next quarterly deadline (October 15, 2021).  *See* 53 Stanhope

Confirmation Order at 5.

33.      Only after Brooklyn Lender filed a letter with the Court on October 27, 2021, and

requested a status conference to address the 53 Stanhope Debtors' failure to comply with their

obligations under the 53 Stanhope Plan, *see* [Dkt. 324-325], did the 53 Stanhope Debtors purport

to file such an update, minutes before the requested status conference on November 2, 2021.

[Dkt. 326] (the "November Status Report").

34.     The November Status Report, issued by Rosewood disclosed that the highest bid

received was an aggregate bid of "$18,250,000 inclusive of fee" and that it expected the auction

to occur during the first week in December.  *Id.* at 34.  Debtors' counsel reiterated at the status

conference that it expected closing to occur within this timeframe.  Stein Decl., Ex. A at 6:3-5.

35.     The Court also stated at the November 2021 status conference, that the 53

Stanhope Debtors needed to comply with their quarterly progress report filing requirements

under the 53 Stanhope Plan.  *Id.* at 6:8-10.

**H.     The 53 Stanhope Debtors' Failure to Comply with Auction Noticing
Requirements and Further Delay.**

36.     On December 8, 2021, the 53 Stanhope Debtors noticed an auction for December

15, 2021 [Dkt. 332] (the "Original Auction Notice") (one week later than contemplated in the

Status Report).  The Original Auction Notice, in violation of the express requirements of the Bid

Procedures, did not contain any information with respect to bid amounts.  Nor was Brooklyn

Lender  consulted as to bid amounts.  The Original Auction Notice also failed to disclose:  (1)

who were "Qualified Bidders" meeting the requirements outlined in the Bid Procedures,

including payment of a 10% cash deposit prior to submission of an initial bid for all parties other

than Brooklyn Lender; (2) the value of opening bids and the identity of Qualified Bidders on an

asset-by-asset basis; and (3) the terms of bidding on an asset-by-asset basis.  *See id.*  The 53

Stanhope Debtors failed to consult with Brooklyn Lender as to these items in advance of filing

the notice as required under the 53 Stanhope Plan and Bid Procedures.  *See* 53 Stanhope Plan, ¶

68; Bid Procedures at 48.  Brooklyn Lender raised these deficiencies in a letter filed with the

Court on December 9, 2021, as well as its concerns that the 53 Stanhope Debtors were "unjustifiably delaying the sale of their assets." [Dkt. 333].

37.    Subsequently, the Debtors determined that the auction could not go forward on December 15, 2021. No notice of adjournment was filed on the Court's docket. Instead, on December 28, 2021, and again without consulting with Brooklyn Lender, the 53 Stanhope Debtors filed an amended auction notice, setting an auction for January 6, 2022 at 11:00 a.m. [Dkt. 336] (the "Amended Auction Notice"). The Amended Auction Notice contained the same deficiencies as the Original Auction Notice. After Brooklyn Lender brought the issues to the attention of the 53 Stanhope Debtors, the 53 Stanhope Debtors filed a second amended auction notice [Dkt. 337] (the "Second Amended Auction Notice"), disclosing that minimum opening aggregate bid was $17,350,000.00 and that there would be "no minimum opening bids for property-by-property bids." *Id.* at 2. The reduced bid amount now stood a full five million below Brooklyn Lender's agreed upon secured claim for credit bidding purposes. The Second Amended Notice did not disclose that the opening aggregate bid was submitted by a purported stalking horse bidder. In fact, there was no disclosure on the docket prior to the Auction of the existence of a purported stalking horse bidder; indeed, at most, the Debtors disclosed only of the possibility that one might be selected buried in the November Status Report and referenced in a letter filed by Debtors' counsel. [Dkt. 326]; at 34; [Dkt. 334] at 1.

I.    **The Stalking Horse Agreement.**

38.    On December 29, 2021, the 53 Stanhope Debtors revealed the existence of an executed sale contract and stalking horse agreement to Brooklyn Lender that had not been filed

on the docket or approved by this Court (the "Stalking Horse Agreement").[5]    FREO U.S.

Acquisitions, LLC ("FREO") was named stalking horse bidder.  Brooklyn Lender wrote to the

Court on January 3, 2022 to raise concerns with several problematic provisions in the Stalking

Horse Agreement (in addition to the insufficient disclosure of auction procedures in the Second

Amended Auction Notice and the 53 Stanhope Debtors' purported modification of the Bid

Procedures to require that Brooklyn Lender include a cash component in its bid to cover

administrative and other expenses to ensure that it would be picked as highest and best).  [Dkt.

338].  Brooklyn Lender also requested a status conference, though the Court deferred

consideration until the Sale Hearing.  The problematic provisions in the Stalking Horse

Agreement included:

- The 53 Stanhope Debtors had represented and continued to represent that the proposed, and objectionable break-up fee would not apply in the event that Brooklyn Lender's credit bid was the winning bidder, but the Stalking Horse Agreement did not contain such exclusion.  *Id.*, ¶¶ 1.04-1.05

- The 53 Stanhope Debtors had represented and continued to represent that the amount of the stalking horse bid would result in a net recovery of $17.35 million to the 53 Stanhope Debtors' estates, but the Stalking Horse Agreement provided that such amount is the gross purchase price.  *Id.*, ¶ 2.01.

- There existed open-ended obligations for indemnification and repairs in the Stalking Horse Agreement that threatened to impact the actual consideration offered by FREO adversely, or would render such consideration illusory.  *Id.*, ¶¶ 10.02, 14.10.

- The Stalking Horse Agreement failed to allocate consideration on a property-by-property basis.  *Id.*, Ex. A.

- The 53 Stanhope Debtors unilaterally altered the deposit requirement of the bidder in contravention of the Bid Procedures.  *Id.*, ¶ 2.01.

39.    Although, as discussed below, the 53 Stanhope Debtors attempted to resolve some

of these issues on the record minutes prior to commencement of bidding at the Auction, not all

---

[5]    The Stalking Horse Agreement was filed on January 12, 2022, days after the conclusion of the Auction held on January 6, 2022 and January 7, 2022 (the "Auction").  *See* Sale Notice, Ex. C.

issues were resolved.  And there is nothing in the record to suggest that Auction participants were given notice of the Stalking Horse Agreement prior to the start of the Auction.

> **J.**     **The Highly Disorganized and Chaotic Auction.**

40.     The Auction was held on January 6, 2022 (starting after 2:00 p.m. rather than at the noticed 11:00 a.m. time) and on January 7, 2022.  *See* [Dkt. 342], Ex. D (the "Jan. 6 Auction Transcript" and "Jan. 7 Auction Transcript").  The Auction was conducted in a haphazard manner with previously undisclosed procedures invented on the fly.  And there appeared to be a great degree of confusion on the part of bidders other than FREO who submitted non-aggregate bids prior to the commencement of the auction (the "Individual Bidders") related to bidding requirements, in particular concerning FREO's asserted, but unapproved, entitlement to a break-up fee, even if it were selected as the winning bidder.

41.     Specifically, at the auction, and contrary to the Debtors' statement in the Second Amended Auction Notice, the Debtors' counsel stated that there would be minimum opening bids for individual properties.  *Compare* Jan. 6 Auction Tr. at 5:5 ("Minimum opening bids will be announced by the auctioneer for each property and for aggregate bids") *with* Second Amended Auction Notice at 2 ("There are no minimum bids for property-by-property bids.").  Yet, not all bidding opened with an announcement as to minimum bid.  *Se id.* at 35:16-24 (bidder opening with a bid of $1.1 million despite auctioneer not having set a minimum bid amount).  Where minimum bids were announced, they disclosed spontaneously by the auctioneer  prior to the commencement of each bidding round.

42.     The Debtors also stated on the record, without any citation to controlling authority (then or since other than to a vague reference to a "carve out" in the 53 Stanhope Plan), that Brooklyn Lender's credit bid must include cash sufficient to pay all administrative expense claims, estimated by the Debtors to be $3 million.  Jan. 6 Auction Tr. at 6:13-19.  And to

accommodate the 53 Stanhope Debtors' unapproved, eleventh-hour change to the Bid

Procedures, the auctioneer announced a procedure by which the auction would proceed on two

parallel tracks, a cash auction and a credit bid auction to accommodate the 53 Stanhope Debtors'

unapproved, eleventh-hour change to the Bid Procedures. *Id.* at 7:5-9. In each round, the dollar

value of Brooklyn Lender's credit bid was ignored, and bidders were free to top the highest cash

bid amount rather than the highest dollar value amount (which in all cases was Brooklyn

Lender). This previously undisclosed procedure confused at least one individual bidder. *Id.* at

46:15-47:6 (Individual Bidder questioning knockdown of Brooklyn Lender's credit bid and

objecting to its participation in the auction of 834 Metropolitan Avenue LLC Properties).

43. Prior to commencement of bidding, Brooklyn Lender noted its objections on the

record to the numerous problems with the auction, and requested clarification by the 53 Stanhope

Debtors with respect to certain issues while reserving all rights. The issues raised and the

Debtors' responses include those referenced in the chart below:

| Objection/Request for Clarification | Response |
|---|---|
| The Second Amended Auction Notice incorrectly stated the time for the auction was 11:00 a.m., when the auction was being starting past 2:00 p.m. *Id.* at 9:17-21 | The 53 Stanhope Debtors' counsel represented on the record that all potential bidders had been informed of the time change, *id.* at 10:8-9, but the 53 Stanhope Debtors have not provided evidence to Brooklyn Lender or to the Court that this is the case. |
| The 53 Stanhope Debtors failed to consult sufficiently with Brooklyn Lender as required in the Bid Procedures. *Id.* at 10:11-18. | N/A |
| Brooklyn Lender requested clarification that bidding is on an as-is, where-is basis, given apparent deviations from this requirement in the Sale Contract, and that it would not be responsible for paying a stalking horse fee. *See id.* at 13:13-15:10, 21:21-25. | Confirmation of both points was provided. *See id.* at 13:13-15:10, 22:1-5. |
| Brooklyn Lender requested clarification as to the number of bids and whether the bidders conformed with the bid qualifications. *Id.* at 16:11-17:6. | The 53 Stanhope Debtors stated that there were eleven bidders who demonstrated "varying levels of compliance" with the 53 Stanhope Debtors' bid qualifications. *Id.* at 16:11-17, 17:7-8. |

| Objection/Request for Clarification | Response |
|---|---|
| | As previously noted by Brooklyn Lender, the 53 Stanhope Debtors confirmed that FREO made a deposit of less than 10% in cash, notwithstanding the Bid Procedures. *Id.* at 17:12-13.<br><br>Other bidders had "minor changes" to their contract, and "*most of these bidders qualified in the last day and we just have not had time to go over all of this in advance of the auction with you,*" and that "[c]*ontracts were coming in today, this morning. That's part of the reason we had to put this off until 2:00. We wanted to get as many participants as possible.*" *Id.* at 17:18-21 (emphasis added). |
| Brooklyn Lender objected to any requirement that a cash component be included with its bid, in violation of the 53 Stanhope Plan, the 53 Stanhope Confirmation Order, and the Bankruptcy Code. *Id.* at 18:12-19:10. Brooklyn Lender further noted that the requested $3 million contravened the 53 Stanhope Disclosure Statement's substantially lower estimated administrative expenses. *Id.* at 19:3-22. | N/A |
| Brooklyn Lender requested clarification that bidding was in gross amounts to ensure apples-to-apples price comparison. *Id.* at 11:10-13:12. | Greg Corbin, Rosewood's broker, and the auctioneer, confirmed that real estate commissions would be in excess of the bid amounts. *Id.* However, as noted below, an apples-to-apples comparison became problematic later in the Auction when substantial confusion arose over FREO's asserted break-up fee. |
| Brooklyn Lender reserved all rights to further object. *Id.* at 18:4-11 | The 53 Stanhope Debtors acknowledged that all rights were reserved. *Id.* at 18:3. |

44.    As noted in the chart above, some objections were resolved at the auction. However, due to the haphazard nature in which auction was conducted, lack of forethought, and deviation from the Bid Procedures, significant confusion arose during the course of the auction, which at times devolved into a chaotic and disorganized shouting match among the bidders, and the auctioneer, with sporadic and insufficient interventions by the 53 Stanhope Debtors and their professionals. In fact, by the end of the first day of bidding, FREO stated on the record that the Auction "has been a highly irregular process" consisting of "improper and irregular procedures." *Id.* at 95:4-11. This accurately sums up not just the first day of bidding, but the entire Auction.

   **1.  Confusion Regarding Brooklyn Lender's Right to Credit Bid and to Apply Same Bid to Joint and Several Loans.**

  45.  There are two Loans in the 53 Stanhope Debtors' portfolio for which there are two Debtors who are jointly and severally liable (the "Joint and Several Loans").  *See* [Dkt. 208-24]; [Dkt. 208-8] at 48-70.  One Joint and Several Loan is with 325 Franklin Avenue LLC and 53 Stanhope LLC.  The other Joint and Several Loan is with 834 Metropolitan Avenue LLC and 92 South 4th Street LLC.  [Dkt. 208-8] at 48-70.  Brooklyn Lender intended to use one identical credit bid per Joint and Several Loan, as the same collateral covered such Loans, and asked for clarification at the auction as to whether the properties would be auctioned together.  *Id.* at 34:21-25, 35:13-15.  However, neither the auctioneer, who deferred to Greg Corbin of Rosewood, nor Greg Corbin, who deferred to the Debtors' counsel, were prepared to answer whether this was permissible, and the Debtors' counsel was not sure and could only say that he "th[ought]" this was acceptable.  *Id.* at 35:4-9.  As a result, the auction for 325 Franklin LLC and 53 Stanhope LLC had to be tabled.  *Id.* at 35:16-22.  Later in the Auction, when 834 Metropolitan Avenue LLC's assets came up for bidding, Debtors' counsel clarified that he was "corrected by the client" and that the assets would be sold separately.  *Id.* at 42:17-43:1.  The auctioneer followed along with this instruction.  *Id.*

  46.  This lack of notice and invention of procedure on the fly confused at least one Individual Bidder, who fervently objected to Brooklyn Lender's right to credit bid one amount for the Joint and Several Loans.  *Id.* at 53:22-54:19 (Individual Bidder questioning identical bid submitted by Brooklyn Lender with respect to Properties securing Metropolitan Avenue LLC and 92 South 4th Street LLC Joint and Several Loan, and arguing with Brooklyn Lender's counsel regarding right to credit bid); 55:10-12 (Individual Bidder accusing Brooklyn Lender of "misleading the auction" by submitting an identical bid for separately-auctioned properties

securing a joint and several Loan), 55:20-56:56:3 (Individual Bidder arguing with Brooklyn

Lender's representative regarding permissibility of submitting an identical bid), 55:21-21-

56:58:2 (Individual Bidder arguing with auctioneer over permissibility of submitting its own

combined bid); 64:14-65:11 (Individual Bidder arguing with auctioneer over Brooklyn Lender's

right to credit bid the same amount for 325 Franklin Avenue LLC's and 92 South 4th Street's

Properties), 66:6-12 (Individual Bidder accusing 53 Stanhope Debtors of "confusing a bidder").

47.     In response, David Goldwasser, the 53 Stanhope Debtors' representative, had to

clarify multiple times on the record Brooklyn Lender's right to make a combined bid on the

Debtors' whose Properties secured the Joint and Several Loans and explain how to top such a

bid. *Id.* at 54:20-55:6, 58:8-20, 65:12-66:5, 66:14-19.

### 2.    Confusion Regarding New and Previously Undisclosed Procedures for Bidding on January 7.

48.     The first day of the auction concluded with FREO's stalking horse bid remaining

at $17,350,000 in cash, the piecemeal bids on individual Properties totaling $15,650,000, and

Brooklyn Lender's bid easily surpassing both at $19,000,000 (although the record reflects an

amount of $30,756,000 taking into account the joint and several bids on the individual

properties). Jan 7 Tr. at 4:16-25.[6]  Given the differential between the two sets of cash bids, the

53 Stanhope Debtors decided to entertain additional bids to determine whether the Individual

Bidders were willing to top FREO, but without any rationale or justification, decided not to

reopen full bidding, and instead only gave the high Individual Bidders from January 6 the option

to increase their collective bids to $17,800,000 (a figure that included an unapproved stalking

---

[6]     Brooklyn Lender ultimately increased its credit bid to $20 million following the conclusion of the Auction
on January 7, 2022. *Id.* at 61:18-62:2.

horse fee) and stated that unless the total of the individual bids exceeded FREO's bid, FREO's

stalking horse bid would not be upended. *Id.* at 5:13-6:10.

49.     Given the lack of prior disclosure of these procedures, Brooklyn Lender

questioned whether individual bidders were given notice of the opportunity to submit new bids

following the end of the auction on January 6, and the Debtors' representative David Goldwasser

responded that high Individual Bidders were informed of the need to evaluate their numbers to

bid in real time. *Id.* at 7:21-8:2, 8:11-19.  No evidence has been presented of what notice was

provided.

50.     The Debtors' announcement was questioned by at least one Individual Bidder,

who thought that all parties should be able to submit topping bids, rather than just the high

Individual Bidders, but the auctioneer rejected the concern, responding reflexively that there was

a "fair auction yesterday, and if you were the high bidder at that moment, then you were the high

bidder." *Id.* at 6:10-6:24.[7]  Later, the Individual Bidder decided to submit a topping bid on a

property for which he was not the high bidder anyway on 1125-1133 Greene Ave LLC's

Properties, while noting an objection. Jan 7 Tr. at 12:2-21.

51.     This concern only grew.  Another Individual Bidder stated that he was confused

by the process and was concerned that the high Individual Bidders would be bidding against

themselves to top FREO's bid. *Id.* at 9:10-10:15 ("[I]t just doesn't make any sense at that point

because if I can't hit the number -- if we're not going to hit the number, what's the point of even

overbidding?  I may as well hold my bids."), 10:22-23 ("If it doesn't make sense for him to bid

against myself, it doesn't make sense for me to bid against myself.").

---

[7]      It should be noted that in addition to the issues already raised with respect to January 6 bidding, one Individual
Bidder was precluded from topping a bid because he stated that he had a connectivity issue seconds after bidding had
closed, but was denied the ability to submit a final bid by the auctioneer.  Jan. 6 Tr. at 91:6-92:11.

52.     As a result, the auctioneer decided on the spot that Individual Bidders could

collude with one another, an additional new procedural change that had not been disclosed

previously, furthering the confusion that existed on January 6.  *Id.* at 10:25-11:2 (auctioneer

inquiring if Individual Bidders would like to submit joint aggregate bids), 11:3-19 (Individual

Bidder objecting to the process of having parallel credit bid and cash bid auctions and likening

the process to a "chessboard game"), 12:20-21 (Individual Bidder stating that "the bidding

process was very confusing all together").  Eventually, in an attempt to short circuit the problem,

the auctioneer advised that Individual Bidders submit smaller incremental bid increases to start.

*Id.* at 14:9-17.

53.     Although an Individual Bidder had already purported to top the $17,800,000

required to surpass the stalking horse bid, *id.* at 12:2-21, the auctioneer credited another

Individual Bidder (because the 1125-1133 Greene Ave LLC bid was for a "closed" property) at

the unapproved $17.8 million stalking horse threshold.  *Id.* at 15:4-7, 16:4-5.  FREO then

increased its aggregate bid to $17.9 million.  *Id.* at 18:13-14.

### 3.     Confusion Regarding Application of FREO Break-Up Fee and FREO's Right to Credit Bid.

54.     Notwithstanding that the Bid Procedures provided only Brooklyn Lender with the

right to credit bid, and notwithstanding the Debtors' statement at the beginning of the auction

that all bids other than Brooklyn Lender's would need to be submitted in cash, and FREO's lack

of objection at the time, *see* Jan. 6 Auction Tr. at 4:24-5:1, FREO pronounced on the record on

January 7 that it was entitled to receive a continuing cash credit toward its breakup fee pursuant

to a provision in paragraph 1.04 of the Stalking Horse Agreement, and that a portion of the $17.9

million was a credit bid.  *Id.* at 19:18-23, 26:24-25.  Subsequently, FREO revised its position to

articulate a new view that because the Stalking Horse Agreement purportedly granted it a

continuing right to obtain a 2% breakup fee credit, as a result, for each round of bidding, so that

the 2% breakup fee would need to be calculated each time a new bid was submitted and applied

as a discount, and that the amounts owed were increasing "exponentially." *Id.* at 22:6-20, 23:20-

23.[8]  Brooklyn Lender reiterated its objection to the allowance of FREO to the break-up fee, on

the grounds that there was no benefit to the estates associated with FREO's 2% tax on each

round of bidding. *Id.* at 22:23-23:7, 27:22-28:9.  FREO then asked for confirmation on the

record from Debtors' counsel that this increasing break-up fee would be paid even in the event it

was the winning bidder, which Debtors' counsel did not opine on. *Id.* at 26:3-27:9.  The auction

rapidly fell into a tailspin.  It should be noted that he Court advised on January 4, 2022 that the

circumstances in which a break-up fee would be awarded needed to be clearly established before

bidding began. Stein Decl., Ex. B.

55.    An Individual Bidder also commented that it was "ridiculous," that FREO could

"get[] [a] 2 percent credit in their own bid that they win," and would not increase his bid under

the circumstances because otherwise, they're [FREO] bidding against us with play money that

we believe is not real" and FREO's use of "phantom money" made no sense and was something

that he had never seen before, notwithstanding his participation in many bankruptcy cases. *Id.*at

28:11-29:4; *see also, e.g.*, *id.* at 29:23-30:5 (stating that "when we are increasing our bid, we

cannot have a little mouse bid against us and say we need to outbid them" and reserving the right

to decrease the bid at a later time to line up with the real money on the table), 32:16 ("[T]he

[FREO's] bid is not a bid, and I reserve the right to knock out their bid . . . And I'm going to

reserve my right to use . . . this coffee cup . . . it might be Bitcoin to bid with as well . . . ."),

---

[8]        Not only did this proposal violate the 53 Stanhope Debtors' representations that bids would need to be in cash amounts, it also violated the 53 Stanhope Debtors' clarification on January 6 that bids would be in gross amounts. *See* Jan. 6. Auction Tr. at 11:10-13:12.

34:14-23, 35:11-13 (Individual Bidder providing two alternative bids based on Court's allowance
or lack of allowance of breakup fee, and encouraging others to do the same), 41:3-6 (noting that
FREO's asserted right to bid at a discount was the "maybe the highest for Rosewoods'
commission but not the highest to the Debtor[s]"); 41:19-42:17 (threatening to walk out of the
auction and asking auctioneer to knock it down).

56.     After the Auction had devolved into a raucous shouting match, the Debtors'
counsel attempted to rein things in by explaining to the Individual Bidder that the Debtors agreed
with his position on the breakup fee, but admonished him that his tactics were going to
complicate the Debtors' decision because "[i]f we're going to have to win the litigation for yours
to be highest and best, that's going to be a problem." *Id.* at 45:20-46:9.  At that point, the same
Individual Bidder suggested that given the problem of one of the bidders providing a "$400,000
phantom bid," the auction needed to be postponed. *Id.* at 46:10-15.

57.     At this point, which was toward the end of the Auction on January 7, FREO
withdrew its reservation of rights to obtain a 2% discount in the event that it was the winning
bidder but would require a 2% breakup fee in the event they were the losing bidder, *id.* at 46:23-
47:12.  By this point, the damage to the process had already been done.

### 4.     The Auction Concludes in Disarray.

58.     The disorganized and erratic procedure for the unnoticed second day of the
auction may have chilled bidding because at least two Individual Bidders were time-limited
because they were in a rush to leave to observe the Sabbath, and FREO, in their view, was taking
an excessively long time to calculate its bids after each round of bidding.  *Id.* at 33:18-20, 39:10-
12, 39:17-19, 40:21-24.  To address this concern, toward the end of Auction, the auctioneer
imposed a time limit of two minutes.  *Id.* at 50:22-25.

59.    At the conclusion of the auction, FREO's bid was $18,300,000 in aggregate, and an Individual Bidder increased his bid on one of the Debtors' Properties by $1 and another Debtor by $10,000, for a total of $18,310,001.  *Id.* at 51:18-52:4.  Brooklyn Lender reiterated its objection on the record regarding procedural irregularities and the lack of adequate notice to participants and its intent to file a formal objection.  *Id.* at 60:11-61:1.  Brooklyn Lender also increased its bulk credit bid from $19 million to $ 20 million, which is the highest dollar-value bid of any participant, and requested sale agreements of the Individual Bidders.  *Id.* at 61:18, 62:7-11.  Brooklyn Lender's increased bid was ignored in Rosewood's marketing report that the 53 Stanhope Debtors filed, which incorrectly states that its final bid was $19 million.  *See* Sale Notice, Ex. B at 150-51.

### K.    Post-Auction Problems.

60.    Following the close of the Auction, Brooklyn Lender reiterated to the Debtors its position that its bid was indisputably the highest and best, but also sought to resolve the cash issue consensually through settlement efforts.  Ultimately a resolution was not achieved.

61.    On January 12, 2022, Rosewood notified Brooklyn Lender that the 53 Stanhope Debtors had selected the individual "high bidders" as the winning bidders.  Brooklyn Lender followed up with a letter to the Court the next day outlining the multitude of problems addressed herein and requesting a status conference in advance of the Sale Hearing.  [Dkt. 345].  The Court determined that no status conference was necessary at that time, and that the issues raised would be litigated at the Sale Hearing.

**OBJECTION**

I. **A Sale to Individual Bidders or FREO Should not be Approved because Brooklyn Lender is the Highest and Otherwise Best Bidder.**

62.    The 53 Stanhope Plan provides for the sale of the 53 Stanhope Debtors' assets subject to Sections 363(b), 1126(a)(6), 1129, and 1141 of the Bankruptcy Code.  53 Stanhope Plan, ¶ 67; Jan. 6 Auction Tr. at 9:1-2 ("The sale is going to be done in accordance with Bankruptcy Code Section 363 and [53 Stanhope Plan].").  Whether viewed as a Section 363 sale or a Section 1123(a)(5) and 1141(c) sale,[9] the 53 Stanhope Debtors, are estate fiduciaries bound to act in the best interest of their creditors and in conformity with their obligations under the 53 Stanhope Plan, the 53 Stanhope Confirmation Order, and the Bankruptcy Code.  *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) ("The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate."); *In re Paradigm Elizabeth, LLC*, No. 14-24901 (DHS), 2015 WL 435067, at *3 (D.N.J. Jan. 30, 2015) ("[S]o long as the liquidation plan is maximizing the value of the debtor's estate, it serves a valid bankruptcy purpose . . . ."); *In re Claar Cellars LLC*, 623 B.R. 578, 601 (Bankr. E.D. Wash. 2021) ("A liquidating plan furthers other policies embodied in the Bankruptcy Code: the orderly disposition of assets to maximize value, and the equal treatment of claims of similar priority.") (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004)).

---

[9]    The Court previously questioned why a sale of assets in a post-confirmation debtor would be taking place pursuant to Section 363(b) of the Bankruptcy Code at the hearing to consider approval of the 53 Stanhope Disclosure Statement.  Stein Decl., Ex. D at 20:6-19.  The Debtors' counsel responded that it was intended in response to comfort title companies, and the Court suggested in response that the 53 Stanhope Plan should be thought of instead as a sale incorporating Section 363(b) of the Bankruptcy Code through Sections 11123(a)(5), 1141(c) (although the 53 Stanhope Plan (amended since that hearing) does not expressly refer to Section 1123(a)(5)).  *Id.* at 20:-22.

63.    The failure of the 53 Stanhope Debtors or their professionals to achieve a greater

cash bid for their assets than Brooklyn Lender's Secured Claims against them does not excuse

them of their fiduciary duties or obligations under the 53 Stanhope Plan and 53 Stanhope

Confirmation Order.  It just means that the 53 Stanhope Plan cannot go effective, absent

Brooklyn Lender's consent.

A.    **Brooklyn Lender's Credit Bid Tops FREO's and the
Individual Bidders' Bids.**

64.    Brooklyn Lender's bulk credit bid of $20 million tops the $18,300,000 or

$18,310,001 offered by FREO or the Individual Bidders.[10]  As discussed in Section E, *supra*,

Brooklyn Lender's right to credit bid was unqualified in the 53 Stanhope Plan and Bid

Procedures.  53 Stanhope Plan, ¶ 68; Bidding Procedures at 48.  Any asserted right by the 53

Stanhope Debtors to select a lower cash bid to satisfy administrative or effective date obligations

cannot be justified under the circumstances.

65.    Indeed, the right to credit bid is enshrined in Section 363(k) of the Bankruptcy

Code, and may only be denied upon Court order denying the right "for cause."  11 U.S.C. §

363(k).  As recognized by the Supreme Court, this right "helps to protect a creditor against the

risk that its collateral will be sold at a depressed price," and "enables the creditor to purchase the

collateral for what it considers the fair market price (up to the amount of its security interest)

without committing additional cash to protect the loan."  *RadLAX Gateway Hotel, LLC v.

Amalgamated Bank*, 566 U.S. 639, 644 (2012).

66.    Where, as here, there is no question that Brooklyn Lender had an unqualified right

to credit bid up to the allowed amount of its Secured Claims, courts have rejected arguments that

---

[10]    Although the Debtors have not chosen FREO as the highest and best bidder, Brooklyn Lender addresses
their highest bid here as well for completeness.

lower cash bids can be accepted.  For example, in *Macquarie Rotorcraft Leasing Holdings Ltd.*

*v. LCI Helicoptors Long Island Ltd. (In re Waypoint Leasing Holdings Ltd.)*, the bankruptcy

court rejected a disappointed stalking horse bidder's argument that the debtors were damaged by

accepting a secured creditor's higher credit bid over its lower cash bid for certain of its assets to

prevent the sale at a distressed price, specifically noting that the argument "defies common

sense" as well as *RadLAX*.  607 B.R. 143, 154 (Bankr. S.D.N.Y. 2019) ("[Secured creditor]

outbid [stalking horse] by roughly $13 million to prevent a sale to [stalking horse] at a depressed

price, precisely what Bankruptcy Code § 363(k) is designed to do."); *see also In re Spa Chakra*,

No. 09-17260(SMB), 2010 WL 779270, at *6 (Bankr. S.D.N.Y. Mar. 5, 2010) ("[Secured

creditor] had the right to credit bid over $15 million, well above any estimate of the market value

of the assets.  Unless a potential buyer was willing to top that amount, there was little reason to

expend much time, effort and money pursuing the assets.  Furthermore, even if another party

interposed a bid believing that [secured creditor] might drop out of the auction, [secured creditor]

would still be entitled to the first $15 million in proceeds before anything trickled down to the

other creditors."); *In re Finova Capital Corp.*, 356 B.R. 609, 626 (Bankr. D. Del. 2006)

(crediting testimony that secured lender "is the functional equivalent of a 'cash' bid, at least as

regards to the secured lender; the credit bid merely saves a step of payment by the lender, as

buyer, to the lender, as seller, and thus acts as a convenience" as being consistent with

established precedent) (citing *Cohen v. KB Mezzanine Fund II, (In re SubMicron Sys. Corp.)*,

432 F.3d 448, 461 (3d Cir. 2006)).  Here, the Debtors treated Brooklyn Lender's credit bid at the

Auction as a side show and not a real bid in that Individual Bidders in the property-by-property

auction were never required to top Brooklyn Lender's credit bid.  This was a violation of the 53

Stanhope Plan, the 53 Stanhope Confirmation Order, and the Bid Procedures, protecting

Brooklyn Lender's right to credit bid.

67.    Thus, because Brooklyn Lender's bulk credit bid of $20 million tops FREO's

bulk bid and the Individual Bidders' cash bids, Brooklyn Lender's bid is undeniably the highest

and best, and notwithstanding the procedural defects in the auction allowing a parallel cash

auction to occur, Brooklyn should have been declared the successful bidder.

**B.    The 53 Stanhope Debtors Have no Authority to Surcharge Brooklyn
        Lender's Collateral or to Otherwise Force Brooklyn Lender to Bid in Cash.**

68.    There is no authority under either the 53 Stanhope Plan or the 53 Stanhope

Confirmation Order that permits the Debtors to surcharge Brooklyn Lender's collateral pursuant

to Section 506(c) of the Bankruptcy Code.  To the extent the Debtors rely on the *Interim Order*

*Granting Debtor's Use of Cash Collateral* [Dkt. 25] (the "Cash Collateral Order") (the only cash

collateral order in this case), such order expired by its own terms within 55 days of entry in

August of 2019.  *Id.* at 4.  Even if the Cash Collateral Order had not expired, it only provided

limited carve-outs for expenses that are not relevant to what the Debtors are seeking to pay here

(*see* Section F, *supra*):  (i) chapter 7 administrative expenses up to $10,000 to the extent

necessary; (ii) payment of statutory bankruptcy fees and interest; and (iii) amounts owed to the

Clerk of the Court.  *Id.* at 3.

69.    Even if the Debtors had sought authority to surcharge the collateral securing the

53 Stanhope Debtors' Loans with Brooklyn Lender, they would not have been entitled to do so

under the circumstances.  Section 506(c) of the Bankruptcy Code provides that unless a secured

creditor consents, a debtor may obtain authorization to surcharge a secured creditor's collateral

only to recover "the reasonable, necessary costs and expenses of preserving, or disposing of,

such property to the extent of any benefit to the holder of such claim . . . ."  11 U.S.C. § 506(c);

*In re Lorick*, No. 1-16-45645-NHL, 2018 WL 3854139, at *5 (Bankr. E.D.N.Y. Aug. 9, 2018).

It is the debtor's burden of proof, and a "high burden" at that, to establish entitlement to

surcharge collateral, and the three factors outlined in Section 506(c) (reasonableness, necessity,

and benefit to the holder of the claim) must be satisfied. *Id.*; *see In re Sears Holding Corp*, Case

No. 18-23538 (RDD) (Bankr. S.D.N.Y. July 31, 2019) [Dkt. 5475] at 61:8-9.

70.    Here, although Rosewood states in its marketing report attached as Exhibit B to

the Sale Notice that the Auction was "determined a resounding success by all involved," this is

completely belied by:  (i) the persistent lack of adequate notice to and consultation regarding the

process with Brooklyn Lender which Brooklyn first brought to the Court's attention in an

October 2021 letter (and again at a status conference in November 2021, and in additional letters

in December 2021 and January 2022); (ii) the objections of FREO, the Individual Bidders, and

Brooklyn Lender at the Auction; and (iii) Brooklyn Lender's correspondence with the 53

Stanhope Debtors and the Court since the Auction's conclusion.

71.    Brooklyn Lender has had difficulty at all stages preceding the Auction obtaining

basic information from the 53 Stanhope Debtors or their professionals regarding the Auction.

The fact that "most of th[e] qualified bidders qualified in the last day," that the 53 Stanhope

Debtors claim to "have not had time to go over this in advance of the auction with [Brooklyn

Lender]," and decided to postpone the auction noticed for January 6, 2022 at 11:00 a.m. by three

hours because of contracts coming in the morning of the Auction, Jan 6  Tr. at 17:18-21, is

evidence of anything but a robust marketing process.  Instead, it is evidence of a severely

delayed and underwhelming process.  Indeed, the Debtors' conduct suggests that marketing was

not considered other than on a bulk bidding basis until January 2022.  In fact, Greg Corbin

admitted in an email to Brooklyn Lender on January 4, 2022 that "we are marketing as 13, but it

has been viewed by most as 9" and appeared to be convinced that FREO's bid would be as good

as the Debtors could obtain.  Stein Decl., Ex. C.  And of course, as noted in Section J, *supra*, the

Auction itself was a chaotic, disorganized, and confused process that sidelined Brooklyn

Lender's credit bidding, and may well have resulted in less than would have been obtained had

the process been conducted in accordance with the Bid Procedures and in consultation with

Brooklyn Lender.

72.    Paying broker's fees, closing costs, and other general freight in this case is not

reasonable, or necessary, and does not benefit Brooklyn Lender.  Brooklyn Lender should not be

made to pay the unnecessary, and unreasonably high costs requested by the 53 Stanhope Debtors

for the benefit of their professionals.  Brooklyn Lender could have fared better in a chapter 7

proceeding, where administrative expenses would not be paid were the cash not there to pay

them, or in a foreclosure proceeding where Brooklyn Lender would be in control of the process.

*See, e.g.*, *In re Sears Holding Corp.*, 621 B.R. 563, 575 (S.D.N.Y. 2020) ("Although the Second

Circuit has said that a bankruptcy court cannot 'direct that interim fees and disbursements of

attorneys and accountants be paid from the encumbered collateral' it has allowed 'fees payable

from [the creditor's] collateral . . . for services which were for the benefit of [the creditor] rather

than the debtor or other creditors.") (Drain, J.); *In re Hotel Syracuse, Inc.*, 275 B.R. 679, 682

(Bankr. N.D.N.Y. 2002) ("It is well settled law in the Circuit that absent an agreement to the

contrary, a secured creditor's collateral may only be charged for administrative expenses,

including attorney's fees, to the extent these expenses directly benefitted that secured creditor.")

(citations omitted); *In re Happy Wave LLC*, No. 14-74389 (REG), 2015 WL 7575497, at *2

(Bankr. E.D.N.Y. Nov. 25, 2015) (denying surcharge of collateral where the debtor "produced no

evidence to show that BSI fared any better as a result of the bankruptcy auction than it would
have in the context of the pending non-bankruptcy foreclosure").

73.    Finally, to the extent that the 53 Stanhope Debtors seek to rely on the equitable
doctrine of marshaling, that cannot apply either.  "[T]he equitable doctrine of marshaling rests
upon the principle that a creditor having two funds to satisfy his debt may not, by his application
of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer
v. United States*, 375 U.S. 233, 236 (1963) (quoting *Sowell v. Fed. Reserve Bank*, 268 U.S. 449,
456-57 (1925)).  To that end, courts in this district have held that "[t]he party who seeks
marshalling must demonstrate that the rights of other creditors, including the senior creditor will
not be prejudiced." *Walther v. Bank of New York*, 772 F. Supp. 754, 767 (S.D.N.Y. 1991). The
53 Stanhope Debtors' attempt to cripple the auction process here by foisting an inferior bid, all to
benefit the rights of a junior class of creditors, administrative claimants, makes that prejudice all
the more real.  That the 53 Stanhope Debtors can find no authority in any order entered by the
Court to support that level of prejudice further evidences the conclusion that the Brooklyn
Lender's offer constitutes the highest or best bid and must be accepted.

74.    There is simply no basis for Brooklyn Lender to be made to pay administrative
expenses under the circumstances.

## II.    Rosewood Added No Value and Payment of Fees to Rosewood Should Not Be Awarded in Any Amount.

75.    Rosewood is not entitled to collect any fee here because it is not a retained
professional and its compensation structure was never approved by this Court as required under
the Bankruptcy Code.  Even were that not the case, or were the Court to find Rosewood could
otherwise be paid by the Debtors, the 5% fee is grossly excessive here, where the auction that it
led was a disorganized and chaotic mess that failed to maximize value for the Debtors' estates.

76.     The 53 Stanhope Plan references that Rosewood would be conducting the auction

post-confirmation, 53 Stanhope Plan, ¶ 72.  Yet, the Debtors have never sought this Court's

approval for either Rosewood's retention or, more importantly, the terms of Rosewood's

compensation.  There is no question Mr. Corbin, the real estate broker performing the work for

the 53 Stanhope Debtors, is a professional whose retention cannot be authorized absent approval

pursuant to Section 327 and compensation cannot be approved outside of Sections 328 and/or

330.  The failure to obtain court authorization is a *per se* bar with respect to the payment of fees

in this Circuit.  *In re Ne. Dairy Co-op. Fed'n, Inc.*, 74 B.R. 149, 152 (Bankr. N.D.N.Y. 1987)

("Clearly . . . absent involvement in a debtor's daily operations, real estate brokers are

'professionals' within the meaning of Code § 327(a)."); *see also In re Bronx 439 E. 135th St.*

*D.T. Bldg. Corp.*, No. 11-15855 (MG), 2014 WL 200996, at *3 (Bankr. S.D.N.Y. Jan. 17, 2014)

("In the Second Circuit, there is a per se prohibition against compensating professionals for

services rendered prior to a retention order.").  The strict rule applied in this Circuit ensures that

Courts can evaluate the existence of any conflicts and also helps to avoid the incurrence of

frivolous expenses.  *Bronx 439 E. 135th St.*, 2014 WL 200996, at *3.[11]

77.     Brooklyn Lender submits further that all parties understood the scope of the

Court's jurisdiction over Rosewood's retention and compensation.  That Rosewoods' retention

was a condition precedent to Rosewood's compensation is or should be unquestioned.  The

executed engagement agreement between the 53 Stanhope Debtors and Rosewood, expressly

requires the 53 Stanhope Debtors to retain Rosewood pursuant to Section 327(a) of the

Bankruptcy Code.  53 Stanhope Plan, Ex. A. 63, ¶ 5 ("Subject to Bankruptcy Court approval of

---

[11]     It is unclear what the relationship is among the auctioneer, Rosewood, and the 53 Stanhope Debtors, or
how the auctioneer is being compensated, but it should be noted that Section 327(a) expressly includes "auctioneers"
within statutory definition, and the auctioneer was not retained as required and should also be denied any
compensation.

this Agreement, Rosewood will be authorized to act as agent for Debtor, and to advertise, market, negotiate and coordinate the closing on the sale or refinancing of the Property . . . ."), ¶ 6 (requiring 53 Stanhope Debtors to file retention application). Yet, no application was filed. As described below, and as reflected in the 53 Stanhope Disclosure Statement filing, the fee was materially smaller than that now demanded by Rosewood.

78.      The 53 Stanhope Debtors' decision to deny all parties in interest the opportunity to object to Rosewood's retention is particularly prejudicial here. Given such an opportunity, Brooklyn Lender would have objected to the terms of proposed compensation. Its application to an auction which results in a credit bid constituting the highest bid further creates the exact type of conflict of interest that results in a lower cash bid winning at auction, as was the case here. It also compensates a broker who can do no better than the offer of a captive credit bidder already at the negotiating table.

79.      Even were the Court to allow Rosewood's retention after the filing of a Section 327(a) application and authorize its retention on a *nunc pro tunc* basis, Rosewood did nothing to add value to the 53 Stanhope Debtors' estates. Therefore, payment of a 5% fee should not be authorized under the 53 Stanhope Plan's own requirements. *Id.*, ¶ 74 (requiring post-confirmation sale be subject to Court determination, *inter alia*, "that the terms and conditions of the sale are fair and reasonable"). And even the 53 Stanhope Debtors themselves appeared to acknowledge the broker fee was not definitive, as Exhibit B to the 53 Stanhope Disclosure Statement references a 4% broker fee. *Compare* Stanhope Disclosure Statement, Ex. B at 79 (referencing 4% estimated broker fee) *with* 53 Stanhope Plan, Ex. A at 63-64, ¶¶ 3-4 (referencing 5% broker fee).

80.     Although Rosewood contends that the auction was "determined a resounding success by all involved," Sale Notice, Ex. B at 152, a review of the Auction transcript conflicts with that conclusion, let alone how the process unfolded in the months preceding the Auction.  In fact, FREO, and other Individual Bidders, and Brooklyn Lender spoke up at the auction concerning multiple irregularities and unusual conduct that deviated from how bankruptcy auctions are normally conducted, and impeded bidding.  *See* Section J, *supra*.  At the same time, statements by the Debtors' counsel on the record at the Auction suggest that a flood of bids came in during the last week preceding the Auction, and the Auction had to be delayed to sort through bids.  Jan. 6 Auction Tr. at 17:18-21.  No matter how many numbers the marketing report filed by the 53 Stanhope Debtors throws out to justify Rosewood's fee, it is unquestionably unjustified under the circumstances.

81.     Allowance of a broker fee at 5% would total $900,000-$1,000,000 depending on what bid is ultimately approved.  At any level, this amount would be double the total value of the professional fees disclosed in the 53 Stanhope Disclosure Statement for the Debtors' other professionals  It is particularly egregious in light of the fact that the highest and best bid was a credit bid for which no effort by the broker was required.

**III.    The Break-Up Fee Provided No Value to the Estates and Chilled Bidding,
and Should Therefore be Denied.**

82.     "Breakup fees are authorized in the bankruptcy auction sale context to provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders."  *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003); *In re Marose Corp.*, No. 89 B 12171 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (noting that breakup fees may be

used in the chapter 11 context to enhance bidding and attract more favorable offers, and to
enhance value for creditors).

83.     There are three essential questions that a Court must consider in deciding whether
to award a break-up fee:  (1) whether the relationship of the parties who negotiated the breakup
fee tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages
bidding; and (3) whether the amount of the fee is unreasonable relative to the purchase price.
*See In re MSR Hotels & Resorts, Inc.*, No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr.
S.D.N.Y. Oct. 1, 2013).  With respect to the second and third factors, where a break-up fee fails
to enhance bidding or maximize value, courts decline to award such fees.  *Gey Assocs. Gen.
P'ship v. 310 Assocs., L.P.*, No. 02-0710, 2002 WL 31426344, at *3 (S.D.N.Y. Oct. 29, 2002)
(finding that a breakup fee "did not encourage bidding" and was "unnecessary" because "there
were already multiple bidders"); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200,
204 n.5 (3d Cir. 2010) (affirming bankruptcy court's decision to deny a break-up fee, and finding
that "as a factual matter break-up fees often are not needed when there are bidders for an asset
other than the initial bidder").

84.     FREO's participation in the Auction provided no added value to the 53 Stanhope
Debtors.  First, based on the representation on the record by Debtors' counsel that most of the
bidders qualified the day before the auction and the apparent lack of disclosure of the existence
of the Stalking Horse Agreement or the existence of a stalking horse bidder until the Auction,
neither the Debtors nor FREO can demonstrate that the stalking horse bid set any floor to
encourage other bidders' participation.  *See* Jan. 6 Auction Tr. at 17:18-21.  Instead, the Debtors'
non-disclosure eviscerated any potential impact that a stalking horse bidder could have had on
the Auction.  Additionally, by the 53 Stanhope Debtors' own admission, and as evidenced in the

Stalking Horse Agreement, FREO did not submit a 10% cash deposit with its bid as required under the Bid Procedures and 53 Stanhope Plan and Bid Procedures. *See* Jan. 6 Auction Tr. at 17:12-13; 53 Stanhope Plan, ¶ 68; Bid Procedures at 48. Therefore, it failed to comply with the most basic of requirements to even qualify as a bidder, let alone a stalking horse. Moreover, throughout most of the Auction on January 7, FREO stated that it would be withholding cash from its bids (in violation of the Bidding Procedures), maintaining that it had a right to apply a continuing 2% non-cash discount in each round of successive bidding (and that it would be entitled to payment even if it were selected as a winning bidder), which derailed Auction. *See* Section J.3, *supra*. FREO's conduct at the auction had the effect of diminishing the value of the 53 Stanhope Debtors' assets and wreaked additional havoc in the middle of an Auction that was already being conducted in a confused and haphazard manner.

85.     Additionally, to ensure the maximization of the value of assets to be sold, bankruptcy courts have required that the debtor engage in a meaningful marketing of the subject assets before selecting a stalking horse and moving the court to approve bid protections. *See In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (denying proposed bidding procedures where the debtors "did not negotiate with third party prospective purchasers, pick the best of them and then proceed to seek approval for topping and expense reimbursement fees"). Here, although Mr. Corbin of Rosewood conveyed to Brooklyn Lender his opinion that FREO was likely the best the Debtors were going to get, *see* Stein Decl., Ex. C, the Individual Bidders ultimately provided higher cash bids. Further, there is no evidence that Individual Bidders were aware of the Stalking Horse Agreement prior to the commencement of the Auction. And there is no evidence in the record that the 53 Stanhope Debtors sought to negotiate with FREO, which ultimately was not even a Qualified Bidder, regarding its break-up fee.

86.     Under these circumstances, the break-up fee should be denied.

## IV.    Any New Auction Must Not Violate Brooklyn Lender's Due Process Rights.

87.     "Federal Courts have long been concerned with the integrity of the sale process.

Mindful of the need to engender stability and integrity of the auction process," bankruptcy courts

will decline to uphold sales that are "tinged with fraud, error, or similar defects which would in

equity affect the validity of any private transactions." *C & J Clark Am. Inc. v. Carol Ruth, Inc.

(In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988).  Here, the failure of the 53

Stanhope Debtors to comply with mandated procedural requirements, both before, during, and

after the conclusion of the Auction, raise serious problems with the integrity of the sale process.

88.     The most acute issue, as set forth above, was the 53 Stanhope Debtors' deviation

from the requirements of the 53 Stanhope Plan to allow Brooklyn Lender to submit an

unqualified credit bid up to the allowed amount of its Secured Claims (which as referenced in

Section G, *supra*, in no event do the 53 Stanhope Debtors believe to be lower than the highest

individual bids or FREO's aggregate bid).  Although Brooklyn Lender disagrees that any cash

requirement is necessary or appropriate, to the extent the Court finds it is and the 53 Stanhope

Debtors decide to proceed along these lines, adequate notice must be given of any revisions to

the Bid Procedures.  *See Jon J. Peterson*, 411 B.R. at 136 (deletion of contingences from bid

procedures incorporated into stalking horse asset purchase agreement used as a model for

competing bids after the bid procedures had been approved and stalking horse would have

obtained the benefit of such provisions, was inconsistent with due process and impermissible).

Similarly, clarity is needed with respect to the legitimacy of the requested break-up fee, the

legitimacy of the claimed 5% broker fee, and whether Individual Bidders have the right to

collude.

89.     Based on the above, the Court cannot approve the sale to the Individual Bidders. Instead, to the extent that the Court does not deem Brooklyn Lender's credit bid as highest and best, the Court should order the Debtors to reconduct the auction, in a manner that comports with due process to Brooklyn Lender and all other creditors and potential bidders by ensuring that any revised procedures are made in consultation with Brooklyn Lender and approved of by the Court, with notice filed on the docket containing adequate disclosure of the rules and other information necessary to inform bidding within 7 days of the Auction.

## RESERVATION OF RIGHTS

90.     Brooklyn Lender reserves the right to amend, supplement, or modify this objection, including to reply to any other objections to the sale of the 53 Stanhope Debtors' Properties.

## CONCLUSION

91.     Wherefore, Brooklyn Lender respectfully requests that this Court enter an order denying approval of the sale of the 53 Stanhope Debtors Properties to the Individual Bidders or to FREO.

Dated:  January 18, 2022
         New York, New York

                                        **KASOWITZ BENSON TORRES LLP**

                                        By: */s/ Matthew B. Stein*
                                              Jennifer S. Recine
                                              David S. Rosner
                                              Matthew B. Stein
                                          1633 Broadway
                                          New York, New York 10019
                                          Telephone:  (212) 506-1700
                                          Facsimile:  (212) 506-1800

                                          *Attorneys for Brooklyn Lender LLC*