UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                                                          Chapter 11

     53 Stanhope LLC, *et al*,[1]                      Case no.  19-23013 (RDD)
                                                                               Jointly Administered

            Debtor.

---------------------------------------------------------x

## **REPLY TO OBJECTION TO SALE APPROVAL[2]**

        53 Stanhope LLC, , 325 Franklin LLC, 618 Lafayette LLC, 92 South 4th St LLC, 834 Metropolitan Avenue LLC, 1125-1133 Greene Ave LLC, APC Holding 1 LLC; Eighteen Homes LLC, and 1213 Jefferson LLC (each a "Debtor", and collectively, the "Debtors"), as and for their reply to the objection of Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") to the sale of the Debtors' real property (the "Properties") pursuant to the Debtors' Joint Plan of Liquidation (the "Plan"), respectfully represent as follows:

**(a)**      **Since Brooklyn Lender only made credit bids to set off payment of its Secured Claims, such bids could not be accepted because they provided no cash to pay senior Liens, Administrative and Priority Claims, as required by the Plan and Bankruptcy Code,**

**(b)**      **Rosewood's retention and 5% buyer's premium compensation were pre-approved in the Plan so there is basis to deny sale approval based upon the Debtors' agreement to honor that Plan obligation,**

**(c)**      **Similarly, the Plan pre-approved a 2% stalking horse breakup fee, so there is basis to deny sale approval based upon the Debtors' agreement to also honor that Plan obligation, and**

**(d)**      **Brooklyn Lender has not alleged, let alone proffered credible evidence of "fraud, unfairness or mistake in the conduct of the sale," or that "the price brought at the sale was so grossly inadequate as to shock the conscience of the court," sufficient to upset the sale and reopen bidding on new terms.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC  Holding 1 LLC (0290); D&W Real Estate Spring LLC (4591); Meserole and Lorimer  LLC (8197); 106 Kingston  LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155).

[2]  Capitalized terms not defined herein shall have meaning set forth in the Debtors' Chapter 11 plan, docket no. 240.

## BACKGROUND

1.      On May 20, 2019, each of the Debtors filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

2.      These cases involve loans made by Signature Bank to the Debtors in 7 separate notes and mortgages covering 13 properties dating back to September 2012. The loans were assigned to Brooklyn Lender LLC ("Brooklyn Lender" or "Mortgagee") on or about May 17, 2017.  At that time, each Debtor was current on its payment obligations.  The Debtors have remained current with interest payments at the non-default contract rate at all relevant times.

3.      Brooklyn Lender discovered a Federal Court lawsuit against Mr. Strulovitch, the Debtors' principal, and targeted the loans on the Debtors' Properties.  Although Signature Bank treated the loans as "performing," Brooklyn Lender purchased such loans to assert non-monetary non-material defaults.

4.      As soon as Brooklyn Lender acquired the loans, it sent default notices primarily alleging non-monetary defaults arising from unproven allegations in the now dismissed Federal Court lawsuit that Strulovitch, as the potential guarantor of the mortgages, submitted potentially misleading financial statements with the Debtors' loan applications.  Brooklyn Lender claimed that it was therefore entitled to 24% default interest retroactive to the loans' origination dates, plus other related charges, essentially doubling the amount due.  Besides the misrepresentations, Brooklyn Lender also declared each loan in default for alleged small open water and sewer bills and HPD and DOB violations, as an additional basis for 24% interest.

5.      The Debtors filed these cases to obtain a determination that the alleged defaults, even if proven, were so non-material as to be unenforceable in law and equity.

2

6.      The Debtors, with the other jointly administered debtors herein, obtained exit financing to pay all creditors the Allowed Amounts their Claims under their initial plan, including Brooklyn Lender at the non-default contract rate.  The Court denied confirmation of that initial plan because, as to the Debtors herein, the Brooklyn Lender loans matured during these cases, but were not extended by the Debtors, thus entitling Brooklyn Lender to post-maturity default interest in an amount that exceeded the Debtors' exit financing.

7.      The other jointly administered debtors thereafter filed, confirmed and consummated plans that paid off the Allowed Amounts of their Brooklyn Lender loans with exit financing.

8.      The Debtors filed and confirmed their joint liquidating Plan providing for a sale of the Properties.  Brooklyn Lender appealed the Plan confirmation order (the "Appeal").  Briefing is complete.  The District Court has not yet ruled.

9.      Brooklyn Lender did not obtain a stay pending Appeal, so the Debtors moved forward with the sale of the Properties.

10.      Brooklyn Lender is classified as Class 2 under the Plan.  Under paragraph 53, "Each Debtor shall pay the Class 2 Claimant in Cash on the Effective Date the net Property Sale Proceeds from the sale of its Property after payment of Administrative Claims, Class 1 Claims, Class 3 Claims and Priority Tax Claims, up to the Allowed Amount of such Claim 2 Claim plus interest at the applicable contractual rate as it accrues from the Petition Date through the date of payment."

11.      "Property Sale Proceeds" is defined at 41 of the Plan as "the proceeds of sale of the Properties, less all charges to be incurred in connection with the marketing, negotiation,

documentation, execution, and closing of the sale of the Properties, including, without limitation, any fees and expenses paid to retain an auctioneer, real estate broker, and/or special real estate counsel."

12.     Administrative Claims are defined at paragraph 1 of the Plan as "any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code."

13.     Class 1 Claims are described at paragraph 49 of the Plan as "Allowed Secured Claims for New York City real estate taxes and other non-Class 2 Liens."

14.     Class 3 Claims are described at paragraph 55 of the Plan as "Allowed Priority Claims under sections 507(a)(3),(4),(5),(6), and (7) of the Bankruptcy Code."

15.     Priority tax Claims are described at paragraph 64 of the Plan as "Priority tax Claims under Section 507(a)(8) of the Bankruptcy Code."

16.     Under the Plan, therefore, Brooklyn Lender is entitled to be paid the remaining proceeds of sale of the Properties after payment of the costs of sale, senior Lien Claims, Administrative Claims, and Priority Claims.  Payment of such amounts is required to confirm any plan under section 1129 of the Bankruptcy Code.  Brooklyn Lender did not raise payment of such amounts as an issue on Appeal.

17.     Regarding the sale of the Properties, paragraph 71 of the Plan provides that the "transfer of the Properties under the Plan shall be free and clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and to be disbursed under the Plan, provided, however, that the Mortgagee shall provide for an

4

assignment of each of its mortgage and an assumption by the Purchaser in connection with the sale of the Properties under the Plan."

18.     Under paragraph 72 of the Plan. "Marketing will be performed by Rosewood Group under the direction of Greg Corbin (the "Broker"), who shall market to prospective well-qualified purchasers that are ready, willing and able to purchase the Properties." The Rosewood listing agreement was annexed to the bidding auction procedures at Exhibit A to the Plan (the "Auction Procedures'). The Broker's retention under the Plan was similarly not raised as an issue on appeal.

19.     The Auction Procedures provide that "Bidding shall be limited to all cash offers." The auction procedures provide further that Brooklyn Lender "shall have the right under section 363(k) of the Bankruptcy Code to credit bid for each Debtors' property up to the Allowed Amount of its Secured Claim against such Debtor."

20.     In summary, since the sale under the Plan was free and clear of liens claims and encumbrances, the Auction Procedures required all bidders to make cash bids. Brooklyn Lender, however, could credit bid its "Secured Claim." Since payment of its Secured Claim is subordinate under the Plan to the costs of sale, senior Lien Claims, Administrative Claims, and Priority Claims, Brooklyn Lender had to bid cash to cover those amounts in addition to its credit bid. This is required by the credit bidding rules under section 363(k) of the Bankruptcy Code. Accordingly, the Auction Procedures were similarly not raised as an issue on Appeal.

21.     Exhibit A to the Debtors' January 12, 2022 notice of hearing to approve the sale named the winning bidders as proposed by the Debtors for Bankruptcy Court approval, set forth their bid amounts, and attached proposed contracts of sale in substantially the same form

annexed to the Auction Procedures.  The total of all the proposed winning bids is $18,310,001.

All proposed contracts have since been executed and 10% deposits paid into escrow.

22.     Exhibit B to the notice of hearing is a sale report prepared by Rosewood.

As summarized in the second to last page, Rosewood spent seven months marketing, reached

approximately 80,000 people, produced 11 registered bidders which resulted in 153 bidding

rounds, and winning bids at about 25% above market comparables.  This, despite the fact that the

Plan that authorized the sale was under the cloud of Brooklyn Lender's unresolved appeal.

23.     Exhibit C is a copy of the stalking horse contract the Debtors entered into

with FREO U.S. Acquisitions, LLC ("FREO").  FREO was the proposed second highest bidder

with an aggregate $18,300,000 bid.  Under the Auction Procedures, the Debtors could allow a 2%

breakup fee to a stalking horse bidder.  Breakup fees are routine in bankruptcy sales and the

breakup fee in the Auction Procedures was not raised by Brooklyn Lender as an issue on appeal.

The FREO contract allows the breakup fee, the Debtors believe that FREO spent substantial time

and money on due diligence and contract negotiation, that the stalking horse bid encouraged

bidding and that FREO is entitled to payment.

24.     Exhibit D to the notice of hearing is the auction transcript.  This was an

unusual auction.  The auctioneer solicited bids for the Properties both in the aggregate and

separately to get to the highest and best price.  Brooklyn Lender set the tone at the outset by

complaining about the Plan, the Auction Procedures and numerous other issues in unnecessary

"reservation of rights" statements.  This could have tainted the sale.  At a minimum, it signaled to

other bidders that even if they won the auction, the sale could be mired in litigation before closing.

And following Brooklyn Lender's lead, other bidders also felt it necessary to find reason to complain and make their own reservation of rights statements.

25.    Fortunately, the auctioneer did not take Brooklyn Lender's bait and maintained control.  The bidders appear to have been sophisticated enough to be unfazed by the distraction as well.  All issues except the Brooklyn Lender issues were resolved by agreement during the auction, a bidding war ensued, and based on the Rosewood report, the sale was an unqualified success.

**(a) Since Brooklyn Lender only made credit bids to set off payment of its Secured Claims, such bids could not be accepted because they provided no cash to pay senior Liens, Administrative and Priority Claims, as required by the Plan and Bankruptcy Code**

26.    Section 363(k) of the Bankruptcy Code states that the holder of secured claim "may bid" at a sale, and if the holder is the successful purchaser, "may offset" its claim against the purchase price, "unless the court for cause orders otherwise."  Section 363(k) states:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

27.    A secured claimant must therefore bid like any other bidder, and if the secured claimant wins, then as purchaser, it can offset its claim.  *Collier on Bankruptcy* confirms that a secured claimant cannot avoid paying cash for the portion of its bid that does not constitute an offset of its claim, as follows:  "A credit bid does not necessarily relieve a secured creditor of any need to come up with cash as part of the sale price."  3 *Collier on Bankruptcy* para. 363.09[2]

(16th Ed., Matthew Bender, 2021), *citing In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 64

(Bankr. D.S.C. 2010).

28.    For example, *Collier* continues, "[i]f the creditor has a junior lien, the

creditor will be required to pay off or otherwise settle with the senior lienors in the sale."  If in this

case there were second mortgages junior to Brooklyn Lender, Brooklyn Lender would have

demanded that the Debtor ignore junior mortgagee bids that lacked a cash payment to pay off

Brooklyn Lender's first mortgages.

29.    Here, Brooklyn Lender's Lien is junior to Class 1 senior Liens, and under

the Plan, distributions to Brooklyn Lender are also subordinate to the costs of the auction,

Administrative and Priority Claims.  At the auction, however, Brooklyn Lender did not bid like

any other bidder, with its credit bid to be applied to that portion of the purchase price allocable as

an offset to its Claim.  Instead, Brooklyn Lender bid with no cash for payment of senior Liens,

costs of sale, Administrative and Priority Claims.  This violated the Plan, the Auction Procedures

and section 363(k) of the Bankruptcy Code.  Although, the face amount of Brooklyn Lender's bids

were larger than the other bids, they were not better because they could not close.

30.    Against this background, Brooklyn Lender argues that it had the

"unqualified right to credit bid up to the allowed amount of its Secured Claims," and thus the

Debtors cannot accept a lower cash bid.  Brooklyn Lender's reliance on the authorities it cites is

misplaced.

31.    In *In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143 (Bankr. S.D.N.Y.

2019) the Court approved a credit bid that exceeded the cash bid.  *Waypoint* is silent on provisions

for necessary cash payments.  But the order approve bidding procedures is available on the docket

8

of the case.  On page 16 of the order, a copy of which is annexed hereto as Exhibit A (without exhibits), the approved bidding procedures provide that besides the credit bid offset, credit bidders had to make a large cash "Exit Payment."  *Waypoint,* therefore, does not hold that a credit bid must be accepted over a cash bid even if the credit bid makes no provision for payment of senior obligations.

32.     In *In re Spa Chakra*, No. 09-17260(SMB), 2010 WL 779270, at *2 (Bankr. S.D.N.Y. Mar. 5, 2010), the winning credit bid similarly required a cash component of approximately $2,000,000 plus assumption of about $3,000,000 of obligations, besides the $8,000,000 credit bid.

33.     Brooklyn Lender cited *In re Finova Capital Corp.* 356 B.R. 609, 626 (Bankr. D. Del. 2006) for the general observation that a credit bid acts as a convenience saving a step in the payment of lender's secured claim.  Interestingly, the observation was made not regarding credit bidding under the United States Bankruptcy Code, but under a mash up of Ontario, Canada foreclosure law and Indiana UCC law.  Even in that context, the next line after the quote cited by Brooklyn Lender, confirms the Debtor's argument in this case that, "the secured party remains liable to make additional payment to the estate for its bid if the secured claim is later deemed infirm or otherwise subordinated.  *Id. at* 625–26.  Here, payment of Brooklyn Lender's Claim was subordinated under the Plan to senior Liens, costs of sale, Administrative and Priority claims, but each of Brooklyn Lender's bids all explicitly disclaimed any liability for any additional payment above its credit bid, and thus its bid could not be accepted.

34.     In summary, Brooklyn Lender cited nothing to contradict the unremarkable principle that under section 363(k) of the Code, as explained by *Collier*, the right to credit bid does

9

not relieve a secured creditor of the need to come up with cash as part of its purchase price where senior claims must be paid. And under the Plan, payment of Brooklyn Lender's Claims is subordinate to senior Liens, Administrative Claims and Priority Claims. Those senior obligations, therefore, must be paid in cash, *in addition to* any credit bid which can be set off against Brooklyn Lender's Liens.

35.    In the absence of case law that supports its argument, Brooklyn Lender knocks down straw man arguments. Although the Debtors may have arguments under section 506(c) of the Bankruptcy Code to surcharge Brooklyn Lender's collateral. And although the Debtors might also have arguments under the cash collateral order and the equitable doctrine of marshaling, the Debtors made no such arguments. Were this sale conducted independent of the Plan, which it obviously was not, those arguments would be more relevant.

36.    Either way, to win the auction, Brooklyn Lender's bid had to provide for payment of senior Liens, costs of sale, Administrative Claims and Priority Claims *in addition to* setting off payment of its Secured Claim. Brooklyn Lender failed to make such a bid. The sale, therefore, should be approved over Brooklyn Lender's objection.

**(b)    Rosewood's retention and 5% buyer's premium compensation were pre-approved in the Plan so there is basis to deny sale approval based upon the Debtors' agreement to honor that Plan obligation**

37.    The Plan provides for Rosewood's retention at paragraph 72 and a copy of Rosewood's listing agreement was annexed to the Plan as an attachment to the Bidding Procedures. The listing agreement provides for a flat 5% buyer's premium fee. Rosewood was retained under the Plan pursuant to the listing agreement, which provided for the 5% buyer's premium. Rosewood is therefore entitled to payment.

10

38.     Contrary to Brooklyn Lender's objection, since Rosewood was retained under the Plan for post-confirmation work, no separate retention application under section 1127 of the Bankruptcy Code was required.  *E.g. Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 689 (D.Mass.2000) (observing that a reorganized debtor may employ professionals without court approval if it can meet its obligations under the confirmed plan); *Kaiser Grp. Holdings, Inc. v. Squire Sanders & Dempsey LLP (In re Kaiser Grp. Int'l, Inc.,* 421 B.R. 1, 13 (Bankr.D.Colo.2009) ("Normally, a bankruptcy court does not approve fees for post-confirmation conduct nor has an active role in the removal of post-confirmation counsel.").

39.     Against this background, Brooklyn Lender's reliance on the authorities it cites to deny payment to Rosewood is again misplaced.  *In re Ne. Dairy Co-op. Fed'n, Inc.*, 74 B.R. 149 (Bankr. N.D.N.Y. 1987) (Court denied compensation to unretained broker for sale of assets during Chapter 11 case – not post-confirmation); *In re Bronx 439 E. 135th St. D.T. Bldg. Corp.*, No. 11-15855 (MG), 2014 WL 200996 (Bankr. S.D.N.Y. Jan. 17, 2014) (in an opinion marked "NOT FOR PUBLICATION," court denied compensation to unretained attorney for Chapter 11 services – not for post-confirmation services.).

40.     Brooklyn Lender concludes that even if Rosewood was properly retained, its performance was substandard because the bidders did not materialize until close to the auction and that since Brooklyn Lender was the winning bidder, Rosewood contributed no value to the process.

41.     The Debtors respectfully submit that the Rosewood's skill in signing up a stalking horse bidder, signing up an additional ten competing bidders, and then orchestrating a bidding war that resulted in an above-market purchase prices is impressive; particularly so given

the obstacles Brooklyn Lender threw in the path including a pending appeal of the Plan, publicly-filed Court documents hostile to the process and speeches on the record of the auction that could only have chilled interest among all but the most sophisticated bidders.

42.    Rosewood's retention and compensation under the Plan were not raised on appeal and it is too late to challenge Plan confirmation now.  The sale, therefore, should be approved, including Rosewood's entitlement to collect its 5% buyer's premium.

**(c)    The Plan pre-approved a 2% stalking horse breakup fee, so there is basis to deny sale approval based upon the Debtors' agreement to honor that Plan obligation**

43.    The bidding procedures incorporated in the Plan permit the Debtors to pay a 2% breakup fee to a stalking horse bidder.  With Rosewood's advice, The Debtors selected FREO.  Accordingly, FREO is entitled to be paid under the Plan.

44.    Brooklyn Lender disregards the fact that the Auction Procedures, and the breakup fee provision therein, were already so-ordered by the Plan confirmation order.  Brooklyn Lender mistakenly analyzes the issue as if the instant application were not an application to approve the winning bidders, but an application to approve sale procedures.  Thus, Brooklyn Lender's reliance on the cases it cites is misplaced.  *In re MSR Hotels & Resorts, Inc.*, No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (analyzing factors for deciding whether to approve breakup fee provisions of proposed bidding procedures); *Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*, No. 02 CIV.0710 (SHS), 2002 WL 31426344, at *3 (S.D.N.Y. Oct. 29, 2002), *aff'd sub nom. In re 310 Assocs.*, 346 F.3d 31 (2d Cir. 2003) (on motion to reconsider approval of order permitting breakup fee, Bankruptcy Court properly vacated its prior order based on facts undisclosed when breakup fee approved); *In re Reliant Energy Channelview*

12

*LP*, 594 F.3d 200 (3d Cir. 2010) (on motion to approve bidding procedures, bankruptcy court properly denied request for breakup fee).

45.    Brooklyn Lender's complaint that the breakup fee was unnecessary and undeserved ignores the fact that it was pre-approved under the Plan.  And again, although Brooklyn Lender sought to reverse the Confirmation Order on appeal, it did not challenge the breakup fee.  The sale, therefore, should be approved, including the FREO breakup fee.

**(d) Brooklyn Lender has not alleged, let alone proffered credible evidence of "fraud, unfairness or mistake in the conduct of the sale" or that "the price brought at the sale was so grossly inadequate as to shock the conscience of the court," sufficient to upset the sale and reopen bidding on new terms.**

46.    "Typically, a court will reopen bidding, and thereby upset the results of a properly conducted judicial auction, only if 'there was fraud, unfairness or mistake in the conduct of the sale...or...the price brought at the sale was so grossly inadequate as to shock the conscience of the court.'"  *Four B. Corporation v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558 (8th Cir.1997), *quoting In re Stanley Eng'g Corp.,* 164 F.2d 316, 318 (3rd Cir.1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948).  Additionally, the *Food Barn* Court stated that "an unwavering adherence to formality" was not desirable, and that a bankruptcy judge should not be "'shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.'"  *Food Barn,* 107 F.3d at 564, *quoting Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1069 (2nd Cir.1983).

47.    Here, the sale was conducted under the sale procedures with only minor deviations typically permitted in bankruptcy sales to permit potential bidders to submit late

qualifying bids and to permit bidders to mark up the sale terms, understanding that such mark ups

will be considered in determining whether such bid is a qualifying bid and if the winning bid,

whether it is the highest and best bid.  There is no reason to believe that the additional bidding that

resulted therefrom decreased the ultimate purchase prices.  To the contrary, the winning bids were

submitted by bidders who qualified late, and each such bidder agreed to the Debtors' form of

contract.

48.    Brooklyn Lender nonetheless argues that if the Court finds that Brooklyn

Lender must make a cash bid, the Court should schedule a do-over auction, presumably after

further hearings on "the legitimacy of the requested break-up fee, the legitimacy of the claimed

5% broker fee, and whether Individual Bidders have the right to collude."  But Brooklyn Lender

knew, or should have known, that the Plan required cash payments above and beyond the payment

of Brooklyn Lender's Claims, and that the breakup fee and the broker fee were part of the

confirmed Plan; not reversed on appeal.  The collusion allegation is manufactured from whole

cloth.[3]

49.    In short, Brooklyn Lender has not alleged, let alone proffered credible

evidence of "fraud, unfairness or mistake in the conduct of the sale...or...the price brought at the

_____

[3] Moreover, Brooklyn Lender's right to credit bid is not absolute under section 363(k) of the Bankruptcy Code.  The factors considered in deciding whether to deny a secured creditor the right to credit bid include inequitable conduct such as claim acquisition to effectuate a loan to own scheme, and a disputed claim amount.  *E.g., In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60 (Bankr. D.S.C. 2010).  Although portions of Brooklyn Lender's Claims have not been fixed by the Court, and although Brooklyn Lender acquired its Claims to effectuate a forfeiture, the Debtors did not object to Brooklyn Lender's right to credit bid.  The Debtors assumed that since a Chapter 11 sale would save Brooklyn Lender time and money, Brooklyn Lender would not obstruct the process.  But Brooklyn Lender's recent conduct suggests that it is feigning ignorance of basic credit bidding rules to abort the sale as a ploy to re-litigate plan confirmation issues it previously overlooked that merely ensure fair treatment of creditors and potential purchasers.  If there must be a new sale, the Debtors suggest that cause exists to deny Brooklyn Lender credit bidding rights at such sale.

sale was so grossly inadequate as to shock the conscience of the court," sufficient to upset the sale

and reopen bidding on new terms.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that Court approve the sale and

that the Court grant such other and further relief as may be just and proper.

Dated: New York, New York
        January 21, 2021

**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Debtors**

By:     s/Mark Frankel
        800 Third Avenue
        New York, New York 10022
        (212) 593-1100

## <u>VERIFICATION</u>

David Goldwasser, being duly affirmed, states under penalty of perjury as follows:

1.      I am the authorized signatory of GC Realty Advisors, LLC, as vice president of the Debtors and fully familiar with the annexed Reply.

2.      To the best of my knowledge information and belief, the facts stated in the annexed Reply are true and correct.

Dated: Boca Raton, Florida
        January 21, 2022

<u>s/David Goldwasser</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re                                                          :        Chapter 11
                                                               :
**WAYPOINT LEASING**                                           :        Case No. 18-13648 (SMB)
**HOLDINGS LTD.,** *et al.,*                                   :
                                                               :        **(Jointly Administered)**
          Debtors.[1]                                          :
---------------------------------------------------------------x

## ORDER APPROVING (A) BIDDING PROCEDURES, (B) BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF CURE COSTS, AUCTION, SALE TRANSACTION, AND SALE HEARING, AND (D) DATE FOR AUCTION, IF NECESSARY, AND SALE HEARING

Upon the motion (the "**Motion**")[2] of Waypoint Leasing Holdings Ltd. and certain

of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "**Debtors**")

in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 363,

365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules

2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of

New York (the "**Local Rules**"), and the *Amended Sale Guidelines for the Conduct of Asset Sales*

*Established and Adopted by the United States Bankruptcy Code for the Southern District of New*

*York* (the "**Sale Guidelines**") for:  (i) entry of an order approving (a) the Bidding Procedures

substantially in the form attached hereto as **Exhibit 1**; (b) authorizing and approving certain

bidding protections for Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**"), including

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as **Exhibit A**.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Macquarie APA (as defined herein), as applicable.

an expense reimbursement and break-up fee on the terms set forth in the Macquarie APA (as

defined below); (c) scheduling an auction (the "**Auction**") to be held on **January 8, 2019 at 10:00**

**a.m. (ET)**, if necessary; (d) scheduling one or more hearings with respect to the approval of the

sale of the Purchased Assets (each, a "**Sale Hearing**"), subject to the Court's availability, and

approving the notices related thereto; (e) authorizing and approving the procedures set forth in the

Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption

and assignment of certain of the Debtors' executory contracts and unexpired leases and the

determination of cure costs related thereto; (f) approving various deadlines in connection with the

foregoing; and (g) authorizing and approving the form and manner of (y) the notice of Auction,

Sale Transaction, and Sale Hearing (the "**Sale Notice**"), substantially in the form attached hereto

as **<u>Exhibit 2</u>** and (z) the notice to various counterparties of proposed cure costs and the assumption

and assignment of certain of the Debtors' executory contracts and unexpired leases (the "**Cure**

**Notice**"), substantially in the form attached hereto as **<u>Exhibit 3</u>** ((a) through (g) collectively, the

"**Bidding and Auction Process**"); and (ii) entry of one or more separate orders (each, a "**Sale**

**Order**") approving (a) the sale of the Purchased Assets (directly or indirectly) free and clear of

liens, claims, encumbrances, and other interests; (b) the assumption and assignment of certain of

the Debtors' executory contracts and unexpired leases in connection therewith (the "**Transferred**

**Contracts**") ((a) and (b) collectively, the "**Sale Transaction**"); and (c) related relief, all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order

of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and

the requested relief therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the Motion having been given as provided in the Motion, and such notice having been adequate

and appropriate under the circumstances; and it appearing that no other or further notice need be

provided; and any objections to the requested relief having been withdrawn or overruled on their

merits; and the Court having held a hearing on December 20, 2018 to consider the relief requested

in the Motion as to the Bidding and Auction Process (the "**Hearing**"); and all of the proceedings

had before the Court; and the Court having reviewed the Motion and the Niemann Declaration

filed in support of the Motion; and the Court having addressed the objections raised to the Motion

on the record at the Hearing and overruled all objections raised to the Motion; and the Court's

findings and rulings set forth at the Hearing are incorporated herein; and the Court having found

and determined that the relief sought in the Motion as to the Bidding and Auction Process is in the

best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to hear and determine the Motion and to grant

the relief requested herein with respect to the Bidding and Auction Process pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant
to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any
of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the
following conclusions of law constitute findings of fact, they are adopted as such.

B. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, Local Rules 2002-1, 6004-1, 6006-1, and 9006-1(b), and the Sale Guidelines.

C. Good and sufficient notice of the Motion, the Bidding and Auction Process, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bidding Procedures.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

D. The Debtors and their advisors engaged in a robust and extensive marketing and sale process before the Petition Date to solicit and develop the highest or best offer for the Purchased Assets.

E. Macquarie submitted a bid (the "**Macquarie Bid**") for the Purchased Assets as reflected in that certain Stock and Asset Purchase Agreement (the "**Macquarie APA**"), as annexed to the Motion, which represents the highest or best third party offer the Debtors have received to purchase the Purchased Assets.  The Macquarie Bid shall be subject to higher or better offers, including Credit Bids, in accordance with the Bidding Procedures.

F. Pursuit of the Macquarie Bid reflects a sound exercise of the Debtors' business judgment.  The Macquarie Bid provides the Debtors with the opportunity to sell the Purchased Assets to preserve and realize their going concern value.  ~~Without the Macquarie Bid, the Debtors would likely realize a lower price for the Purchased Assets, therefore, the contributions of Macquarie to the process have indisputably provided a substantial benefit to the Debtors, their estates, and creditors.~~  The Macquarie Bid will ~~enable the Debtors to continue their operations, minimize disruption to the Debtors' business, and~~ secure a fair and adequate baseline price for the

4

Purchased Assets at the Auction and, accordingly, will provide a benefit to the Debtors' estates, their creditors, and all parties in interest.  **[SMB: 12/21/18]**

       G.     The Bid Protections, including the Break-Up Fee and Expense Reimbursement, have been negotiated by Macquarie, the Debtors, and their respective advisors at arms' length and in good faith and are necessary to ensure that Macquarie will continue to pursue the Macquarie Bid and the Sale Transaction.  The Break-Up Fee and Expense Reimbursement, to the extent payable under the Macquarie APA, (a) is an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and shall be treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code; (b) is commensurate to the real and material benefits conferred upon the Debtors' estates by Macquarie; and (c) is fair, reasonable, and appropriate, including in light of the necessity to announce a sale transaction for the Purchased Assets at the outset of the Chapter 11 Cases, and the efforts that have been and will be expended by Macquarie.  The Bid Protections, including the Break-Up Fee and Expense Reimbursement, are material inducements for, and conditions of, Macquarie's execution of the Macquarie APA and are adequately designed to ensure that the highest or best offers are attained for the sale of the Debtors' assets.  Unless it is assured that the Bid Protections, including the Break-Up Fee and Expense Reimbursement, will be available, Macquarie is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Macquarie APA (including the obligation to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

       H.     The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures; (ii) the Bid Protections, including the Break-Up Fee

and Expense Reimbursement (to the extent payable under the Macquarie APA); and (iii) the form and manner of notice of Cure Costs, the Auction, Sale Transaction, and Sale Hearing.

I.      The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Purchased Assets, thus maximizing the value of the Debtors' estates.

J.      Macquarie is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between Macquarie and the Debtors.

K.      The Sale Notice and Cure Notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, Assumption and Assignment Procedures, Auction, Sale Hearing, and Sale Transaction free and clear of any liens, claims, encumbrances, or other interests pursuant to section 363(f) of the Bankruptcy Code (with such liens, claims, encumbrances or other interests attaching to the proceeds of any such sale) and any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion, the Sale Transaction, or the assumption and assignment of the Transferred Contracts except as expressly required herein.

L.      The agreement by each of the Debtors to sell its assets or equity (or transfer such assets or equity) to the WAC Lenders pursuant to a Successful Credit Bid on the terms set forth in this Order and the Bidding Procedures and to comply with the Bidding Procedures and other obligations set forth in this Order is an integral component of the adequate protection provided to the Participating WAC Secured Parties for the Debtors' use of such Participating WAC Secured Parties' cash collateral and an inducement to obtain the consent of the Participating WAC

Secured Parties to the terms of the DIP Facility, including the granting of the DIP Claims and the

DIP Liens (each as defined in the DIP Credit Agreement).

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn with

prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are

overruled and denied on the merits with prejudice.

**Bidding Procedures and Auction**

3.      The Bidding Procedures, attached hereto as **Exhibit 1**, are fully

incorporated herein and approved and shall apply with respect to any bids for, and the auction and

sale of, the Purchased Assets. ~~The procedures and requirements set forth in the Bidding
Procedures, including those associated with submitting a Qualified Third Party Bid and a Credit
Bid, are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit
of the Debtors' estates, creditors, and all parties in interest.~~ The Debtors are authorized to take all

actions, including incurring and paying costs and expenses, consistent with the Approved Budget

(as defined in the DIP Credit Agreement) and otherwise in accordance with the *Interim Order*

*Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552, Fed. R. Bankr. P. 2002, 4001,*

*6003, 6004, and 9014, and L. Bankr. R. 2002-1, 4001-2, 9013-1, 9014-1, and 9014-2*

*(I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition*

*Financing, (B) Grant Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash*

*Collateral; (II) Granting Adequate Protection, (III) Scheduling a Final Hearing; and*

*(IV) Granting Related Relief* (ECF No. 77), as are necessary or appropriate to implement the

Bidding Procedures.  **[SMB: 12/21/18]**

         4.      Notwithstanding anything herein to the contrary, each WAC Facility Agent

shall have the absolute and irrevocable right to credit bid for its WAC Collateral, subject only to

such WAC Facility Agent complying with the requirements of a Streamlined Credit Bid or 363(k)

Credit Bid.  In the event that a WAC Facility Agent elects to make a Streamlined Credit Bid by

January 14, 2019 and complies with the requirements of this Order and the Bidding Procedures,

then subject only to a Successful Third Party Bidder's right to submit a Matching Bid (as defined

in the Bidding Procedures), by no later than February 15, 2019, either (i) the Court shall have

entered an order approving such Streamlined Credit Bid and authorizing the sale to such WAC

Facility Agent, which order shall provide for a closing as soon as reasonably possible, or (ii) upon

seven (7) calendar days' notice by the relevant WAC Facility Agent to the Debtors, in addition to

all other remedies available to the WAC Facility Agent, the automatic stay imposed under section

362 of the Bankruptcy Code shall automatically and without further notice or action by any party

or further order of the Court be lifted to permit such WAC Facility Agent to exercise rights and

remedies with respect to its WAC Collateral.  Notwithstanding anything to the contrary herein or

in the Bidding Procedures, if the WAC Facility Agent for WAC 9 submits a Credit Bid for the full

amount of its claim under its WAC Facility, then Macquarie shall not submit a Matching Bid.

Furthermore, notwithstanding anything to the contrary herein or in the Bidding Procedures, with

respect to any WAC Facility in which Macquarie and/or any of its affiliates constitute the Required

Lenders under such WAC Facility:

            i.   neither Macquarie nor any of its affiliates will submit or direct a Credit Bid

                to be made under such WAC Facility unless either (i) the Macquarie APA

has been terminated under Article XI of the Macquarie APA; or (ii) a credit

bid has been made with respect to such WAC Facility or a Successful Third

Party Bid (other than the Macquarie Bid) has been selected as the highest

or best offer with respect to the applicable WAC at the Auction;

ii.  unless the Macquarie APA has been terminated under Article XI of the

Macquarie APA, neither Macquarie nor any of its affiliates will exercise

any rights to control or limit the use of cash collateral under such WAC

Facility as provided under the second interim order approving the *Motion*

*of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552,*

*Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-*

*1, 4001-2, 9013-1, 9014-1, and 9014-2 for Interim and Final Orders (I)*

*Authorizing the Debtors to (A) Obtain Senior Secured Priming*

*Superpriority Postpetition Financing (B) Grant Liens and Superpriority*

*Administrative Expense Status, and (C) Utilize Cash Collateral, (II)*

*Granting Adequate Protection, (III) Scheduling Final Hearing, and (IV)*

*Granting Related Relief*, filed on December 8, 2018 (ECF No. 51) or any

subsequent interim or final order relating to such use of cash collateral; and

iii.  if Macquarie or any of its affiliates exercise the right to make a Credit Bid

under any WAC Facility, then each other WAC Lender under such WAC

Facility can elect, in its sole discretion to either (i) participate in such Credit

Bid, or (ii) require that the Macquarie entity that exercised such credit

bidding right pay such WAC Lender its proportionate share of such credit

bid in cash in full satisfaction of such WAC Lenders' rights, claims and

interests in the collateral that is subject to such credit bid (and such Macquarie entity will then hold sole rights, title and interest in such other WAC Lender's proportionate share in the collateral that is subject to such credit bid).

5.    Subject to the Bidding Procedures and this Order, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including, without limitation, to:   (i) determine which bidders are Qualified Third Party Bidders; (ii) determine which bids are Qualified Third Party Bids; (iii) determine which bid is a Successful Third Party Bid and Back-Up Third Party Bid, each as it relates to the Auction; (iv) reject any Third Party Bid or Credit Bid that is (a) inadequate or insufficient and not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (b) contrary to the best interests of the applicable Debtors and their estates; (v) adjourn or cancel the Auction and/or the Sale Hearing as provided in the Bidding Procedures; and (vi) modify the Bidding Procedures consistent with their fiduciary duties and the Bankruptcy Code; in each case, solely to the extent consistent with the terms of the Macquarie APA, the Bidding Procedures, and this Order.

## Notice of Sale Transaction

6.    The Sale Notice, substantially in the form attached hereto as **Exhibit 2** is approved.

7.    All parties in interest shall receive or be deemed to have received good and sufficient notice of (i) the Motion; (ii) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Transferred Contracts to Macquarie pursuant to the Macquarie APA or to bidders submitting a Successful Third Party Bid or Successful Credit Bid;

(iii) the Auction; and (iv) the Sale Transaction, including the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests and no further notice of the foregoing shall be required, if:

    a) Within three (3) business days[4] after entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall cause the Sale Notice to be filed with the Court and served by email, mail, facsimile, or overnight delivery on:  (i) counsel for Macquarie; (ii) counsel for the Steering Committee; (iii) counsel for the DIP Agent; (iv) counsel for the WAC Facility Agents; (v) any official committee appointed in the Chapter 11 Cases; (vi) the Office of the United States Trustee for Region 2; (vii) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets in whole or in part during the past twelve (12) months; (viii) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Purchased Assets (for whom identifying information and addresses are available to the Debtors); (ix) all non-Debtor parties to the Transferred Contracts (for whom identifying information and addresses are available to the Debtors); (x) any Government Authority (as defined in the Macquarie APA) known to have a claim in the Chapter 11 Cases; (xi) the United States Attorney for the Southern District of New York; (xii) the Office of the Attorney General in each state in which the Debtors operate; (xiii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (xiv) the Federal Trade Commission; (xv) the United States Attorney General/Antitrust Division of Department of Justice; (xvi) the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); (xvii) all affected federal, state, and local regulatory (including environmental) agencies; (xviii) the United States Environmental Protection Agency; (xix) the Internal Revenue Service; and (xx) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by the Court (for whom identifying information and addresses are available to the Debtors); and

    b) Within seven (7) business days after entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall cause the Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in the national editions of each of *The New York Times*, *The Financial Times*, and *Aviation Week*.

---

[4] All reference to "days" shall be business days, unless expressly noted.

## Macquarie APA and Bid Protections

8.      The Bid Protections are approved in their entirety, including the Break-Up Fee and Expense Reimbursement, payable in accordance with, and subject to the terms of, the Macquarie APA and this Order.   Specifically, Macquarie shall be entitled to payment of (i) an expense reimbursement up to a cap of $3,000,000 (the "**Expense Reimbursement**") for the actual, documented and reasonable out of pocket costs, fees and expenses that are incurred or to be incurred by Macquarie in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of the transactions contemplated by the Macquarie APA and (ii) a break-up fee in an amount equal to three percent (3%) of the Base Purchase Price, or $19,500,000 (the "**Break-Up Fee**"), in each case, subject and pursuant to the terms and conditions in the Macquarie APA and this Order.  Macquarie shall provide the Debtors and the U.S. Trustee with copies of all expense documentation for which they are requesting payment pursuant to the Expense Reimbursement.  Except as expressly provided for herein, no other break-up fee or expense reimbursements are authorized or permitted under this Order.  Except as set forth in the Macquarie APA, and subject to paragraph 10 of this Order, the Break-Up Fee and Expense Reimbursement shall not be subject to reduction for any reason.

9.      The Debtors are authorized and directed to pay the Break-Up Fee and Expense Reimbursement by wire transfer of immediately available funds in accordance with the terms and conditions set forth in the Macquarie APA, subject to paragraph 10 of this Order, and without further order of the Court.  The Break-Up Fee and Expense Reimbursement, to the extent payable under the Macquarie APA, and subject to paragraph 10 of this Order, shall constitute an

allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

10.     Notwithstanding anything to the contrary in this Order, the Bidding Procedures or the Macquarie APA, no Break-Up Fee shall be due upon consummation of either: (i) any transaction that is effected by any WAC Facility Agent or Credit Bidco exercising credit bid rights or other remedies (including, without limitation, foreclosure of its collateral) under any or all WAC Facilities and related documentation; or (ii) any plan of reorganization for one or more of the Debtors that does not effectuate a Plan Sale and results in only the WAC Lenders obtaining the equity of the Debtors on account of their claims (or any rights offering or similar transaction related thereto).  Upon the consummation of a Successful Credit Bid and the Debtors' receipt of the Exit Payment (as defined in the Bidding Procedures) in full, the applicable WAC Facility Agent, the applicable WAC Lenders, and the entities the equity of which such WAC Lenders are (directly or indirectly) acquiring through such Successful Credit Bid, shall not be liable for any Expense Reimbursement payable pursuant to the Macquarie APA.

11.     Notwithstanding any other terms of the agreements and orders relating to any debtor-in-possession financing facilities for the Debtors, and subject to paragraph 10 of this Order, the Break-Up Fee and the Expense Reimbursement shall be paid by the Seller Parties (as defined in the Macquarie APA) and their bankruptcy estates when due and, as applicable, the Break-Up Fee and the Expense Reimbursement shall be paid from the sources (*e.g.*, the Break-Up Fee is payable as the initial uses of the proceeds obtained from any consummated sale transaction) and at the times specified in the Macquarie APA.

12.     All of the Debtors' pre-closing obligations under the Macquarie APA are hereby authorized and approved.

## Sale Hearing(s) and Sale Objection Deadline

13. At the **February 12, 2019** omnibus hearing at **10:00 a.m. (ET)** and, as needed, additional Sale Hearings before this Court, the Debtors will seek the entry of an order authorizing and approving, among other things, the applicable Sale Transaction. The objection deadline for any Sale Transaction to be approved at the February 12, 2019 omnibus hearing will be **February 5, 2019** at **4:00 p.m. (ET)**. The Debtors, in the exercise of their business judgment, may adjourn a Sale Hearing without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at a Sale Hearing or (ii) the filing of a notice of adjournment with this Court prior to the commencement of a Sale Hearing.

14. Objections to any Sale Transaction and entry of a Sale Order (each, a "**Sale Objection**") must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Court and served on (a) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Robert J. Lemons, and Kelly DiBlasi); (b) the attorneys for the official committee of unsecured creditors appointed in the Chapter 11 Cases, if any; (c) the attorneys for Macquarie, Vedder Price P.C., 1633 Broadway, 31st Floor, New York, New York 10019 (Attn: Douglas J. Lipke, Michael J. Edelman, and Geoffrey R. Kass); (d) the attorneys for the Steering Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005 (Attn: Dennis Dunne and Tyson M. Lomazow); (e) the attorneys for SunTrust Bank, as administrative agent under that certain Amended and Restated Credit Agreement, dated as of November 8, 2013, and that certain Amended and Restated Credit Agreement, dated as of April 28, 2017, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309 (Attn: David Wender); (f) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New

York 10036 (Attn: Renée M Dailey); (g) the attorneys for Wells Fargo Bank, National Association, as administrative agent under that certain Credit Agreement, dated as of April 16, 2014, and that certain Note Purchase Agreement, dated as of July 29, 2015, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Frederick Hyman and Scott Zemser); (h) the attorneys for Airbus Helicopters Financial Services Limited, as agent under that certain Euro Term Loan Facility Agreement, dated February 21, 2017, Dentons US LLP, 22 Little West 12th Street, New York, NY 10014 (Attn: Lee P. Whidden); (i) the attorneys for BNP Paribas, as administrative agent under that certain Credit Agreement, dated as of August 6, 2014, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Brian Trust and Scott Zemser); (j) the attorneys for Bank of Utah, as administrative agent under that certain Credit Agreement, dated as of March 23, 2015, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019 (Attn: Howard Beltzer); (k) the attorneys for Lombard North Central PLC, as administrative agent under that certain Credit Agreement, dated as of March 24, 2016, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Andrew G. Dietderich and Brian D. Glueckstein); (l) the attorneys for Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent under that certain Credit Agreement, dated as of August 2, 2017, Clifford Chance US LLP, 31 West 52nd Street, New York, New York 10019 (Attn: Jennifer C. DeMarco); and (m) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.) (collectively, the "**Objection Notice Parties**").

15.     The Debtors shall file a notice of a Sale Hearing and the deadline to file a Sale Objection (the "**Sale Objection Deadline**") at least seven (7) calendar days before a Sale

Hearing is scheduled to take place, substantially in the form attached hereto as **Exhibit 2**.  Any timely Sale Objections will be heard by the Court at the Sale Hearing.

16.     The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Macquarie APA, a Successful Third Party Bid (if an Auction is held), or a Successful Credit Bid, including the transfer of assets to Macquarie, a Successful Third Party Bidder, or Successful Credit Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.

## Cure Objections and Adequate Assurance Objections

17.     The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved and is reasonably calculated to provide sufficient notice to the non-Debtor parties to the Transferred Contracts of the Debtors' intent to assume and assign the Transferred Contracts in connection with the Sale Transaction and constitutes adequate notice thereof.  Within three (3) business days after the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall file the Cure Notice with the Court and serve such notice by first class mail on each non-Debtor party to the Transferred Contracts.  Service of the Cure Notice in accordance with this Order on all non-Debtor parties to the Transferred Contracts is hereby deemed to be good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Transferred Contracts.  Within three (3) business days after the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall post a copy of the Cure Notice on the website for the Chapter 11 Cases maintained by the Debtors' claims and noticing agent.

18.     Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance (each, an "**Adequate Assurance Objection**") must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) with respect to a Cure Objection, state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with the Court and served on the Objection Notice Parties.

19.     Any Cure Objection in respect of a Transferred Contract must be filed and served by **January 16, 2019 at 5:00 p.m. (ET)**.  Any Adequate Assurance Objection in respect of a Transferred Contract must be filed and served by **February 1, 2019 at 5:00 p.m. (ET)**.  If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtors may determine.

20.     To the extent the Debtors identify, at any time after the Cure Notice is served, additional Transferred Contracts to be assumed and assigned to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder, the Debtors shall file with the Court and serve by first class mail on the non-Debtor party to such Transferred Contract a supplemental Cure Notice (each, a "**Supplemental Cure Notice**," the form of which shall be identical to the form of Cure Notice attached hereto as **Exhibit 3**).  If such a related Cure Objection or Adequate Assurance Objection is timely received and cannot otherwise be resolved by the parties, such objection will be heard at an emergency hearing scheduled prior to any scheduled closing of the Sale Transaction.

21.     The assumption and assignment of the Transferred Contracts to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder is subject to approval of the Court and the consummation of the Sale Transaction.  Accordingly, absent the closing of such sale, the

Transferred Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

22.     The inclusion of a contract, lease, or other agreement on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, Macquarie, or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved).  The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

## **General Provisions**

23.     All persons or entities that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing matters.

24.     To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order (excluding exhibits) shall control; provided, however, that if the terms of this Order, the Macquarie APA and/or the Bidding Procedures (i) do not expressly resolve the issue under consideration or (ii) are ambiguous with regard to such issue, the Debtors, Macquarie, or other parties in interest, on such notice as may be appropriate, may seek such relief from this Court as may be necessary.

25.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 9014, or any applicable provisions of the Local Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

26.     The requirements set forth in Local Rules 2002-1, 6004-1, 6006-1, 9006-1(b), and 9013-1 are hereby satisfied.

27.     Subject to this Order, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the parties to the Macquarie APA to allow the parties thereto to deliver any notices and/or take any actions as provided under the Macquarie APA in accordance with the terms, provisions, and conditions thereof.

28.     Nothing in the findings set forth herein shall be used or construed to limit the rights of any WAC Facility Agent to credit bid its claims in accordance with the terms of this Order, the Bidding Procedures, and applicable law.

29.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

30.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: December 21, 2018
     New York, New York

         /s/ *Stuart M. Bernstein*
         STUART M. BERNSTEIN
       United States Bankruptcy Judge